# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO

FILED
JAMES ~~~ INI
CLE~~

04 JUL -2 PM 12: 42

U.S. ~~~~~~
SO~~~~~ ~~~~~

|  |  |
|---|---|
| GERALD BURGER, Individually and On Behalf of All Others Similarly Situated, | ) ) |
|  | ) CIVIL ACTION NO. |
| Plaintiff, | ) |
|  | ) **C2.04     575** |
| vs. | ) |
|  | ) CLASS ACTION COMPLAINT |
| CARDINAL HEALTH, INC., ROBERT D. WALTER and RICHARD J. MILLER | ) **JUDGE SMITH** |
|  | ) |
| Defendants. | ) **JURY TRIAL DEMANDED** |
|  | ) **MAGISTRATE JUDGE KING** |

Plaintiff, Gerald Burger ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Cardinal Health, Inc. ("Cardinal" or the "Company") securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.  This is a federal class action on behalf of purchasers of the securities of Cardinal between October 24, 2000 and June 30, 2004, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.  The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

3.  This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. 78aa) and 28 U.S.C. 1331.

4.  Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. 78aa and 28 U.S.C. 1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District. Additionally, the Company maintains a principal executive office in this Judicial District.

5.  In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, Gerald Burger, as set forth in the accompanying certification, incorporated by reference herein, purchased Cardinal securities at artificially inflated prices during the Class Period and has been damaged thereby.

7.      Defendant Cardinal is an Ohio Corporation with its principal executive offices located at 7000 Cardinal Place, Dublin, Ohio 43017.

8.      Defendant Robert D.Walter ("Walter") is the Company's Chairman and Chief Executive Officer.

9.      Defendant Richard J. Miller ("Miller") is the Company's Chief Financial Officer, Executive Vice President, and Principal Accounting Officer.

10.     Defendants Walter and Miller are collectively referred to hereinafter as the "Individual Defendants."  During the Class Period, each of the Individual Defendants, as senior executive officers and/or directors of Cardinal were privy to non-public information concerning its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

11.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal

corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

12.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above.  Each of the above officers of Cardinal, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein.  Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

13.     As officers and controlling persons of a publicly-held company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and was traded on the New York Stock Exchange ("NYSE") and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and

to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

14.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Cardinal, each of the Individual Defendants had access to the adverse undisclosed information about Cardinal financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Cardinal and its business issued or adopted by the Company materially false and misleading.

15.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

–5–

16.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Cardinal securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Cardinal business, operations, management and the intrinsic value of Cardinal securities; and (ii) caused Plaintiff and other members of the Class to purchase Cardinal securities at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

17.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of Cardinal between October 24, 2000 and June 30, 2004, inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

18.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Cardinal's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Cardinal or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

19.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

20.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

21.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        (a)  whether the federal securities laws were violated by defendants' acts as alleged herein;

        (b)  whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Cardinal; and

        (c)  to what extent the members of the Class have sustained damages and the proper measure of damages.

22.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action

–7–

## SUBSTANTIVE ALLEGATIONS

### Background

23.    Cardinal is a holding company encompassing a number of operating subsidiaries that do business as Cardinal.  The Company is a provider of products and services supporting the healthcare industry and helping healthcare providers and manufacturers improve the efficiency and quality of healthcare.

24.    Cardinal has four reporting segments: Pharmaceutical Distribution and Provider Services, Medical Products and Services, Pharmaceutical Technologies and Services and Automation and Information Services.  In January 2003, the Company acquired Syncor International Corporation, a provider of high-technology healthcare services concentrating on nuclear pharmacy services, medical imaging, niche manufacturing and radiotherapy.

### Materially False And Misleading
### Statements Issued During The Class Period

25.    The Class Period commenced on October 24, 2000.  At this time, Cardinal reported record revenues and earnings in its fiscal 2001 first quarter ended September 30, 2000 with strong performances in each of its business segments and rising returns across the Company.  Cardinal again exceeded its longstanding goal of growing earnings per share by 20 percent while continuing to invest for future growth.  Earnings per diluted share in the first quarter rose 23 percent to a record $0.65 from $0.53 a year ago.  Net earnings rose to a first-quarter record $184 million from $152 million in the year-earlier period.  Driving the earnings gains were strong operating revenues, which increased 20 percent to a record $7.0 billion in the first quarter from $5.8 billion a year ago.  Commenting on these results, defendant Walter stated:

–8–

> "This was another exceptional performance by Cardinal Health that reflects the continuing strength and diversity of our earnings as well as the effectiveness of our business strategy[.]...We are doing exactly what we said we'd do - growing our businesses through outstanding service to our customers and investing for our future. As we look ahead[.]...our consistent performance gives us confidence in our ability to sustain the momentum we have created over the last decade. The strength of our balance sheet and earnings performance gives us a unique ability to invest, and so we reaffirm our 20 percent EPS growth objective."

26.    On November 13, 2000, Cardinal filed its quarterly report with SEC on Form 10-Q. The Company's Form 10-Q was signed by the Individual Defendants and reaffirmed the previously announced financial results. Additionally and with respect to the presentation of its financial results, Cardinal stated:

> These condensed consolidated financial statements have been prepared in accordance with the instructions to Form 10-Q and include all of the information and disclosures required by generally accepted accounting principles for interim reporting. In the opinion of management, all adjustments necessary for a fair presentation have been included. Except as disclosed elsewhere herein, all such adjustments are of a normal and recurring nature.

27.    On January 30, 2001, Cardinal reported record revenues, earnings, and return on capital for its fiscal 2001 second quarter ended December 31, 2000 with strong gains in each of its four business segments. Cardinal grew earnings per diluted share in the second quarter by 21 percent to a record $0.75 from $0.62 a year ago. Net earnings rose to a second-quarter record $215 million from $177 million in the year- earlier period. Reflecting growing demand for Cardinal's unique offering, the Company reported very strong operating revenues, up 24 percent to a record $7.7 billion in the second quarter from $6.3 billion a year ago. Revenue growth and improved productivity fueled second-quarter operating earnings, which rose 19 percent over the prior year to

$364 million. Reflecting the quality and diversity of its earnings growth, the Company reported

record second-quarter operating earnings as a percent of sales in each of its four business segments.

The Company continued to shift the mix of its business lines within each segment toward higher

profitability categories. Commenting on these results, defendant Walter stated:

> "This was another outstanding quarter for Cardinal Health, with
> strong growth across the company, especially in our Pharmaceutical
> Distribution and Provider Services segment[.]...In each of our
> segments, we are growing our strong positions, emphasizing a
> higher-return mix of products and services, and improving our
> productivity and profitability. Our consistent performance reflects the
> increasing value we bring to health-care manufacturers and providers
> - and the disciplined execution of our strategy. We serve vital,
> growing markets and we see continued consistent growth for Cardinal
> Health. We reaffirm our long-term objective of growing annual
> earnings per share by 20 percent or more, along with improving our
> returns on invested capital and increasing our commitment to invest
> in our businesses. To our customers we reaffirm our commitment to
> expand our capabilities and provide the highest quality products and
> services supporting healthcare."

28. On February 12, 2001, Cardinal filed its quarterly report with SEC on Form 10-Q.

The Company's Form 10-Q was signed by the Individual Defendants and reaffirmed the previously

announced financial results. Additionally and with respect to the presentation of its financial results,

Cardinal stated:

> These condensed consolidated financial statements have been
> prepared in accordance with the instructions to Form 10-Q and
> include all of the information and disclosures required by generally
> accepted accounting principles for interim reporting. In the opinion of
> management, all adjustments necessary for a fair presentation have
> been included. Except as disclosed elsewhere herein, all such
> adjustments are of a normal and recurring nature.

29. On April 26, 2001, Cardinal reported record revenues, earnings, and return on capital

for its fiscal 2001 third quarter ended March 31, 2001. The Company's strong performance was

driven by exceptional sales gains in its two largest business segments - Pharmaceutical Distribution

and Provider Services, and Medical- Surgical Products and Services. Cardinal grew earnings per

diluted share in the third quarter by 22 percent to a record $0.56 from $0.46 a year ago. Net earnings

rose 23 percent to a third-quarter record $255 million from $208 million in the year- earlier period.

Increasing demand for Cardinal's pharmaceutical distribution and medical-surgical products and

services fueled a 35 percent increase in operating revenues to a record $10.3 billion in the third

quarter from $7.7 billion in the previous year. Commenting on these results, defendant Walter

stated:

> "This was another outstanding quarter for Cardinal Health, with exceptional growth in our two largest business segments - Pharmaceutical Distribution and Provider Services, and Medical-Surgical Products and Services which together represent 96 percent of our operating revenues and 80 percent of our operating earnings[.]...Looking ahead over the next several quarters, we expect these segments to continue to fuel the earnings growth of the company, both through strong internal growth and the realization of efficiencies and other benefits from two significant mergers.
>
> Longer term[.]...we intend to continue to grow our leadership positions across the company, expanding the breadth and proprietary nature of our product and service lines, and extending the reach of our distribution channels. Health care continues to be a vital and growing industry, driven by an aging population and product innovation. Though largely unaffected by economic swings, health care is in need of services that improve patient care and efficiency. This represents real opportunity for Cardinal Health's unique capabilities, integrated resources and problem-solving approach. These factors, combined with our financial strength, capital efficiency and operating discipline, give us confidence in our objective of growing annual earnings per share by 20 percent for the foreseeable future, just as we have done for more than 13 years."

30.     On May 10, 2001, Cardinal filed its quarterly report with SEC on Form 10-Q. The

Company's Form 10-Q was signed by the Individual Defendants and reaffirmed the previously

announced financial results.  Additionally and with respect to the presentation of its financial results, Cardinal stated:

> These condensed consolidated financial statements have been prepared in accordance with the instructions to Form 10-Q and include all of the information and disclosures required by generally accepted accounting principles for interim reporting. In the opinion of management, all adjustments necessary for a fair presentation have been included. Except as disclosed elsewhere herein, all such adjustments are of a normal and recurring nature.

31.     On July 31, 2001, Cardinal reported record revenues, earnings, operating cash flow, and return on committed capital for its fourth quarter and fiscal year ending June 30, 2001.  The Company's performance was driven by strong growth in sales and operating earnings, rising returns on sales, and strong cash flow in each of its four business segments.  Net earnings rose 24 percent to a record $265 million from $214 million in the year-earlier period.  Earnings per diluted share in the fourth quarter rose 21 percent to a record $0.58 from $0.48 a year ago.  Operating earnings rose 20 percent to a record $445 million from $370 million a year ago.  This growth was driven by strong performances in each of the Company's four business segments.  Commenting on these results, defendant Walter stated:

> "We are realizing well-balanced performance across all of our segments, with significant achievements in growth, investment and returns[.]...Our strategy of focusing on health care, while building scale, leadership positions and proprietary solutions is working.  Our ability to cross-sell our products and services has accelerated our growth rate this year.  In fiscal 2001, we signed more than 40 new agreements with health-care providers bringing the total to 72 corporate agreements.   These agreements, that bring multiple Cardinal products and services together, provide about $1.4 billion in annual operating revenues.  Similarly, we have been successful in selling our breadth and depth of pharmaceutical technologies and services to pharmaceutical manufacturers. The power to bring

integrated solutions to our customers is reflected in the strength and diversity of our earnings this year."

32.     On August 24, 2001, Cardinal filed its annual report with SEC on Form 10-K. The

Company's Form 10-K was signed by the Individual Defendants and reaffirmed the Company's

previously announced financial results. Furthermore, Independent Auditors Report, signed by the

Company's accountants Deloitte & Touche LLP ("D&T"), was integrated into Cardinal's Form 10-K

report, which stated the following:

> In our opinion, based on our audit and the reports of the other auditors, the consolidated financial statements referred to above present fairly, in all material respects, the results of operations and cash flows of Cardinal Health, Inc. and subsidiaries, for the year ended June 30, 1999 in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, such consolidated financial statement schedule, as it relates to the year ended June 30, 1999, when considered in relation to the basic fiscal 1999 consolidated financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

33.     On October 23, 2001, Cardinal reported another strong quarter, posting records in

four key financial measures -- revenues, earnings, and returns on sales and committed capital -- for

its fiscal 2002 first quarter ended September 30, 2001. The Company grew net earnings by 30

percent before special items to $254 million on $9.9 billion of operating revenues, up 16 percent

from the year-ago quarter. Earnings per share rose 28 percent before special items to $0.55. The

quality of the Company's earnings and asset management also improved, with return on sales rising

22 basis points to 4.18 percent and return on committed capital increasing 310 basis points to 29.6

percent, both first-quarter records. Commenting on these results, defendant Walter stated:

> "This was another record-setting quarter for Cardinal Health," said Robert D. Walter, chairman and chief executive officer. "It demonstrates the strength and diversity of our portfolio, the continued strong demand for our products and services and the attractiveness of our industry and our position in it. Our financial formula continues to deliver. We achieve excellent growth at the top line and accelerate that growth at the operating earnings and net earnings levels through disciplined financial management and strategic focus on profitable growth."

34.     On November 14, 2001, Cardinal filed its quarterly report with SEC on Form 10-Q. The Company's Form 10-Q was signed by the Individual Defendants and reaffirmed the previously announced financial results. Additionally and with respect to the presentation of its financial results, Cardinal stated:

> These condensed consolidated financial statements have been prepared in accordance with the instructions to Form 10-Q and include all of the information and disclosures required by generally accepted accounting principles for interim reporting. In the opinion of management, all adjustments necessary for a fair presentation have been included. Except as disclosed elsewhere herein, all such adjustments are of a normal and recurring nature.

35.     On January 22, 2002, Cardinal reported record revenues, earnings and returns on sales and committed capital on strong, balanced performance across each of its four health-care business segments in the Company's fiscal 2002 second quarter, which ended December 31, 2001. Diluted earnings per share before special items rose 28 percent to $0.64 versus the prior-year quarter. Strong revenue growth of 17 percent to $11.2 billion drove operating earnings growth of 24 percent to $487 million, and net earnings up 29 percent to $294 million, before special items. Commenting on these results, defendant Walter stated:

> "This latest record quarter re-confirms the remarkable strength of Cardinal Health's family of complementary high-growth businesses[.]...These results validate Cardinal Health's strategy to

> offer a broad portfolio of market-leading products and services to our health-care customers. Our financial formula is to combine strong revenue growth, disciplined expense management and accelerated investment in future opportunities. This enables us to consistently deliver robust earnings growth with rising returns on sales and capital. While all of our segments performed well in the second quarter, we are particularly pleased with our Pharmaceutical Distribution and Provider Services segment and our Automation and Information Services segment."

36.     On February 13, 2002, Cardinal filed its quarterly report with SEC on Form 10-Q. The Company's Form 10-Q was signed by the Individual Defendants and reaffirmed the previously announced financial results. Additionally and with respect to the presentation of its financial results, Cardinal stated:

> These condensed consolidated financial statements have been prepared in accordance with the instructions to Form 10-Q and include all of the information and disclosures required by generally accepted accounting principles for interim reporting. In the opinion of management, all adjustments necessary for a fair presentation have been included. Except as disclosed elsewhere herein, all such adjustments are of a normal and recurring nature.

37.     April 23, 2002, Cardinal reported record third quarter financial results reflecting exceptional profitability and productivity performance across all four of its business segments. Diluted earnings-per-share ("EPS") grew 27 percent before special items. This result was driven by record revenues and improvements in gross margin, expense ratios and returns on sales and committed capital in all segments. The Company generated strong operating cash flow and increased investment spending to fund future growth. EPS before special items, which were primarily merger related, rose 27 percent to $0.71 for the third quarter versus $0.56 last year. Operating revenue grew by 12 percent to an all-time record $11.5 billion versus prior year revenue of $10.3 billion. Operating earnings rose 22 percent to an all-time record $533 million versus prior

year earnings of $436 million. Operating cash flow more than doubled versus the prior year to $504 million. Commenting on these results, defendant Walter stated:

> "Cardinal Health continues to demonstrate that its balanced portfolio of high-growth health care businesses provides for sustained financial performance[.]...We are pleased with the profit expansion and productivity advances achieved in each of our segments. The highlights for the quarter are the rising returns in all segments, strong earnings performance in Pharmaceutical Distribution and Provider Services, and robust results in Automation and Information Services. With leading market positions in all our businesses, we remain highly confident in our ability to extend our competitive advantage in expanding markets. Cardinal Health is on track to deliver fourth quarter earnings growth of 20 percent or more, which will complete our 15th consecutive year of annual EPS growth of at least 20 percent, with rising returns on sales and committed capital."

38. On May 8, 2002, Cardinal filed its quarterly report with SEC on Form 10-Q. The Company's Form 10-Q was signed by the Individual Defendants and reaffirmed the previously announced financial results. Additionally and with respect to the presentation of its financial results, Cardinal stated:

> These condensed consolidated financial statements have been prepared in accordance with the instructions to Form 10-Q and include all of the information and disclosures required by generally accepted accounting principles for interim reporting. In the opinion of management, all adjustments necessary for a fair presentation have been included. Except as disclosed elsewhere herein, all such adjustments are of a normal and recurring nature

39. On August 6, 2002, Cardinal reported record fourth quarter and full year financial results reflecting exceptional profitability and productivity performance across all four of its business segments. For the fourth quarter, each of the Company's business segments performed well with notable performances from the pharmaceutical distribution and automation businesses. Diluted earnings-per-share ("EPS") before special items grew 28 percent to $0.74 for the fourth quarter

–16–

versus $0.58 last year. Record revenues combined with excellent expense controls drove expansion

in return on sales and capital in every segment. In addition, the Company generated record returns

on committed capital. Operating revenue grew by 15 percent to an all-time record $11.8 billion

versus prior year revenue of $10.3 billion. Operating earnings rose 22 percent to a fourth quarter

record $541 million versus prior year earnings of $445 million. Operating cash flow was an all-time

record at $1.4 billion. Commenting on these results, defendant Walter stated:

> "Cardinal Health produced another outstanding quarter, delivering
> value with a broad offering of superior products and services to our
> customers[.]...As a result, the company continued its tradition of
> delivering consistently strong and quality financial results for our
> shareholders. This performance demonstrates the enduring strength of
> our business model of balanced earnings growth accompanied by
> expanding returns on sales and capital and strong cash flow in every
> segment. Cardinal Health's balance sheet is stronger than at any time
> in our history."

40.     On September 30, 2002, Cardinal filed its annual report with SEC on Form 10-K.

The Company's Form 10-K was signed by the Individual Defendants and reaffirmed the Company's

previously announced financial results.

41.     On October 22, 2002, Cardinal reported first quarter records in six key financial

measures for its fiscal 2003 first quarter ended September 30, 2002. Earnings per diluted share,

before special items, rose 22 percent to $0.67. Operating revenues increased to $11.4 billion, up 16

percent. Operating earnings, before special items, rose 18 percent to $486 million. Return on sales

improved to 4.26 percent, an eight basis point improvement. Return on committed capital increased

to 33 percent, up a substantial 340 basis points. Return on equity rose to 19 percent, a 70 basis point

improvement. Commenting on these results, defendant Walter stated:

> "Cardinal Health continues to deliver outstanding financial performance across all of our businesses in a robust health care market that remains attractive for the company's products and services[.]...Our powerful business model allows us to generate high quality earnings that are balanced and sustainable. Consistent execution and productivity improvements this quarter yielded record revenues and earnings with record rates of returns on sales and capital, while we continued to invest in the business."

42. On November 15, 2002, Cardinal filed its quarterly report with SEC on Form 10-Q. The Company's Form 10-Q was signed by the Individual Defendants and reaffirmed the previously announced financial results. Additionally and with respect to the presentation of its financial results, Cardinal stated:

> These condensed consolidated financial statements have been prepared in accordance with the instructions to Form 10-Q and include all of the information and disclosures required by generally accepted accounting principles for interim reporting. In the opinion of management, all adjustments necessary for a fair presentation have been included. Except as disclosed elsewhere herein, all such adjustments are of a normal and recurring nature.

43. On January 23, 2003, Cardinal reported record results for the second quarter ended December 31, 2002. Earnings per diluted share, before special items, rose 20 percent to $0.77. Operating revenues increased to $12.7 billion, up 13 percent. Operating earnings, before special items, expanded with return on sales rising to 4.36 percent. Return on committed capital, before special items, increased to 35.9 percent, up a substantial 530 basis points. Operating cash flow was $373 million, an $839 million improvement versus prior year. Commenting on the results, defendant Walter stated:

> "Cardinal Health continues to generate outstanding financial results by leveraging leadership positions in the attractive health care market, consistent operational performance and productivity improvement, and expanding a diverse and proprietary products and services

–18–

offering[.]...Strong earnings and asset management are enabling the company to generate tremendous cash flow and record returns on committed capital which position us strongly for the future. This capital productivity enhances our ability to reinvest in existing businesses and seek new acquisitions, while at the same time maintaining our financial flexibility. We are well positioned to reach our financial commitment of EPS growth of 20 percent or more for fiscal year 2003."

44.    On February 14, 2003, Cardinal filed its quarterly report with SEC on Form 10-Q. The Company's Form 10-Q was signed by the Individual Defendants and reaffirmed the previously announced financial results. Additionally and with respect to the presentation of its financial results, Cardinal stated:

These condensed consolidated financial statements have been prepared in accordance with the instructions to Form 10-Q and include all of the information and disclosures required by generally accepted accounting principles for interim reporting. In the opinion of management, all adjustments necessary for a fair presentation have been included. Except as disclosed elsewhere herein, all such adjustments are of a normal and recurring nature

45.    On April 23, 2003, Cardinal reported record results for its fiscal 2003 third quarter ended March 31, 2003 (as reported in accordance with generally accepted accounting principles). Earnings per diluted share from continuing operations grew 29 percent to $0.85. Operating revenues increased to $12.8 billion, up 11 percent. Operating earnings rose 23 percent to $608 million. Earnings from continuing operations improved 28 percent to $385 million. Commenting on these results, defendant Walter stated:

"This quarter's revenue and earnings performance was record setting and broad based[.]...High quality earnings yielded record rates of return on sales, committed capital and equity, while expense and capital efficiency generated significant cash flow. Additionally, we continued to invest in our future during the quarter.

–19–

Demonstrating the benefits of our diverse portfolio of health care businesses, earnings were driven by strong gains in each of the company's business segments, highlighted by a terrific quarter at Automation and Information Services and Medical Products and Services. The integration of Syncor International Corporation, which we acquired in early January 2003, is progressing smoothly and the combined nuclear pharmacy services business in Pharmaceutical Technologies and Services delivered a very strong quarter.

We are confident in our financial guidance for the remainder of the year and will enter fiscal year 2004 with momentum. Working with our customers, Cardinal Health is creating quality and efficiency in health care and our company's focus remains on producing long-term value for our customers and shareholders."

46.    On May 15, 2003, Cardinal filed its quarterly report with SEC on Form 10-Q. The Company's Form 10-Q was signed by the Individual Defendants and reaffirmed the previously announced financial results. Additionally and with respect to the presentation of its financial results, Cardinal stated:

These condensed consolidated financial statements have been prepared in accordance with the instructions to Form 10-Q and include all of the information and disclosures required by generally accepted accounting principles for interim reporting. In the opinion of management, all adjustments necessary for a fair presentation have been included. Except as disclosed elsewhere herein, all such adjustments are of a normal and recurring nature

47.    On July 31, 2003, Cardinal reported record results for the fourth quarter and fiscal year ended June 30, 2003. Operating revenues rose 15 percent for the fourth quarter to $13.5 billion from $11.8 billion a year ago. Earnings per diluted share from continuing operations grew 28 percent to $0.82 for the fourth quarter, up from $0.64 a year ago. Operating earnings rose 22 percent to a record $575 million for the quarter, up from $471 million a year ago. Earnings from continuing operations were up 25 percent to $371 million for the quarter, up from $296 million a year ago. For

the full fiscal year 2003, operating revenues rose 14 percent to $50.5 billion from $44.4 billion a year ago. Earnings per diluted share from continuing operations grew 27 percent to $3.12 for the year compared to $2.45 a year ago. Operating earnings rose 22 percent to $2.2 billion for the year, up from $1.8 billion in the prior year. Earnings from continuing operations, before the cumulative effect of a change in accounting, were up 25 percent to $1.4 billion for the year, up from $1.1 billion a year ago. Commenting on these results, defendant Walter stated:

> "We've completed another fiscal year with impressive financial results – results that demonstrate the benefits of a focus on the fast growing health care industry, our market leading positions, and our broad and diverse offering to our customers[.]...Acceleration in demand for our proprietary products and services in our pharmaceutical technologies, automation and medical products businesses drove the strong performance in the fourth quarter.
>
> Importantly, we continued to ensure future growth of our business, investing approximately $1.5 billion in 2003 in strategic growth initiatives, research and development, acquisitions, and capital expenditures[.]...Record revenues, strong gross margins and continued improvement in productivity yielded record rates of return on sales, committed capital and equity. Our balance sheet is the strongest it has ever been with $1.7 billion in cash at year end, allowing us to maximize growth opportunities to build on our leadership positions in the marketplace and giving us confidence that Cardinal Health will continue to deliver exceptional performance into fiscal 2004 and beyond."

48.     On September 29, 2003, Cardinal filed its annual report with SEC on Form 10-K. The Company's Form 10-K was signed by the Individual Defendants and reaffirmed the Company's previously announced financial results. Furthermore, Independent Auditors Report, signed by the Company's accountants Ernst & Young LLP ("Ernst&Young"), was integrated into Cardinal's Form 10-K report, which stated the following:

In our opinion, the fiscal 2003 and 2002 consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of the Company as of June 30, 2003 and 2002, and the consolidated results of their operations and their cash flows for the years then ended in conformity with accounting principles generally accepted in the United States. Also, in our opinion, the related fiscal 2003 and 2002 financial statement schedules, when considered in relation to the basic consolidated financial statements taken as a whole, present fairly in all material respects the information set forth therein.

49.     On October 23, 2003, Cardinal announced record first quarter business results marked by a double-digit revenue increase, continued improvement in productivity and progress against its strategy to expand healthcare products and services along the chain of care.  For the period ending Sept. 30, 2003, revenue rose 16 percent to $13.3 billion from $11.4 billion a year ago and earnings per diluted share from continuing operations increased 16 percent to $0.74.  Operating earnings grew 12 percent to $522 million, with more than 60 percent contributed by businesses outside the Company's core pharmaceutical distribution activities.  Commenting on these results, defendant Walter stated:

"Performance for the quarter reflects Cardinal Health's diversified leadership positions in a strong healthcare market[.]...Our medical products, pharmaceutical technologies and automation businesses delivered solid earnings results, with excellent momentum going into the remainder of the year. Pharmaceutical distribution delivered exceptional revenue growth, while earnings growth was affected by a challenging vendor margin environment. With strong momentum from our other key lines of business and expected second half improvement in pharmaceutical distribution results, Cardinal Health continues to target earnings per share growth of mid teens or better for fiscal 2004."

50.     On November 14, 2003, Cardinal filed its quarterly report with SEC on Form 10-Q. The Company's Form 10-Q was signed by the Individual Defendants and reaffirmed the previously

announced financial results. Additionally and with respect to the presentation of its financial results, Cardinal stated:

> These condensed consolidated financial statements have been prepared in accordance with the instructions to Form 10-Q and include all of the information and disclosures required by generally accepted accounting principles for interim reporting. In the opinion of management, all adjustments necessary for a fair presentation have been included. Except as disclosed elsewhere herein, all such adjustments are of a normal and recurring nature.

51.    On January 22, 2004, Cardinal announced record second quarter revenue, net earnings and earnings per share, led by strong customer demand for the Company's product and service offerings across the chain of care. For the quarter ended Dec. 31, 2003, revenue rose to $14.1 billion, earnings from continuing operations reached $381 million and earnings per diluted share from continuing operations improved to $0.87. Year-to-date revenues rose to $27.4 billion, with earnings and earnings per diluted share from continuing operations reaching $711 million and $1.61, respectively. During the first half of fiscal 2004, the Company generated $548 million of operating cash flow, an increase of 53 percent over the first half of fiscal 2003. Commenting on the results, defendants Walter stated:

> "Our financial performance for the second quarter was consistent with our expectations and once again reflects strong demand from customers in all segments[.]...As expected, overall earnings growth was below our historic and anticipated future levels as strong performances in medical products, automation and pharmaceutical technologies were offset by short term challenges in pharmaceutical distribution. Looking forward, we expect results will continue to demonstrate the power of Cardinal Health's diverse portfolio of health care products and services."

52.    On February 17, 2004, Cardinal filed its quarterly report with SEC on Form 10-Q. The Company's Form 10-Q was signed by the Individual Defendants and reaffirmed the previously

-23-

announced financial results. Additionally and with respect to the presentation of its financial results, Cardinal stated:

> These condensed consolidated financial statements have been prepared in accordance with the instructions to Form 10-Q and include all of the information and disclosures required by generally accepted accounting principles for interim reporting. In the opinion of management, all adjustments necessary for a fair presentation have been included. Except as disclosed elsewhere herein, all such adjustments are of a normal and recurring nature.

53.     On April 22, 2004, Cardinal announced that the quarter ended March 31, 2004, revenue rose 14 percent to $14.6 billion, operating earnings increased 9 percent to $665 million and earnings from continuing operations were up 11 percent to $429 million. Earnings per diluted share from continuing operations improved 15 percent to $0.98. Year-to-date revenues now exceed $42 billion, with operating earnings and earnings per diluted share from continuing operations reaching $1.8 billion and $2.58, respectively. With strong operating cash flow of $787 million during the quarter, the Company expects to exceed its operating cash flow target of $1.3 billion for the full fiscal year ending June 30. Commenting on these results, defendant Walter stated:

> "Our results this quarter once again demonstrate the power of our diverse portfolio of market-leading products and services and the tremendous growth opportunities within the healthcare industry[.]...The success of our strategy to achieve scale and integrate our offerings is once again reflected in this quarter's results. In addition, continued exceptional cash flow allows us to fund this strategy for the future and fuel long-term growth."

54.     On May 14, 2004, Cardinal filed its quarterly report with SEC on Form 10-Q. The Company's Form 10-Q was signed by the Individual Defendants and reaffirmed the previously announced financial results. Additionally and with respect to the presentation of its financial results, Cardinal stated:

These condensed consolidated financial statements have been prepared in accordance with the instructions to Form 10-Q and include all of the information and disclosures required by generally accepted accounting principles for interim reporting. In the opinion of management, all adjustments necessary for a fair presentation have been included. Except as disclosed elsewhere herein, all such adjustments are of a normal and recurring nature.

55.     The statements contained in ¶¶ 25-54 were materially false and misleading when made because failed to disclose or indicate the following: (1) that the Company manipulated various aspects of its accounting practices to continuously portray profitability to market; (2) that the Company held inventory for an average of two months, and reaped exorbitant profits from price inflation; (3) that the Company improperly accounted for the $22 million recovered from Vitamin makers accused of overcharging Cardinal by booking such recoveries as revenue when the antitrust cases had not been resolved; (4) that the Company's pharmaceutical distribution business improperly classified revenues by reporting the revenues as either operating revenue or revenues form bulk deliveries to consumer warehouses when revenues were not derived from such; (5) that as a consequence of the aforementioned practices, the Company's financial results were in violation of Generally Accepted Accounting Principles ("GAAP") and the Company's own accounting interpretations on revenue recognition; (6) that the Company lacked adequate internal controls; and (7) that the Company's earnings per share were materially inflated; and (8) that as a result of the above, the Company's financial results were inflated at all relevant times.

## The Truth Begins to Emerge

56.     On March 14, 2004, Cardinal announced that on May 6, 2004, it was notified by the SEC that a previously-disclosed informal inquiry initiated in October, 2003, has been converted to a formal investigation. The SEC's initial request sought historical financial and related information,

including but not limited to information pertaining to the accounting treatment of $22 million

recovered from vitamin manufacturers who were found to have overcharged the Company. In April,

in connection with the SEC's informal inquiry, the audit committee of Cardinal Health retained

independent counsel to conduct its own on-going review.

57.     On May 15, 2004, the Columbus Dispatch, discussing Cardinal's woes, reported:

> The Securities and Exchange Commission has elevated its probe of
> Cardinal Health Inc.'s accounting practices to a formal investigation.

> The regulatory agency launched a preliminary inquiry in October
> after questions arose about whether the Dublin-based company tried
> to manage its earnings through the accounting treatment of $22
> million expected from an antitrust lawsuit.

> Cardinal, one of the nation's largest health-care products and services
> businesses, was notified May 6 of the probe's new status and reported
> it yesterday in its quarterly filing with regulators.

> Upgrading to a formal investigation gives the SEC power to subpoena
> documents and financial records.

> A commission spokesman said the move does not indicate a lack of
> cooperation.

> Cardinal -- Ohio's highest-ranked Fortune 500 company with $56.7
> billion in revenues -- said it "intends to continue to respond to the
> SEC's ongoing investigation and provide all information required."

> The company also revealed that its audit committee last month hired
> an outsider to help conduct an internal review.

> On Wall Street, reaction to the news was swift. When the market
> opened yesterday, Cardinal's stock price tumbled $2.38 -- 3.1 percent
> -- from Thursday's close of $74.68. By day's end, the stock recovered
> to finish at $73.45, off $1.23.

> Analysts said the SEC's decision was a step back for Cardinal.

"The company has already been taken to the woodshed by investors for this perception of earnings management" once the news broke last year, said David K. Francis, an industry analyst for investment firm Jefferies & Co. "If anything, it will just be a little bit of a nuisance going forward as they continue to grow the business."

Cardinal's accounting methods became a subject of discussion early last year after investment professionals questioned the company's decision to record quarterly gains in 2000 and 2001 from expected settlements in antitrust cases that had not been resolved at the time. The lawsuits were related to overcharges by vitamin manufacturers.

In documents filed with the SEC during fall 2002, Cardinal said it booked income of $10 million in the quarter that ended Dec. 31, 2000, and $12 million for the three months ended Sept. 30, 2001, based on projected settlements of the cases.
Cardinal said the decision was based on the "virtual certainty" of recovery. It has recovered $144.7 million.

Even though the earlier expectations appear conservative in hindsight, several accountants said that taking the gains in 2000 and 2001 did not meet generally accepted accounting principles. Other experts said the gains could be recognized.

Investors questioned the timing, wondering whether the gains helped Cardinal meet its earning expectations for the two quarters.

58.     On June 30, 2004, Cardinal announced earnings per share for its fiscal year 2004 are expected to increase approximately 11 percent, which is below prior guidance of mid-teens or better growth. Operating cash flow for the fourth quarter was substantially above expectations and for the full year is now expected to exceed $2 billion, well ahead of the Company's $1.3 billion prior guidance. Additionally the Company, in its press release stated:

Earnings per share expectations for the company's fourth quarter and full fiscal year ended today are summarized in the following table.

Earnings Per Share Expectations From Continuing
Operations

–27–

|                                              | Q4 Range          | Fiscal Year 2004 Range |
| -------------------------------------------- | ----------------- | ---------------------- |
| GAAP Earnings Per Share                      | $0.88 - $0.91     | $3.46 - $3.49          |
| Special Items                                | $(0.05) - $(0.04) | $(0.07) - $(0.06)      |
| Earnings Per Share, Excluding Special Items  | $0.93 - $0.95     | $3.53 - $3.55          |

The company also affirmed its long-term goal to increase earnings per share at a mid-teens or better rate. However, for the upcoming fiscal year 2005, growth is expected to be lower, at a rate of at least 10 percent, with continued strong cash flow and return on equity. Growth expectations for fiscal 2005 exclude special items, which the company believes can not be reasonably projected at this time.

Separately, the company announced that on June 21, as part of the Securities and Exchange Commission's (SEC) formal investigation disclosed by the company on May 14, it received an SEC subpoena that included a request for the production of documents relating to revenue classification, and the methods used for such classification, in the company's pharmaceutical distribution business as either operating revenue or revenues from bulk deliveries to customer warehouses. In addition, Cardinal Health has learned that the U.S. Attorney's Office for the Southern District of New York has commenced an inquiry that the company understands relates to this same subject. This subject is also being reviewed as part of the ongoing inquiry by Cardinal Health's Audit Committee and its independent counsel. As previously disclosed on May 16, the company understands the SEC and Audit Committee inquiries are not limited to this subject. Cardinal Health continues to respond to these inquiries and provide all information required.

59.    News of this shocked the market. Shares of Cardinal fell $17.19 per share or 24.54 percent on July 1, 2004 to close at $52.86 per share. More than 35.5 million Cardinal shares were traded, more than 15 times the three-month daily average.

## CARDINAL'S VIOLATION OF GAAP RULES

60.     GAAP states that "revenue should not be recognized until it is realized or realizable and earned." FASB Concepts Statement No. 5, ¶83. The conditions for the recognition of revenue are met when "persuasive evidence of an arrangement exists, delivery has occurred or services have been rendered, the seller's price is fixed or determinable, collectibility of the sales price is reasonably assured and when the entity has substantially performed the obligations which entitle it to the benefits represented by the revenue." Here, Cardinal improperly recognized revenue when revenue from such transactions was not realizable and earned, which is in violation of GAAP.

61.     Given these accounting irregularities, the Company announced financial results that were in violation of GAAP, the Company's own announced revenue recognition policies, and the following principles:

(a)     The principle that "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements" was violated (APB No. 28, ¶10);

(b)     The principle that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions" was violated (FASB Statement of Concepts No. 1, ¶34);

(c)     The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of

–29–

transactions, events, and circumstances that change resources and claims to those resources" was violated (FASB Statement of Concepts No. 1, ¶40);

(d)  The principle that "financial reporting should provide information about an enterprise's financial performance during a period" was violated (FASB Statement of Concepts No. 1, ¶42);

(e)  The principle that "completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions" was violated (FASB Statement of Concepts No. 2, ¶79);

(f)  The principle that "financial reporting should be reliable in that it represents what it purports to represent" was violated (FASB Statement of Concepts No. 2, ¶¶58-59); and

(g)  The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" was violated. (FASB Statement of Concepts No. 2, ¶95).

62.  The adverse information concealed by defendants during the Class Period and detailed above was in violation of Item 303 of Regulation S-K under the federal securities law (17 C.F.R. 229.303).

## UNDISCLOSED ADVERSE FACTS

63.  The market for Cardinal's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Cardinal' securities traded at artificially inflated prices during the Class Period. Plaintiff

and other members of the Class purchased or otherwise acquired Cardinal securities relying upon the integrity of the market price of Cardinal' securities and market information relating to Cardinal, and have been damaged thereby.

64. During the Class Period, defendants materially misled the investing public, thereby inflating the price of Cardinal' securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

65. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Cardinal' business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Cardinal and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

66.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Cardinal, their control over, and/or receipt and/or modification of Cardinal allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Cardinal, participated in the fraudulent scheme alleged herein.

67.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

### Applicability Of Presumption Of Reliance:
### Fraud-On-The-Market Doctrine

68.     At all relevant times, the market for Cardinal securities was an efficient market for the following reasons, among others:

(a) Cardinal stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Cardinal filed periodic public reports with the SEC and the NYSE;

(c) Cardinal regularly communicated with public investors <u>via</u> established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Cardinal was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

69. As a result of the foregoing, the market for Cardinal securities promptly digested current information regarding Cardinal from all publicly-available sources and reflected such information in Cardinal stock price. Under these circumstances, all purchasers of Cardinal securities during the Class Period suffered similar injury through their purchase of Cardinal securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

70. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful

−33−

cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Cardinal who knew that those statements were false when made.

### FIRST CLAIM
### Violation Of Section 10(b) Of
### The Exchange Act Against And Rule 10b-5
### Promulgated Thereunder Against All Defendants

71.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

72.     During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Cardinal securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

73.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high

−34−

market prices for Cardinal securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

74.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Cardinal as specified herein.

75.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Cardinal value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Cardinal and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Cardinal securities during the Class Period.

76.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports;

(iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

77.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Cardinal operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

78.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Cardinal securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Cardinal publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the

−36−

securities trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired Cardinal securities during the Class Period at artificially high prices and were damaged thereby.

79.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Cardinal was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Cardinal securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

80.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

81.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM
### Violation Of Section 20(a) Of
### The Exchange Act Against the Individual Defendants

82.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

83.     The Individual Defendants acted as controlling persons of Cardinal within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level

positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

84.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

85.     As set forth above, Cardinal and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)  Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

(b)  Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)  Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)  Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated:  7/2/04

**CLIMACO, LEFKOWITZ, PECA,**
**WILCOX & GAROFOLI CO., L. P. A.**


By:

John R. Climaco (0011456)
jrclim@climacolaw.com
Scott D. Simpkins (0066775)
sdsimp@climacolaw.com
1228 Euclid Avenue
Suite 900
Cleveland, Ohio 44115
Phone: (216) 621-8484
Fax: (216) 771-1632

**SCHIFFRIN & BARROWAY, LLP**

Marc A. Topaz
Richard A. Maniskas
Tamara Skvirky
Three Bala Plaza East
Suite 400
Bala Cynwyd, PA  19004
(610) 667-7706

**Attorneys for Plaintiff**

## CERTIFICATION OF NAMED PLAINTIFF
### PURSUANT TO FEDERAL SECURITIES LAWS

I, Gerald L. Burger, (Plaintiff) declare, as to the claims asserted under the federal securities laws, that:

1. Plaintiff has reviewed the Complaint and retains Schiffrin & Barroway, LLP and such co-counsel it deems appropriate to associate with to pursue such action on a contingent fee basis.

2. Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff's transactions in the Cardinal Health, Inc. (NYSE: CAH) security that is the subject of this action during the Class Period are as follows:

| No. of Shares | Buy/Sell | Date | Price Per Share |
|---|---|---|---|
| 65 | Bought | 07/25/01 | $71.9649 |
| 65 | Sold | 01/28/03 | $56.7013 |
| 30 | Bought | 11/14/01 | $65.0952 |
| 30 | Sold | 01/28/03 | $56.7013 |

List additional transactions on a separate sheet of paper, if necessary.

5. During the three years prior to the date of this Certification, Plaintiff has sought to serve or served as a representative party for a class in the following actions filed under the federal securities laws: N/A

6. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1 day of JULY, 2004.

GERALD L. BURGER