UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| In re CARDINAL HEALTH, INC. SECURITIES LITIGATION | ) ) ) | No. C2-04-575 |
| | ) | CLASS ACTION |
| This Document Relates To: | ) ) | Judge Marbley |
| ALL ACTIONS. | ) ) | Magistrate Judge King |
| | ) | DEMAND FOR JURY TRIAL |

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ..................................................................................................1

JURISDICTION AND VENUE ..........................................................................................12

PARTIES ..............................................................................................................................13

    Lead Plaintiffs ..............................................................................................................13

    Defendants ...................................................................................................................15

FRAUDULENT SCHEME AND FALSE AND MISLEADING STATEMENTS ....................24

    False Statements and Omissions During FY 2001......................................................24

    False Statements and Omissions During FY 2002......................................................40

    False Statements and Omissions During FY 2003......................................................66

    False Statements and Omissions During FY 2004......................................................93

THE TRUTH ABOUT DEFENDANTS' FRAUD EMERGES ...................................................114

CARDINAL DEFENDANTS' KNOWLEDGE AND ADDITIONAL INDICIA OF
    SCIENTER ..................................................................................................................123

    Cardinal Defendants' Knowledge of the Fraud ..........................................................123

    Additional Indicia of Scienter.....................................................................................129

    Covering Up Market Pressure and Resistance to Fee-for-Service Conversion ..............130

    Corporate Acquisitions ...............................................................................................131

    Cardinal's Note Offerings ...........................................................................................133

    Maintaining Cardinal's Investment Grade Ratings......................................................134

    The Individual Defendants and Corporate Insiders Personally Profited from the
        Fraudulent Scheme ..............................................................................................135

    Executive Compensation..............................................................................................141

    Employment Agreements and Promotions ..................................................................145

    GAAP Violations, Cardinal's Restatement and Post-Class Period Admissions..............146

DEFENDANTS' FALSE FINANCIAL REPORTING AND GAAP VIOLATIONS
DURING THE CLASS PERIOD ...................................................................146

Mischaracterizing Revenue and Inadequate Disclosures Regarding Revenue ...............148

Other Accounting Improprieties ...................................................................163

Improper Recording of Settlement Proceeds ...................................................163

Improper Reserve Accounting and Accrual Adjustments ...............................165

Failure to Disclose the Company's Recognition of Cash Discounts ...............166

Improper Recognition of Revenue ................................................................167

Excessive Special Charges...........................................................................171

Understatement of Receivables through the Securitization of Pyxis Receivables...........175

Cardinal's Violations of SEC Regulations Due to Its Inadequate Internal Controls .......176

Cardinal's Restatement is an Admission of Falsity .......................................179

Cardinal's Financial Statements Violated Fundamental Concepts of GAAP .................179

ERNST & YOUNG'S PARTICIPATION IN THE SCHEME AND ISSUANCE OF
FALSE FINANCIALS ...................................................................................181

E&Y's False Statements as to Cardinal's FY 2002-FY 2003 Financial Statements .......183

E&Y Ignored the Audit Evidence It Gathered................................................185

E&Y Ignored Numerous Red Flags ..............................................................186

E&Y Failed to Identify Material Weaknesses in Internal Controls .................192

E&Y's Audit Violated Fundamental Concepts of GAAS ...............................195

PROXIMATE LOSS CAUSATION/ECONOMIC LOSS .......................................199

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET
DOCTRINE ...................................................................................................205

NO SAFE HARBOR EXISTS FOR DEFENDANTS' STATEMENTS....................206

LEAD PLAINTIFFS' CLASS ACTION ALLEGATIONS.......................................206

JURY DEMAND..................................................................................................213

## NATURE OF THE ACTION

1.      Lead plaintiffs, Amalgamated Bank, as Trustee for the LongView Collective Investment Fund, California Ironworkers Field Trust Funds, New Mexico State Investment Council and PACE Industry Union-Management Pension Fund bring this action on their own behalf and on behalf of all persons who purchased the publicly traded securities of Cardinal Health, Inc. ("Cardinal" or the "Company") during the October 24, 2000 through July 26, 2004 Class Period. The action is brought against Cardinal, the Company's senior officers who directed and approved the fraud, Robert D. Walter, George L. Fotiades, Richard J. Miller, James F. Millar, Gary Jensen and Mark Parrish, and Cardinal's auditors, Ernst & Young, LLP, for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

2.      Cardinal is generally recognized as one of the three largest distributors of pharmaceutical products in the United States. While efforts have been made to diversify Cardinal's business, throughout the Class Period more than 85% of the Company's revenues were derived from the distribution business – moving pharmaceutical products from manufacturers to retailers.

3.      Leading into the Class Period, the pharmaceutical distribution business was on the brink of a wholesale industry-wide transformation. For over a decade, Cardinal had reported annual growth exceeding 20% through a combination of corporate acquisitions and capitalizing on manufacturers' willingness to have distributors buy and hold excess supplies of pharmaceutical products. Through the acquisitions, Cardinal expanded its regional markets and customer base. Through the buy and hold practice, Cardinal profited on the inflation in pharmaceutical prices between the date the products were purchased from manufacturers and the date the products were sold to retailers. It was through this practice that Cardinal took advantage of rapidly rising drug prices in the 1990s and did not have to charge either pharmaceutical manufacturers or retailers for the Company's distribution services. As a result of consolidation and changes in the market,

Cardinal's ability to continue growing through acquisitions and deriving profits from buying and holding pharmaceuticals was being sharply curtailed by fiscal year 2001.[1]

4.     By early 2001, the pharmaceutical distribution market had been effectively divided between Cardinal, McKesson Corporation and AmerisourceBergen Corporation.  With Cardinal's $2.2 billion acquisition of Bindley Western Industries, Inc. in February 2001 and AmeriSource Health Corporation's $2.4 billion merger with Bergen Brunswig Corporation in March 2001, 90% of the drug distribution business was controlled by Cardinal and the Company's two large competitors. Moreover, it was widely recognized that federal authorities were likely to limit further consolidation of the pharmaceutical distribution business.  Indeed, in 1999, the Federal Trade Commission halted a proposed merger between Cardinal and Bergen Brunswig on the basis that it would be detrimental to consumers if one company controlled too large a percentage of the pharmaceutical distribution market.  As a result of the distribution market being consolidated, investors and analysts recognized that Cardinal would no longer be able to rely on acquisitions for material growth.  In addition, with the market dominated by three large distributors, investors realized that the Company's distribution business would be subject to increasing pressure on profit margins as the big three distributors battled each other for the same market.

5.     The consolidation of the distributor market was matched by an equally intense consolidation in the retail pharmacy market.  Mass retailers, such as CVS Corporation and Walgreen Company, had succeeded in capturing an enormous share of the market.  Combined with the bankruptcy of Kmart in January 2002, these retailers began to use their stature to limit price increases, negotiate directly with pharmaceutical manufacturers and bypass the big distributors to

---

[1]     At all relevant times, Cardinal's fiscal year ran from July 1 to June 30.  Hereinafter, fiscal year will be abbreviated FY (*i.e.*, FY 2001 for fiscal year 2001) and fiscal quarter will be abbreviated Q (*i.e.*, 1Q 2002 for first quarter of fiscal year 2002).

seek out discounted and generic drugs from specialty wholesalers. This consolidation put even more pressure on Cardinal's profit margins going into and during the Class Period.

6. Concurrently, pharmaceutical manufacturers were rapidly putting an end to the distributors' buy and hold business model. Reacting to a string of investigations into manufacturers doctoring financial earnings through "channel stuffing" – shipping excess product to distributors to record revenue in a particular financial period – and in an effort to recoup the profits distributors were achieving from inflation in wholesale pharmaceutical prices, the primary pharmaceutical manufacturers collectively moved to making just-in-time product shipments. Accordingly, manufacturers sought to sell and ship their drug products to Cardinal and other distributors only when there was a corresponding retail request and stopped making bulk shipments to the distributors without regard for demand. Cardinal, as a result, was rapidly losing the ability to sit on pharmaceutical products and profit from the price increases. In response and to cover the lost profits, Cardinal commenced an effort to revolutionize its business away from buy and hold towards a model whereby Cardinal charged pharmaceutical manufacturers for the Company's distribution services. This so-called fee-for-service model was, naturally, opposed by manufacturers who had grown accustomed to not incurring any distribution costs.

7. The changing relationship between Cardinal, as well as the other distributors, and pharmaceutical manufacturers and retailers was a primary concern of investors and the market early in the Class Period. Facing increasingly intense competition and margin pressure and losing the ability to profit from rising drug prices, investors were focused on whether or not Cardinal could continue to grow revenue and earnings. This scrutiny could hardly have come at a worse time. The 1990s bull market was crashing and there was a torrent of news revealing rampant accounting violations and securities fraud at some of the country's largest corporations. Investors were, understandably, even more focused on the accuracy of financial statements and the ability of

corporations to meet revenue and earnings projections. Any acknowledgement by a publicly traded corporation of diminishing markets, slowing growth or missing projections caused investors to severely punish the corporation's stock price.

8. In the face of this perfect storm of diminishing opportunities from manufacturers, increased buying power from retailers and a lack of acquisition prospects, defendants knew their 10 year track record of uninterrupted growth was over. To avoid having to disclose slowing growth, and the resulting negative impact on Cardinal's stock price, defendants embarked on a scheme to artificially boost Cardinal's reported Operating Revenue while fraudulently inflating the Company's reported earnings, as necessary, to hit projections. Cardinal's reported Pharmaceutical Distribution and Provider Services ("Pharmaceutical Distribution") Operating Revenue was highlighted by the defendants as "the main driver" of the Company's growth rate and was particularly important to investors and analysts in ascertaining whether or not Cardinal could maintain its historical growth and successfully convert manufacturers to the fee-for-service model in the face of marketplace changes. For several years prior to the Class Period, Cardinal had separately reported Operating Revenue and zero margin Bulk Deliveries revenue. The Bulk Deliveries category, according to Cardinal's filings with the United States Securities and Exchange Commission ("SEC") was purported to include all "deliveries made to customers' warehouses," whereby the Company "acts as an intermediary in the ordering and subsequent delivery of pharmaceutical products." This was distinct from orders where Cardinal provided a service repackaging and customizing orders to meet the specific requests of a retailer.

9. The distinction between Operating Revenue and Bulk Deliveries revenue was critical because, unlike Operating Revenue, Bulk Deliveries revenue was unpredictable, provided little or no margin and was not an indicator of growth or expanding markets. As defendants knew, escalating Bulk Deliveries revenue would have been perceived, appropriately, by investors and analysts as a

sign that Cardinal was failing to expand its markets or convert manufacturers to the fee-for-service model and that the large pharmaceutical retailers were increasingly using Cardinal as an intermediary with little or no chance at deriving any profit. To the contrary, growing Pharmaceutical Distribution Operating Revenue was touted by defendants as a strong indicator that Cardinal was increasing its market, expanding its customer base, migrating sales from no margin Bulk Deliveries to profitable direct-store business and, most importantly, that Cardinal was adapting and thriving despite changes to the drug distribution market.

10. Defendants achieved the façade of growth and ongoing business success by blatantly misrepresenting Cardinal's Operating Revenue and understating the Company's Bulk Deliveries revenue. Over 15 consecutive quarters, defendants improperly inflated the Operating Revenue by more than *$26 billion*. All told, Operating Revenue growth was overstated by 30%. Set forth below is a chart graphically demonstrating Cardinal's actual versus reported Operating Revenue during the Class Period:



- 5 –

11.     At the same time, manipulating Cardinal's statements, defendants only reported 42% of the Company's actual bulk Delivery sales for 1Q 2001-3Q 2004.  Set forth below is a chart graphically demonstrating Cardinal's actual versus reported Bulk Deliveries revenue, which continued to grow during the Class Period:



12.     Defendants' scheme was as simple as it was successful at misrepresenting the Company's financial status and adaptation to industry consolidation and changing practices: repeatedly, defendants took billions of dollars of Bulk Deliveries revenue, where Cardinal provided no services and simply acted as an intermediary in ordering and delivering products, and publicly reported it as Operating Revenue.  Under the guise of undisclosed, internal policies, defendants would book the zero margin Bulk Deliveries as Operating Revenue while deceiving investors and the market.

13.     Rather than revealing that Cardinal's history of achieving double digit growth was over and the Company's business prospects were fading, defendants publicly reported double-digit growth rates, in Operating Revenue and championed shrinking Bulk Deliveries revenue as evidence of Cardinal's thriving distribution business.  Defendants' false statements included: "***The company reported very strong operating revenues, up 24 percent to a record $7.7 billion***"; "***Increasing demand for Cardinal's pharmaceutical distribution and medical-surgical products and services fueled a 35 percent increase in operating revenues to a record $10.3 billion in the third quarter from $7.7 billion a year ago***"; "***I can't remember an internal growth rate even remotely as high, at any time in the company's history***"; and "***Operating revenues, the main driver of the company's improved operating earnings, increased 27 percent in the fourth quarter to a record $10.3 billion from $8.1 billion in the year-earlier period***."  *See* ¶¶63, 72, 75, 80.  Securities analysts following Cardinal repeated defendants' false statements and emphasized the importance of the purportedly shrinking Bulk Deliveries revenue:  "***We note that Cardinal's bulk deliveries in the quarter declined 24% year over year to $1.7 billion, while direct-to-stores revenues increased 13% year over year.  We believe this divergence in growth between dock-to-dock sales and direct store sales is indicative of Cardinal's success in migrating some of its customers away from self-warehousing of pharmaceuticals***."  And "***[w]e note that Cardinal's bulk deliveries in the quarter declined 41% y/y to approximately $1.3 billion.  This follows bulk delivery declines of 24% in the March quarter and 21% in the December quarter.  We attribute a large part of this decline to Cardinal migrating sales from bulk shipments to direct sales***."  *See* ¶¶114, 120.

14.     Defendants' statements were false and misleading when made, used by defendants to artificially inflate Cardinal's stock price and cover-up the Company's declining business prospects and failure to adapt to changing market conditions.  The charts set forth below demonstrate

Cardinal's reported versus the actual growth rate for total Operating Revenue and Pharmaceutical Distribution Operating Revenue during the Class Period.



**Cardinal Health Reported v. Actual Operating Revenue Growth Rate**



Only after the Class Period did investors discover that more than $26 billion of the reported Operating Revenue was, in reality, simply Bulk Deliveries.

15.     The Cardinal Defendants' scheme did not end with the overstatement of Operating Revenue and underreporting of Bulk Deliveries.  Throughout the Class Period, defendants took a series of steps to artificially boost earnings whenever it appeared that Cardinal might not hit financial projections.  In 2Q 2001 and 1Q 2002, defendants improperly included a total of $22 million in proceeds purportedly from the settlement of a vitamin antitrust suit in Cardinal's publicly reported results.  The settlement, however, had not occurred and the potential proceeds from the litigation could not be recognized.  Nevertheless, defendants' manipulations allowed Cardinal to meet analysts' earnings estimates when Cardinal, otherwise, would have missed the projections in both quarters.  Defendants also overstated Cardinal's net income by $64 million by manipulating balance sheet reserves and accrual adjustments.  Defendants improperly and prematurely recognized tens of millions of dollars in revenue from purported sales of the Company's Pyxis drug delivery systems,

despite specific public statements that the Company had discontinued the practice. Finally, defendants manipulated the timing when cash discounts on pharmaceutical purchases were recognized and overstated so-called special charges in order to understate expenses and inflate earnings. Combined, these practices impacted Cardinal's reported revenue and earnings throughout the Class Period, allowing defendants to claim that they had "hit the numbers."

16.     Under cover of the revenue and earnings manipulations, defendants were able to reassure investors that the conversion to the fee-for-service distribution model was proceeding smoothly and that Cardinal was successfully adapting to the new manufacturer-distributor relationship. Defendants claimed that they "***reached important agreements***" with manufacturers – "***we're making significant progress with out branded manufacturers***" and "***[w]e have agreements with everybody today and those agreements are going to continue to get refined***." In addition, while repeatedly making egregious accounting manipulations, defendants sought to distance themselves from ongoing accounting scandals at other companies and assured investors that they practiced "***conservative accounting***," were "***intimate with the [financial] numbers***" and that "***the integrity and reliability of [Cardinal] begins and ends with the people at the top of the Company***." Defendants' false statements and omissions were carried in Cardinal's SEC filings and press releases, confirmed in the Company's conference calls with investors and analysts and repeated by securities analysts and news reporters in publicly disseminated reports.

17.     Defendants' fraud succeeded, at the expense of lead plaintiffs and Cardinal shareholders, in artificially inflating the Company's stock price and delaying the truth about Cardinal's stagnant growth and failure to adjust to the changing dynamics of the distribution market. As demonstrated in the stock chart attached as Exhibit A, for nearly four years, defendants' misrepresentations and omissions allowed Cardinal's stock to trade at both artificially inflated levels and a premium to the Standard & Poor's 500 Healthcare Index and the Company's competitors.

18.     Defendants took advantage of the artificial inflation in Cardinal's stock price during the Class Period. The Individual Defendants made $49.74 million in insider trading proceeds while collecting an additional $245 million in incentive-based compensation. *See* Insider Trading Chart attached as Exhibit B. The defendants' families, cohorts and other insiders made another $95.85 million in Class Period sales of Cardinal stock. Moreover, defendants used Cardinal's inflated stock price to make two dozen corporate acquisitions and $1.3 billion in note offerings, all while maintaining the Company's critically important debt rating.

19.     The Cardinal Defendants were not alone in orchestrating or profiting from the fraud. After years of providing consulting services to Cardinal, in May 2002 auditor Ernst & Young, LLP ("E&Y") had the opportunity to bid for the Company's multi-million dollar account. Cardinal's previous auditor, Arthur Andersen, had just imploded under the weight of involvement in massive accounting frauds, including Enron and WorldCom, and had been released as the Company's auditors only weeks before the end of FY 2002. E&Y stepped into the breach, after receiving $2.31 million from Cardinal for pre-engagement services, and promptly certified the Company's FY 2002 financial results – including $7.0 billion in improperly reported Operating Revenue. Through the remainder of the Class Period, E&Y continued to ignore obvious red flags – Cardinal's poor internal controls, the rapidly changing market for pharmaceutical distributors, the inability to convert manufacturers to the fee-for-service model, massive insider trading and incentive-based compensation and numerous accounting errors and irregularities – while certifying Cardinal's FY 2003 financial statements and reviewing the Company's FY 2003 and FY 2004 quarterly results.

20.     Finally, beginning in May 2004, defendants' scheme began to unravel. First, defendants admitted that an SEC inquiry which was purportedly limited to revenue recognized from the vitamin litigation was actually a full investigation into Cardinal's accounting practices. Next, defendants acknowledged that there were serious issues with the Company's Pharmaceutical

Distribution revenue recognition and reporting practices. Defendants also made the stunning admission that the Company was facing a revenue and earnings shortfall because of its failure to convert manufacturers to the fee-for-service business model despite prior statements that the Company had "turned the corner" and had agreements in place. Investors were stunned as they learned for the first time that Cardinal's reported revenue results could not be trusted and that the Company was failing to adapt to new market conditions. Cardinal's stock plunged from over $70.00 per share on June 30, 2004 to $52.77 on July 1, 2004.

21. On July 26, 2004, investors were stunned again when Cardinal Chief Financial Officer Richard Miller resigned as a result of the investigation into Cardinal's revenue recognition practices, further revealing the extent of defendants' fraud. As one securities analyst reported on national television: "***Either, A, they're cooking the books . . . or, B, it's just fraud up and down the line to fix the earnings***." ¶211. Ultimately, defendants were forced to restate Cardinal's Class Period financial statements, acknowledging that billions of dollars in Bulk Deliveries revenue was improperly reported as Operating Revenue, the Company's financial statements had been both false and misleading and that Cardinal's internal controls were utterly deficient. In response to these admissions and the revelation of the truth, Cardinal's stock price plummeted from $74.73 on May 13, 2004 to a low of $44.00 per share on July 27, 2004, the day after Miller's forced resignation. In the span of two months, Cardinal's stock dropped 41% and lead plaintiffs and other members of the Class lost up to $28.75 per share.

## JURISDICTION AND VENUE

22. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

23.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act.

24.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts and transactions giving rise to the violations of law complained of herein, including the preparation and dissemination of materially false and misleading statements, occurred in substantial part in this District.  In addition, Cardinal's principle executive offices are in Dublin, Ohio, the Individual Defendants conducted the day-to-day operations of the Company in this District and the primary E&Y office involved in Cardinal audits is in Columbus, Ohio.

25.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

### Lead Plaintiffs

26.    By Court Order dated January 26, 2005, Amalgamated Bank, as Trustee for the LongView Collective Investment Fund, California Ironworkers Field Trust Funds, New Mexico State Investment Council and PACE Industry Union-Management Pension Fund were appointed as lead plaintiffs in this action.

(a)    Lead plaintiff Amalgamated Bank ("Amalgamated Bank's LongView Fund"), chartered in 1923, is headquartered in New York, New York and is America's oldest union owned and operated labor bank, having investment relations with over 200 employee benefit funds, including union plans.  As a labor bank, Amalgamated Bank's LongView Fund caters to unions and small wage earners.  Amalgamated Bank's LongView Fund purchased shares of Cardinal common stock during the Class Period as detailed in the Bank's certification filed with the Court on August 31, 2004 in support of its motion to be appointed lead plaintiff.  As a result of the defendants'

conduct detailed herein, Amalgamated Bank's LongView Fund, suffered damages in connection with its purchase of Cardinal securities.

(b)     Lead plaintiff California Ironworkers Field Trust Funds (the "Funds") is a pension fund headquartered in Pasadena, California, established for the benefit of current and retired private and public sector ironworkers in the construction, welding and heavy industry trades.  The Funds purchased shares of Cardinal common stock during the Class Period as detailed in the Funds' certification filed with the Court on August 31, 2004 in support of its motion to be appointed lead plaintiff.  As a result of the defendants' conduct detailed herein, the Funds suffered damages in connection with its purchase of Cardinal securities.

(c)     Lead plaintiff the New Mexico State Investment Council (the "NMSIC") is a state agency reporting to the Governor of New Mexico that handles an $11.5 billion fund headquartered in Santa Fe, New Mexico.  The agency was established by the New Mexico state legislature on March 28, 1957 and subsequently ratified by a constitutional amendment adopted by the citizens of New Mexico in the general election of 1958.  The purpose of the NMSIC is to optimize New Mexico state funds to insure that future generations receive the same benefits as current beneficiaries and benefit the state's general fund.  The NMSIC purchased shares of Cardinal common stock during the Class Period as detailed in the NMSIC's certification filed with the Court on August 31, 2004 in support of its motion to be appointed lead plaintiff.  As a result of the defendants' conduct detailed herein, the NMSIC suffered damages in connection with its purchase of Cardinal securities.

(d)     Lead plaintiff PACE Industry Union-Management Pension Fund (the "PACE Fund") is a multi-employer pension fund headquartered in Nashville, Tennessee.  The PACE Fund is a Taft-Hartley trust fund, jointly administered by a board of trustees of both labor and management representatives.  The PACE Fund purchased shares of Cardinal common stock during the Class

Period as detailed in the PACE Fund's certification filed with the Court on August 31, 2004 in support of its motion to be appointed lead plaintiff. As a result of the defendants' conduct detailed herein, the PACE Fund suffered damages in connection with its purchase of Cardinal securities.

**Defendants**

27.     Defendant Cardinal is one of the three largest pharmaceutical distribution companies in the United States and describes itself as "the leading provider of products and services supporting the health care industry." Founded in 1971 as a regional food distributor, Cardinal moved into drug wholesaling and grew its pharmaceutical distribution business through a series of corporate acquisitions. After previously trading on the NASDAQ exchange, Cardinal commenced trading on the New York Stock Exchange ("NYSE") under the symbol CAH in 1994. Throughout the Class Period, Cardinal traded in an efficient market on the NYSE.

28.     Defendant Robert D. Walter ("Walter") founded Cardinal and, at all relevant times, served as the Chairman and Chief Executive Officer of the Company. During the Class Period, Walter also led the Company's Operating Committee, which met every month to address Cardinals' business, operations and finances and included defendants Fotiades, Miller, Millar and Parrish, and was Chairman of the Board of Director's Executive Committee.

29.     As part of the duties of his senior positions at Cardinal and as more fully detailed in ¶¶224-37, Walter was responsible for directing the Company's finances and business affairs and confirmed to investors and the market that he was "intimate with the [financial] numbers." As the Chairman and the only senior executive on Cardinal's Board of Directors, Walter was required to not only keep himself informed of the Company's day-to-day business and finances, but also to keep Cardinal's non-management directors apprised of the state of Cardinal's business and finances, including the revenue and growth figures and the outlook for the Company's primary Pharmaceutical Distribution business.

30.     During the Class Period, Walter participated in the issuance of false and misleading statements and failed to disclose material information about Cardinal's business, accounting and financial status and outlook.  As detailed in ¶¶55-59, 63-66, 68, 72, 76, 80-85, 88-92, 94-95, 97-99, 101-05 108-12, 114, 118-27, 132-37, 141-46, 151, 153-59, 163, 171, 173-78, 181-87, and 191-95. Walter prepared and signed the Company's SEC filings, issued statements in press releases and led the Company's conference calls with analysts and investors, representing himself as one of the primary persons with knowledge about Cardinal's business, financial reports and outlook and business practices.

31.     In conjunction with each of Cardinal's public financial statements filed with the SEC beginning with the Company's September 30, 2002 Form 10-K for FY 2002, Walter signed a certification pursuant to §302 of the Sarbanes-Oxley Act, attesting that he reviewed the contents of the filing to confirm the "report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."  To assure that the certification was not simply a hollow gesture, Walter was required to and did further confirm that he, along with defendant Miller, was responsible for establishing and maintaining Cardinal's disclosure controls and procedures, had designed such controls to assure that material information relating to Cardinal's business was promptly made known to Walter and the Company's senior executives and had routinely evaluated the effectiveness of the Company's policies with regard to assuring that he and other executives were made aware of material information.  At no time during the Class Period did Walter or any other defendant assert that they were not aware of material aspects of Cardinal's business or finances or that the Company's disclosure controls and procedures were ineffective.

32.     During the Class Period, while in possession of material, undisclosed information about Cardinal's accounting fraud and false financial statements, Walter sold 593,910 shares of his

personal Cardinal stock for insider trading proceeds of $38.19 million. Walter's stock sales were not part of any pre-established trading plan and were dramatically out of line with Walter's pre-Class Period trading practices. Moreover, as a result of the fraudulent scheme, defendant Walter rewarded himself with bonuses and option awards worth more than $132 million and, placed his son, Matthew Walter, on the Company's Board of Directors and Compensation Committee in 2002. Matthew Walter sold 120,000 shares for insider trading proceeds of $7.44 million during the Class Period.

33. Defendant George L. Fotiades ("Fotiades"), during the Class Period, served as the President and Chief Executive Officer of the Company's Life Science Products and Services division, overseeing Cardinal's Pharmaceutical Technologies and Services segment, until February 2004 when he was promoted to Executive Vice President and Chief Operating Officer of Cardinal. In that capacity, he oversaw the day-to-day operations for all Cardinal business segments. Throughout the Class Period, Fotiades was also a member of the executive Operating Committee, led by defendant Walter, which met monthly to discuss Cardinal's business, operations and finance.

34. As part of the duties of his senior positions at Cardinal, Fotiades was responsible for directing the Company's finances and business affairs, including the revenue and growth figures and outlook for the Company's primary Pharmaceutical Distribution business segment. Throughout the Class Period, Fotiades participated in the issuance of false and misleading statements and failed to disclose material information about Cardinal's business, accounting and financial status and outlook. As detailed in ¶¶55-59, 63-66, 68, 72-73, 76, 80-82, 84-85, 88-91, 94-95, 97, 99, 101, 104-05, 108-12, 114, 118, 120, 124-26, 132, 134-36, 141-45, 151, 153-58, 163, 165-66, 171, 173, 175-77, 181, 183-85, 187 and 191. Fotiades participated in the preparation of the Company's SEC filings and press releases, and participated in the Company's conference calls with analysts and investors, representing himself as one of the primary persons with knowledge about Cardinal's pharmaceutical distribution business, financial reports and outlook and business practices.

35.     During the Class Period, while he was in possession of material, undisclosed information about Cardinal's accounting fraud and false financial statements, Fotiades sold 65,960 shares of his personal Cardinal stock for insider trading proceeds of $4.68 million. Fotiades' stock sales were not part of any pre-established trading plan and were dramatically out of line with his pre-Class Period trading practices. Moreover, as a result of the fraudulent scheme, Fotiades obtained bonuses and option awards worth more than $46 million.

36.     Defendant Richard J. Miller ("Miller") served as Cardinal's Executive Vice President, Chief Financial Officer and Principal Accounting Officer from March 1999 through July 2004. Prior to that, Miller served as the Company's acting Chief Financial Officer since August 1998, and as a Controller and Vice President from August 1995 through March 1999. Before joining Cardinal, Miller was a partner with Deloitte & Touche with over 13 years of financial and accounting experience. Miller is a certified public accountant and holds a bachelor's degree in accounting from Ohio State University.

37.     As part of the duties of his position at Cardinal, Miller participated in the issuance of false and misleading statements and failed to disclose material information about Cardinal's business, accounting and financial status and outlook. As detailed in ¶¶55-59, 63-66, 68, 72-76, 80-85, 88-92, 94-95, 97-99, 101-05, 108-12, 114, 118-27, 132-37, 141-46, 151, 153-59, 163-67, 173-78, 181-87 and 191-95. Miller prepared and signed the Company's SEC filings, issued statements in press releases and participated in the Company's conference calls with analysts and investors, representing himself as one of the primary persons with knowledge about Cardinal's business, financial reports and outlook and business practices.

38.     In conjunction with each of Cardinal's public financial statements filed with the SEC beginning with the Company's September 30, 2002 Form 10-K for FY 2002, Miller signed a certification pursuant to §302 of the Sarbanes-Oxley Act, attesting that he reviewed the contents of

the filing to confirm the "report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading." To assure that the certification was not simply a hollow gesture, Miller was required to and did further confirm that he, along with defendant Walter, was responsible for establishing and maintaining Cardinal's disclosure controls and procedures, had designed such controls to assure that material information relating to Cardinal's business was promptly made known to Miller and the Company's senior executives and had routinely evaluated the effectiveness of the Company's policies with regard to assuring that he and other executives were made aware of material information. At no time during the Class Period did Miller or any other defendant assert that they were not aware of material aspects of Cardinal's business or finances or that the Company's disclosure controls and procedures were ineffective.

39. Defendant Miller was replaced in July 2004, under pressure from external and internal investigations regarding the Cardinal accounting fraud. Upon his resignation, Miller admitted that "[c]ertain financial reporting practices and judgments that occurred during my tenure as CFO have come under scrutiny in the ongoing investigations."

40. During the Class Period, while in possession of material, undisclosed information about Cardinal's accounting fraud and false financial statements, Miller obtained incentive-based bonuses and option awards worth more than $15.14 million

41. Defendant James F. Millar ("Millar") served as the Executive Vice President and President and Chief Operating Officer of Cardinal's Pharmaceutical Distribution segment from the beginning of the Class Period through December 2002 at which time Millar was promoted to President and Chief Executive Officer of the Company's Healthcare Products segment. In February 2004, Millar was promoted again, this time to the position of Executive Director, Strategic Initiatives. In that capacity, Millar worked directly with defendants Walter and Fotiades on business

strategy related to pharmaceutical distribution and health care provider opportunities. Additionally, throughout the Class Period, Millar was a member of Cardinal's executive Operating Committee, led by defendant Walter, which met monthly to discuss the Company's business, operations and finance.

42.     During the Class Period, Millar participated in the issuance of false and misleading statements and failed to disclose material information about Cardinal's business, accounting and financial status and outlook. As detailed in ¶¶55-59, 63-66, 68, 72-74, 76, 80-85, 88-92, 94-95, 97, 99, 101, 104-05, 108-12, 114, 118-20, 122-26, 132, 134-36, 141-45, 151, 153-58, 163, 165-66, 171, 173-77, 181, 183-85, 191 and 193-94. Millar participated in the preparation of the Company's SEC filings and press releases, and participated in the Company's conference calls with analysts and investors, representing himself as one of the primary persons with knowledge about Cardinal's pharmaceutical distribution business, financial reports and outlook and business practices.

43.     During the Class Period, while he was in possession of material, undisclosed information about Cardinal's accounting fraud and false financial statements, Millar sold 86,043 shares of his personal Cardinal stock for insider trading proceeds of $5.15 million. Millar's stock sales were not part of any pre-established trading plan and were dramatically out of line with his pre-Class Period trades. Moreover, as a result of the fraudulent scheme, Millar obtained incentive-based bonuses and option awards worth more than $41.76 million.

44.     Defendant Gary Jensen ("Jensen") served as the Senior Vice President of Audit and Financial Services, Corporate Controller and Principal Accounting Officer for FY 2003 and FY 2004, throughout the Class Period and until February 2005, when he was forced to resign as a result of his involvement in the Cardinal accounting fraud.

45.     As detailed in ¶¶55-59, 63-66, 68, 72-73, 76, 80-82, 84-85, 88-91, 94-95, 97, 99, 101, 104-05, 108-09, 111-12, 114, 118, 120, 122-23, 125-26, 132, 134-36, 141, 143-45, 151, 153, 155-58, 163, 165-66, 171, 173, 175-77, 181, 183-85, 191 and 193-94. During the Class Period, Jensen

participated in the issuance of false and misleading statements and failed to disclose material information about Cardinal's business, accounting and financial status and outlook.

46.    Defendant Jensen resigned on February 4, 2005 following Cardinal's internal review in connection with investigations of the Company's accounting practices by the SEC and U.S. Attorney's Office.    Cardinal spokesman Jim Mazzola acknowledged that defendant Jensen's resignation was "tied to the audit over how the company classifies revenue from its pharmaceutical distribution business."

47.    During the Class Period, while in possession of material, undisclosed information about Cardinal's accounting fraud and false financial statements, Jensen sold 10,357 shares of his personal Cardinal stock for insider trading proceeds of $743,984.    Jensen stock sales were unusual in both timing and amount and were not part of any pre-established trading plan.

48.    Defendant Mark Parrish ("Parrish") was promoted to Chairman and Chief Executive Officer of the Company's Pharmaceutical Distribution business in August 2004.    In this role, he oversaw strategy for Cardinal's Pharmaceutical Distribution businesses and pharmacy franchising operations, including Medicine Shoppe International Inc. and Medicap Pharmacies Inc.    Prior to August 2004, Parrish served as the Executive Vice President and Group President of the Pharmaceutical Distribution business in which he was responsible for Cardinal's pharmaceutical and specialty distribution businesses and reported directly to defendant Millar.    In addition, beginning in FY 2003, Parrish was a member of Cardinal's executive Operating Committee, led by defendant Walter, which met monthly to discuss the Company's business, operations and finances.

49.    As part of the duties of his senior positions at Cardinal, Parrish was responsible for directing the Company's finances and business affairs, including the reported revenue and growth results and outlook for the Company's primary distribution business segment.    Throughout the Class Period, Parrish participated in the issuance of false and misleading statements, and failed to disclose

material information about Cardinal's business, accounting and financial status and outlook. As detailed in ¶¶55-59, 63-66, 68, 72-73, 76, 80-82, 84-85, 88-91, 94-95, 97, 99, 101, 104-05, 108-09, 111-12, 114, 118, 120, 122-23, 125-26, 132, 134-36, 141, 143-45, 151, 153, 155-58, 163, 165-66, 171, 173, 175-77, 181, 183-85, 187, 191, and 193-94. Parrish participated in the preparation of the Company's SEC filings and press releases, and participated in the Company's conference calls with analysts and investors, representing himself as one of the primary persons with knowledge about Cardinal's pharmaceutical distribution business, financial reports and outlook and business practices. During the Class Period, while in possession of material, undisclosed information about Cardinal's accounting fraud and false financial statements, Parrish sold 16,032 shares of his personal Cardinal stock for insider trading proceeds of $972,835.

50. Defendants Walter, Fotiades, Miller, Millar, Jensen and Parrish are collectively referred to herein as the "Individual Defendants." Cardinal and the Individual Defendants are collectively referred to herein as the "Cardinal Defendants."

51. By reason of their direct and substantial management position and responsibilities during the Class Period, the Individual Defendants were "control persons" of Cardinal within the meaning of §20 of the Exchange Act, 15 U.S.C. §78, and had the power and influence to control Cardinal and exercised that control to cause the Company to engage in the violations and improper practices complained of herein. Each of the Individual Defendants was directly involved in the day-to-day operations of Cardinal, including the improper accounting for and reporting of more than $26 billion in revenue for Cardinal's Pharmaceutical Distribution business.

52. As senior officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, traded on the NYSE and governed by the provisions of the federal securities laws, defendants Walter, Fotiades, Miller, Millar, Jensen and Parrish had a duty to disseminate promptly, accurate and truthful

information with respect to Cardinal's business performance, finances, accounting, growth rate and material facts that could effect valuation, growth and earnings, as well as to correct or amend any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

53. Defendant E&Y, commencing on May 8, 2002, was the outside auditor and accountant for Cardinal. E&Y has 670 offices in approximately 140 countries, including an office located at 41 South High Street, Columbus, Ohio, which is the office that performed and billed for the primary Cardinal audit and non-audit work. E&Y audited Cardinal's financial statements for the fiscal years ended June 30, 2002 and June 30, 2003, as well as reviewed the Company's interim financial reports. As detailed in ¶¶128, 168 and 367-403, E&Y falsely represented that it performed these audits in accordance with Generally Accepted Auditing Standards ("GAAS") and issued materially false and misleading unqualified audit opinions as to those financial statements during the Class Period, claiming that the financial statements were prepared and presented in accordance with Generally Accepted Accounting Principles ("GAAP").

54. Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Cardinal securities by disseminating materially false and misleading statements and concealing material adverse facts. The scheme: (a) deceived the investing public regarding Cardinal's business, accounting, finances, financial statements and the intrinsic value of Cardinal's common stock; (b) enabled Cardinal's senior executives to sell their Cardinal stock generating $49.74 million in insider trading proceeds and collect in excess of $235 million in incentive bonuses and option awards and enabled E&Y to collect

more than $25 million in fees; and (c) caused lead plaintiffs and other members of the Class to be damaged when Cardinal's share price fell as a result of defendants' fraud being revealed.

## FRAUDULENT SCHEME AND FALSE AND MISLEADING STATEMENTS

**False Statements and Omissions During FY 2001**

55.     The Class Period commences on October 24, 2000.  On that date, the Cardinal Defendants issued a news release over the *PR Newswire* in which they reported the Company's financial results for 1Q 2001, ended September 30, 2000.  The news release stated that record earnings were driven by "***strong operating revenues***," and that the Company had "again exceeded its longstanding goal of growing earnings per share by 20 percent while continuing to invest for future growth."[2]  The Cardinal Defendants reported quarterly Operating Revenues of $6.9 billion, up 20% from Operating Revenues of $5.8 billion reported for 1Q 2000.  The press release reported revenue as follows:

### FIRST QUARTER 2001

| Revenue (in millions) | September 2000 | September 1999 | % Change |
|---|---|---|---|
| Operating Revenue | $6,983.20 | $5,829.30 | 20% |
| Bulk Deliveries to Customer Warehouses | $1,751.40 | $954.40 | 84% |

56.     With respect to the Pharmaceutical Distribution business, the press release stated as follows:

> The Pharmaceutical Distribution and Provider Services segment posted record first-quarter operating earnings of $151 million, up 22 percent.  ***These strong earnings were fueled by a 22 percent increase in operating revenues to $5.3 billion - an all-time high***.

> \*          \*          \*

> Highlights

---

[2]     All emphasis added unless otherwise noted.

- *This segment produced strong revenue growth in all customer categories, with especially robust growth - up more than 40 percent - with retail chain pharmacies. This growth was fueled by higher sales to existing customers as well as contract wins in the second half of last year. While chain revenues carry a lower gross margin, costs to serve these customers are also lower, which drives operating earnings and returns for this segment*.

57.     Commenting on the overall results, defendant Walter was quoted in the press release as follows:

> This was another exceptional performance by Cardinal Health that reflects the continuing strength and diversity of our earnings as well as the effectiveness of our business strategy . . . .  We are doing exactly what we said we'd do - growing our businesses through outstanding service to our customers and investing for our future.

> As we look ahead . . . our consistent performance gives us confidence in our ability to sustain the momentum we have created over the last decade.  The strength of our balance sheet and earnings performance gives us a unique ability to invest, and so we reaffirm our 20 percent EPS growth objective.

58.     On November 13, 2000, the Cardinal Defendants filed Cardinal's quarterly report with the SEC on Form 10-Q for 1Q 2001.  The Company's Form 10-Q was signed by defendants Walter and Miller and affirmed the previously announced total Operating Revenue and financial results and stated: "Total operating revenue for the three  months ended September 30, 2000 increased 20% compared to the same period of the prior year."  The Form 10-Q for 1Q 2001 reported results as follows:

### FIRST QUARTER 2001

| Revenue (in millions) | September 2000 | September 1999 |
|---|---|---|
| Operating Revenue | $6,983.20 | $5,829.30 |
| Pharmaceutical Distribution Operating Revenue | $5,252.00 | $4,289.70 |
| Bulk Deliveries to Customer Warehouses | $1,751.40 | $954.40 |
| Earnings Per Share | $0.61 | $0.43 |

The Form 10-Q specifically stated that Bulk Deliveries consisted of the following:

> The Company reports as revenue bulk deliveries made to customers' warehouses, whereby the Company acts as an intermediary in the ordering and subsequent delivery of pharmaceutical products.

59. Additionally, and with respect to the presentation of the Company's financial results, the Cardinal Defendants confirmed:

> These condensed consolidated financial statements have been prepared in accordance with the instructions to Form 10-Q and include all of the information and disclosures required by generally accepted accounting principles for interim reporting. In the opinion of management, all adjustments necessary for a fair presentation have been included. Except as disclosed elsewhere in this Form 10-Q, all such adjustments are of a normal and recurring nature.

60. The Cardinal Defendants' statements regarding the Company's 1Q 2001 financial results were materially false and misleading when made. Defendants knew or recklessly disregarded, but failed to disclose, the following:

(a) As detailed in ¶¶285-318, during 1Q 2001 the Cardinal Defendants improperly classified bulk shipment orders filled from the Company's inventory as Operating Revenue, the key performance metric monitored by securities analysts and investors, to create the materially false and misleading impression that Cardinal's Pharmaceutical Distribution business was adapting to market changes and meeting projected growth rates. The improper classification of Bulk Deliveries revenue allowed the Cardinal Defendants to understate actual bulk sales by approximately $705 million during 1Q 2001 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amount;[3]

(b) During 1Q 2001, the Cardinal Defendants failed to disclose known trends and uncertainties by not reporting their practice of improperly classifying Bulk Deliveries revenue as Operating Revenue and thereby not disclosing Cardinal's actual financial performance and anemic Operating Revenue growth rate;

---

[3] The Cardinal Defendants have admitted that revenue manipulation occurred during FY 2001. *See* ¶___. The $705 million overstatement of Operating Revenue in FY 2001 is a conservative approximation based on the amount and percentage of the overstatement that the Cardinal Defendants have acknowledged took place in other periods during the Class Period.

(c)     As detailed in ¶¶326-30, 343-52, during 1Q 2001 the Cardinal Defendants improperly managed earnings through various accounting manipulations which allowed them to hit security analysts' earnings expectations including:

(i)     improperly accounting for Cardinal's balance sheet reserves and accrual adjustments which caused the Company's reported net income to be overstated; and

(ii)     improperly causing Cardinal to take excessive special charges (merger related and restructuring) which were not related to unusual or infrequent events.  By taking these excessive charges as special charges, defendants caused Cardinal to understate normal recurring expenses which worked to inflate the Company's operating earnings and manage the Company's earnings going forward;

(d)     As detailed in ¶¶358-61, the Company lacked adequate internal controls;

(e)     As detailed in ¶¶365-66, as a consequence of the aforementioned practices, the Company's revenues and net income were artificially inflated and reported financial results were in violation of GAAP; and

(f)     But for defendants' improper classification and reporting of zero margin bulk sales as Operating Revenue, Cardinal would have only achieved growth in its Pharmaceutical Distribution Operating Revenue of 6%, versus the 22% growth reported, and a Company-wide Operating Revenue growth of 8%, versus the 20% reported growth.

61.     Defendants' statements on and about October 24, 2000 and November 13, 2000, which were false and misleading when made, had a direct effect on Cardinal's stock price preventing greater reductions in the stock price which continued to trade at artificially inflated levels above $62.00 per share.

62.     Notwithstanding their knowledge that the statements regarding 1Q 2001 financial results were false and misleading, within weeks of the statements being made, defendants Walter and Fotiades sold 28,062 shares of Cardinal stock for insider trading proceeds exceeding $1.75 million.

63.     On January 30, 2001, the Cardinal Defendants issued a news release over the *PR Newswire* in which they reported the Company's financial results for 2Q 2001.  With respect to Cardinal's Operating Revenues, the release stated as follows:

> • ***Reflecting growing demand for Cardinal Health's unique offering, the company reported very strong operating revenues, up 24 percent to a record $7.7 billion*** in the second quarter from $6.3 billion a year ago.

> •     Revenue growth and improved productivity fueled second-quarter operating earnings, which rose 19 percent over the prior year to $364 million. Reflecting the quality and diversity of its earnings growth, the company reported record second-quarter operating earnings as a percent of sales in each of its four business segments.  The company continues to shift the mix of its business lines within each segment toward higher profitability categories.

The press release reported revenue as follows:

### SECOND QUARTER 2001

| Revenue (in millions) | December 2000 | December 1999 | % Change |
|---|---|---|---|
| Operating Revenue | $7,745.10 | $6,254.30 | 24% |
| Bulk Deliveries to Customer Warehouses | $1,892.80 | $1,145.20 | 65% |

64.     With respect to the Pharmaceutical Distribution business, the press release stated as follows:

> Aided by growth from new contracts and strong vendor margins, the Pharmaceutical Distribution and Provider Services segment posted record second-quarter operating earnings of $175 million, up 29 percent.  ***These exceptional earnings, which reflect a full allocation of corporate expenses, were fueled by a 28-percent increase in operating revenues to $5.9 billion - an all-time high***. Operating margin expanded in the second quarter to 2.97 percent from 2.93 percent the prior quarter.

65.     In the release, defendant Walter stated: "'This was another outstanding quarter for Cardinal Health with strong growth across the company, especially in our pharmaceutical distribution and provider services business.'"  Walter also affirmed the Company's 20% annual

growth guidance, stating: "'We reaffirm our long-term objective of growing annual earnings per share by 20 percent or more, along with improving our returns on invested capital and increasing our commitment to invest in our businesses.'"

66.     On February 14, 2001, the Cardinal Defendants filed Cardinal's quarterly report with the SEC on Form 10-Q for 2Q 2001.  The Company's Form 10-Q was signed by defendants Walter and Miller and affirmed the previously announced financial results.  Additionally, the 2Q 2001 Form 10-Q again stated that all revenue derived from "bulk deliveries made to customers' warehouses," whereby the Company "acts as an intermediary in the ordering and subsequent delivery of pharmaceutical products" was reported as "Bulk Deliveries."  The Form 10-Q also repeated defendants' assurance that "[t]hese condensed consolidated financial statements have been prepared in accordance with the instructions to Form 10-Q and include all of the information and disclosures required by generally accepted accounting principles for interim reporting."  The Form 10-Q for 2Q 2001 reported results as follows:

### SECOND QUARTER 2001

| Revenue (in millions) | December 2000 | December 1999 |
|---|---|---|
| Operating Revenue | $7,745.10 | $6,254.30 |
| Pharmaceutical Distribution Operating Revenue | $5,885.30 | $4,607.90 |
| Bulk Deliveries to Customer Warehouses | $1,892.80 | $1,145.20 |
| Earnings Per Share | $0.73 | $0.61 |

67.     On February 15, 2001, while Cardinal stock was trading at artificially inflated prices, the Cardinal Defendants issued 23.1 million shares of Company stock, with an inflated value of $2.2 billion, to acquire Bindley Western Industries, Inc.

68.     On February 27, 2001, Cardinal announced a 3-for-2 stock split payable on April 20, 2001 to shareholders of record on April 5, 2001.  The press release also stated that the Company's financial results, restated for the merger with Bindley Western which closed February 14, 2001, were available and, with the incorporated changes, Cardinal's Pharmaceutical Distribution business

increased operating revenue by 32% for 2Q 2001. The release also stated that the Pharmaceutical Distribution business would achieve 20% revenue growth in FY 2001.

69. The Cardinal Defendants' statements regarding the Company's 2Q 2001 financial results and FY 2001 revenue growth were materially false and misleading when made. Defendants knew or recklessly disregarded, but failed to disclose, the following:

(a) As detailed in ¶¶285-318, during 2Q 2001 the Cardinal Defendants improperly classified bulk shipment orders filled from the Company's inventory as Operating Revenue, the key performance metric monitored by securities analysts and investors, to create the materially false and misleading impression that Cardinal's Pharmaceutical Distribution business was adapting to market changes and meeting projected growth rates. The improper classification of Bulk Deliveries revenue allowed the Cardinal Defendants to understate actual bulk sales by approximately $705 million during 2Q 2001 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amount;

(b) During 2Q 2001, the Cardinal Defendants failed to disclose known trends and uncertainties by not reporting their practice of improperly classifying Bulk Deliveries revenue as Operating Revenue and thereby not disclosing Cardinal's actual financial performance and anemic Operating Revenue growth rate;

(c) As detailed in ¶¶320-30, 343-52, during 2Q 2001 the Cardinal Defendants improperly managed earnings through various accounting manipulations which allowed them to hit security analysts' earnings expectations including:

(i) prematurely recording $10 million in expected proceeds from a lawsuit involving antitrust claims related to vitamin pricing before a settlement in the litigation had been reached. But for the Cardinal Defendants' premature revenue recognition, the Company would have fallen $0.02 per share short of Wall Street analysts' earnings targets in 2Q 2001;

(ii) improperly accounting for Cardinal's balance sheet reserves and accrual adjustments which caused the Company's reported net income to be overstated; and

(iii) improperly causing Cardinal to take excessive special charges (merger related and restructuring) which were not related to unusual or infrequent events. By taking these excessive charges as special charges, defendants caused Cardinal to understate normal recurring expenses which worked to inflate the Company's operating earnings and manage the Company's earnings going forward;

(d) As detailed in ¶¶358-361, the Company lacked adequate internal controls;

(e) As detailed in ¶¶365-66, as a consequence of the aforementioned practices, the Company's revenues and net income were artificially inflated and reported financial results were in violation of GAAP; and

(f) But for defendants' improper classification and reporting of zero margin bulk sales as Operating Revenue, Cardinal would have only achieved growth in its Pharmaceutical Distribution Operating Revenue of 12%, versus the 28% growth reported, and a Company-wide Operating Revenue growth of 13%, versus the 24% reported growth.

70. Defendants' statements on and about January 30, 2001 and February 12, 2001, which were false and misleading when made, had a direct effect on Cardinal's stock price which continued to trade at artificially inflated levels above $66.00 per share.

71. Notwithstanding their knowledge that the statements regarding 2Q 2001 financial results and FY 2001 revenue growth were false and misleading, within weeks of the statements being made, defendants Walter and Millar sold 93,000 shares of Cardinal stock for insider trading proceeds exceeding $6.2 million.

72.     On April 26, 2001, the Cardinal Defendants issued a news release over the *PR Newswire* in which they reported the Company's financial results for 3Q 2001. The release stated, in pertinent part, as follows:

> • ***Increasing demand for Cardinal's pharmaceutical distribution and medical-surgical products and services fueled a 35 percent increase in operating revenues to a record $10.3 billion in the third quarter from $7.7 billion a year ago***.

> • Revenue growth and improved productivity in the third quarter drove higher operating earnings, which rose 19 percent over the prior year to a record $436 million. This strong performance includes continued planned increases in investment spending for research and development and other activities that support future earnings growth.

The press release reported revenue as follows:

**THIRD QUARTER 2001**

| Revenue (in millions) | March 2001 | March 2000 | % Change |
|---|---|---|---|
| Operating Revenue | $10,334.20 | $7,665.90 | 35% |
| Bulk Deliveries to Customer Warehouses | $2,245.90 | $1,945.60 | 15% |

73.     Commenting on the overall results, defendant Walter stated:

> This was another outstanding quarter for Cardinal Health, with exceptional growth in our two largest business segments - Pharmaceutical Distribution and Provider Services, and Medical-Surgical Products and Services which together represent 96 percent of our operating revenues and 80 percent of our operating earnings.

The release also provided with regard to the Pharmaceutical Distribution business:

> ***This segment dramatically outpaced the growth of the pharmaceutical industry overall, posting record operating revenues in the third quarter of $8.4 billion, a 39 percent increase that is entirely internal growth***.

74.     The same day, April 26, 2001, defendants hosted a conference call with analysts and investors to discuss Cardinal's business operations and prospects and 3Q 2001 financial results. The call repeated and addressed information previously made public in the Cardinal Defendants' April 26, 2001 press release. Defendants Walter, Miller and Millar participated on the call and had an opportunity to address analysts and investors' questions and concerns.

75. On April 26, 2001 immediately following the release of Cardinal's 3Q 2001 results, a *Dow Jones Newswire* article titled "Healthcare Earnings Reflect Robust Pharmaceuticals Mkt," quoted defendant Walter:

> "***I can't remember an internal growth rate even remotely as high, at any time in the company's history***." He said the company is "optimistic" about the future, and expects to meet its long-term goal of growing annual earnings at a rate of 20% per year.
>
> Walter said strong growth in drug distribution came from existing customers, including some new initiatives that added business from retail chains such as Walgreen Co. (WAG) and CVS Corp. (CVS), and from new customers.

76. On May 10, 2001, the Cardinal Defendants filed Cardinal's quarterly report with the SEC on Form 10-Q for 3Q 2001. The Company's Form 10-Q was signed by defendants Walter and Miller and affirmed the previously announced financial results. Additionally, the 3Q 2001 Form 10-Q again stated that all revenue derived from "bulk deliveries made to customers' warehouses," whereby the Company "acts as an intermediary in the ordering and subsequent delivery of pharmaceutical products" was reported as "Bulk Deliveries." The Form 10-Q also repeated defendants' assurance that "[t]hese condensed consolidated financial statements have been prepared in accordance with the instructions to Form 10-Q and include all of the information and disclosures required by generally accepted accounting principles for interim reporting." The Form 10-Q for 3Q 2001 reported results as follows:

### THIRD QUARTER 2001

| Revenue (in millions) | March 2001 | March 2000 |
|---|---|---|
| Operating Revenue | $10,334.20 | $7,665.90 |
| Pharmaceutical Distribution Operating Revenue | $8,447.90 | $6,097.80 |
| Bulk Deliveries to Customer Warehouses | $2,245.90 | $1,945.60 |
| Earnings Per Share | $0.42 | $0.44 |

77. The Cardinal Defendants' statements regarding the Company's Operating Revenue growth rate, business success and 3Q 2001 financial results were materially false and misleading when made. Defendants knew or recklessly disregarded, but failed to disclose, the following:

(a)     As detailed in ¶¶285-318, during 3Q 2001 the Cardinal Defendants improperly classified bulk shipment orders filled from the Company's inventory as Operating Revenue, the key performance metric monitored by securities analysts and investors, to create the materially false and misleading impression that Cardinal's Pharmaceutical Distribution business was adapting to market changes and meeting projected growth rates. The improper classification of Bulk Deliveries revenue allowed the Cardinal Defendants to understate actual bulk sales by approximately $705 million during 3Q 2001 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amount;

(b)     During 3Q 2001, the Cardinal Defendants failed to disclose known trends and uncertainties by not reporting their practice of improperly classifying Bulk Deliveries revenue as Operating Revenue and thereby not disclosing Cardinal's actual financial performance and anemic Operating Revenue growth rate;

(c)     As detailed in ¶¶326-30, 343-52, during 3Q 2001 the Cardinal Defendants improperly managed earnings through various accounting manipulations which allowed them to hit security analysts' earnings expectations including:

(i)     improperly accounting for Cardinal's balance sheet reserves and accrual adjustments which caused the Company's reported net income to be overstated; and

(ii)     improperly causing Cardinal to take excessive special charges (merger related and restructuring) which were not related to unusual or infrequent events. By taking these excessive charges as special charges, defendants caused Cardinal to understate normal recurring expenses which worked to inflate the Company's operating earnings and manage the Company's earnings going forward;

(d)     As detailed in ¶¶358-61, the Company lacked adequate internal controls;

(e)     As detailed in ¶¶365-66, as a consequence of the aforementioned practices, the Company's revenues and net income were artificially inflated and reported financial results were in violation of GAAP; and

(f)     But for defendants' improper classification and reporting of zero margin bulk sales as Operating Revenue, Cardinal would have only achieved growth in its Pharmaceutical Distribution Operating Revenue of 27%, versus the 39% growth reported, and a Company-wide Operating Revenue growth of 26%, versus the 35% reported growth.

78.     Defendants' statements on and about April 26, 2001 and May 10, 2001, which were false and misleading when made, had a direct effect on Cardinal's stock price which rose $3.73 per share from the close on April 25, 2001 to the close on May 11, 2001.

79.     Notwithstanding their knowledge that the statements regarding 3Q 2001 financial results and Cardinal's business success were false and misleading, within weeks of the statements being made, defendants Walter, Millar and Fotiades rushed to unload 101,305 shares of Cardinal stock for insider trading proceeds exceeding $6.86 million.

80.     On July 31, 2001 the Cardinal Defendants issued a news release over the *PR Newswire* in which they reported the Company's financial results for 4Q and FY 2001. The release stated, in pertinent part, as follows:

> Cardinal Health, Inc., a leading provider of products and services supporting the health-care industry, today reported ***record revenues***, earnings, operating cash flow, and return on committed capital for its fourth quarter and fiscal year ending June 30, 2001. The company's performance was driven by strong growth in sales and operating earnings, rising returns on sales, and strong cash flow in each of its four business segments.
>
> *            *            *
>
> •     Net earnings rose 24 percent to a record $265 million from $214 million in the year-earlier period. Earnings per diluted share in the fourth quarter rose 21 percent to a record $0.58 from $0.48 a year ago.

- Operating earnings rose 20 percent to a record $445 million from $370 million a year ago. This growth was driven by strong performances in each of the company's four business segments.

- ***Operating revenues, the main driver in the company's improved operating earnings, increased 27 percent in the fourth quarter to a record $10.3 billion from $8.1 billion in the year-earlier period.***

The press release reported revenue as follows:

**FOURTH QUARTER 2001**

| Revenue (in millions) | June 2001 | June 2000 | % Change |
|---|---|---|---|
| Operating Revenue | $10,254.30 | $8,085.70 | 27% |
| Bulk Deliveries to Customer Warehouses | $2,146.70 | $2,449.40 | (12)% |

81.    With respect to FY 2001, the release stated as follows:

**Financial Highlights -  Fiscal Year**

The strong fourth-quarter performance capped a fiscal year that set all-time company records for revenues, earnings, return on committed capital, return on equity, and cash flow.  At the same time, Cardinal Health continued to make increasing investments to support its future growth.

- Net earnings rose 23 percent to a record $943 million from $768 million in the prior year.  Earnings per diluted share for the year rose 21 percent to a record $2.07 from $1.71 a year ago.

- ***Operating revenues reached a record $38.7 billion, a 28 percent increase from the $30.3 billion in the prior year.***

The press release reported FY 2001 revenue as follows:

**YEAR-TO-DATE**

| Revenue (in millions) | June 2001 | June 2000 | % Change |
|---|---|---|---|
| Operating Revenue | $38,660.10 | $30,257.80 | 28% |
| Bulk Deliveries to Customer Warehouses | $9,287.50 | $8,092.10 | 15% |

82.    In addition, the Cardinal Defendants' July 31, 2001 press release reported $31.2 billion in FY 2001 Operating Revenue for the Pharmaceutical Distribution business.

83.    The same day, July 31, 2001, defendants hosted a conference call with analysts and investors to discuss Cardinal's business operations and prospects and 4Q and FY 2001 financial results.  The call repeated and addressed information previously made public in the Cardinal Defendants' July 31, 2001 press release.  Defendants Walter, Miller and Millar participated on the

call and had an opportunity to address analysts and investors' questions and concerns. During the call, defendant Walter stated: "The fourth quarter was outstanding by virtually any measure. We had strong revenue growth overall and in each segment." Defendant Miller also commented: "Pharmaceutical Distribution and Provider Services segment continues to deliver outstanding results, growing revenue at 27% [and] setting new records."

84.     On August 24, 2001, the Cardinal Defendants filed Cardinal's annual report with the SEC on Form 10-K for 4Q and FY 2001. The Company's Form 10-K was signed by defendants Walter and Miller and affirmed the Company's previously announced financial results. Additionally, the FY 2001 Form 10-K again stated that all revenue derived from "bulk deliveries made to customers' warehouses," whereby the Company acts "as an intermediary in the ordering and subsequent delivery of pharmaceutical products" was reported as "Bulk Deliveries." The Form 10-K also repeated defendants' assurance that "[t]hese condensed consolidated financial statements have been prepared in accordance with the instructions to Form 10-K and include all of the information and disclosures required by generally accepted accounting principles for interim reporting." The Form 10-K reported revenue for 4Q 2001 as follows:

**FOURTH QUARTER 2001**

| Revenue (in millions) | June 2001 | June 2000 |
|---|---|---|
| Operating Revenue | $10,254.30 | $8,085.70 |
| Pharmaceutical Distribution Operating Revenue | $8,257.00 | - - |
| Bulk Deliveries to Customer Warehouses | $2,146.70 | $2,449.40 |
| Earnings Per Share | $0.55 | $0.46 |

85.     With respect to revenues and earnings, the Form 10-K presented the following information regarding Cardinal's results:

At or For the Fiscal Year Ended June 30,

| EARNINGS DATA Revenue (in millions) | 2001 | 2000 | 1999[4] | 1998[4] | 1997 |
|---|---|---|---|---|---|
| Operating revenue | $38,660.10 | $30,257.80 | $25,682.50 | $20,844.80 | $ 18,123.20 |
| Pharmaceutical Distribution Operating Revenue | $31,185.80 | $23,849.60 | $19,606.20 | | |
| Bulk deliveries to Customer warehouse | $9,287.50 | $8,092.10 | $7,050.40 | $7,541.10 | $5,659.30 |
| Earnings Per Share | $1.88 | $1.60 | $1.12 | $1.07 | $0.85 |

86. The Cardinal Defendants' statements regarding the Company's 4Q and FY 2001 financial results were materially false and misleading when made. Defendants knew or recklessly disregarded, but failed to disclose, the following:

(a) As detailed in ¶¶285-318, during 4Q 2001 and throughout FY 2001 the Cardinal Defendants improperly classified bulk shipment orders filled from the Company's inventory as Operating Revenue, the key performance metric monitored by securities analysts and investors, to create the materially false and misleading impression that Cardinal's Pharmaceutical Distribution business was adapting to market changes and meeting projected growth rates. The improper classification of Bulk Deliveries revenue allowed the Cardinal Defendants to understate actual bulk sales by approximately $705 million during 4Q 2001 and $2.82 billion for FY 2001 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amounts;

(b) During 4Q 2001, the Cardinal Defendants failed to disclose known trends and uncertainties by not reporting their practice of improperly classifying Bulk Deliveries revenue as Operating Revenue and thereby not disclosing Cardinal's actual financial performance and anemic Operating Revenue growth rate;

---

[4]       Amounts do not reflect the impact of pro forma adjustments related to ALP taxes.

(c)　　As detailed in ¶¶319-24, 325-29, 342-51, the Cardinal Defendants improperly managed earnings through various accounting manipulations which allowed them to hit security analysts' earnings expectations including:

(i)　　prematurely recording $10 million in expected proceeds from a lawsuit involving antitrust claims related to vitamin pricing before a settlement in the litigation had been reached;

(ii)　　improperly accounting for Cardinal's balance sheet reserves and accrual adjustments which caused the Company's reported net income to be overstated by $27.1 million, which, in turn, resulted in EPS being overstated by $0.06; and

(iii)　　improperly causing Cardinal to take excessive special charges (merger related and restructuring) which were not related to unusual or infrequent events. By taking these excessive charges as special charges, defendants caused Cardinal to understate normal recurring expenses which worked to inflate the Company's operating earnings and manage the Company's earnings going forward;

(d)　　As detailed in ¶¶358-61, the Company lacked adequate internal controls;

(e)　　As detailed in ¶¶365-66, as a consequence of the aforementioned practices, the Company's revenues and net income were artificially inflated and reported financial results were in violation of GAAP; and

(f)　　But for defendants' improper classification and reporting of zero margin bulk sales as Operating Revenue, Cardinal would have only achieved growth in its Pharmaceutical Distribution Operating Revenue of 17%, versus the 28% growth reported, and a Company-wide Operating Revenue growth of 18%, versus the 27% reported growth.

87.     Defendants' statements on and about July 31, 2001, August 16, 2001 and August 24, 2001, which were false and misleading when made, had a direct effect on Cardinal's stock price which continued to trade at artificially inflated levels above $74.00 per share.

**False Statements and Omissions During FY 2002**

88.     On August 16, 2001, the Cardinal Defendants issued a news release over the *PR Newswire* announcing that the Company was hosting its annual Investor Day Conference in New York City.  During the Investor Day Conference, the Cardinal Defendants made presentations covering each of the Company's business segments and provided revenue and earnings guidance that the Company's Pharmaceutical Distribution business would achieve 20% Operating Revenue growth and overall EPS growth of 20%.

89.     On August 17, 2001, following the Investor Day Conference, WR Hambrecht & Co. ("Hambrecht") analyst Sean Wieland issued a report based on defendants' statements which provided:

CAH: CARDINAL BOASTS ENCOURAGING OUTLOOK AT INVESTOR DAY

•     **Cardinal Investor Day oozes exuberance.** Cardinal's management team exhibited enthusiasm for the future prospects of the company at its Analyst Day in New York held on Thursday, August 16, 2001.  Key managers from all divisions spoke positively about the future prospects for the company, as well as reviewed key past milestones

•     **The guidance calls for momentum to continue.** Dick Miller, CFO, indicated that Cardinal's superior growth rate should continue into 2002 and beyond, calling for revenues in the range of $45 billion in 2002, and indicating comfort with consensus earnings of $2.52 per share, before goodwill adjustments.  The company also reiterated its goal to surpass 30% return on committed capital.

•     **Each division is calling for close to 20% revenue growth.** According to the company, growth will stem from overall expansion of pharmaceutical utilization, new product lines, facility expansion, and international expansion.  The company stated that they expect to invest $100 million in capital investments in fiscal year 2002.

(Emphasis in original.)

90.     On August 20, 2001, Credit Suisse/First Boston ("CSFB") issued an analyst report by

Robert M. Willoughby repeating statements made by the Cardinal Defendants at the Company's

Investor Day Conference:

> For the drug distribution business, CAH reiterated its plan to grow 20% in fiscal
> 2002, nearly 1.5 times the 12-13% growth rate for the pharmaceutical industry.

91.     On October 23, 2001, the Cardinal Defendants issued a news release over the *PR*

*Newswire* in which they reported Cardinal's financial results for 1Q 2002.  The release stated, in

pertinent part, as follows:

> Cardinal Health, Inc., a leading provider of products and services supporting the
> health-care industry, today reported another strong quarter, posting records in four
> key financial measures -  revenues, earnings, and returns on sales and committed
> capital -  for its fiscal 2002 first quarter ended September 30, 2001.  The company
> grew net earnings by 30 percent before special items to $254 million on $9.9 billion
> of operating revenues, up 16 percent from the year-ago quarter.

> "***This was another record-setting quarter for Cardinal Health***," said Robert
> D. Walter, chairman and chief executive officer.  "It demonstrates the strength and
> diversity of our portfolio, the continued strong demand for our products and services
> and the attractiveness of our industry and our position in it.  Our financial formula
> continues to deliver.  We achieve excellent growth at the top line and accelerate that
> growth at the operating earnings and net earnings levels through disciplined financial
> management and strategic focus on profitable growth."

> *        *        *

> •       ***Operating revenues, a key driver of the company's improved***
> ***operating earnings, increased 16 percent to a first-quarter record $9.9 billion from***
> ***$8.5 billion in the year-earlier period***.

> Pharmaceutical Distribution and Provider Services

> The Pharmaceutical Distribution and Provider Services segment, which
> represents 51 percent of Cardinal's operating earnings, recorded another outstanding
> quarter, with first-quarter records in revenues, operating earnings and returns on sales
> and committed capital.  ***Total revenues in this segment grew 17 percent to $8.0***
> ***billion.  Revenues from the pharmaceutical-distribution portion of the segment***
> ***grew 19 percent and continued to outpace the industry in all customer categories,***
> ***led by strong gains with chain stores and health systems.  The balance of the***
> ***segment, made up of specialty distribution and a range of provider services, grew***
> ***revenues 9 percent over prior year***.

The press release reported revenue as follows:

**FIRST QUARTER 2002**

| Revenue (in millions) | September 2001 | September 2000 | % Change |
|---|---|---|---|
| Operating Revenue | $9,865.40 | $8,510.90 | 16.00% |
| Bulk Deliveries to Customer Warehouses | $1,908.00 | $2,529.00 | (25.00)% |

92.     The same day, October 23, 2001, defendants hosted a conference call with analysts and investors to discuss Cardinal's business operations and prospects and 1Q 2002 financial results. The call repeated and addressed information previously made public in the Cardinal Defendants' October 23, 2001 press release. Defendants Walter, Miller and Millar participated on the call and had an opportunity to address analysts and investors' questions and concerns. During the call, defendant Miller stated: "Once again we posted another great quarter with revenue growth of 16% . . . . Our Pharmaceutical Distribution and Provider Services segment continues to deliver strong results with record performances in virtually every area."

93.     After the Company's October 23, 2001 earnings announcement and conference call, securities analysts following the Company, including analysts from Morgan Stanley, USBancorp/Piper Jaffray ("USB"), Hambrecht, UBS Warburg, Jefferies, CSFB, Salomon Smith Barney and PNC Advisors, all noted that Cardinal's stock price dropped because the Company announced a 17% revenue growth rate for the Pharmaceutical Distribution business, short of defendants' FY 2002 guidance of 18-22% growth. These analysts also noted that the 17% revenue growth for the Pharmaceutical Distribution business was down from 23% revenue growth the Company announced in 1Q 2001. As a result of slightly missing the projected Operating Revenue growth rate, Cardinal's stock dropped 17% from $76.60 on October 22, 2001 to $63.90 on November 8, 2001. Defendants' statements on and about October 23, 2001, which were false and misleading when made, had a direct effect on Cardinal's stock price, preventing greater reductions in the stock price which continued to trade at artificially inflated levels.

94.     On November 14, 2001, the Cardinal Defendants filed Cardinal's quarterly report with the SEC on Form 10-Q for 1Q 2002. The Company's Form 10-Q was signed by defendants Walter and Miller and affirmed the previously announced financial results. In addition, the Form 10-Q included:

> *Total operating revenue for the three months ended September 30, 2001 increased 16% compared to the same period of the prior year*. The increase in operating revenue resulted from a higher sales volume to existing customers; pharmaceutical price increases; acquisitions; and addition of new customers, some of which was a result of cross-selling opportunities among the various businesses.

The Form 10-Q for 1Q 2002 reported results as follows:

### FIRST QUARTER 2002

| Revenue (in millions) | September 2001 | September 2000 |
|---|---:|---:|
| Operating Revenue | $9,865.40 | $8,510.90 |
| Pharmaceutical Distribution Operating Revenue | $7,960.70 | $6,779.70 |
| Bulk Deliveries to Customer Warehouses | $1,908.00 | $2,529.00 |
| Earnings Per Share | $0.38 | $0.42 |

95.     Additionally, the 1Q 2002 Form 10-Q again stated that all revenue derived from "bulk deliveries made to customers' warehouses," whereby the Company "acts as an intermediary in the ordering and subsequent delivery of pharmaceutical products" was reported as "Bulk Deliveries." The Form 10-Q also repeated defendants' assurance that "[t]hese condensed consolidated financial statements have been prepared in accordance with the instructions to Form 10-Q and include all of the information and disclosures required by generally accepted accounting principles for interim reporting."

96.     The Cardinal Defendants' statements regarding actual and projected Operating Revenue growth, business success and 1Q 2002 financial results were materially false and misleading when made. Defendants knew or recklessly disregarded, but failed to disclose, the following:

(a)     As detailed in ¶¶285-318, during 1Q 2002 the Cardinal Defendants improperly classified bulk shipment orders filled from Cardinal's own inventory as Operating

Revenue, the key performance metric monitored by securities analysts and investors, to create the materially false and misleading impression that Cardinal's Pharmaceutical Distribution business was adapting to market changes and meeting projected growth rates. The improper classification of Bulk Deliveries revenue allowed the Cardinal Defendants to understate actual bulk sales by $1.4 billion during 1Q 2002 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amount.[5]

(b) During 1Q 2002 the Cardinal Defendants failed to disclose known trends and uncertainties by not reporting their practice of improperly classifying Bulk Deliveries revenue as Operating Revenue and thereby not disclosing Cardinal's actual financial performance, failure to meet revenue growth projections and the Company's inability to adjust to changes in the distribution market;

(c) As detailed in ¶¶320-52, the Cardinal Defendants improperly managed earnings through various accounting manipulations which allowed them to hit security analysts' earnings expectations, including:

(i) prematurely recording $12 million in expected proceeds from a lawsuit involving antitrust claims related to vitamin pricing before a settlement in the litigation had been reached. But for the Cardinal Defendants' premature revenue recognition, the Company would have fallen $0.02 per share short of Wall Street analysts' earnings targets in 1Q 2002;

(ii) improperly accounting for Cardinal's balance sheet reserves and accrual adjustments which caused the Company's reported net income to be overstated by $3.1 million which, in turn, resulted in EPS being overstated by $0.01;

---

[5] The quarterly overstatement of Operating Revenue based on bulk sales filled from Cardinal's inventory is based on an even quarterly breakdown of the total bulk-in-stock overstatement the Cardinal Defendants have acknowledged took place during the Class Period.

(iii) improperly recognizing cash discounts on pharmaceutical purchases before the drugs were resold and failing to disclose when the Company was using these discounts to reduce the costs of goods sold;

(iv) fraudulently recognizing revenue on contracts from Cardinal's Automation and Information Services business related to the Pyxis subsidiary in violation of GAAP and the Company's own publicly expressed policy not to recognize revenue on such contracts until the equipment sold under the contracts was installed; and

(v) improperly causing Cardinal to take excessive special charges (merger related and restructuring) which were not related to unusual or infrequent events. By taking these excessive charges as special charges, defendants caused Cardinal to understate normal recurring expenses which worked to inflate the Company's operating earnings and manage the Company's earnings going forward;

(d) As detailed in ¶¶353-57, the Cardinal Defendants improperly accounted for the securitization of receivables from Cardinal's Pyxis subsidiary as an off-balance sheet transaction which resulted in the Company understating liabilities by $150 million;

(e) As detailed in ¶¶358-61, the Company lacked adequate internal controls;

(f) As detailed in ¶¶365-66, as a consequence of the aforementioned practices, the Company's revenues and net income were artificially inflated and reported financial results were in violation of GAAP; and

(g) But for defendants' improper classification and reporting of zero margin bulk sales as Operating Revenue, Cardinal would have been forced to disclose a decline in its Pharmaceutical Distribution Operating Revenue of 3%, versus the 17% growth reported, and a Company-wide Operating Revenue decline of 1%, versus the 16% reported growth.

97.     On January 22, 2002, the Cardinal Defendants issued a news release over the *PR Newswire* titled "Net Earnings Up 29%, EPS Rises 28% Before Special Items, Propelled by Growth in Revenues to Record $11.2 Billion" in which they reported Cardinal's financial results for 2Q 2002. The release stated, in pertinent part, as follows:

> Cardinal Health, Inc., a leading provider of products and services supporting the health-care industry, today reported record revenues, earnings and returns on sales and committed capital on strong, balanced performance across each of its four health-care business segments in the company's fiscal 2002 second quarter, which ended December 31, 2001.
>
> Diluted earnings per share before special items rose 28 percent to $0.64 versus the prior-year quarter. ***Strong revenue growth of 17 percent to $11.2 billion*** drove operating earnings growth of 24 percent to $487 million, and net earnings up 29 percent to $294 million, before special items.
>
> "This latest record quarter re-confirms the remarkable strength of Cardinal Health's family of complementary high-growth businesses," said Robert D. Walter, chairman and chief executive officer of Cardinal Health. "These new results validate Cardinal Health's strategy to offer a broad portfolio of market-leading products and services to our health-care customers. Our financial formula is to combine strong revenue growth, disciplined expense management and accelerated investment in future opportunities. This enables us to consistently deliver robust earnings growth with rising returns on sales and capital. While all of our segments performed well in the second quarter, ***we are particularly pleased with our Pharmaceutical Distribution and Provider Services segment and our Automation and Information Services segment***."
>
> *               *               *
>
> • Operating earnings rose 20 percent to an all-time record $487 million from $406 million a year ago. This growth was driven by strong performances in each of the company's four business segments.
>
> • ***Operating revenues, a key driver of the company's improved operating earnings, increased 17 percent to an all-time record $11.2 billion from $9.6 billion in the year-earlier period. The company's largest segment, Pharmaceutical Distribution and Provider Services, led the revenue performance, growing 20 percent overall and generating 22 percent growth in its full-line pharmaceutical distribution business***.

The press release reported revenue as follows:

## SECOND QUARTER 2002

| Revenue (in millions) | December 2001 | December 2000 | % Change |
|---|---|---|---|
| Operating Revenue | $11,221.70 | $9,560.70 | 17.00% |

| Bulk Deliveries to Customer Warehouses | $1,870.40 | $2,365.90 | (21.00)% |
|---|---|---|---|

98.     The same day, January 22, 2002, defendants hosted a conference call with analysts and investors to discuss Cardinal's business operations and prospects and 2Q 2002 financial results. The call repeated and addressed information previously made public in the Cardinal Defendants' January 22, 2002 press release.  Defendants Walter and Miller participated on the call and had an opportunity to address analysts and investors' questions and concerns.  During that call, defendant Miller stated: "Strong revenue growth of 17% was led by pharmaceutical distribution with 22% growth."

99.     Following the release of 2Q 2002 results and the conclusion of the conference call with securities analysts hosted by the Cardinal Defendants on January 22, 2002, securities analysts repeated the 2Q 2002 financial results to the market.  Securities analysts following the Company, including analysts from USB, Jefferies, UBS Warburg, Morgan Stanley, J.P. Morgan, Bear Stearns and Salomon Smith Barney, emphasized that, unlike 1Q 2002 when the Company failed to achieve the Cardinal Defendants' revenue guidance, Cardinal achieved 20% Pharmaceutical Distribution Operating Revenue growth.

100.    Defendants' statements on and about January 22, 2002, which were false and misleading when made, had a direct effect on Cardinal's stock price which rose $5.24 per share after the Company's 2Q 2002 earnings announcement.

101.    In addition, certain analysts were clearly ecstatic the Company was able to return to strong growth rates and commented that the reduction in Bulk Deliveries revenue was a positive development for Cardinal and the Pharmaceutical Distribution business.  For example, on January 22, 2002, Salomon Smith Barney issued an analyst report by Glen J. Santangelo, which stated:

> CAH reported F2Q02 (Dec) EPS of $0.64, which was a penny better than consensus, and a 28% increase y/y.  All business segments reported solid results, but in our opinion the real story is rev growth in the drug business.

CAH reported 22% growth in its drug distribution business, led by its chain segment which grew sales approx. 26% and mail-order business which was up almost 30%. We attribute this to three main factors: 1) migration from dock-to-dock to direct-store business; 2) stocking inventory in new chain store openings; and 3) new customers which Cardinal has not disclosed (i.e. new regions of Kroger).

\* \* \*

**WHERE IS THE TOP-LINE GROWTH COMING FROM**?

The company reported that on top of the 22% growth in its drug distribution business, its chain segment grew approximately 26%. We believe some investors may wonder how the company is achieving this level of growth given the declining pharmacy growth coming out of the major retail chains over the last several months.

Migration from dock-to-dock to direct-store business: We believe Cardinal is picking up a grater share of direct store business to CVS and WAG, which might have been self-warehoused previously. ***We note that Cardinal's bulk deliveries in the quarter declined 21% y-o-y to $1.9 bil.*** As Cardinal migrates sales from bulk deliveries to direct store sales (operating revenues) two things happen: 1) operating revenue growth increases, and 2) gross margin decreases since the chain business carries lower gross margins. ***We believe that this explains the strong revenue growth in the quarter and also 18 bps decline in gross margin y-o-y***.

(Emphasis in original.)

102. On January 31, 2002, Cardinal hosted its mid-year Investor Day Conference in New York City. Defendants Walter, Fotiades and Miller participated in the conference and reiterated guidance that Cardinal would grow operating revenue from 16%-18%.

103. On February 1, 2002, following the Investor Day Conference analyst Raymond C. Falci issued a report based on defendants' statements which stated:

DRUG DISTRIBUTION PROFITABILITY FORECASTS INCREASE SLIGHTLY – While recent attention has wrongly been focused on CAH's drug distribution revenue, in our view, CAH raised its prior guidance of greater than 20% operating income growth to a range of 22% – 24% from this unit, driven by 1H02 performance ahead of plan, and our sense of increasing confidence in gross margin stabilization driven by better than expected forward buys, and generic margin opportunities.

\* \* \*

CAH's success at moving prior dock-to-dock business into its channel could continue in our view, based on current erratic manufacturing at many drug manufacturers which enables CAH (and all distributors) to perform the important

role of providing access to much needed inventories at times when self-warehousing chains can not get enough product to service their needs.

104.    On February 13, 2002, the Cardinal Defendants filed Cardinal's quarterly report with the SEC on Form 10-Q for 2Q 2002.  The Company's Form 10-Q was signed by defendants Walter and Miller and affirmed the previously announced financial results.  The Form 10-Q for 2Q 2002 reported results as follows:

**SECOND QUARTER 2002**

| Revenue (in millions) | December 2001 | December 2000 |
|---|---|---|
| Operating Revenue | $11,221.70 | $9,560.70 |
| Pharmaceutical Distribution Operating Revenue | $9,214.50 | $7,700.90 |
| Bulk Deliveries to Customer Warehouses | $1,870.40 | $2,365.90 |
| Earnings Per Share | $0.62 | $0.52 |

105.    Additionally, the 2Q 2002 Form 10-Q again stated that all revenue derived from "bulk deliveries made to customers' warehouses," whereby the Company "acts as an intermediary in the ordering and subsequent delivery of pharmaceutical products" was reported as "Bulk Deliveries." The Form 10-Q also repeated defendants' assurance that "[t]hese condensed consolidated financial statements have been prepared in accordance with the instructions to Form 10-Q and include all of the information and disclosures required by generally accepted accounting principles for interim reporting."

106.    The Cardinal Defendants' statements in connection with the January 31, 2002 Investor Day Conference and regarding 2Q 2002 financial results were materially false and misleading when made.  Defendants knew or recklessly disregarded, but failed to disclose, the following:

(a)    As detailed in ¶¶285-318, during 2Q 2002 the Cardinal Defendants improperly classified revenue from bulk sales as Operating Revenue, the key performance metric monitored by securities analysts and investors, to create the materially false and misleading impression that Cardinal's Pharmaceutical Distribution business was adapting to market changes and

– 49 –

meeting projected growth rates. The improper classification of Bulk Deliveries revenue allowed the Cardinal Defendants to understate actual bulk sales by $1.6 billion during 2Q 2002 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amount. The Cardinal Defendants' improper revenue classification included the following accounting manipulations:

(i)      by improperly classifying bulk shipment orders filled from Cardinal's own inventory as Operating Revenue, the Cardinal Defendants were able to and did understate actual Bulk Deliveries revenue by $1.4 billion during 2Q 2002 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amount; and

(ii)      by improperly classifying bulk shipment orders intentionally or arbitrarily held by Cardinal for more than 24 hours as Operating Revenue, the Cardinal Defendants were able to and did understate actual Bulk Deliveries revenue by $238 million during 2Q 2002 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amount;

(b)      During 2Q 2002 the Cardinal Defendants failed to disclose known trends and uncertainties by not reporting their practice of improperly classifying Bulk Deliveries revenue as Operating Revenue and thereby not disclosing Cardinal's actual financial performance, failure to meet revenue growth projections and the Company's inability to adjust to changes in the distribution market;

(c)      As detailed in ¶¶326-52, the Cardinal Defendants improperly managed earnings through various accounting manipulations which allowed them to hit security analysts' earnings expectations, including:

(i)      improperly accounting for Cardinal's balance sheet reserves and accrual adjustments which caused the Company's reported net income to be overstated by $2.7 million which, in turn, resulted in EPS being overstated by $0.01;

(ii)	improperly recognizing cash discounts on pharmaceutical purchases before the drugs were resold and failing to disclose when the Company was using these discounts to reduce the costs of goods sold;

(iii)	fraudulently recognizing revenue on contracts from Cardinal's Automation and Information Services business related to the Pyxis subsidiary in violation of GAAP and the Company's own publicly expressed policy not to recognize revenue on such contracts until the equipment sold under the contracts was installed; and

(iv)	improperly causing Cardinal to take excessive special charges (merger related and restructuring) which were not related to unusual or infrequent events.  By taking these excessive charges as special charges, the defendants caused Cardinal to understate normal recurring expenses which worked to inflate the Company's operating earnings and manage the Company's earnings going forward;

(d)	As detailed in ¶¶358-61, the Company lacked adequate internal controls;

(e)	As detailed in ¶¶365-66, as a consequence of the aforementioned practices, the Company's revenues and net income were artificially inflated and reported financial results were in violation of GAAP; and

(f)	But for defendants' improper classification and reporting of zero margin bulk sales as Operating Revenue, Cardinal would have been forced to disclose a decline in Pharmaceutical Distribution Operating Revenue of 2%, versus the 20% growth reported, and no growth in Company-wide Operating Revenue, versus the 17% reported growth.

107.	Notwithstanding their knowledge that the statements regarding 2Q 2002 financial results and Cardinal's business success were false and misleading, within days or weeks of the statements being made, defendants Walter and Millar dumped 173,831 shares of Cardinal stock for insider trading proceeds exceeding $11.43 million.

108.    On April 23, 2002, the Cardinal Defendants issued a news release titled "Cardinal

Health Reports Record Third Quarter Revenues and Earnings," over the *PR Newswire* in which they

reported Cardinal's financial results for 3Q 2002.  The release stated, in pertinent part, as follows:

> Cardinal Health, Inc. today reported record third quarter financial results reflecting exceptional profitability and productivity performance across all four of its business segments.  Diluted earnings-per-share (EPS) grew 27 percent before special items.  ***This result was driven by record revenues and improvements in gross margin, expense ratios and returns on sales and committed capital in all segments.  The company generated strong operating cash flow and increased investment spending to fund future growth***.
>
> EPS before special items, which were primarily merger related, rose 27 percent to $0.71 for the third quarter versus $0.56 last year.  ***Operating revenue grew by 12 percent to an all-time record $11.5 billion versus prior year revenue of $10.3 billion.  Operating earnings rose 22 percent to an all-time record $533 million versus prior year earnings of $436 million***.  Operating cash flow more than doubled versus the prior year to $504 million.
>
> "Cardinal Health continues to demonstrate that its balanced portfolio of high-growth health care businesses provides for sustained financial performance," said Robert D. Walter, chairman and chief executive officer of Cardinal Health.  "We are pleased with the profit expansion and productivity advances achieved in each of our segments.  The highlights for the quarter are the rising returns in all segments, strong earnings performance in Pharmaceutical Distribution and Provider Services, and robust results in Automation and Information Services.
>
> "With leading market positions in all our businesses, we remain highly confident in our ability to extend our competitive advantage in expanding markets.  ***Cardinal Health is on track to deliver fourth quarter earnings growth of 20 percent or more, which will complete our 15th consecutive year of annual EPS growth of at least 12 percent, with rising returns on sales and committed capital,"*** concluded Walter.
>
> For the first three quarters of fiscal year 2002, Cardinal Health generated exceptionally strong top-and bottom-line financial results.  ***Operating revenues increased 15 percent over prior year to $32.6 billion***.  Before special items and the cumulative effect of the change in accounting principle related to the previously announced business model changes at Pyxis, operating earnings improved 23 percent to $1.4 billion, net earnings rose 29 percent to $873 million, and earnings per diluted share increased 27 percent to $1.90.

The press release reported revenue as follows:

### THIRD QUARTER 2002

| Revenue (in millions) | March 2002 | March 2001 | % Change |
|---|---|---|---|
| Operating Revenue | $11,541.30 | $10,334.20 | 11.68% |

| | | | |
|---|---|---|---|
| Bulk Deliveries to Customer Warehouses | $1,700.70 | $2,245.90 | (24.28)% |

109.    With respect to the Pharmaceutical Distribution business, the April 23, 2002 press release stated as follows:

> *This segment, which represents 56 percent of third quarter operating earnings, posted record revenue.  Total revenues grew 13 percent to $9.5 billion driven by solid sales increases across all customer segments, including growth in mail order and government customers, and strong results in specialty distribution. The revenue growth was affected by one less billing day in the quarter, which impacted growth by approximately 2 percent, and the challenging prior year comparison.  This quarter's revenue performance follows the remarkable 39 percent revenue growth experienced in the third quarter of 2001.  The third quarter revenue growth rate compounded over the past two years has been a healthy 25 percent, which compares favorably to the two-year compounded growth rate of 23 percent in the first half of this year*.

110.    The same day, April 23, 2002, defendants hosted a conference call with analysts and investors to discuss Cardinal's business operations and prospects and 3Q 2002 financial results.  The call repeated and addressed information previously made public in the Cardinal Defendants' April 23, 2002 press release.  Defendants Walter, Miller, Fotiades and Millar participated on the call and had an opportunity to address analysts and investors' questions and concerns.  During the call, defendant Walter reported: "Cardinal Health generated [an] all-time record with revenues $11.5 billion, an increase of 12 percent over last years 35 percent top-line growth." Walter continued, "Pharmaceutical Distribution Provider Services delivered an unbelievable performance. . . . Pharmaceutical Distribution . . . set many financial records this quarter.  Total revenues were up 13 percent to an all-time $9.5 billion."  Defendant Miller also stated "[e]very segment set new records" and "revenue growth in pharmaceutical distribution . . . will pick up in the fourth quarter."

111.    On May 8, 2002, the Cardinal Defendants filed Cardinal's quarterly report with the SEC on Form 10-Q for 3Q 2002.  The Company's Form 10-Q was signed by Walter and Miller and affirmed the previously announced financial results.  The Form 10-Q for 3Q 2002 reported results as follows:

## THIRD QUARTER 2002

| Revenue (in millions) | March 2002 | March 2001 |
|---|---|---|
| Operating Revenue | $11,541.30 | $10,334.20 |
| Pharmaceutical Distribution Operating Revenue | $9,542.50 | $8,447.90 |
| Bulk Deliveries to Customer Warehouses | $1,700.70 | $2,245.90 |
| Earnings Per Share | $0.66 | $0.42 |

112.    Additionally, the 3Q 2002 Form 10-Q again stated that all revenue derived from "bulk deliveries made to customers' warehouses," whereby the Company "acts as an intermediary in the ordering and subsequent delivery of pharmaceutical products" was reported as "Bulk Deliveries." The Form 10-Q also repeated defendants' assurance that "[t]hese condensed consolidated financial statements have been prepared in accordance with the instructions to Form 10-Q and include all of the information and disclosures required by generally accepted accounting principles for interim reporting."

113.    On May 8, 2002, the Cardinal Defendants issued a press release over the *PR Newswire* announcing that defendant E&Y had replaced Arthur Andersen as Cardinal's independent outside auditors.

114.    On May 10, 2002, Salomon Smith Barney issued an analyst report by Glen J. Santangelo, based on the Company's reported financial results and statements made by the Cardinal Defendants, which stated:

### Cardinal Continues to Migrate Dock-to-Dock Revenues to Direct-to-Store Revenues

We believe Cardinal is picking up a greater share of direct store business to CVS and Walgreen, which might have been self-warehoused previously. *We note that Cardinal's bulk deliveries in the quarter declined 24% year over year to $1.7 billion, while direct-to-stores revenues increased 13% year over year. We believe this divergence in growth between dock-to-dock sales [Bulk Deliveries] and direct store sales is indicative of Cardinal's success in migrating some of its customers away from self-warehousing of pharmaceuticals. As Cardinal migrates sales from bulk deliveries to direct store sales (operating revenues), two things happen: 1) operating revenue growth increases, and 2) gross margin decreases* since the chain business carries lower gross margins. However, we note that this migration toward direct-to-stores revenues is accretive in nature as these types of revenues flow to the bottom line, while dock-to-dock revenues typically carry minimal gross margins

– 54 –

(distributors are in this business mainly for the float period between collection of the cash and the date the drugs are to be delivered).

Figure 4.  Analysis of Dock-to-Dock and Direct-to-Store Revenue Growth ($ in thousands)

|  | Dec-00 | Mar-01 | Jun-01 | Sep-01 | Dec-01 | Mar-02 |
|---|---|---|---|---|---|---|
| Direct Store Revenues | $7,701,000 | $8,448,000 | $8,257,000 | $7,961,000 | $9,215,000 | $9,542,100 |
| % change y-o-y | 32.5% | 38.5% | 28.4% | 17.4% | 19.7% | 13.0% |
| Dock-to-Dock Revenues | $2,760,841 | $2,245,900 | $2,146,700 | $1,908,000 | $1,870,400 | $1,700,700 |
| % change y-o-y | 28.8% | 18.0% | (12.4)% | (24.6)% | (32.3)% | (24.3)% |

115.    The Cardinal Defendants' statements regarding declining Bulk Deliveries revenue, 3Q 2002 financial results and 4Q 2002 projections were false and misleading when made. Defendants knew or recklessly disregarded, but failed to disclose, the following:

(a)    As detailed in ¶¶285-318, during 3Q 2002 the Cardinal Defendants improperly classified revenue from bulk sales as Operating Revenue, the key performance metric monitored by securities analysts and investors, to create the materially false and misleading impression that Cardinal's Pharmaceutical Distribution business was adapting to market changes and meeting projected growth rates.  The improper classification of Bulk Deliveries revenue allowed the Cardinal Defendants to understate actual bulk sales by $1.7 billion during 3Q 2002 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amount.  The Cardinal Defendants' improper revenue classification included the following accounting manipulations:

(i)    by improperly classifying bulk shipment orders filled from Cardinal's own inventory as Operating Revenue, the Cardinal Defendants were able to and did understate actual Bulk Deliveries revenue by $1.4 billion during 3Q 2002 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amount;

(ii)    by improperly classifying bulk shipment orders intentionally or arbitrarily held by Cardinal for more than 24 hours as Operating Revenue, the Cardinal Defendants

were able to and did understate actual Bulk Deliveries revenue by $155 million during 3Q 2002 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amount; and

(iii) by arbitrarily and improperly classifying zero margin bulk shipment orders as Operating Revenue when Cardinal merely substituted the Company's manufacturer order for a customer's order, the Cardinal Defendants were able to and did understate actual Bulk Deliveries revenue by $157 million during 3Q 2002 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amount;

(b) During 3Q 2002 the Cardinal Defendants failed to disclose known trends and uncertainties by not reporting their practice of improperly classifying Bulk Deliveries revenue as Operating Revenue and thereby not disclosing Cardinal's actual financial performance, failure to meet revenue growth projections and the Company's inability to adjust to changes in the distribution market;

(c) As detailed in ¶¶331-52, the Cardinal Defendants improperly managed earnings through various accounting manipulations which allowed them to hit security analysts' earnings expectations including:

(i) improperly recognizing cash discounts on pharmaceutical purchases before the drugs were resold and failing to disclose when the Company was using these discounts to reduce the costs of goods sold;

(ii) fraudulently recognizing revenue on contracts from Cardinal's Automation and Information Services business related to the Pyxis subsidiary in violation of GAAP and the Company's own publicly expressed policy not to recognize revenue on such contracts until the equipment sold under the contracts was installed; and

(iii) improperly causing Cardinal to take excessive special charges (merger related and restructuring) which were not related to unusual or infrequent events. By taking these

excessive charges as special charges, defendants caused Cardinal to understate normal recurring expenses which worked to inflate the Company's operating earnings and manage the Company's earnings going forward;

(d)     As detailed in ¶¶358-61, the Company lacked adequate internal controls;

(e)     As detailed in ¶¶365-66, as a consequence of the aforementioned practices, the Company's revenues and net income were artificially inflated and reported financial results were in violation of GAAP; and

(f)     But for defendants' improper classification and reporting of zero margin bulk sales as Operating Revenue, Cardinal would have been forced to disclose a decline in Pharmaceutical Distribution Operating Revenue of 7%, versus the 13% growth reported, and Company-wide revenue decline of 5%, versus the 12% reported growth.

116.     Defendants' statements on and about April 23, 2002 and May 8, 2002, which were false and misleading when made, had a direct effect on Cardinal's stock price preventing greater reductions in the stock price which continued to trade at artificially inflated levels above $69.00 per share.

117.     Notwithstanding his knowledge that the press release regarding 3Q 2002 financial results was false and misleading, within seven days of the press release being issued, defendant Fotiades sold 44,144 shares of his Cardinal stock for insider trading proceeds exceeding $3.01 million.

118.     On August 6, 2002, the Cardinal Defendants issued a news release over the *PR Newswire* in which they reported Cardinal's financial results for 4Q and FY 2002.  The release stated, in pertinent part, as follows:

> Cardinal Health, Inc. today reported record fourth quarter and full year financial results reflecting exceptional profitability and productivity performance across all four of its business segments.  "***Cardinal Health produced another outstanding quarter***, delivering value with a broad offering of superior products and services to

our customers," said Robert D. Walter, chairman and chief executive officer. "As a result, the company continued its tradition of delivering consistently strong and quality financial results for our shareholders. This performance demonstrates the enduring strength of our business model of balanced earnings growth accompanied by expanding returns on sales and capital and strong cash flow in every segment. ***Cardinal Health's balance sheet is stronger than at any time in our history***."

For the fourth quarter, each of the company's business segments performed well with notable performances from the pharmaceutical distribution and automation businesses. Diluted earnings-per-share (EPS) before special items grew 28 percent to $0.74 for the fourth quarter versus $0.58 last year. ***Record revenues combined with excellent expense controls drove expansion in return on sales and capital in every segment***. In addition, the company generated record returns on committed capital. Operating revenue grew by 15 percent to an all-time record $11.8 billion versus prior year revenue of $10.3 billion. Operating earnings rose 22 percent to a fourth quarter record $541 million versus prior year earnings of $445 million. Operating cash flow was an all-time record at $1.4 billion.

For the full fiscal year, earnings per diluted share increased 28 percent to $2.64. ***Operating revenues increased 15 percent to $44.4 billion*** with operating earnings gaining 22 percent to $2.0 billion and net earnings rising 29 percent to $1.2 billion.

The press release reported revenue as follows:

### FOURTH QUARTER 2002

| Revenue (in millions) | June 2002 | June 2001 | % Change |
|---|---|---|---|
| Operating Revenue | $11,765.90 | $10,254.30 | 14.74% |
| Bulk Deliveries to Customer Warehouses | $1,262.30 | $2,146.70 | (41.20)% |

119. The same day, August 6, 2002, defendants hosted a conference call with analysts and investors to discuss Cardinal's business operations and prospects and 4Q and FY 2002 financial results. The call repeated and addressed information previously made public in the Cardinal Defendants' August 6, 2002 press release. Defendants Walter, Miller and Millar participated on the call and had an opportunity to address analysts and investors' questions and concerns. During the call, defendant Walter stated:

Cardinal Health had a great 4th quarter. Completed another tremendous year for our company. The financial results were outstanding. Matching the forecast we made all year. No surprises. And that's how we like it, and I'm sure that's how you like it also.

Regarding Cardinal's accounting, defendant Miller stated: "As you have come to expect from Cardinal, there are no surprises and our accounting is sound."

120.    Following the release of 4Q and FY 2002 results, and the conference call with analysts, securities analysts from USB, CSFB, Hambrecht, Salomon Smith Barney, Thomas Weisel Partners, Prudential Securities, Morgan Stanley, Jefferies, J.P. Morgan and Bear Stearns issued reports clearly upbeat about the Pharmaceutical Distribution business operating revenue growth reported by the Cardinal Defendants. The analysts emphasized that Cardinal reported 17% Pharmaceutical Distribution business revenue growth versus the disappointing 13% growth reported the prior quarter. For example, on August 6, 2002, Salomon Smith Barney analyst Glen J. Santangelo issued a report which stated:

> Drug Distribution Growth Driven by Increasing Penetration of Customer Base
>
> Pharmaceutical Distribution & Provider Services outperformed on the top-line with revenue growth of 17% driven by two primary factors: 1) strong growth at its retail chain and mail-order customers, and 2) increasing penetration of retail chain and mail-order customers.
>
> *       *       *
>
> Additionally, we believe Cardinal is picking up a greater share of direct store business from its large retail and mail-order customers, which might have been self-warehoused previously. *We note that Cardinal's bulk deliveries in the quarter declined 41% y/y to approximately $1.3 billion. This follows bulk delivery declines of 24% in the March quarter and 21% in the December quarter.* We attribute a large part of this decline to Cardinal migrating sales from bulk shipments to direct sales.

121.    On August 15, 2002, Cardinal hosted its Semi-Annual Investor Update meeting in New York City. Defendants Walter and Miller participated in the Updated and reiterated Cardinal's previously reported financial results and guidance. During the Update, defendant Miller stated:

> Let me just talk for a minute about the role of our external auditors. We changed to Ernst & Young this year and they did an extremely add. [*sic*] audit. They issued a clean [opinion] on Cardinal they agree that *our policies are conservative but we take our responsibility for the accounting seriously.* We don't rely on the external auditors to come in and find a problem. We expect them to confirm that there isn't an issue and that, in fact, stays secure. We expect every

external audit at this time to be conducted – finally as Bob mentioned on the certification process, as we stated on the earnings call, Bob and I will, in fact, certify to the credibility and completeness and provide [certifications with] of our financial results when we file our 10-Q in September, basically they way we see it we've certifying what we've always done.

Let's talk a little bit about the conservative accounting area. ***Cardinal we have straightforward transaction[s], we have consistently utilized conservative accounting policies and procedures***.

\*     \*     \*

Let me now finish up with your guidance for fiscal 2003. We expect revenues to exceed $50 billion for the year. That's revenue growth of 14 to 16% which we expect to generate operating earnings growth of 18 to 20%.

\*     \*     \*

Pharmaceutical distribution and provider services, we're looking for revenue growth of 14 to 17% as our customer mix, and faster growing retail chain which allows us to grow faster than the overall pharmaceutical market.

With regard to recognizing revenue from the Company's Automation and Information Services segment, defendant Miller stated:

With regard to Pyxis leases we follow GAAP without exception and with regard to residual value on the leases. These are five year full pay-out leases which we retain title to and we record very minimal residual value relative to that.

122. On August 19, 2002, following the Semi-Annual Investor Update meeting, Bear Stearns analyst Raymond Faki issued a report based on the Cardinal Defendants' statements which stated:

Cardinal Health – Attractive Positive Analyst meeting accentuates the next era of CAH's Evolution

***Pharmaceutical distribution revenue growth*** is expected to modestly decelerate from 17% in FY02 as the company has guided to a range of 14%-17% growth. While CAH has anniversaried the more difficult comps of FY01, we view the expectations resulting from a slight slowdown in the overall pharma market (including the moderating top line effect of generics, as we estimate that Prozac and Glucophage alone have lowered overall industry revenue growth by over 200bp), ***a 30% decline in bulk delivery revenue (some of which we suspect CAH successfully converted to operating revenue in FY02 and other which was converted over to other wholesalers), and anticipated continued difficulties K-Mart and other customers.***

123.    On August 29, 2002, A.G. Edwards analyst Andrew L. Speller issued a report based

on the Cardinal Defendants' statements which stated:

> Fiscal Fourth Quarter 2002 Results In Line With Expectations
>
> CAH signals that Pharmaceutical Distribution & Provider Service (PDPS) segment
> can continue to outpace overall U.S. Pharmaceutical growth due to the company's
> customer mix.
>
> In our opinion, the PDPS segment growth will be the main catalyst of share price
> performance over the next six to 12 months.

124.    On September 30, 2002, the Cardinal Defendants filed Cardinal's annual report with

the SEC on Form 10-K for 4Q and FY 2002.  The Company's Form 10-K was signed by defendants

Walter and Miller and affirmed the previously announced financial results.  In the September 2002

Form 10-K, the Company disclosed for the first time that it had recorded $22 million in expected

proceeds from the lawsuit involving vitamin pricing as a gain.  In this regard, the Company stated in

the Form 10-K as follows:

> In addition, during both fiscal 2002 and 2001, the Company recognized pricing
> adjustments related to the minimum recovery expected to be received for claims
> against vitamin manufacturers for amounts overcharged in prior years (see Note 2 of
> "Notes to Consolidated Financial Statements").  These pricing adjustments were
> recorded as a reduction of cost of goods sold, consistent with the classification of the
> original overcharge, and were based on the minimum amounts estimated to be
> recoverable based on the facts and circumstances available at the time they were
> recorded.  The amounts recorded for these pricing adjustments were $12.0 million in
> the first quarter of fiscal 2002 and $10.0 million in the second quarter of fiscal 2001.

125.    The Form 10-K reported revenue for 4Q 2002 as follows:

### FOURTH QUARTER 2002

| Revenue (in millions) | June 2002 | June 2001 |
|---|---|---|
| Operating Revenue | $11,765.90 | $10,254.30 |
| Pharmaceutical Distribution Operating Revenue | $9,642.00 | $8,257.00 |
| Bulk Deliveries to Customer Warehouses | $1,262.30 | $2,146.70 |
| Earnings Per Share | $0.64 | $0.55 |

126.    The Form 10-K for FY 2002 reported results as follows:

CARDINAL HEALTH, INC.  AND SUBSIDIARIES SELECTED CONSOLIDATED
FINANCIAL DATA (IN MILLIONS, EXCEPT PER SHARE AMOUNTS)

At or For the Fiscal Year Ended June 30, 2002

| Revenue (in millions) | 2002 | 2001 | 2000 | 1999[6] | 1998[6] |
|---|---|---|---|---|---|
| Operating revenue | $44,394.30 | $38,660.10 | $30,257.80 | $25,682.50 | $20,844.80 |
| Pharmaceutical Distribution Operating Revenue | $36,359.80 | $31,185.80 | $23,849.60 | $19,606.20 | -- |
| Bulk Deliveries to Customer Warehouse | $6,741.40 | $9,287.50 | $8,092.10 | $7,050.40 | $7,541.10 |
| Earnings Per Share | $2.30 | $1.88 | $1.60 | $1.12 | $1.07 |
| Pharmaceutical Distribution Bulk Deliveries | $6,741.40 | $9,287.50 | $8,092.10 | -- | -- |

127.    The Form 10-K also contained signed certifications by defendants Walter and Miller

submitted pursuant to §§302 and 906 of the Sarbanes-Oxley Act, which purported to confirm the

veracity of the Company's financial statements, as follows:

1.    I have reviewed this annual report on Form 10-K of Cardinal Health, Inc.;

2.    Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report; and

3.    Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report.

128.    With respect to Cardinal's financial statements for FY 2002 (ended June 30, 2002),

E&Y represented, in a report dated August 6, 2002 and included in the Company's FY 2002 Form

10-K, the following:

---

[6]    Amounts do not reflect the impact of pro forma adjustments related to ALP taxes.

We conducted our audit in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the fiscal 2002 consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Cardinal Health, Inc. and subsidiaries as of June 30, 2002, and the consolidated results of their operations and their cash flows for the year then ended in conformity with accounting principles generally accepted in the United States. Also, in our opinion, the related fiscal 2002 financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

129. Defendants' statements regarding 4Q and FY 2002 financial results and revenue guidance were false and misleading when made. Defendants knew or recklessly disregarded, but failed to disclose, the following:

(a) As detailed in ¶¶285-318, during 4Q 2002 the Cardinal Defendants improperly classified revenue from bulk sales as Operating Revenue, the key performance metric monitored by securities analysts and investors, to create the materially false and misleading impression that Cardinal's Pharmaceutical Distribution business was adapting to market changes and meeting projected growth rates. The improper classification of Bulk Deliveries revenue allowed the Cardinal Defendants to understate actual bulk sales by $2.2 billion during 4Q 2002 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amount. The Cardinal Defendants' improper revenue classification included the following accounting manipulations:

(i) by improperly classifying bulk shipment orders filled from Cardinal's own inventory as Operating Revenue, the Cardinal Defendants were able to and did understate actual Bulk Deliveries revenue by $1.4 billion during 4Q 2002 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amount;

(ii)　　　by improperly classifying bulk shipment orders intentionally or arbitrarily held by Cardinal for more than 24 hours as Operating Revenue, the Cardinal Defendants were able to and did understate actual Bulk Deliveries revenue by $487 million during 4Q 2002 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amount; and

(iii)　　　by arbitrarily and improperly classifying zero margin bulk shipment orders as Operating Revenue when Cardinal substituted the Company's manufacturer order for a customer's order, the Cardinal Defendants were able to and did understate actual Bulk Deliveries revenue by $325 million during 4Q 2002 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amount;

(b)　　　During 4Q 2002 the Cardinal Defendants failed to disclose known trends and uncertainties by not reporting their practice of improperly classifying Bulk Deliveries revenue as Operating Revenue and thereby not disclosing Cardinal's actual financial performance, failure to meet revenue growth projections and the Company's inability to adjust to changes in the distribution market;

(c)　　　As detailed in ¶¶320-57, the Cardinal Defendants improperly managed earnings through various accounting manipulations which allowed them to hit security analysts' earnings expectations including:

(i)　　　prematurely recording $12 million in expected proceeds from a lawsuit involving antitrust claims related to vitamin pricing before a settlement in the litigation had been reached.  But for the Cardinal Defendants' premature revenue recognition, the Company would have fallen $0.02 per share short of Wall Street analysts' earnings targets in 4Q 2002;

(ii)　　　improperly recognizing cash discounts on pharmaceutical purchases before the drugs were resold and failing to disclose when the Company was using these discounts to reduce the costs of goods sold;

(iii)	fraudulently recognizing revenue on contracts from Cardinal's Automation and Information Services business related to the Pyxis subsidiary in violation of GAAP and the Company's own publicly expressed policy not to recognize revenue on such contracts until the equipment sold under the contracts was installed;

(iv)	improperly causing Cardinal to take excessive special charges (merger related and restructuring) which were not related to unusual or infrequent events.  By taking these excessive charges as special charges, defendants caused Cardinal to understate normal recurring expenses which worked to inflate the Company's operating earnings and manage the Company's earnings going forward; and

(v)	improperly accounting for the securitization of receivables from Cardinal's Pyxis subsidiary as an off-balance sheet transaction which served to allow the Company to understate liabilities by $150 million;

(d)	As detailed in ¶¶358-61, the Company lacked adequate internal controls;

(e)	As detailed in ¶¶365-66, as a consequence of the aforementioned practices, the Company's revenues and net income were artificially inflated and reported financial results were in violation of GAAP; and

(f)	But for defendants' improper classification and reporting of zero margin bulk sales as Operating Revenue, Cardinal would have been forced to disclose a decline in Pharmaceutical Distribution Operating Revenue of 10%, versus the 17% growth reported, and a Company-wide Operating Revenue decline of 7%, versus the 15% reported growth.

130.	Defendants' statements on and about August 6, 2002, August 15, 2002 and September 30, 2002, which were false and misleading when made, had a direct effect on Cardinal's stock price which rose $15.64 per share from the close of August 5, 2002 to the close of August 21, 2002.

131.     Notwithstanding his knowledge that his statements at Cardinal's August 15, 2002 Semi-Annual Investor Update meeting were false and misleading, within weeks of the meeting, defendant Walter dumped 100,000 shares of his Cardinal stock for insider trading proceeds exceeding $6.58 million.

**False Statements and Omissions During FY 2003**

132.     On October 22, 2002, the Cardinal Defendants issued a news release over the *PR Newswire* titled "Cardinal Health Reports Record First Quarter Revenues and Earning-EPS Rises 22 Percent Before Special Items" in which they reported the Company's financial results for Cardinal's fiscal 1Q 2003.  The release stated, in pertinent part, as follows:

> Cardinal Health, Inc., the leading provider of products and services supporting the health care industry, today reported first quarter records in six key financial measures for its fiscal 2003 first quarter ended September 30, 2002:
>
> > - Earnings per diluted share, before special items, rose 22 percent to $0.67.
> >
> > - *Operating revenues increased to $11.4 billion, up 16 percent*.
> >
> > - *Operating earnings, before special items, rose 18 percent to $486 million*.
>
> *     *     *
>
> "Cardinal Health continues to deliver outstanding financial performance across all of our businesses in a robust health care market that remains attractive for the company's products and services," said Robert D. Walter, chairman and chief executive officer.  "Our powerful business model allows us to generate high quality earnings that are balanced and sustainable.  Consistent execution and productivity improvements this quarter yielded record revenues and earnings with record rates of returns on sales and capital, while we continued to invest in the business."
>
> *     *     *
>
> BUSINESS HIGHLIGHTS
>
> > - *First quarter growth was highlighted by the particular strength of the Pharmaceutical Distribution and Provider Services (PDPS), and Automation and Information Services (AIS) segments*.
>
> SEGMENT HIGHLIGHTS
>
> Pharmaceutical Distribution and Provider Services (51 percent of operating earnings)

The segment recorded another outstanding quarter, with first quarter records in revenues, operating earnings and return on sales while return on committed capital reached an all-time high. A favorable customer mix and disciplined expense control drove the performance.

*Total revenues grew 17 percent to $9.4 billion, led by strong growth in the pharmaceutical distribution and specialty distribution businesses.*

The press release reported revenue as follows:

**FIRST QUARTER 2003**

| Revenue (in millions) | September 2002 | September 2001 | % Change |
|---|---|---|---|
| Operating Revenue | $11,416.60 | $9,865.40 | 15.72% |
| Bulk Deliveries to Customer Warehouses | $1,669.50 | $1,908.00 | (12.50)% |

133. The same day, October 22, 2002, defendants hosted a conference call with analysts and investors to discuss Cardinal's business operations and prospects and 1Q 2003 financial results. The call repeated and addressed information previously made public in the Cardinal Defendants' October 22, 2002 press release. Defendants Walter and Miller participated on the call and had an opportunity to address analysts and investors' questions and concerns. During the call, defendant Walter stated:

The financial momentum that Cardinal Health enjoyed last fiscal year has continued into first quarter fiscal year '03. The results came in as we expected and they're outstanding. . . . [o]perating revenues up to 11.4 billion, up 16%.

With regard to the Pharmaceutical Distribution business, defendant Miller also reiterated:

Some of the highlights would include we had strong revenue performance driven by 19% growth in our chain store and 25% growth in our alternate care customer classes.

134. Following the release of 1Q 2003 results and the conference call with securities analysts, USB, Legg Mason, UBS Warburg, Bear Stearns, Morgan Stanley, J.P. Morgan, Hambrecht, CSFB, Salomon Smith Barney, Thomas Weisel Partners and Prudential Securities all issued analyst reports which repeated Cardinal's 1Q 2003 financial results to the market and emphasized Cardinal's total Operating Revenue and Pharmaceutical Distribution business Operating Revenue growth. For

example, on October 22, 2002, Salomon Smith Barney analyst Glen J. Santangelo issued a report

which stated:

DRUG DISTRIBUTION GROWTH DRIVEN BY INCREASING PENETRATION
OF CUSTOMER BASE

Pharmaceutical Distribution & Provider Services (51% of op. profit) reported strong performance with revenues up 17%, which is higher than the 16% that the Street and we were expecting. The strong revenue growth in the quarter was driven by strong growth at its retail chain and mail-order customers. The company reported that its chain segment grew 19% *y/y*, while its alternate, site/mail-order customers grew 25% growth.

\*　　　\*　　　\*

Additionally, we believe Cardinal is picking up a greater share of direct store business from its large retail and mail-order customers, which might have been self-warehoused previously. ***We note that Cardinal's bulk deliveries in the quarter declined 13% y/y to approximately $1.67 billion. This follows bulk delivery declines of 41% in the June quarter and 24% in the March quarter.*** We attribute a large part of this decline to Cardinal migrating sales from bulk shipments to direct sales.

135.    On November 14, 2002, the Cardinal Defendants filed Cardinal's quarterly report

with the SEC on Form 10-Q for 1Q 2003.  The Company's Form 10-Q was signed by defendants

Walter and Miller and affirmed the previously announced financial results.  The Form 10-Q for 1Q

2003 reported results as follows:

**FIRST QUARTER 2003**

| Revenue (in millions) | September 2002 | September 2001 |
|---|---|---|
| Operating Revenue | $11,416.60 | $9,865.40 |
| Pharmaceutical Distribution Operating Revenue | $9,351.50 | $7,960.70 |
| Bulk Deliveries to Customer Warehouses | $1,669.50 | $1,908.00 |
| Earnings Per Share | $0.64 | $0.38 |

136.    Additionally, the 1Q 2003 Form 10-Q again stated that all revenue derived from

"bulk deliveries made to customers' warehouses," whereby the Company "acts as an intermediary in

the ordering and subsequent delivery of pharmaceutical products" was reported as "Bulk Deliveries."

The Form 10-Q also repeated defendants' assurance that "[t]hese condensed consolidated financial

statements have been prepared in accordance with the instructions to Form 10-Q and include all of

the information and disclosures required by generally accepted accounting principles for interim reporting."

137.    Filed together with Cardinal's 1Q 2003 Form 10-Q were certifications from defendants Walter and Miller in compliance with §§302 and 906 of the Sarbanes-Oxley Act. Included in the certifications were statements by Walter and Miller asserting that they had reviewed the Company's 3Q 2002 Form 10-Q and that the public report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading" as of September 30, 2002.

138.    On January 2, 2003, while Cardinal stock was trading at artificially inflated prices, the Cardinal Defendants issued 12.5 million shares of Company stock, with an inflated value of $780 million, to acquire Syncor International Corp.

139.    The Cardinal Defendants' statements regarding 1Q 2003 financial results were false and misleading when made. Defendants knew or recklessly disregarded, but failed to disclose, the following:

(a)    As detailed in ¶¶285-318, during 1Q 2003 the Cardinal Defendants improperly classified revenue from bulk sales as Operating Revenue, the key performance metric monitored by securities analysts and investors, to create the materially false and misleading impression that Cardinal's Pharmaceutical Distribution business was adapting to market changes and meeting projected growth rates. The improper classification of Bulk Deliveries revenue allowed the Cardinal Defendants to understate actual bulk sales by $2.1 billion during 1Q 2003 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amount. The Cardinal Defendants' improper revenue classification included the following accounting manipulations:

(i) by improperly classifying bulk shipment orders filled from Cardinal's own inventory as Operating Revenue, the Cardinal Defendants were able to and did understate actual Bulk Deliveries revenue by $1.5 billion during 1Q 2003 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amount;

(ii) by improperly classifying bulk shipment orders intentionally or arbitrarily held by Cardinal for more than 24 hours as Operating Revenue, the Cardinal Defendants were able to and did understate actual Bulk Deliveries revenue by $208 million during 1Q 2003 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amount; and

(iii) by arbitrarily and improperly classifying zero margin bulk shipment orders as Operating Revenue when Cardinal substituted the Company's manufacturer order for a customer's order, the Cardinal Defendants were able to and did understate actual Bulk Deliveries revenue by $351 million during 1Q 2003 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amount;

(b) During 1Q 2003 the Cardinal Defendants failed to disclose known trends and uncertainties by not reporting their practice of improperly classifying Bulk Deliveries revenue as Operating Revenue and thereby not disclosing Cardinal's actual financial performance, failure to meet revenue growth projections and the Company's inability to adjust to changes in the distribution market;

(c) As detailed in ¶¶326-52, the Cardinal Defendants improperly managed earnings through various accounting manipulations which allowed them to hit security analysts' earnings expectations including:

(i) improperly accounting for Cardinal's balance sheet reserves and accrual adjustments which caused the Company's reported net income to be overstated by $6.9 million which, in turn, resulted in EPS being overstated by $.02;

(ii)       improperly recognizing cash discounts on pharmaceutical purchases before the drugs were resold and failing to disclose when the Company was using these discounts to reduce the costs of goods sold;

(iii)       fraudulently recognizing revenue on contracts from Cardinal's Automation and Information Services business related to the Pyxis subsidiary in violation of GAAP and the Company's own publicly expressed policy not to recognize revenue on such contracts until the equipment sold under the contracts was installed; and

(iv)       improperly causing Cardinal to take excessive special charges (merger related and restructuring) which were not related to unusual or infrequent events.  By taking these excessive charges as special charges, defendants caused Cardinal to understate normal recurring expenses which worked to inflate the Company's operating earnings and manage the Company's earnings going forward;

(d)       As detailed in ¶¶358-61, the Company lacked adequate internal controls;

(e)       As detailed in ¶¶365-66, as a consequence of the aforementioned practices, the Company's revenues and net income were artificially inflated and reported financial results were in violation of GAAP; and

(f)       But for defendants' improper classification and reporting of zero margin bulk sales as Operating Revenue, Cardinal would have been forced to disclose a decline in Pharmaceutical Distribution Operating Revenue of 9%, versus the 17% growth reported, and a Company-wide Operating Revenue decline of 5%, versus the 16% reported growth.

140.       Defendants' statements on and about October 22, 2002 and November 15, 2002, which were false and misleading when made, had a direct effect on Cardinal's stock price which continued to trade at artificially inflated levels above $70.00 per share.

141.     On January 23, 2003, the Cardinal Defendants issued a news release over the *PR Newswire* in which they reported the Company's financial results for 2Q 2003.  The release stated, in pertinent part, as follows:

Cardinal Health, Inc., the leading provider of products and services supporting the health care industry, today reported record results for the second quarter ended December 31, 2002:

- Earnings per diluted share, before special items, rose 20 percent to $0.77.

- Operating revenues increased to $12.7 billion, up 13 percent.

*          *          *

"Cardinal Health continues to generate outstanding financial results by leveraging leadership positions in the attractive health care market, consistent operational performance and productivity improvement, and expanding a diverse and proprietary products and services offering," said Robert D. Walter, chairman and chief executive officer.  "Strong earnings and asset management are enabling the company to generate tremendous cash flow and record returns on committed capital which position us strongly for the future.  This capital productivity enhances our ability to reinvest in existing businesses and seek new acquisitions, while at the same time maintaining our financial flexibility.  We are well positioned to reach our financial commitment of EPS growth of 20 percent or more for fiscal year 2003."

***For the first two quarters of fiscal year 2003, Cardinal Health generated exceptionally strong revenue and earnings.  Operating revenues increased 14 percent over prior year to $24.1 billion***.  Before special items and cumulative effect of change in accounting, net earnings rose 19 percent to $649 million and earnings per diluted share increased 21 percent to $1.44.

*          *          *

SEGMENT HIGHLIGHTS

Pharmaceutical Distribution and Provider Services (51 percent of operating earnings)

The segment delivered another outstanding quarter, highlighted by a dramatic increase in return on committed capital which rose to an all-time high.  ***Revenues were also an all-time record while operating earnings and return on sales were second quarter records***.

Total revenues grew 14 percent to $10.5 billion, led by strong growth across the segment.

The press release reported revenue as follows:

| Revenue (in millions) | December 2002 | December 2001 | % Change |
|---|---|---|---|
| Operating Revenue | $12,706.30 | $11,221.70 | 13.23% |
| Bulk Deliveries to Customer Warehouses | $1,384.70 | $1,870.40 | (25.97)% |

142.    The same day, January 23, 2003, defendants hosted a conference call with analysts and investors to discuss Cardinal's business operations and prospects and 2Q 2003 financial results. The call repeated and addressed information previously made public in the Cardinal Defendants' January 23, 2003 press release. Defendants Walter, Miller, Fotiades and Millar participated on the call and had an opportunity to address analysts and investors' questions and concerns. During the call, defendant Walter stated:

> I'm happy to report to you another strong quarter for Cardinal overall where we met our goals and market expectations. We positioned ourselves for a second half of fiscal 2003 that will allow us to deliver on a commitment of 20% earnings per share growth with the solid improvement and return on sales and capital and strong cash flow and – cash flow in excess of $1 billion.

> *        *        *

> I was very pleased with the quarter. Revenue and earnings were in line with expectations but cash flow in return and committed capital was substantially better than I expected. I will explain what is driving that in each of our segments. . . . ***The pharmaceutical distribution and provider service segment continued with above-industry revenue growth driven predominantly by a favorable mix towards change, up 17%, and alternate site up 20%.***

> *        *        *

> I already mentioned that fiscal 2004 revenues will be strong. Earnings in the second half for the segment will grow a little slower than in the first half, but with favorable revenue and expense trends, earning growth rates for FY04 will pick up over the second half of FY03. Return on sales, capital and cash flow will be very strong. Now, let me shift to the medical products and service area. I really like what I see happening here. Ron [Labrum] and his team have really stepped up the momentum, and you will see it in our second half. First, there is a new leadership in the distribution business segment and a strong determination to grow our distribution volume. And we are winning in the marketplace with some very important new contracts.

With regard to the ongoing changes in the distribution market, Walter stated:

The fact is our models are changing a bit, frankly for the better and we want to you understand it.

\* \* \*

*Cardinal continued to enter into an inventory management agreements with manufacturers, whereby we are compensated on incentive basis to help manufacturers better match their shipments with market demand.*

143. Following the release of 2Q 2003 results and the conference call with securities analysts, CSFB, Salomon Smith Barney, Thomas Weisel Partners, Hambrecht, Morgan Stanley, Legg Mason, UBS Warburg, Bear Stearns, Jefferies, J.P. Morgan and Prudential Securities all issued analyst reports which repeated Cardinal's 2Q 2003 financial results to the market.

144. On February 14, 2003, the Cardinal Defendants filed Cardinal's quarterly report with the SEC on Form 10-Q for 2Q 2003. The Company's Form 10-Q was signed by defendants Walter and Miller and reaffirmed the previously announced financial results. The Form 10-Q for 2Q 2003 reported results as follows:

### SECOND QUARTER 2003

| Revenue (in millions) | December 2002 | December 2001 |
|---|---|---|
| Operating Revenue | $12,706.30 | $11,221.70 |
| Pharmaceutical Distribution Operating Revenue | $10,539.00 | $9,214.50 |
| Bulk Deliveries to Customer Warehouses | $1,384.70 | $1,870.40 |
| Earnings Per Share | $0.82 | $0.62 |

145. Additionally, the 2Q 2003 Form 10-Q again stated that all revenue derived from "bulk deliveries made to customers' warehouses," whereby the Company "acts as an intermediary in the ordering and subsequent delivery of pharmaceutical products" was reported as "Bulk Deliveries." The Form 10-Q also repeated defendants' assurance that "[t]hese condensed consolidated financial statements have been prepared in accordance with the instructions to Form 10-Q and include all of the information and disclosures required by generally accepted accounting principles for interim reporting."

146. Filed together with Cardinal's 2Q 2003 Form 10-Q were certifications from defendants Walter and Miller in compliance with §§302 and 906 of the Sarbanes-Oxley Act. Included in the certifications were statements by Walter and Miller asserting that they had reviewed the Company's Form 10-Q for 2Q 2003 and that the public report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading" as of December 30, 2002.

147. The Cardinal Defendants' statements regarding 2Q 2003 actual financial results and the Company's adaptation to the changing distribution market were false and misleading when made. Defendants knew or recklessly disregarded, but failed to disclose, the following:

(a) As detailed in ¶¶285-318, during 2Q 2003 the Cardinal Defendants improperly classified revenue from bulk sales as Operating Revenue, the key performance metric monitored by securities analysts and investors, to create the materially false and misleading impression that Cardinal's Pharmaceutical Distribution business was adapting to market changes and meeting projected growth rates. The improper classification of Bulk Deliveries revenue allowed the Cardinal Defendants to understate actual bulk sales by $2.7 billion during 2Q 2003 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amount. The Cardinal Defendants' improper revenue classification included the following accounting manipulations:

(i) by improperly classifying bulk shipment orders filled from Cardinal's own inventory as Operating Revenue, the Cardinal Defendants were able to and did understate actual Bulk Deliveries revenue by $1.5 billion during 2Q 2003 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amount;

(ii) by improperly classifying bulk shipment orders intentionally or arbitrarily held by Cardinal for more than 24 hours as Operating Revenue, the Cardinal Defendants

were able to and did understate actual Bulk Deliveries revenue by $873 million during 2Q 2003 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amount; and

(iii)     by arbitrarily and improperly classifying zero margin bulk shipment orders as Operating Revenue when Cardinal substituted the Company's manufacturer order for a customer's order, the Cardinal Defendants were able to and did understate actual Bulk Deliveries revenue by $265 million during 2Q 2003 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amount;

(b)     During 2Q 2003 the Cardinal Defendants failed to disclose known trends and uncertainties by not reporting their practice of improperly classifying Bulk Deliveries revenue as Operating Revenue and thereby not disclosing Cardinal's actual financial performance, failure to meet revenue growth projections and the Company's inability to adjust to changes in the distribution market;

(c)     As detailed in ¶¶331-52, the Cardinal Defendants improperly managed earnings through various accounting manipulations which allowed them to hit security analysts' earnings expectations including:

(i)     improperly recognizing cash discounts on pharmaceutical purchases before the drugs were resold and failing to disclose when the Company was using these discounts to reduce the costs of goods sold;

(ii)     fraudulently recognizing revenue on contracts from Cardinal's Automation and Information Services business related to the Pyxis subsidiary in violation of GAAP and the Company's own publicly expressed policy not to recognize revenue on such contracts until the equipment sold under the contracts was installed; and

(iii)     improperly causing Cardinal to take excessive special charges (merger related and restructuring) which were not related to unusual or infrequent events.  By taking these

excessive charges as special charges, the Cardinal Defendants caused Cardinal to understate normal recurring expenses which worked to inflate the Company's operating earnings and manage the Company's earnings going forward;

(d)     As detailed in ¶¶358-61, the Company lacked adequate internal controls;

(e)     As detailed in ¶¶365-66, as a consequence of the aforementioned practices, the Company's revenues and net income were artificially inflated and reported financial results were in violation of GAAP;

(f)     But for defendants' improper classification and reporting of zero margin bulk sales as Operating Revenue, Cardinal would have been forced to disclose a decline in Pharmaceutical Distribution Operating Revenue of 14%, versus the 14% growth reported, and a Company-wide Operating Revenue decline of 11%, versus the 13% reported growth; and

(g)     The Cardinal Defendants were failing to convince a material number of pharmaceutical distributors to enter into Inventory Management Agreements or agree to a fee-for-service distribution model that would preserve Cardinal's profit margin.

148.     Defendants' statements on and about January 23, 2003 and February 14, 2003, which were false and misleading when made, had a direct effect on Cardinal's stock price preventing greater reductions in the stock price which continued to trade at artificially inflated levels above $58.00 per share.

149.     Notwithstanding his knowledge that the statements in Cardinal's January 23, 2003 press release regarding 2Q 2003 financial results were false and misleading, within seven days of the press release being issued, defendant Walter unloaded another 133,190 shares of his Cardinal stock for insider trading proceeds exceeding $7.71 million.

150.     On April 2, 2003, *The Wall Street Journal* published a "Heard On The Street" column in which it challenged Cardinal's accounting treatment of the $22 million in anticipated settlement

proceeds from the vitamin pricing litigation. The column was headlined "Cardinal Health's Accounting Raises Some Questions" and it stated, in pertinent part, as follows:

It's a cardinal rule of accounting: Don't count your chickens before they hatch. Yet new disclosures in Cardinal Health, Inc.'s latest annual report suggest that is what the drug wholesaler has done not just once, but twice, independent accounting specialists say.

As the disclosures show, Cardinal recorded $22 million of an expected legal settlement with certain vitamin manufacturers that it had accused of overcharging for products - in advance of an actual settlement. Specifically, Cardinal recorded a $10 million pretax gain, as well as a corresponding receivable on its balance sheet, during its December 2000 quarter. It recorded a further $12 million gain during the quarter ended Sept. 30, 2001, after concluding that its minimum future recovery would be that much bigger.

Cardinal, which says it has done nothing improper, did reach a $35.3 million settlement in the vitamin antitrust litigation last spring. The company recorded the remaining $13.3 million during the final quarter of its past fiscal year, ended June 30.

To those unfamiliar with accounting rules, the posting of the two initial sums might not raise obvious questions. Yet even first-year accounting students are taught this: Under generally accepted accounting principles, companies aren't supposed to record expected gains as current income until they are certain the gains will be realized. When it comes to a litigation settlement, that means waiting until an actual settlement agreement has been reached with a party that is able to pay, independent accounting specialists say.

Now consider this twist: Had Cardinal not recorded the two initial sums when it did, it would have fallen short of Wall Street analysts' earnings targets by two cents a share for both the December 2000 and September 2001 quarters; Cardinal's earnings met analysts' targets for each of the quarters. Cardinal didn't disclose the size of the gains until September 2002, when it filed its latest annual report.

151. The Cardinal Defendants reacted quickly to blunt the impact of the article. On April 2, 2003, the Cardinal Defendants issued a news release over the *PR Newswire* defending the Company's accounting practices. The release stated, in pertinent part, as follows:

Cardinal Health, Inc. today affirmed its financial accounting treatment of a vendor overcharge recovery mentioned in an article in today's *The Wall Street Journal*.

"***Cardinal Health has a long-standing reputation for conservative accounting and financial transparency,*" said Robert D. Walter, chairman and chief executive officer.** "The implications made in the article's two headlines and the assertion of improper accounting for a vendor overcharge recovery demands a response."

"The article focused on Cardinal Health's treatment of recoveries of claims in the second quarter of fiscal year 2001 and the first quarter of fiscal year 2002," said Richard J. Miller, executive vice president and chief financial officer. "The amounts recognized offset a portion of prim period accounting costs that arose from overcharges by vitamin manufacturers. **Cardinal Health takes pride in properly accounting for all transactions**. The vitamin overcharge recovery was no different. The transaction was fully approved by Arthur Andersen, LLP, who were our auditors at the time, and was subsequently approved by our current auditors, Ernst & Young.

Miller continued, "The recording of this item was not a contingent litigation gain. It was the recognition of an asset related to expected recoveries for vendor overcharges in prior periods. Our assessment of the certainty of a minimum recovery, accepted by our independent auditor and supported by independent legal opinions, was sound and fundamentally conservative."

\*       \*       \*

"**We stand behind, along with our auditors, the accuracy of our financial statements in their entirety,**" said Miller.

"**Those who have followed our company for a long time understand the strength of our commitment to broad and open financial disclosure and honest accounting,**" concluded Walter. "**I have tremendous confidence in our reputation for ethical business practices and the rigorous internal review procedures we have in place to maintain our high standards.**"

152. The Cardinal Defendants' statements in the Company's April 2, 2003 press release were false and misleading when made. Defendants knew or recklessly disregarded, but failed to disclose, the following:

(a)    As detailed in ¶¶285-366, Cardinal's accounting was extremely aggressive, not conservative and the Company's financial statements and disclosures were not transparent, open or honest;

(b)    And detailed in ¶¶320-25, the Cardinal Defendants' premature recording of $22 million in potential proceeds from the vitamin litigation violated GAAP and was only done to enable Cardinal to hit quarterly earnings targets; and

(c)    As a result of Cardinal's revenue and earnings manipulations and the Company's failure to maintain adequate internal controls, there was no reasonable basis for Walter's statements that the Company had a strong commitment to "broad and open financial disclosures and

honest accounting" and that "I have tremendous confidence in our reputation for ethical business practices and the rigorous internal review procedures we have in place to maintain our high standards."

153.     On April 23, 2003, the Cardinal Defendants issued a news release over the *PR Newswire* in which they reported the Company's financial results for 3Q 2003. The release stated, in pertinent part, as follows:

> - Earnings per diluted share from continuing operations grew 29 percent to $0.85.
>
> **- *Operating revenues increased to $12.8 billion, up 11 percent*.**
>
> - Operating earnings rose 23 percent to $608 million.
>
> - Earnings from continuing operations improved 28 percent to $385 million.
>
> "***This quarter's revenue and earnings performance was record setting and broad based*** *said Robert D. Walter, chairman and chief executive officer*. "High quality earnings yielded record rates of return on sales, committed capital and equity, while expense and capital efficiency generated significant cash flow. Additionally, we continued to invest in our future during the quarter."

The press release reported revenue as follows:

**THIRD QUARTER 2003**

| Revenue (in millions) | March 2003 | March 2002 | % Change |
|---|---|---|---|
| Operating Revenue | $12,837.30 | $11,541.30 | 11.23% |
| Bulk Deliveries to Customer Warehouses | $1,534.00 | $1,700.70 | (9.80)% |

154.     The same day, April 23, 2003, defendants hosted a conference call with analysts and investors to discuss Cardinal's business operations and prospects and 3Q 2003 financial results. The call repeated and addressed information previously made public in the Cardinal Defendants' April 23, 2003 press release. Defendants Walter, Miller, Fotiades and Millar participated on the call and had an opportunity to address analysts and investors' questions and concerns. During the call, defendant Walter stated:

> So we go to our core business, which is to take care of the provider who has the prescription in hand. That business grew 15%. And it will pick up as we move

into the fourth quarter.  It will be at a rate higher than that.  We have good, solid demand.  So that business is very healthy.

*       *       *

We're comfortable with the guidance we've given in February. . . .  So the revenue growth indicators we've just given you for Q4, which talks about mid teens for our pharmaceutical distribution segment includes the consideration of a slowdown in trading.

So that means we're expecting strong growth in our April quarter, with what I call our core distribution business, nontrading, stronger than frankly I believe you think it's going to be.

155.    In May 2003, the Cardinal Defendants published the inaugural edition of *The Cardinal Health Investor*, which was distributed to investors, potential investors and analysts and described as follows:

With *The Cardinal Health Investor* we are looking to create a tool that will be of interest and use to you as you consider your investme nt decisions.  As always, we invite your comments and look forward to your input as this publication evolves over time.

156.    The May 2003 *Investor* identified several "Hot Topics," one of which was the Company's inventory management agreements with manufacturers:

IMAs - Our critical role

We've been getting questions about our relationships with pharmaceutical manufacturers lately, particularly in light of "channel stuffing" activities being repotted.  Manufacturers are looking to better align productivity with health care providers' product demand and, because of this, are offering less inventory for sale into the channel, which you all are aware has had an impact on our trading company business this year.

Inventory Management Agreements (IMAs), which are agreements negotiated between pharmaceutical manufacturers and distributors, are an attempt to balance manufacturing production with actual prescription demand by retailers and consumers.  IMAs, which often contain provisions limiting the distributor's inventory investments, are an important part of doing business as a pharmaceutical distributor.  The channel can operate more efficiently, and costs to eventual patients can be contained.

We look to structure IMAs to achieve similar levels of profitability and improve our return on capital by reducing the capital that is needed for investment in inventory.  That frees up capital for reinvestment either in this business or in other

areas of the company. With the diversity of our businesses and attractive investment alternatives, we will deploy the capital returned from these agreements into new opportunities.

Evolution occurring in the marketplace over the past several years can be a positive development for the industry, but also one in which we have to remain diligent in understanding how the structure of these agreements will impart our profit over the next several years. We will continue to utilize our experience and competitive expertise to negotiate individually with manufacturers, but we will always weigh the economic value of every product we carry to ensure it is consistent with our profit targets and the value we bring to manufacturers.

We are confident that we can work with manufacturers to meet their needs and also preserve our profit consistent with the influential role we play in the pharmaceutical channel.

157.    On May 15, 2003, the Cardinal Defendants filed Cardinal's quarterly report with the SEC on Form 10-Q for 3Q 2003. The Company's Form 10-Q was signed by defendants Walter and Miller and reaffirmed the previously announced financial results. The Form 10-Q for 3Q 2003 reported results as follows:

### THIRD QUARTER 2003

| Revenue (in millions) | March 2003 | March 2002 |
|---|---|---|
| Operating Revenue | $12,837.30 | $11,541.30 |
| Pharmaceutical Distribution Operating Revenue | $10,446.00 | $9,513.50 |
| Bulk Deliveries to Customer Warehouses | $1,534.00 | $1,700.70 |
| Earnings Per Share | $0.84 | $0.66 |

158.    Additionally, the 3Q 2003 Form 10-Q again stated that all revenue derived from "bulk deliveries made to customers' warehouses," whereby the Company "acts as an intermediary in the ordering and subsequent delivery of pharmaceutical products" was reported as "Bulk Deliveries." The Form 10-Q also repeated defendants' assurance that "[t]hese condensed consolidated financial statements have been prepared in accordance with the instructions to Form 10-Q and include all of the information and disclosures required by generally accepted accounting principles for interim reporting."

159.    Filed together with Cardinal's 3Q 2003 Form 10-Q were certifications from defendants Walter and Miller in compliance with §§302 and 906 of the Sarbanes-Oxley Act.

Included in the certifications were statements by Walter and Miller asserting that they had reviewed the Company's 3Q 2003 Form 10-Q and that the public report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading" as of May 15, 2003.

160.    The Cardinal Defendants' statements regarding 3Q 2003 actual financial results and Cardinal's success in transitioning the pharmaceutical distribution business were false and misleading when made.  Defendants knew or recklessly disregarded, but failed to disclose, the following:

(a)    As detailed in ¶¶285-318, during 3Q 2003 the Cardinal Defendants improperly classified revenue from bulk sales as Operating Revenue, the key performance metric monitored by securities analysts and investors, to create the materially false and misleading impression that Cardinal's Pharmaceutical Distribution business was adapting to market changes and meeting projected growth rates.  The improper classification of Bulk Deliveries revenue allowed the Cardinal Defendants to understate actual bulk sales by $2.3 billion during 3Q 2003 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amount.  The Cardinal Defendants' improper revenue classification included the following accounting manipulations:

(i)    by improperly classifying bulk shipment orders filled from Cardinal's own inventory as Operating Revenue, the Cardinal Defendants were able to and did understate actual Bulk Deliveries revenue by $1.5 billion during 3Q 2003 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amount;

(ii)    by improperly classifying bulk shipment orders intentionally or arbitrarily held by Cardinal for more than 24 hours as Operating Revenue, the Cardinal Defendants

were able to and did understate actual Bulk Deliveries revenue by $500 million during 3Q 2003 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amount; and

(iii)    by arbitrarily and improperly classifying zero margin bulk shipment orders as Operating Revenue when Cardinal substituted the Company's manufacturer order for a customer's order, the Cardinal Defendants were able to and did understate actual Bulk Deliveries revenue by $252 million during 3Q 2003 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amount;

(b)    During 3Q 2003 the Cardinal Defendants failed to disclose known trends and uncertainties by not reporting their practice of improperly classifying Bulk Deliveries revenue as Operating Revenue and thereby not disclosing Cardinal's actual financial performance, failure to meet revenue growth projections and the Company's inability to adjust to changes in the distribution market;

(c)    As detailed in ¶¶326-52, the Cardinal Defendants improperly managed earnings through various accounting manipulations which allowed them to hit security analysts' earnings expectations including:

(i)    improperly accounting for Cardinal's balance sheet reserves and accrual adjustments which caused the Company's reported net income to be overstated by $14.5 million which, in turn, resulted in EPS being overstated by $0.03;

(ii)    improperly recognizing cash discounts on pharmaceutical purchases before the drugs were resold and failing to disclose when the Company was using these discounts to reduce the costs of goods sold;

(iii)    fraudulently recognizing revenue on contracts from Cardinal's Automation and Information Services business related to the Pyxis subsidiary in violation of GAAP

and the Company's own publicly expressed policy not to recognize revenue on such contracts until the equipment sold under the contracts was installed; and

(iv)      improperly causing Cardinal to take excessive special charges (merger related and restructuring) which were not related to unusual or infrequent events. By taking these excessive charges as special charges, defendants caused Cardinal to understate normal recurring expenses which worked to inflate the Company's operating earnings and manage the Company's earnings going forward;

(d)      As detailed in ¶¶358-61, the Company lacked adequate internal controls;

(e)      As detailed in ¶¶365-66, as a consequence of the aforementioned practices, the Company's revenues and net income were artificially inflated and reported financial results were in violation of GAAP;

(f)      But for defendants' improper classification and reporting of zero margin bulk sales as Operating Revenue, Cardinal would have been forced to disclose a decline in Pharmaceutical Distribution Operating Revenue of 14%, versus the 10% growth reported, and a Company-wide Operating Revenue decline of 9%, versus the 11% reported growth; and

(g)      The Cardinal Defendants were failing to convince a material number of pharmaceutical distributors to enter into Inventory Management Agreements or agree to a fee-for-service distribution model that would preserve Cardinal's profit margin.

161.    Defendants' statements from April 23, 2003 to May 15, 2003, which were false and misleading when made, had a direct effect on Cardinal's stock price preventing greater reductions in the stock price which continued to trade at artificially inflated levels above $58.00 per share.

162.    Notwithstanding his knowledge that the statements in Cardinal's 3Q 2004 financial results regarding Cardinal's April 23, 2003 press release and conference call were false and misleading, within weeks of the April 23, 2003 press release and conference call, defendant Millar

unloaded 44,235 shares of his Cardinal stock for insider trading proceeds exceeding $2.35 million, and defendant Parrish unloaded 8,235 shares of his Cardinal stock for insider trading proceeds exceeding $475,000.

163.    On July 31, 2003, the Cardinal Defendants issued a news release over the *PR Newswire* in which they reported the Company's financial results for 4Q and FY 2003.  The release stated, in pertinent part, as follows:

> As reported in accordance with generally accepted accounting principles, operating revenues rose 15 percent for the fourth quarter to $13.5 billion from $11.8 billion a year ago.  Earnings per diluted share from continuing operations grew 28 percent to $0.82 for the fourth quarter, up from $0.64 a year ago.
>
> *        *        *
>
> For the full fiscal year 2003, operating revenues rose 14 percent to $50.5 billion from $44.4 billion a year ago.  Earnings per diluted share from continuing operations grew 27 percent to $3.12 for the year compared to $2.45 a year ago.
>
> *        *        *
>
> Walter said, "Record revenues, strong gross margins and continued improvement in productivity yielded record rates of return on sales, committed capital and equity. ***Our balance sheet is the strongest it has ever been with $1.7 billion in cash at year end***, allowing us to maximize growth opportunities to build on our leadership positions in the marketplace and giving us confidence that Cardinal Health will continue to deliver exceptional performance into fiscal 2004 and beyond."
>
> *        *        *
>
> **Pharmaceutical Distribution and Provider Services**
>
> ***Pharmaceutical Distribution and Provider Services produced solid results for the fourth quarter, posting record revenues of $10.9 billion, an increase of 14 percent***.  Strong sales increases to all customer segments were partially offset by a decline in wholesale-to-wholesale trading volume, which dampened overall growth by 1 percent.  New contract volume drove the strong sales performance in the quarter, providing solid top line momentum moving into fiscal 2004.
>
> *        *        *
>
> For the fiscal year, Pharmaceutical Distribution and Provider Services generated record revenues of $41.2 billion, an increase of 14 percent.  Operating earnings grew to $1.2 billion, a 14 percent improvement.  The strong revenue growth and continued expense improvement drove a 560 basis point improvement in return on committed capital to a record 36.8 percent, while generating strong cash flow.

The press release reported revenue as follows:

**FOURTH QUARTER 2003**

| Revenue (in millions) | June 2003 | June 2002 | % Change |
|---|---|---|---|
| Operating Revenue | $13,506.40 | $11,765.90 | 15% |
| Bulk Deliveries to Customer Warehouses | $1,682.20 | $1,262.30 | 33% |

164.    The same day, July 31, 2003, defendants hosted a conference call with analysts and investors to discuss Cardinal's business operations and prospects and 4Q and FY 2003 financial results.  The call repeated and addressed information previously made public in the Cardinal Defendants' July 31, 2003 press release.  Defendants Walter and Miller participated on the call and had an opportunity to address analysts and investors' questions and concerns.  During that call, defendant Miller stated:

> As expected, Cardinal Health's 4th quarter financial results capped off the year that delivered on the financial commitment that we made to our shareholders at the beginning of the year.  Strong revenue growth across all of our business segments drove continued expansion and operating earnings.
>
> *        *        *
>
> Now, let me comment on just a few matters of importance in our various operating segments, beginning with the Pharmaceutical Distribution and Provider Services segment.  Strong revenue growth of 14 percent was driven by 42 percent growth from alternate site customers and 11 percent growth from chain customers during the 4th quarter.  Incremental revenue from previously announced new customer wins had a positive impact during the quarter and served to offset the expected dampening effect of a slow down in our wholesaler-to-wholesaler trading revenues.

Defendant Walter also provided:

> Our solid 4th quarter performance capped another strong year for our company.  The financial results for the year were outstanding and we did deliver on the commitments. . . .
>
>         . . . In our analyst meeting last August, we forecasted 14 to 17 percent revenue growth and a 20 to 22 percent earnings per share growth for Cardinal Health, and our performance was right on target. . . .
>
>         Now for some of the highlights from the 4th quarter in fiscal 2003, from my perspective, strong revenue growth across the company, and each segment delivers at or above our expectations.

        \*      \*      \*

In our Pharmaceutical Distribution business . . . [r]evenue growth was strong with some important new relationships being established that provides us more from a supplier that moves us more from a supplier of products to a solutions provider.

        \*      \*      \*

First, we are confident that revenues in each of our segments will continue to be strong. And I've already given you some of the reasons for that. Revenue growth for the corporation should be in the mid-teens. So there is a lot of confidence in sales.

Finally, with regard to Cardinal's ability to adjust to the changing pharmaceutical distribution market, Walter stated:

[I'm] convinced, after extensive conversations with many of our manufacturing partners, that they are not seeking to pull margins from the distribution partners.

        \*      \*      \*

And this has led to the statements I made on the call in April, led to more active conversations at the high level with other manufacturers and I am very pleased with those conversations and met with the CEOs of some of the major pharmaceutical manufacturers to talk about and make sure they know about distribution and make sure they understand how moving to what I call a closer – a model that has sales in production and closer to demand of the patient.

165. On September 29, 2003, the Cardinal Defendants filed Cardinal's annual report with the SEC on Form 10-K for 4Q and FY 2003. The Company's Form 10-K was signed by defendants Walter, Miller and Jensen and reaffirmed previously announced financial results. The Form 10-K for 4Q and FY 2003 reported results as follows:

**FOURTH QUARTER 2003**

| Revenue (in millions) | June 2003 | June 2002 |
|---|---|---|
| Operating Revenue | $13,506.40 | $11,765.90 |
| Pharmaceutical Distribution Operating Revenue | $10,925.00 | $9,642.00 |
| Bulk Deliveries to Customer Warehouses | $1,682.20 | $1,262.30 |
| Earnings Per Share | $0.82 | $0.64 |

## Fiscal Year Ended June 30, 2003

| Revenue (in millions) | 2003 | 2002 | 2001 | 2000 | 1999 |
|---|---|---|---|---|---|
| Operating Revenue | $50,466.60 | $44,394.30 | $38,660.10 | $30,257.80 | $25,682.50 |
| Pharmaceutical Distribution Operating Revenue | $41,194.20 | $36,247.80 | $31,101.30 | - - | - - |
| Bulk Deliveries to Customer Warehouse | $6,270.40 | $6,741.40 | $9,287.50 | $8,092.10 | $7,050.40 |
| Pharmaceutical Distribution Bulk Deliveries | $6,069.90 | $6,741.40 | $9,287.50 | - - | - - |
| Earnings Per Share | $3.10 | $2.30 | $1.88 | $1.60 | $1.12 |

The FY 2003 Form 10-K also stated:

> The Pharmaceutical Distribution and Provider Services segment's operating revenue growth in fiscal 2003 resulted from strong sales to customers within this segment's core pharmaceutical distribution business, some of which were generated from the addition of new contracts.
>
>       *   *   *
>
> The overall gross margin as a percentage of operating revenue decreased in fiscal 2003 and 2002 due to the mix of businesses contributing to the consolidated gross margin. The decrease in gross margin as a percentage of operating revenue within the Pharmaceutical Distribution and Provider Services segment in fiscal 2003 resulted primarily from the following: (1) an increase in sales to lower-margin customers (which have a lower cost of distribution) that reduced gross margins; (2) competitive pricing; and (3) a moderation in vendor margins due to manufacturers attempting to better match their shipments to meet market demand, resulting in less surplus inventory . . .

166. Additionally, the FY 2003 Form 10-Q again stated that all revenue derived from "bulk deliveries made to customers' warehouses," whereby the Company "acts as an intermediary in the ordering and subsequent delivery of pharmaceutical products" was reported as "Bulk Deliveries." The Form 10-Q also repeated defendants' assurance that "[t]hese condensed consolidated financial statements have been prepared in accordance with the instructions to Form 10-Q and include all of the information and disclosures required by generally accepted accounting principles for interim reporting."

167. Filed together with Cardinal's FY 2003 Form 10-Q were certifications from defendants Walter and Miller in compliance with §§302 and 906 of the Sarbanes-Oxley Act. Included in the certifications were statements by Walter and Miller asserting that they had reviewed

the Company's FY 2003 Form 10-Q and that the public report "does not contain any untrue

statement of a material fact or omit to state a material fact necessary to make the statements made, in

light of the circumstances under which such statements were made, not misleading" as of June 30,

2003.

168.    With respect to Cardinal's financial statements for FY 2003 (ended June 30, 2003),

E&Y represented, in a report dated July 30, 2003 and included in the Company's FY 2003 10-K, the

following:

> We conducted our audit in accordance with auditing standards generally
> accepted in the United States. Those standards require that we plan and perform the
> audit to obtain reasonable assurance about whether the financial statements are free
> of material misstatement. An audit includes examining, on a test basis, evidence
> supporting the amounts and disclosures in the financial statements. An audit also
> includes assessing the accounting principles used and significant estimates made by
> management, as well as evaluating the overall financial statement presentation. We
> believe that our audit provides a reasonable basis for our opinion.

> In our opinion, the fiscal 2003 consolidated financial statements referred to
> above present fairly, in all material respects, the consolidated financial position of
> Cardinal Health, Inc. and subsidiaries as of June 30, 2003, and the consolidated
> results of their operations and their cash flows for the year then ended in conformity
> with accounting principles generally accepted in the United States. Also, in our
> opinion, the related fiscal 2003 and 2002 financial statement schedule, when
> considered in relation to the basic consolidated financial statements taken as a whole,
> presents fairly in all material respects the information set forth therein.

169.    The Cardinal Defendants' and E&Y's statements regarding 4Q and FY 2003 actual

financial results and Cardinal's success in transitioning the Pharmaceutical Distribution business

were false and misleading when made.  Defendants knew or recklessly disregarded, but failed to

disclose, the following:

(a)    As detailed in ¶¶285-318, during 4Q and FY 2003 the Cardinal Defendants

improperly classified revenue from bulk sales as Operating Revenue, the key performance metric

monitored by securities analysts and investors, to create the materially false and misleading

impression that Cardinal's Pharmaceutical Distribution business was adapting to market changes and

meeting projected growth rates.  The improper classification of Bulk Deliveries revenue allowed the

Cardinal Defendants to understate actual bulk sales by $2.5 billion during 4Q 2003 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amount. The Cardinal Defendants' improper revenue classification included the following accounting manipulations:

(i)      by improperly classifying bulk shipment orders filled from Cardinal's own inventory as Operating Revenue, the Cardinal Defendants were able to and did understate actual Bulk Deliveries revenue by $2.1 billion during 4Q 2003 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amount;

(ii)      by improperly classifying bulk shipment orders intentionally or arbitrarily held by Cardinal for more than 24 hours as Operating Revenue, the Cardinal Defendants were able to and did understate actual Bulk Deliveries revenue by $232 million during 4Q 2003 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amount; and

(iii)      by arbitrarily and improperly classifying zero margin bulk shipment orders as Operating Revenue when Cardinal substituted the Company's manufacturer order for a customer's order, the Cardinal Defendants were able to and did understate actual Bulk Deliveries revenue by $334 million during 4Q 2003 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amount;

(b)      During 4Q and FY 2003 the Cardinal Defendants failed to disclose known trends and uncertainties by not reporting their practice of improperly classifying Bulk Deliveries revenue as Operating Revenue and thereby not disclosing Cardinal's actual financial performance, failure to meet revenue growth projections and the Company's inability to adjust to changes in the distribution market;

(c)      As detailed in ¶¶326-52, the Cardinal Defendants improperly managed earnings through various accounting manipulations which allowed them to hit security analysts' earnings expectations including:

(i) improperly accounting for Cardinal's balance sheet reserves and accrual adjustments which caused the Company's reported net income to be overstated by $11.9 million and $30.7 million for 4Q and FY 2003, respectively, which, in turn, resulted in EPS for the same periods being overstated by $0.03 and $0.07;

(ii) improperly recognizing cash discounts on pharmaceutical purchases before the drugs were resold and failing to disclose when the Company was using these discounts to reduce the costs of goods sold;

(iii) fraudulently recognizing revenue on contracts from Cardinal's Automation and Information Services business related to the Pyxis subsidiary in violation of GAAP and the Company's own publicly expressed policy not to recognize revenue on such contracts until the equipment sold under the contracts was installed; and

(iv) improperly causing Cardinal to take excessive special charges (merger related and restructuring) which were not related to unusual or infrequent events. By taking these excessive charges as special charges, the Cardinal Defendants caused Cardinal to understate normal recurring expenses which worked to inflate the Company's operating earnings and manage the Company's earnings going forward;

(d) As detailed in ¶¶358-61, the Company lacked adequate internal controls;

(e) As detailed in ¶¶365-66, as a consequence of the aforementioned practices, the Company's revenues and net income were artificially inflated and reported financial results were in violation of GAAP;

(f) But for defendants' improper classification and reporting of zero margin bulk sales as Operating Revenue, Cardinal would have been forced to disclose a decline in Pharmaceutical Distribution Operating Revenue of 8%, versus the 13% growth reported, and a Company-wide Operating Revenue decline of 3%, versus the 15% reported growth; and

(g)     There was no reasonable basis for defendant Walter's statement, when made, that the Company had "important new relationships being established . . . that moves us more from a supplier of products to a solutions provider." The Cardinal Defendants were failing to convince a material number of pharmaceutical distributors to enter into Inventory Management Agreements or agree to a fee-for-service distribution model that would preserve Cardinal's profit margin.

170.     Defendants' statements on and about July 31, 2003 and September 29, 2003, which were false and misleading when made, had a direct effect on Cardinal's stock price preventing greater reductions in the stock price which continued to trade at artificially inflated levels above $59.00 per share.

171.     On October 9, 2003, the Cardinal Defendants issued a news release over the *PR Newswire* in which they announced that Cardinal had received a request for information from the SEC in connection with an informal inquiry.  The release stated as follows:

> Cardinal Health, Inc. announced today that it has received a request for information from the U.S. Securities and Exchange Commission in connection with an informal inquiry.  The request seeks historical financial and related information, including information pertaining to the accounting treatment of $22 million recovered from vitamin manufacturers who were found to have overcharged the company.  The company is highly confident in its accounting and financial disclosure practices, and intends to cooperate fully and provide all information required to satisfy the request

172.     The Cardinal Defendants' October 9, 2003 press release failed to disclose the ongoing improper revenue classification and recognition manipulations at the Company and implied that the SEC investigation was limited to an inquiry concerning the improper recording of the vitamin litigation funds.

**False Statements and Omissions During FY 2004**

173.     On October 23, 2003, the Cardinal Defendants issued a release over the *PR Newswire* in which they reported the Company's financial results for 1Q 2004.  The release stated, in pertinent part, as follows:

Cardinal Health, Inc., the leading provider of products and services supporting the health care industry, today announced *record first quarter business results marked by a double-digit revenue increase*, continued improvement in productivity and progress against its strategy to expand healthcare products and services along the chain of care.

For the period ending Sept. 30, 2003, as reported in accordance with generally accepted accounting principles (GAAP), revenue rose 16 percent to $13.3 billion from $11.4 billion a year ago and earnings per diluted share from continuing operations increased 16 percent to $0.74.

\*     \*     \*

"Performance for the quarter reflects Cardinal Health's diversified leadership positions in a strong healthcare market," said Robert D. Walter, chairman and chief executive officer, Cardinal Health. "Our medical products, pharmaceutical technologies and automation businesses delivered solid earnings results, with excellent momentum going into the remainder of the year. *Pharmaceutical distribution delivered exceptional revenue growth*, while earnings growth was affected by a challenging vendor margin environment. With strong momentum from our other key lines of business and expected second half improvement in pharmaceutical distribution results, Cardinal Health continues to target earnings per share growth of mid teens or better for fiscal 2004."

\*     \*     \*

*Pharmaceutical Distribution and Provider Services delivered 16 percent revenue growth, increasing to $10.8 billion, compared to $9.3 billion during the first quarter of fiscal year 2003.* Results from the company's provider services businesses continued strong across the board. Robust sales from all pharmaceutical distribution customer segments were partially offset by a significant decline in wholesale-to-wholesale trading company revenues.

The press release reported revenue as follows:

## FIRST QUARTER 2004

| Revenue (in millions) | September 2003 | September 2002 | % Change |
|---|---|---|---|
| Operating Revenue | $13,288.30 | $11,416.60 | 16.39% |
| Bulk Deliveries to Customer Warehouses | $2,100.40 | $1,669.50 | 25.81% |

174.    The same day, October 23, 2003, defendants hosted a conference call with analysts and investors to discuss Cardinal's business operations and prospects and 1Q and FY 2004 financial results. The call repeated and addressed information previously made public in the Cardinal Defendants' October 23, 2003 press release. Defendants Walter, Millar and Miller participated on

the call and had an opportunity to address analysts and investors' questions and concerns. During

that call, defendant Walter stated:

> Cardinal Health's first quarter performance was in line with our expectations and on track for our full year earnings and cash flow goals.

> \*       \*       \*

> Pharmaceutical Distribution and Provider Services: Revenue in the quarter came in at a very strong 16% growth rate, particularly in light of the continuing decline in the mix of revenues through our Pharmaceutical Distribution trading company.

Also during that call, defendant Miller told investors and analysts:

> ***Let me comment on just a few key take aways in our various operating segments, beginning with the Pharmaceutical Distribution and Provider Services segment. Excellent revenue growth of 16% was driven by strong growth across all customer classes***.

175. After Cardinal's 1Q 2004 results were issued and the conference call with securities

analysts and investors was completed, Morgan Stanley, Bear Stearns, Hambrecht, CSFB, William

Blair, Susquehanna Financial Group, Thomas Weisel Partners, Raymond James and Jefferies issued

analyst reports which repeated Cardinal's 1Q 2004 financial results to the market. Many of the

analysts noted that the Company's Pharmaceutical Distribution business Operating Revenue growth,

which exceeded management guidance, drove the Company's stock price higher. Based on

statements made by defendants, many of the securities analysts noted that the Company achieved

Operations Revenue growth in the Pharmaceutical Distribution business because the Company was

transitioning to the new business model of buying product from drug manufacturers under IMAs.

For example, an October 23, 2003 analyst report issued by Morgan Stanley stated:

**The Luxury of Low Expectations**

- CAH benefited from beaten down expectations

> Despite reporting its weakest earnings growth on record, CAH rallied due to better than expected distribution revenues, solid cash flow and a continued expectation of a back half improvement.

*     *     *

**Summary and Investment Conclusion**

Cardinal reported fiscal 1Q04 EPS of $0.76, in-line with our estimate and a penny below consensus.  Earnings were up 14% over last year.  Stronger than expected revenues in distribution and med-surg were offset by lower than forecasted revenues in PTS and automation.  All told, this was a weak quarter for Cardinal, but investors were expecting worse.

Drug distribution revenue growth of 16% beat our higher than consensus 15% forecast.  Retail sales growth has looked better in recent months and may be playing a role.

*     *     *

**Highlights**:

- Strong revenue growth was based on new contract wins and possibly improving pharma market growth

*     *     *

**Details**

Stronger than expected drug distribution revenue growth and in-line operating earnings were two key sources of relief for Cardinal investors. . . .

Strong revenue growth was due in part to new contract wins that began to impact volumes earlier this year, and improving growth rates among the company's customers. . . .

Cardinal highlighted Merck's inventory management program announced yesterday as a positive development for the company and an example of the type of agreement Cardinal will pursue with other manufacturers.  Rather than profiting on inflation-linked measures, a distributor will earn a fee for services rendered, which could be a more reliable source of growth.  Merck will specifically pay a distributor to distribute product, provide the manufacturer with sales data and guarantee a maximum level of inventory in the channel.

176.  On November 14, 2003, the Cardinal Defendants filed Cardinal's quarterly report with the SEC on Form 10-Q for 1Q 2004.  The Company's Form 10-Q was signed by defendants Walter and Miller and reaffirmed the previously announced financial results.  The Form 10-Q for 1Q 2004 reported results as follows:

**FIRST QUARTER 2004**

| Revenue (in millions) | September 2003 | September 2002 |
|---|---|---|
| Operating Revenue | $13,288.30 | $11,416.60 |
| Pharmaceutical Distribution Operating Revenue | $10,823.90 | $9,318.40 |
| Bulk Deliveries to Customer Warehouses | $2,100.40 | $1,669.50 |
| Earnings Per Share | $0.74 | $0.64 |

The 1Q 2004 Form 10-Q also stated:

> Total operating revenue for the three months ended September 30, 2003, increased 16% compared to the same period of the prior year. This increase resulted from a higher sales volume across each of the Company's segments.

> \*        \*        \*

> The Pharmaceutical Distribution and Provider Services segment's operating revenue growth of 16% during the first quarter of fiscal 2004 resulted from strong sales to customers within this segment's core pharmaceutical distribution business.

177.    Additionally, the 1Q 2004 Form 10-Q again stated that all revenue derived from "bulk deliveries made to customers' warehouses," whereby the Company "acts as an intermediary in the ordering and subsequent delivery of pharmaceutical products" was reported as "Bulk Deliveries." The Form 10-Q also repeated defendants' assurance that "[t]hese condensed consolidated financial statements have been prepared in accordance with the instructions to Form 10-Q and include all of the information and disclosures required by generally accepted accounting principles for interim reporting."

178.    Filed together with Cardinal's 1Q 2004 Form 10-Q were certifications from defendants Walter and Miller in compliance with §§302 and 906 of the Sarbanes-Oxley Act. Included in the certifications were statements by Walter and Miller asserting that they had reviewed the Company's 1Q 2004 Form 10-Q and that the public report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading" as of September 30, 2003.

179. The Cardinal Defendants' statements regarding 1Q 2004 actual financial results and Cardinal's success in transitioning the Pharmaceutical Distribution business were false and misleading when made. Defendants knew or recklessly disregarded, but failed to disclose, the following:

(a) As detailed in ¶¶285-318, during 1Q 2004 the Cardinal Defendants improperly classified revenue from bulk sales as Operating Revenue, the key performance metric monitored by securities analysts and investors, to create the materially false and misleading impression that Cardinal's Pharmaceutical Distribution business was adapting to market changes and meeting projected growth rates. The improper classification of Bulk Deliveries revenue allowed the Cardinal Defendants to understate actual bulk sales by $2.5 billion during 1Q 2004 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amount. The Cardinal Defendants' improper revenue classification included the following accounting manipulations:

(i) by improperly classifying bulk shipment orders filled from Cardinal's own inventory as Operating Revenue, the Cardinal Defendants were able to and did understate actual Bulk Deliveries revenue by $2.3 billion during 1Q 2004 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amount;

(ii) by improperly classifying bulk shipment orders intentionally or arbitrarily held by Cardinal for more than 24 hours as Operating Revenue, the Cardinal Defendants were able to and did understate actual Bulk Deliveries revenue by $191 million during 1Q 2004 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amount; and

(iii) by arbitrarily and improperly classifying zero margin bulk shipment orders as Operating Revenue when Cardinal substituted the Company's manufacturer order for a customer's order, the Cardinal Defendants were able to and did understate actual Bulk Deliveries

revenue by $13 million during 1Q 2004 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amount;

(b)     During 1Q 2004 the Cardinal Defendants failed to disclose known trends and uncertainties by not reporting their practice of improperly classifying Bulk Deliveries revenue as Operating Revenue and thereby not disclosing Cardinal's actual financial performance, failure to meet revenue growth projections and the Company's inability to adjust to changes in the distribution market;

(c)     As detailed in ¶¶326-52, the Cardinal Defendants improperly managed earnings through various accounting manipulations which allowed them to hit security analysts' earnings expectations including:

(i)     improperly accounting for Cardinal's balance sheet reserves and accrual adjustments which caused the Company's reported net income to be overstated by $4.8 million which, in turn, resulted in EPS being overstated by $0.01;

(ii)     improperly recognizing cash discounts on pharmaceutical purchases before the drugs were resold and failing to disclose when the Company was using these discounts to reduce the costs of goods sold;

(iii)     fraudulently recognizing revenue on contracts from Cardinal's Automation and Information Services business related to the Pyxis subsidiary in violation of GAAP and the Company's own publicly expressed policy not to recognize revenue on such contracts until the equipment sold under the contracts was installed; and

(iv)     improperly causing Cardinal to take excessive special charges (merger related and restructuring) which were not related to unusual or infrequent events.  By taking these excessive charges as special charges, the Cardinal Defendants caused Cardinal to understate normal

recurring expenses which worked to inflate the Company's operating earnings and manage the Company's earnings going forward;

(d)    As detailed in ¶¶358-61, the Company lacked adequate internal controls;

(e)    As detailed in ¶¶365-66, as a consequence of the aforementioned practices, the Company's revenues and net income were artificially inflated and reported financial results were in violation of GAAP;

(f)    But for defendants' improper classification and reporting of zero margin bulk sales as Operating Revenue, Cardinal would have been forced to disclose a decline in its Pharmaceutical Distribution Operating Revenue of 11%, versus the 16% growth reported, and a Company-wide Operating Revenue decline of 5%, versus the 16% reported growth; and

(g)    The Cardinal Defendants were failing to convince a material number of pharmaceutical distributors to enter into Inventory Management Agreements or agree to a fee-for-service distribution model that would preserve Cardinal's profit margin.

180.    Defendants' statements on and about October 23, 2003 and November 14, 2003, which were false and misleading when made, had a direct effect on Cardinal's stock price which rose $5.37 per share from the close of October 22, 2003 to the close of November 17, 2003.

181.    On January 22, 2004, the Cardinal Defendants issued a release over the *PR Newswire* in which they reported the Company's financial results for 2Q 2004.  The release stated, in pertinent part, as follows:

> Cardinal Health, Inc., the leading provider of products and services supporting the health care industry, today announced ***record second quarter revenue***, net earnings and earnings per share, led by strong customer demand for the company's product and service offerings across the chain of care.
>
> ***For the quarter ended Dec. 31, 2003, in accordance with generally accepted accounting principles (GAAP), revenue rose to $14.1 billion, earnings from continuing operations reached $381 million and earnings per diluted share from continuing operations improved to $0.87.  Year-to-date revenues rose to $27.4***

*billion, with earnings and earnings per diluted share from continuing operations reaching $711 million and $1.61, respectively.*

\* \* \*

"Our financial performance for the second quarter was consistent with our expectations and once again reflects strong demand from customers in all segments," said Robert D. Walter, chairman and chief executive officer of Cardinal Health."

The press release reported revenue as follows:

### SECOND QUARTER 2004

| Revenue (in millions) | December 2003 | December 2002 | % Change |
|---|---|---|---|
| Operating Revenue | $14,093.60 | $12,706.30 | 11% |
| Bulk Deliveries to Customer Warehouses | $2,256.80 | $1,384.70 | 63% |

182.    The same day, January 22, 2004, defendants hosted a conference call with analysts and investors to discuss Cardinal's business operations and prospects and 2Q 2004 financial results. The call repeated and addressed information previously made public in the Cardinal Defendants' January 22, 2004 press release. Defendants Walter and Miller participated on the call and had an opportunity to address analysts and investors' questions and concerns. During that call, defendant Walter stated that "*overall operating revenue growth reflects a significant decrease in lower-margin revenue from bulk and wholesale trading sales*." Walter also made the following comments regarding Cardinal's adaptation to changes in the distribution market:

In the last several months, we have made a tremendous amount of progress in accelerating the transition occurring in drug distribution. In fact, since our last earnings call we have reached a number of important agreements with pharmaceutical manufacturers that demonstrates the move to a new type of pricing margin relationship with our manufacturer partners.

The new just-in-time fee-for-service model will be more efficient for manufacturers and for Cardinal, and it will provide us higher returns in the future.

. . . I believe we've turned the corner in pharmaceutical distribution business, and we've seen strong evidence this quarter to support that conclusion.

\* \* \*

We made tremendous progress in the transition to a new inventory and service distribution model.

Today, we are in active negotiations with 47 manufacturers that represent the majority of the volume that moved through our channel. A number of agreements have been reached in the past three months.

*    *    *

So I think the process is going well. 47 manufacturers discussions is a lot, but you know, you have to appreciate we're in discussions with them all the time.

183. On January 22, 2004, the *Dow Jones News Service* published an article titled "Cardinal Health CEO Business Has Turned the Corner" based on defendants' statements in the 2Q 2004 press release and conference call and quoting defendant Walter:

Cardinal Health Inc. Chief Executive Robert Walter said Thursday that he believes the company's struggling drug distribution business in on the right track and will see earnings rise.

Speaking during a conference call after the company reported in-line second-quarter fiscal 2004 earnings, Walter addressed what he called the "transition" of the company's key drug distribution business from one that had been "buy and hold" to one that emphasizes a more efficient "just in time" business model.

This shift which has taken place over the last year, punished Cardinal's business, with operating earnings for its Pharmaceutical Distribution and Provider Services division falling 8% during the quarter.

The division's revenue rose 9% in the quarter to $11.41 billion, a weak showing, according to analysts.

Walker acknowledged that somewhat disappointing results, but said the company is on the right track.

"We've made tremendous progress" in repositioning the company to deal with the business model shift, Walter said. "We're clearly moving it in the right direction and moving it toward renewed earnings growth."

He said the company has "turned the corner," and that the business has long-term strong top line prospects. It will achieve "outstanding financial results" in the long term. Cardinal has an advantage over competitors, he said, because of the breadth of services it offers.

For some time, the company has been studying the profitability of every drug manufacturer and each of their products in order to better understand how the business now works. Walter said the company is in active negotiations with 47 manufacturers. A number of agreements have been reached in the last three months – fee based arrangements "that are good for both parties," with more predictable demand and margins.

184.     On February 17, 2004, the Cardinal Defendants filed Cardinal's quarterly report with the SEC on Form 10-Q for 2Q 2004.  The Company's Form 10-Q was signed by defendants Walter and Miller and reaffirmed the previously announced financial results.  The Form 10-Q for 2Q 2004 reported results as follows:

**SECOND QUARTER 2004**

| Revenue (in millions) | December 2003 | December 2002 |
|---|---|---|
| Operating Revenue | $14,093.60 | $12,706.30 |
| Pharmaceutical Distribution Operating Revenue | $11,414.50 | $10,505.40 |
| Bulk Deliveries to Customer Warehouses | $2,256.80 | $1,384.70 |
| Earnings Per Share | $0.86 | $0.82 |

The 2Q 2004 Form 10-Q also stated:

The Company's Pharmaceutical Distribution and Provider Services segment is in transition in its business model from a "buy and hold," inventory accumulation model to a "just-in-time," fee-for-service model.  Historically, one way the Company obtained value from manufacturers was by buying inventories from them, holding those inventories and generating margins on the subsequent sale of that inventory after pharmaceutical prices increased.  The Company is currently working with its pharmaceutical manufacturing vendors to transition towards a "just-in-time" fee-for-service business model where the Company will be compensated for the many services it provides the manufacturer.  The Company has incurred mismatches in its vendor margins period over period while this transition is occurring.  The Company anticipates this business model transition to continue through the remainder of the current fiscal year as well as into fiscal 2005.  ***However, the Company believes that the most severe of the vendor margin mismatches occurred in the quarter ended December 31, 2003, causing this segment to experience an 8% decline in operating earnings during that quarter***.  The Company does not expect this trend to continue.  As the transition occurs, future periods should gradually evolve to reflect the new model, under which earnings growth should more closely approximate revenue growth.

185.     Additionally, the 2Q 2004 Form 10-Q again stated that all revenue derived from "bulk deliveries made to customers' warehouses," whereby the Company "acts as an intermediary in the ordering and subsequent delivery of pharmaceutical products" was reported as "Bulk Deliveries."  The Form 10-Q also repeated defendants' assurance that "[t]hese condensed consolidated financial statements have been prepared in accordance with the instructions to Form 10-Q and include all of

the information and disclosures required by generally accepted accounting principles for interim reporting."

186.     Filed together with Cardinal's 2Q 2004 Form 10-Q were certifications from defendants Walter and Miller in compliance with §§302 and 906 of the Sarbanes-Oxley Act. Included in the certifications were statements by Walter and Miller asserting that they had reviewed the Company's 2Q 2004 Form 10-Q and that the public report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading" as of December 31, 2003.

187.     On February 19, 2004, Cardinal hosted its Semi-Annual Investor Update conference. During the Update conference, defendants Walter, Miller, Fotiadis and Parrish repeated the previously issued financial results and assured investors that Cardinal's conversion from buy and hold to fee-for-service distribution arrangements with pharmaceutical manufacturers was proceeding smoothly.  Defendant Parrish stated:

> We have seen tremendous organic growth in the business and we're not looking forward maybe projections of winning through large agreement and having to sort of hit one over the fence, if you will in order to make our numbers.

*     *     *

> Our revenue growth is dependable and sustainable.  We're going to grow slightly faster than the marketplace because of our mix of mail-order business and alternate-care business.

*     *     *

> Now finally, as we have been informing you over the last three quarters, our manufacturers' needs have shifted.  It is our inventory management model, with inventory levels that match demand, production efficiencies and increase the safety and security of the U.S. distribution channel.

*     *     *

Finally, as we move through fiscal year 2005, our results will begin to resemble the traditional model for the distribution company, in which earnings grow faster than revenues, the model that you're used to seeing from Cardinal Distribution.

\*      \*      \*

And we're making significant progress with our branded manufacturer customers at this point.

\*      \*      \*

And currently, we have in process 47 manufacturers, representing about 80% of our volume in these negotiations in some phase of these five-step processes.

Defendant Miller also stated during the Update conference:

In the first half of 2004 operating revenues grew a healthy 14% while operating earnings grew 8%.

188.     The Cardinal Defendants' statements regarding 2Q 2004 actual financial results and Cardinal's success in transitioning the Pharmaceutical Distribution business were false and misleading when made. Defendants knew or recklessly disregarded, but failed to disclose, the following:

(a)     As detailed in ¶¶285-318, during 2Q 2004 the Cardinal Defendants improperly classified revenue from bulk sales as Operating Revenue, the key performance metric monitored by securities analysts and investors, to create the materially false and misleading impression that Cardinal's Pharmaceutical Distribution business was adapting to market changes and meeting projected growth rates. The improper classification of Bulk Deliveries revenue allowed the Cardinal Defendants to understate actual bulk sales by $2.5 billion during 2Q 2004 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amount. The Cardinal Defendants' improper revenue classification included the following accounting manipulations:

(i)     by improperly classifying bulk shipment orders filled from Cardinal's own inventory as Operating Revenue, the Cardinal Defendants were able to and did understate actual

Bulk Deliveries revenue by $2.3 billion during 2Q 2004 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amount;

(ii)     by improperly classifying bulk shipment orders intentionally or arbitrarily held by Cardinal for more than 24 hours as Operating Revenue, the Cardinal Defendants were able to and did understate actual Bulk Deliveries revenue by $187 million during 2Q 2004 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amount; and

(iii)     by arbitrarily and improperly classifying zero margin bulk shipment orders as Operating Revenue when Cardinal substituted the Company's manufacturer order for a customer's order, the Cardinal Defendants were able to and did understate actual Bulk Deliveries revenue by $74 million during 2Q 2004 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amount;

(b)     During 2Q 2004 the Cardinal Defendants failed to disclose known trends and uncertainties by not reporting their practice of improperly classifying Bulk Deliveries revenue as Operating Revenue and thereby not disclosing Cardinal's actual financial performance, failure to meet revenue growth projections and the Company's inability to adjust to changes in the distribution market;

(c)     As detailed in ¶¶326-52, the Cardinal Defendants improperly managed earnings through various accounting manipulations which allowed them to hit security analysts' earnings expectations including:

(i)     improperly accounting for Cardinal's balance sheet reserves and accrual adjustments which caused the Company's reported net income to be overstated by $4.9 million which, in turn, resulted in EPS being overstated by $0.01;

(ii)        improperly recognizing cash discounts on pharmaceutical purchases before the drugs were resold and failing to disclose when the Company was using these discounts to reduce the costs of goods sold;

(iii)        fraudulently recognizing revenue on contracts from Cardinal's Automation and Information Services business related to the Pyxis subsidiary in violation of GAAP and the Company's own publicly expressed policy not to recognize revenue on such contracts until the equipment sold under the contracts was installed; and

(iv)        improperly causing Cardinal to take excessive special charges (merger related and restructuring) which were not related to unusual or infrequent events.  By taking these excessive charges as special charges, the Cardinal Defendants caused Cardinal to understate normal recurring expenses which worked to inflate the Company's operating earnings and manage the Company's earnings going forward;

(d)        As detailed in ¶¶358-61, the Company lacked adequate internal controls;

(e)        As detailed in ¶¶365-66, as a consequence of the aforementioned practices, the Company's revenues and net income were artificially inflated and reported financial results were in violation of GAAP;

(f)        But for defendants' improper classification and reporting of zero margin bulk sales as Operating Revenue, Cardinal would have been forced to disclose a decline in its Pharmaceutical Distribution Operating Revenue of 15%, versus the 16% growth reported, and a Company-wide Operating Revenue decline of 9%, versus the 11% reported growth; and

(g)        There was no reasonable basis for defendant Walter's statement that the Company had "turned the corner in pharmaceutical distribution business" and defendant Parrish's statement that "we're making significant progress with our branded manufacturer customers at this point."  The Cardinal Defendants were failing to convince a material number of pharmaceutical

distributors to enter into Inventory Management Agreements or agree to a fee-for-service distribution model that would preserve Cardinal's profit margin.

189.    Defendants' statements on and about January 22, 2004, February 17, 2004 and February 19, 2004, which were false and misleading when made, had a direct effect on Cardinal's stock price which rose $4.65 per share from the close of January 21, 2004 to the close of February 19, 2004.

190.    Notwithstanding their knowledge that the statements regarding Cardinal's 2Q 2004 financial results were false and misleading, within weeks of the statements being made defendant Jensen sold 4,338 shares of his Cardinal stock for insider trading proceeds exceeding $292,000, and within four days of the January 22, 2004 press release and conference call, defendant Parrish unloaded 7,797 shares of his Cardinal stock for insider trading proceeds exceeding $492,000.

191.    On April 22, 2004, the Cardinal Defendants issued a release over the *PR Newswire* in which they reported the Company's financial results for 3Q 2004. The release stated, in pertinent part, as follows:

Strong customer demand for its diversified portfolio of healthcare products and services, combined with disciplined expense and asset management, drove ***record third-quarter operating performance for Cardinal Health, Inc.***, the leading provider of products and services supporting the health care industry announced today.

For the quarter ended March 31, 2004, in accordance with generally accepted accounting principles (GAAP), revenue rose 14 percent to $14.6 billion, operating earnings increased 9 percent to $665 million and earnings from continuing operations were up 11 percent to $429 million. Earnings per diluted share from continuing operations improved 15 percent to $0.98.

Year-to-date revenues now exceed $42 billion, with operating earnings and earnings per diluted share from continuing operations reaching $1.8 billion and $2.58, respectively. With strong operating cash flow of $787 million during the quarter, the company expects to exceed its operating cash flow target of $1.3 billion for the full fiscal year ending June 30.

"Our results this quarter once again demonstrate the power of our diverse portfolio of market-leading products and services and the tremendous growth opportunities within the healthcare industry," said Robert D. Walter, chairman and chief executive officer of Cardinal Health. "The success of our strategy to achieve

scale and integrate our offerings is once again reflected in this quarter's results. In addition, continued exceptional cash flow allows us to fund this strategy for the future and fuel long-term growth."

The press release reported revenue as follows:

**THIRD QUARTER 2004**

| Revenue (in millions) | March 2004 | March 2003 | % Change |
|---|---|---|---|
| Operating Revenue | $14,638.90 | $12,837.30 | 14% |
| Bulk Deliveries to Customer Warehouses | $1,753.40 | $1,534.00 | 14% |

192. The same day, April 22, 2004, defendants hosted a conference call with analysts and investors to discuss Cardinal's business operations and prospects and 3Q 2004 financial results. The call repeated and addressed information previously made public in the Cardinal Defendants' April 22, 2004 press release. Defendants Walter, Miller and Fotiades participated on the call and had an opportunity to address analysts and investors' questions and concerns. During that call, defendant Walter stated:

Overall Cardinal Health third quarter performance was very solid in line with expectations and showing a number of very promising trends. . . .

\* \* \*

As we move through 2005, we're confident that the pharmaceutical distribution will once again return to a formula where operating earnings will grow at least as fast as revenue.

Additionally, regarding the progress of new fee-for-service agreements with pharmaceutical manufacturers, defendant Fotiades stated:

Another important measure of our progress to the just in time business model as seen in our day's inventory on hand, which declined a significant seven days versus the year-ago period, driven largely by distribution . . . .

\* \* \*

So I think these discussions are now moving into a much more informed kind of discussion because, you know, they now know it's real. They're starting to do their own work and it's making good progress. . . . **We have agreements with everybody today and those agreements are going to continue to get refined and we'll continue to see improvements in our business as a result**.

Further, defendant Miller emphasized the Company's decreasing bulk sales by stating:

> The strong growth in direct store door sales is being partially offset by a reduction in the amount of full case bulk from stock sales which actually declined 48%

> During this period of transition in the pharmaceutical distribution business, I believe that the best barometer of downstream customer demand is to aggregate all sales, including the bulk deliveries to customer warehouses which are not included in operating revenues.

193.    On May 14, 2004, the Cardinal Defendants filed Cardinal's quarterly report with the SEC on Form 10-Q for 3Q 2004. The Company's Form 10-Q was signed by defendants Walter and Miller and reaffirmed the previously announced financial results. The Form 10-Q for 3Q 2004 reported results as followed:

**THIRD QUARTER 2004**

| Revenue (in millions) | March 2004 | March 2003 |
|---|---|---|
| Operating Revenue | $14,638.90 | $12,837.30 |
| Pharmaceutical Distribution Operating Revenue | $11,909.20 | $10,446.00 |
| Bulk Deliveries to Customer Warehouses | $1,753.40 | $1,534.00 |
| Earnings Per Share | $0.97 | $0.84 |

194.    Additionally, the 3Q 2004 Form 10-Q again stated that all revenue derived from "bulk deliveries made to customers' warehouses," whereby the Company "acts as an intermediary in the ordering and subsequent delivery of pharmaceutical products" was reported as "Bulk Deliveries." The Form 10-Q also repeated defendants' assurance that "[t]hese condensed consolidated financial statements have been prepared in accordance with the instructions to Form 10-Q and include all of the information and disclosures required by generally accepted accounting principles for interim reporting."

195.    Filed together with Cardinal's 3Q 2004 Form 10-Q were certifications from defendants Walter and Miller in compliance with §§302 and 906 of the Sarbanes-Oxley Act. Included in the certifications were statements by Walter and Miller asserting that they had reviewed the Company's 3Q 2004 Form 10-Q and that the public report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in

light of the circumstances under which such statements were made, not misleading" as of March 30, 2004.

196. The Cardinal Defendants' statements regarding 3Q 2004 actual financial results and Cardinal's success in transitioning the Pharmaceutical Distribution business were false and misleading when made. Defendants knew or recklessly disregarded, but failed to disclose the following:

(a) As detailed in ¶¶285-318, during 3Q 2004 the Cardinal Defendants improperly classified revenue from bulk sales as Operating Revenue, the key performance metric monitored by securities analysts and investors, to create the materially false and misleading impression that Cardinal's Pharmaceutical Distribution business was adapting to market changes and meeting projected growth rates. The improper classification of Bulk Deliveries revenue allowed the Cardinal Defendants to understate actual bulk sales by $2.4 billion during 3Q 2004 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amount. The Cardinal Defendants' improper revenue classification included the following accounting manipulations:

(i) by improperly classifying bulk shipment orders filled from Cardinal's own inventory as Operating Revenue, the Cardinal Defendants were able to and did understate actual Bulk Deliveries revenue by $2.3 billion during 3Q 2004 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amount;

(ii) by improperly classifying bulk shipment orders intentionally or arbitrarily held by Cardinal for more than 24 hours as Operating Revenue, the Cardinal Defendants were able to and did understate actual Bulk Deliveries revenue by $148 million during 3Q 2004 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amount; and

(iii) by arbitrarily and improperly classifying zero margin bulk shipment orders as Operating Revenue when Cardinal substituted the Company's manufacturer order for a

customer's order, the Cardinal Defendants were able to and did understate actual Bulk Deliveries revenue by $31 million during 3Q 2004 and overstate Pharmaceutical Distribution and total Operating Revenue by the same amount;

(b)     During 3Q 2004 the Cardinal Defendants failed to disclose known trends and uncertainties by not reporting their practice of improperly classifying Bulk Deliveries revenue as Operating Revenue and thereby not disclosing Cardinal's actual financial performance, failure to meet revenue growth projections and the Company's inability to adjust to changes in the distribution market;

(c)     As detailed in ¶¶325-51, the Cardinal Defendants improperly managed earnings through various accounting manipulations which allowed them to hit security analysts' earnings expectations including:

(i)     improperly accounting for Cardinal's balance sheet reserves and accrual adjustments which caused the Company's reported net income to be overstated by 5.7 million, which, in turn, resulted in EPS being overstated by $0.01;

(ii)     improperly recognizing cash discounts on pharmaceutical purchases before the drugs were resold and failing to disclose when the Company was using these discounts to reduce the costs of goods sold;

(iii)     fraudulently recognizing revenue on contracts from Cardinal's Automation and Information Services business related to the Pyxis subsidiary in violation of GAAP and the Company's own publicly expressed policy not to recognize revenue on such contracts until the equipment sold under the contracts was installed; and

(iv)     improperly causing Cardinal to take excessive special charges (merger related and restructuring) which were not related to unusual or infrequent events. By taking these excessive charges as special charges, defendants caused Cardinal to understate normal recurring

expenses which worked to inflate the Company's operating earnings and manage the Company's earnings going forward;

(d)     As detailed in ¶¶358-61, the Company lacked adequate internal controls;

(e)     As detailed in ¶¶365-66, as a consequence of the aforementioned practices, the Company's revenues and net income were artificially inflated and reported financial results were in violation of GAAP;

(f)     But for defendants' improper classification and reporting of zero margin bulk sales as Operating Revenue, Cardinal would have been forced to disclose a decline in its Pharmaceutical Distribution Operating Revenue of 9%, versus the 14% growth reported, and a Company-wide revenue decline of 5%, versus the 14% reported growth; and

(g)     There was no reasonable basis for defendant Fotiades' statement, when made, that the Company had made good progress with manufacturers and that "[w]e have agreements with everybody today and those agreements are going to continue to get refined, and we will continue to see improvements in our business as a result." On the contrary, the Cardinal Defendants' attempts to structure inventory management agreements to replace the buy-and-hold inventory model were an abject failure as shown by the fact, revealed at the end of the Class Period, that by June 2004 the Company had reached agreements with no more than 20% of its vendors and those agreements covered only a fraction of pharmaceutical product sales.

197.    Defendants' statements on and about April 22, 2004 and May 14, 2004, which were false and misleading when made, had a direct effect on Cardinal's stock price which rose to above $75.00 per share in the seven trading days following April 22, 2004.

198.    Notwithstanding his knowledge that the statements regarding Cardinal's 3Q 2004 financial results were false and misleading, within weeks of the statements being made – and only

weeks before the truth about defendants' fraud began to be revealed – defendant Jensen rushed to sell 6,019 shares of his Cardinal stock for insider trading proceeds of $451,425.

## THE TRUTH ABOUT DEFENDANTS' FRAUD EMERGES

199.     On May 14, 2004, the same day Cardinal's 3Q 2004 Form 10-Q was filed, the Cardinal Defendants revealed for the first time that the SEC matter was upgraded to a formal investigation.  Defendants issued a press release entitled "Cardinal Health Announces Change in Status of SEC Inquiry."  The press release stated in part:

> Cardinal Health, Inc. announced today that on May 6, 2004, it was notified by ***the U.S. Securities and Exchange Commission that a previously-disclosed informal inquiry initiated in October, 2003, has been converted to a formal investigation***.  The SEC's initial request sought historical financial and related information, including but not limited to information pertaining to the accounting treatment of $22 million recovered from vitamin manufacturers who were found to have overcharged the company.  In April, in connection with the SEC's informal inquiry, the audit committee of Cardinal Health retained independent counsel to conduct its own on-going review.

200.     In response to investors and the market's concerns about defendants' vague disclosure, on Sunday, May 16, 2004, the Company rushed to issue a press release, providing additional information about the previously announced SEC investigation and audit committee review and revealed for the first time that the SEC review was not limited to the vitamin litigation. The May 16, 2004 release stated:

> •      On October 7, 2003, the Company received a request from the SEC, in connection with an informal inquiry, for historical financial and related information including but not limited to the accounting treatment of the recovery from vitamin manufacturers.  The SEC's request sought a variety of documentation, including the Company's accounting records for fiscal 2001 through fiscal 2003, as well as notes, memoranda, presentations, e-mail and other correspondence, budgets, forecasts and estimates.

> •      Since October 2003, the Company has been collecting and providing to the SEC documents responsive to the October request.  Due to the scope of the October request and the breadth of the Company's operations, the Company is cooperating with the SEC to provide documents to the SEC on a rolling basis, and that process is ongoing.

- In April 2004, the Company's audit committee determined to undertake an internal review and retained independent counsel. This review:

   --   was prompted by documents contained in the production to the SEC that raised issues as to certain accounting matters, including but not limited to the establishment and adjustment of certain reserves and their impact on quarterly earnings, and is not limited to the accounting treatment of the recovery from vitamin manufacturers; and

   --   is ongoing and has not reached any conclusions.

- As disclosed in the Company's Form 10-Q, if the audit committee review determines that any changes are required to the Company's disclosure controls and procedures or internal controls, the Company will make any necessary modifications.

- On May 6, 2004, the Company was notified that the pending SEC inquiry had been converted to a formal investigation. The SEC investigation is not limited to the accounting treatment of the recovery from vitamin manufacturers.

201.   As the market finally began to understand the expense and severity of defendants' fraud, Cardinal's stock price plummeted. From a May 14, 2004 high of $73.28, the Company's stock price dropped nearly 10% over the following five trading days, closing at $66.55 on May 21, 2004. Despite the disclosures that the SEC inquiry had been upgraded to a formal investigation and the revelation that the SEC investigation was not limited to the vitamin litigation, Cardinal's stock still traded at artificially inflated levels because the full nature and extent of the Cardinal Defendants' accounting manipulations remained undisclosed.

202.   On May 19, 2004, defendants Walter and Fotiades hosted a conference call with securities analysts to discuss Cardinal's merger with ALARIS. In response to analysts' questions about the SEC investigation, defendant Walter stated: "[I]f I thought there was anything us [*sic*] required to report, I would report it immediately. But I am not anticipating any meaningful announcement anytime soon."

203.   Defendant Walter's statements to reassure securities analysts about the scope of the SEC investigation during the May 19, 2004, conference call were false and misleading as defendant

Walter was aware that Cardinal had used unclassified zero-margin bulk sales to make it appear that the Company was achieving operating revenue growth.

204.    After the close of trading on June 30, 2004, the Cardinal Defendants stunned investors when the Company made the following disclosures:

- 4Q 2004 earnings would be $0.93 cents to $0.95 cents a share before special items, far short of the analyst consensus estimates of $1.03 a share;

- Cardinal lowered FY 2004 EPS growth outlook to 11% from prior guidance that called for an increase in the mid-teens or higher;

- the shortfall and lowered guidance was attributable to the Company's inability to convert its manufacturing client to the new fee-for-service distribution model;

- the Company had received a subpoena from the SEC which included a request for "the production of documents *relating to revenue classification, and the methods used for such classification, in the company's pharmaceutical distribution business as either operating revenue or revenues from bulk deliveries to customer warehouses*"; and

- the U.S. Attorneys' Office for the Southern District of New York had begun a separate inquiry into the same subject of interest to the SEC.

205.    On June 30, 2004, the Company issued a press release to discuss these disclosures:

[T]he company announced that on June 21, as part of the Securities and Exchange Commission's (SEC) formal investigation disclosed by the company on May 14, *it received an SEC subpoena that included a request for the production of documents relating to revenue classification, and the methods used for such classification, in the company's pharmaceutical distribution business as either operating revenue or revenues from bulk deliveries to customer warehouses*. In addition, Cardinal Health has learned that the U.S. Attorney's Office for the Southern District of New York has commenced an inquiry that the company understands relates to this same subject. This subject is also being reviewed as part of the ongoing inquiry by Cardinal Health's Audit Committee and its independent counsel. As previously disclosed on May 16, the company understands the SEC and Audit Committee inquiries are not limited to this subject. Cardinal Health continues to respond to these inquiries and provide all information required.

206.    On the same day, defendants Walter and Fotiades co-hosted a conference call with analysts on the heels of the press release that revealed more information about the SEC investigation. During that call, Cardinal Vice President of Investor Relations Jim Hinrichs reported that:

[W]e did receive a subpoena from the SEC that included a request for the production of documents relating to the classification of revenues in the pharmaceutical

distribution business as either operating revenues or revenues from both deliveries from customer warehouses and the methods by which the company classified such revenues. . . . In addition we've learned that the U.S. Attorney's office for the Southern District of New York has commenced an inquiry the company understands it relates to the same subject.

As previously disclosed, the company understands that the SEC and audit committee inquires are not limited to one particular subject.

207.    During the June 30, 2004 conference call, the defendants also admitted a failure of management in missing their numbers. Defendant Walter blamed "the transition of the pharmaceutical distribution model to a fee-for-services moving more slowly than we expected. At least half the earnings gap in Q4 can be ascribed to the slower-than-expected transition to the fee-for-service model and a faster elimination of inventory investment opportunities." He further acknowledged that the "earnings gap creates a credibility gap for the new term with some shareholders."

208.    The Company's June 30, 2004 disclosure caused a dramatic decline in Cardinal's share price, from a closing price of $69.93 on June 30, 2004 to $52.77 on July 1, 2004, for a total one day decline of 24.5%. Thus, in a single day, the Company lost approximately $7.4 billion in market capitalization.

209.    Securities analysts reacted harshly to the Cardinal Defendants' revelations. For example, the *Wall Street Journal* reported on July 1, 2004 that:

Lehman Brothers analyst Lawrence C. Marsh said the company classified part of these bulk revenues as operating revenue and this could "change the perception as to how fast the company is growing." Mr. Marsh said that in the year-ago fiscal 2003, for example, about $6.3 billion of such revenue, out of total yearly drug revenues of $46 billion, were apparently at issue.

210.    On July 1, 2004, J.P. Morgan issued a report by Lisa Gill stating that the June 30, 2004 announcement created a management credibility issue because of assurances management gave securities analyst during previous conference calls. In that report, analyst Gill stated:

On the conference call, the company stated it is currently engaged in conversations with manufacturers on an individual basis regarding the transition in to

a FFS model, and indicated that the progress was "going well." Management also, however, stated there were some manufacturers uneager to implement FFS agreements, and sidestepped questions related the percentage of revenue currently covered by FFS agreements. Management also stated they expect fees from FFS agreements to meet or exceed fees generated through the buy-and-hold model. We hold little conviction in this statement, as we find it hard to believe manufacturers would compensate distributors more for taking on less risk (since returns would be clear-cut in a FFS agreement).

We believe the earnings preannouncement has created a major management credibility issue going forward. On several occasions over the last few earnings conference calls, management has confidentially spoke about CAH's pioneering role in engaging into dialogue with manufacturers to switch to a FFS model. In reality, the progress on these FFS agreements appears way behind schedule. There is no way to sugar-coat the disappointing news presented yesterday on the conference call, and we certainly feel as though the company does not have its hands around the timing of the business model transition.

211. In a roundtable discussion on July 1, 2004, with securities analysts Larry Marsch from Lehman Brothers and John Ransom from Raymond James appearing on CNBC's Kudlow & Cramer talk show, these analysts debated whether Cardinal was a "crooked company." John Ransom noted "we believe that Cardinal caught a mild case of 1990s bubble fever, was under pressure to manage earnings and show 20 percent growth, which they promised for probably about a year too long." In response, Jim Cramer, asked: "Larry Marsch, you heard what John Ransom said, caught a mild case of something that I think is like catching a mild case of bubonic plague, really hard to beat." Larry Kudlow chimed in: "I appreciate the diplomacy, but . . . revenue identification should be real easy . . . . This is a relatively simple business . . . . So, like, this is their third investigation. *Either, A, they're cooking the books . . . or, B, it's just fraud up and down the line to fix the earnings* and whatever the motive is. But this goes beyond."

212. Other securities analysts who issued reports following Cardinal's June 30, 2004 press release and the Cardinal Defendant's statements during the conference call were also critical of management. For example, on July 1, 2004, Baird issues a report which stated:

Slower Transition To Fee-For-Service Compensation In Pharmaceutical Distribution Is Largest Contributor To Earnings Shortfall. Cardinal attributed roughly

half the earnings shortfall to a slower-than-expected transition toward the fee-for-service pharmaceutical distribution model, from the old buy and hold model.

*     *     *

However, changes in Cardinal's compensation have occurred slower-than expected, with only 20% of volume under majority fee-based compensation agreements. In addition, while these negotiations are taking place, manufacturers continue to restrict purchasing opportunities and thus Cardinal's (and peers) profit opportunities.

213.    Management's comments that only 20% of Pharmaceutical Distribution business was covered by IMAs stand in stark contract to the Cardinal Defendants' assurances prior in the Class Period that the Company had agreements in place with their manufacturing suppliers. Another analyst was shocked that management did not seem to know the status of converting manufacturers to the new fee-for-service model. On July 1, 2004, Jefferies issued a report which stated:

> While the earnings miss and subsequent reduction in guidance is shocking, these are only two of the more puzzling developments to come from management's announcement and conference call meant to put a finer point on things. In no particular order, we find it troubling that a) CAH seems to have been caught off guard only very recently by the surprisingly weak financial performance; b) the Company seems to have a less than firm grip on how much of its business is currently covered by IMAs with its pharmaceutical suppliers; and c) management has a hard time providing more color on how dependent near-term earnings remain on inventory mark-ups. Not to mention the ongoing accounting investigation, which will only grow in perceived importance as a result of this negative surprise. At the end of the day, CAH management looks like the confused Cruiser from Stripes who didn't seem to know that he didn't need to enlist to avoid a non-existent draft – "There was one?" This management team, which had been battling back strongly from a perceived credibility gap since questions about the Company's accounting practices surfaced two years ago, will go back under a very hot and bright light again – minimizing the potential positives of strong cash flow and market leadership for investors.

214.    On July 26, 2004, the magnitude and broad scope of the fraud was further revealed when Cardinal announced that its Chief Financial Officer, Richard Miller, resigned in the wake of the earlier disclosures of June 30, 2004. Specifically, Miller stated it was in the best interests of the Company for him to "step aside" in the face of the government investigations. In his resignation, defendant Millar admitted that "[c]ertain financial reporting practices and judgments that occurred during my tenure as CFO have come under scrutiny in the ongoing investigations." According to

Jerome Dodson, a fund manager at Parnassus Fund in San Francisco, "[u]sually when they leave, there's something more going on; in my opinion, the things we think happened are not enough to make him resign . . . . My guess is there is something else coming down of a more serious nature." Also on July 26, 2004, the Company announced that it will delay releasing full financial results for FY 2004 and the 4Q 2004 until late August or early September 2004. In response to these announcements, the price of Cardinal common stock dropped an additional $6.47 per share, 12%, from $50.47 per share on July 26, 2004 to $44.00 per share on July 27, 2004.

215.    A *Reuters News* article on the same day noted "[a]nalysts said Miller's abrupt departure just before the earnings report was to be released and the delay of four to six weeks in that release could signal that the investigation may involve issues far more serious than previously disclosed."

216.    Jefferies Healthcare Information Technology agreed. An article of the same date entitled "CAH: Another Shoe Drops – CFO Resignation to Trigger More Accounting Jitters," analysts noted:

> This announcement represents the second bombshell announcement by the Company in the last four weeks with ramifications that are likely to rock the stock again. . . . Mr. Miller's resignation will almost certainly lead to additional speculation about other revenue and earnings recognition items that may have been employed by the Company, leading to further trials and tribulations for the Company and the stock.

Andrew Speller of A.G. Edwards agreed: "***It's like a double negative. . . . It definitely made me think there is something more to the accounting issue than has been revealed***."

217.    Additional disclosures were made by Cardinal after the close of trading on September 13, 2004, when Cardinal announced the restatement of its financials for the fiscal years 2001, 2002 and 2003 and for the first three quarters of 2004. The Company stated that those previously announced financial results "should no longer be relied upon." Cardinal also announced that the Board of Directors' Audit Committee determined that the Company's results for fiscal 2001, 2002

and 2003 and the first three quarters of 2004 "should no longer be relied upon." Moreover, the Company stated that based upon results of an internal review conducted by its audit committee, "the Company has concluded that certain bulk shipments ordered by customers were ***intentionally held for more than 24 hours so that, pursuant to the internal policy, such shipments were classified as Operating Revenue*** in four quarters within fiscal 2003 and 2002."

218.    Securities analysts again responded sharply.  On September 14, 2004, A.G. Edwards issued a report which stated:

> [W]e consider the character of the historical practices of the company underlying these changes and their ethical implications to raise the risk profile of CAH from an investor's perspective.  In our opinion ***these discoveries and conclusions reveal a management team that on specific occasions chose to classify or present its performance in ways that would enhance the appearance but not necessarily provide full and fair disclosure.***

and which Cardinal now operates under a "cloud of questionable credibility."

219.    On October 26, 2004, Cardinal issued its delayed 4Q and FY 2004 results and filed with the SEC the Form 10-K which set forth details of its restatement.  In the Form 10-K, defendants revealed that the revenue misclassification first announced on June 30, 2004 was used by defendants to overstate operating revenue by $23.5 billion over a three year period.  All told, the revenue misclassification manipulations exceeded $26 billion during the Class Period.[7]  The Company admitted that it misclassified $23.5 billion in sales over a three year period.  This misclassification drastically enhanced Cardinal's reported revenue growth during the Class Period.  Cardinal further disclosed numerous other accounting irregularities in its past financial statements, including prematurely recording contingent gains, improperly accounting for its balance sheet reserves and accrual adjustments, prematurely recognizing cash discounts and failing to disclose this improper

---

[7]    Defendants admitted that the revenue misclassification errors began in FY 2001, although the Company only restated FY 2002 through 3Q 2004.

practice, and by recognizing revenue based upon falsified documents.  Additionally, Cardinal engaged in other accounting improprieties not included in its restatement, such as by taking excessive special charges in order to understate normal recurring operating expenses, as well as to manage the Company's earnings going forward and by improperly accounting for a securitization transaction as an off-balance sheet transaction thereby understating its reported debt.

220.    Following the restatement, more details were revealed.  On October 26, 2004, in a conference call, defendant Miller's replacement, Mike Losh, admitted the following:

- The Audit Committee concluded that certain bulk shipments were intentionally held beyond 24 hours so that the shipment would be classified as revenue pursuant to Cardinal's internal policy.  This overstated operating revenues by $813 million and understated bulk revenues by $414 million.

- The Company had a practice of periodically accelerating payment of vendor invoices at the end of certain reporting periods to earn cash discounts.  This increased operating results for the reporting periods and was not disclosed.  The Company's new policy was to defer the cash discount upon invoice payment and recognize the cost of goods sold upon sale of the inventory.

- Some equipment confirmations were prematurely executed by customers at the request of Cardinal employees in exchange for "inducements" such as deferral of payment.

- The Company's repurchase of shares had the expected result of boosting Cardinal's overall earnings per share

- Flat earning from Pharmaceutical Distribution business "demonstrates the pressures, the pharmaceutical distribution business model transition is having on the sectors earnings and our earnings."

- Cardinal's independent auditors "identified and communicated a material weakness related to the company's control environment including whether the overall tone set by the company clearly communicated a strong commitment to sound financial reporting practices."

221.    Losh also admitted on the October 26, 2004 call that on October 12, 2004, the SEC issued a subpoena seeking information about the compensation of specific current and former employees and officers.

222.     On February 4, 2005, *Dow Jones News Service* noted that Company spokesman Jim Mazzola announced that Cardinal took disciplinary action against certain employees following an internal accounting probe. Cardinal's controller, defendant Jensen, resigned as a result. According to reports, other employees were fired or quit following the review, and the disciplinary actions affected senior financial and managerial personnel at the corporate level and in four business segments. In the same release, Cardinal admitted that the new service-fee income had yet to make up for the loss of compensation under the old system.

223.     Most recently, on April 8, 2005, Cardinal filed a Form 8-K acknowledging what the media reported on April 9, 2005: that the New York Attorney General, Eliot Spitzer, issued subpoenas to a Cardinal subsidiary. The subpoenas appear to be inquiries regarding Cardinal's secondary trading of pharmaceuticals, counterfeit drugs and pharmaceutical pricing.

## CARDINAL DEFENDANTS' KNOWLEDGE AND ADDITIONAL INDICIA OF SCIENTER

### Cardinal Defendants' Knowledge of the Fraud

224.     Throughout the Class Period, defendants Walter, Miller, Fotiades, Millar, Parrish and Jensen held themselves out to investors and the market as the persons most knowledgeable at Cardinal about the Company's pharmaceutical distribution business, accounting, financial statements and business operations. As described more fully in ¶¶28-52, each of the Individual Defendants held one of the most senior positions at Cardinal with responsibility for directing and managing the Company's business, accounting and financial reporting. During the Class Period, the Individual Defendants specifically touted Cardinal's "tradition of financial performance and level of candor in its disclosure to the investment community." In response to rumors of potential accounting issues in August 2002, defendant Walter not only denied the existence of any irregularities but confirmed that Cardinal's senior officers, including the Individual Defendants, were aware of the Company's day-to-day performance and financial reporting: "[W]e've had [an] internal policy of all of the officers

reporting to me, certifying to me as to the accuracy of their statements over which they're responsible. So we're just extending our internal practices to the external world."

225. Defendants Walter, Fotiades, Miller, Millar and Parrish (beginning in FY 2003) each monitored and directed Cardinal's business, financial reporting and public statements through their participation on the Company's Operating Committee. The twelve person Operating Committee, formed to assure that each of Cardinal's senior officers were aware of and approved of the Company's ongoing operations, met monthly in Cardinal's Dublin, Ohio headquarters throughout the Class Period "to discuss projects and issues across the company." In each of Cardinal's Annual Reports provided to investors during the Class Period, defendants highlighted the Operating Committee as an example of how defendants Walter, Fotiades, Miller, Millar and Parrish were hands-on managers with intimate knowledge of the internal affairs of the Company.

226. Defendants Walter, Miller, Fotiades, Millar and Parrish also routinely communicated with analysts and investors during the Class Period and represented that they were informed of and knowledgeable about Cardinal's business and finances, specifically including the Company's accounting for revenue and conversion to fee-for-service in the Pharmaceutical Distribution business. As described in ¶¶74, 83, 92, 98, 102, 110, 119, 121, 133,142, 154, 164, 174, 182, 187, 192 and 202, each of these defendants – Walter, Miller, Fotiades, Millar and Parrish – participated in Cardinal's quarterly and annual conference calls with analysts and investors. In the course of these calls, defendants presented information regarding Cardinal's revenue growth, market outlook, accounting acumen and adaptation to changing market factors. In addition, defendants represented that they had intimate knowledge of these areas and responded to questions focused on revenue growth, accounting and financial reporting and Cardinal's ability to adjust to changing conditions in the market. At no time did any of the Individual Defendants respond that they were uninformed about any material aspect of Cardinal's business.

227.    In response to Cardinal's dismissal of auditor Arthur Andersen amid disclosures of Andersen's involvement in the Enron accounting scandal and massive stock frauds, defendant Walter asserted during Cardinal's August 6, 2002 conference call:

The final item I want to address at this point is an issue that is of interest to many and that is the certification of our financial results for the year. I realize that we are in a unique time in the history of the public markets and I believe it is a good idea for the executives to certify in writing that the company's reported results are accurate and honest. This is not a big deal for Cardinal, Dick or myself. ***Most of you may not be aware of the affect that for a long time Cardinal senior officers have attested to Dick and me in writing as to the accuracy of their financial results and completeness of their disclosure. The signing of a public document is just an extension of our internal practices that have been in place for a long period of time. I can personally say I am very close to our numbers and always have been so I don't have any issues whatsoever of attesting the accuracy and completely of the SEC filings.***

I built this company from the ground up and with substantial shareholder and care deeply about its fundamental financial soundness and reputation in the investment community. I am proud to sign Cardinal's financial statements because they reflect the honest performance that our team does every day. Integrity is an important part of what Cardinal is all about. We help make health care better and more efficient. Dick and I will certify in writing Cardinal's results that were reported today. Since we are a June year-end company our certification will accompany the filing of our 10-K in September. In addition, Earnst and Young's audit opinion completed and dated today will be filed with our 10-K.

I don't know how long it will take the markets to move out of this period of mistrust, but what I do know is investors need to be able to trust management.

228.    Later in a conference call on August 15, 2002, defendant Walter reiterated:

But yesterday was probably one of my best days I've had in a long time. First of all, ***we had at Cardinal the top two levels of our management presenting to each other on the issues and opportunities that we face over the next year***. And the optimism was just terrific and it's very contagious, ***I like hanging out with our operating people***.

*            *            *

[T]oday we can here who we want because people are saying I want to go to work for Cardinal, you know. They're a real company. They have high quality, high performance, high ethics and evidently those real companies are hard to find. . . . Dick [Miller] and I are kind of having fun with this CFO and CEO certification process and all the scrutiny around that because the integrity of our Company is something that we think is - it's always been there and it's something that we can really sell as a really did he ever rating factor and people are recognizing it as a

different different rating factor so it's actually a fun time for us right now because we're so confident about that we can sell.

229.     During the August 6, 2002 call, defendant Miller also claimed that the new requirements of the Sarbanes-Oxley Act would not present a problem for Cardinal because the Company's senior executives were well-informed of issues relating to accounting and financial reporting:

> ***For years now we have received internal confirmations from each of our business and financial leaders attesting to the accuracy of our financial information.  These assist Bob [Walter] and me in carrying out our fiduciary duties for transparent, accurate financial reporting.***

230.     Nine days later, on August 15, 2002, during a conference call for Cardinal's Semi-Annual Investors Update, defendant Miller again tried to distinguish Cardinal from other companies based on managements high level of involvement in the affairs of the Company:

> As the circumstances behind the recent corporate failures have come to light it's become clear to me that ***the integrity of reliability of any organization begins and ends with the people at the top of the Company***.  For that very reason I thank god every day that I'm part of Cardinal.  ***We're ethical behavior and integrity are endorsed and requisite core values and critical competence***.  This emphasis on integrity is embedded in the culture at Cardinal through published ethics policies that are mandated for every employee and through a corporate responsibility offer.  We maintain an ethics hotline that is managed by an independent third-party with any and all matters dealt with seriously under a zero-tolerance policy.

> Furthermore, we annually require all senior managers across the company, that's a total of 3400 managers worldwide to complete a certificate of compliance which affirmatively confirms their compliance with our ethics policies.  I believe that these policies and procedures represent best practices and they've been in place at Cardinal for years.  They're not just recent measures that we've taken in response to the current environment.

> Now let me briefly touch on our elements for our corporate govern advance which I believe may be of interest to you.  Governance.  ***First you have the financial acumen of their business leaders.  They know their business well and they stay on top of it***.

> \*          \*          \*

> Talk a little bit about our financial controls.  ***We maintain a very strong control environment***.  That's been verified by both our internal and external auditors.  We treat our internal audit group as a quality assurance function.  They set an annual

add [*sic*] at this time plan using a risk assessment approach to establish where to focus their attention. We employ very disciplined budgeting and focusing practices. We have a real focus on the quality of our earnings. That comes down to strong cash flow with rising returns as ***Bob mentioned is our proven financial model as well as conservative accounting practices and policies***. I'll elaborate on that in a minute. ***We former perform monthly financial reviews with Bob and quarterly financial reviews with Bob and each of the business leaders***.

Let me just talk for a minute about the role of our external auditors. We changed Ernst & Young this year and they did an extremely add [*sic*]. Audit. They issued a clean on Cardinal they agree that our policies are conservative but we take our responsibility for the accounting seriously. We don't rely on the external auditors to come in and find a problem. We expect them to confirm that there isn't an issue and that, in fact, stays secure. We expect every external add at this time to be conducted – finally as Bob mentioned on the certification process, as we stated on the earnings call, Bob and I will, in fact, certify to the credibility and completeness and provide [certifications with] our financial results when we file our 10-q in September, basically the way we see it we've certifying what we've always done.

Let's talk a little bit about the conservative accounting area. Cardinal we have straightforward transaction, we have consistently utilized conservative accounting policies and procedures.

231. During Cardinal's January 22, 2004 conference call with investors and analysts, defendant Walter again highlighted both his and the Company's senior executives' detailed knowledge of the Pharmaceutical Distribution business Company-wide and financial controls:

But there – you know, why am I convicted – or why do I have strong convictions what is going to happen in drug distribution? Because I've been in the business for 20 years. ***We're intimate on the numbers. We know what's going on with the manufacturers. We have very strong financial controls***. And we have been good at forecasting what's going to happen in the near term. So that's why I have conviction.

232. Defendant Parrish, during the Company's February 19, 2004 semi-annual investor update call, reiterated the other defendants' statements regarding the Individual Defendants' knowledge of Cardinal's accounting and financial reporting:

***We've always been a very financially detailed company, and oriented toward knowing our numbers***.

233.    Defendant Walter also spoke during the February 19, 2004 semi-annual investor update call and again sought to distinguish Cardinal from other companies by emphasizing the day-to-day involvement of Cardinal's executives in the Company's affairs:

> And the final thing is doing it the right way, and I really have to talk about that.  And while doing it the right way is a part of Cardinal, and it's been in our core, it isn't part of all companies.  But you can trust that aspect is a part of Cardinal.

234.    Defendants, including Walter, also touted their personal involvement in dealing with pharmaceutical customers and manufacturers and directing the effort at Cardinal to adjust to changes in the pharmaceutical distribution model.  For example, during Cardinal's July 31, 2003 conference call with investors and analysts, Walter stated that he was

> convinced, after extensive conversations with many of our manufacturing partners, that they are not seeking to pull margins from the distribution partners. . . .  And that this is **led to the statement I made on the call in April led to more active conversations at the high level with other manufacturers and I am very pleased with those conversations and met with the CEO's of some of the major pharma. manufacturers** to talk about and make sure they know about distribution and make sure they understand how moving to what I call a closer – a model that has sales in production and closer to demand of the patient.

During the Company's June 30, 2004 call, Walter again acknowledged his personal involvement in Cardinal's efforts to adapt to changes in the distribution chain:  "**I'm very knowledgeable about the ongoing dialog that is happening, as we speak, between our distribution personnel and specific manufacturers**."

235.    Concurrent with their representations on conference calls, defendants Walter, Miller and Jensen signed and certified, based on their knowledge and positions as executive officers, Cardinal's SEC filings during the Class Period.  Specifically, defendants Walter and Miller signed all of the Company's Form 10-Q and Form 10-K filings as described in ¶¶58, 66, 76, 84, 94, 104, 111, 124, 135, 144, 157, 165, 176, 184 and 193, and defendant Jensen signed Cardinal's FY 2003 Form 10-K filed September 30, 2002, attesting to their own personal knowledge of the factual basis for the reported information and purported accuracy of the information.  ¶165.

236.    In Cardinal's SEC filings, the Individual Defendants again emphasized their personal involvement in the accounting and financial affairs of the Company and sought to distinguish Cardinal from companies embroiled in accounting scandals and criticized for having executives who were not involved in day-to-day business decisions.  In defendant Walter's letter to shareholders in Cardinal's September 30, 2002 Annual Report, Walter emphasized:

> The recent instances of corporate malfeasance also warrant comment.  In my experience, most public companies value the trust placed in them by employees, customers and shareholders.  ***It is therefore very upsetting to witness the breach of that trust by the leadership of a few large firms.  This behavior is simply unthinkable at Cardinal Health***.  I am reminded of the image of the girl on the cover, who trusts that her mother will be there for her all the time, not just some of the time.  That's the level of trust with which we operate, all day, every day.  We value the trust you place in us to do the right thing and to tell it like it is.

237.    The Individual Defendants' Class Period statements and certifications establish that they were intimately involved in Cardinal's business affairs, accounting and financial reporting.  Together with the enormous magnitude of the financial fraud, involving over $26 billion in falsely reported revenue, and critical nature of the Company's Pharmaceutical Distribution business, these facts strongly evidence each of the Individual Defendants' knowledge of the fraud.

**Additional Indicia of Scienter**

238.    As detailed herein, defendants acted with scienter during the Class Period in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth, or acted with reckless disregard for the truth by failing to ascertain and disclose the true facts, even though such facts were readily available to them.  In addition to their orchestration of the fraudulent scheme, defendants' scienter is evidenced by the following: (a) defendants' efforts to minimize investor scrutiny and compensate for Cardinal's failures to adapt to changes in the pharmaceutical distribution market; (b) defendants' use of Cardinal's artificially inflated stock, market capitalization and perceived growth rate to make 24 corporate acquisitions during the Class Period; (c) the completion of three note offerings, raising $1.3 billion during the Class Period; (d) defendants'

efforts to maintain Cardinal's high debt rating and ability to secure commercial paper based on the Company's reported financial results meeting market expectations; (e) in excess of $49.73 million in insider trading by the Individual Defendants, as well as an additional $95.84 million in suspicious stock sales by other Cardinal insiders; (f) the Individual Defendants' self-interested motivation to preserve their lucrative employment agreements and secure more than $245 million in incentive-based compensation; and (g) the intentional manipulation of the Company's financial results to meet revenue and earnings estimates, the acknowledgement of GAAP violations and post-Class Period admissions and events.

**Covering Up Market Pressure and Resistance to Fee-for-Service Conversion**

239.    As discussed herein, by the beginning of the Class Period, a seismic change was underway among pharmaceutical manufacturers, distributors and retail customers.  Pharmaceutical manufacturers, plagued by allegations of accounting fraud and channel stuffing, were increasingly tying production to actual market demand.  At the same time, increasingly powerful retail customers refused to pay distributed inventory markups and a growing concentration of retail and institutional health care customers shifted leverage downstream.  Those same retail customers demanded growing price and service concessions from wholesalers like Cardinal and its competitors, McKesson Corp. and AmerisourceBergen.

240.    In response, pharmaceutical distributors, including Cardinal, attempted to convert pharmaceutical manufacturers to a new fee-for-service pricing strategy.  Given the critical importance of the Pharmaceutical Distribution business to Cardinal's financial results, it was imperative that defendants avoid scrutiny and publicly project that Cardinal was thriving in the new pharmaceutical distribution environment.  Defendants used continuing reports of growing revenue to avoid inquiry and claim that Cardinal's business and prospects were not harmed by the changing market.  Defendants' scheme worked, and it was only as the Class Period ended that the truth about

Cardinal's shrinking Operating Revenues and failure to adjust to new market forces were finally revealed.

**Corporate Acquisitions**

241.    The Cardinal Defendants were motivated to inflate the Company's stock price and perpetrate the fraudulent scheme and course of business complained of to complete corporate acquisitions.   Defendants relied on these acquisitions to replace revenue being lost in the Pharmaceutical Distribution business and diversify Cardinal's business offerings.   Maintaining Cardinal's inflated stock price, however, was critical to the acquisition strategy.   During the Class Period, Cardinal acquired 24 companies to maintain its position in the wholesale drug industry, buy revenue and diversify offerings.   As a result of their misstatements and omissions, defendants succeeded in artificially inflating Cardinal's stock price and completed the acquisition of 24 companies during the Class Period by exchanging over 36 million shares of Cardinal stock with a value exceeding $3.0 billion, and expending more than $656 million in cash.

242.    Key among these acquisitions were Bindley Western in February 2001 and Syncor in January 2003, involving a combined exchange of over 35.6 million shares of Cardinal stock with an artificially inflated value at the time of $2.98 billion.   Analysts and investors lauded these acquisitions as critical to Cardinal's corporate strategy.   As one analyst noted, defendant "Walter has relied on acquisitions as his primary means of achieving growth."   Walter acknowledged that "[a]cquisitions have helped diversify the business and grow in important markets."

243.    The higher Cardinal's stock price, the more favorable the terms for Cardinal in stock-based acquisitions.   In addition, by maintaining the appearance of growth and high stock price, defendants were far better positioned to solicit and complete the acquisitions, including cash-based acquisitions.   This put tremendous pressure on defendants to present Cardinal's business and

finances in a very favorable light, and obfuscate evidence that Cardinal was not adjusting to changes in the pharmaceutical distribution market.

244.    The following is a list of acquisitions by Cardinal during the Class Period facilitated by Cardinal Defendants' false statements and the Company's artificially inflated stock price:

| Date | Acquired Entity | Consideration | Segment |
|------|-----------------|---------------|---------|
| 11/01/00 | Ni-Med kit manufacturing | Financial terms not disclosed | Medical Products & Services |
| 11/03/00 | CurranCare, LLC | Financial terms not disclosed | Medical Products & Services |
| 12/15/00 | Alcon Inc. (Manufacturing facility in Humacao, Puerto Rico) | Financial terms not disclosed | Pharmaceutical Technologies & Services |
| 12/22/00 | VegiCaps Division from American Home Products Corporation | Financial terms not disclosed | Pharmaceutical Technologies & Services |
| 01/09/01 | International Processing Corporation | $40 million cash; no other financial terms disclosed | Pharmaceutical Technologies & Services |
| 02/15/01 | Bindley Western Industries, Inc. | $2.2 billion stock-for-stock; issued 23.1 million common shares to Bindley's stock-holders and Bindley's stock options converted to purchase 5.1 million common shares | Pharmaceutical Distribution and Provider Services |
| 02/28/01 | Astra-Zeneca (Plant in Corby, UK) | Financial terms not disclosed | Pharmaceutical Technologies & Services |
| 03/16/01 | Critical Care Concept | Financial terms not disclosed | Pharmaceutical Technologies & Services Medical Products & Services |
| 03/23/01 | American Threshold | Financial terms not disclosed | Medical Products & Services |
| 03/28/01 | FutureCare | Financial terms not disclosed | Medical Products & Services |
| 07/03/01 | SP Pharmaceuticals, LLC. | Financial terms not disclosed | Pharmaceutical Technologies & Services |
| 10/23/01 | Schering-Plough Animal Health Corporation Manufacturing facility in Raleigh, NC | Financial terms not disclosed | Pharmaceutical Technologies & Services |
| 11/15/01 | Professional Health-Care Resources, Inc. | Financial terms not disclosed | Medical Products & Services |
| 01/09/02 | Eon Media, Inc. | Financial terms not disclosed | Automation & Information Services |
| 04/15/02 | Magellan Laboratories, Inc | Aggregate consideration $221 million | Pharmaceutical Technologies & Services |
| 06/25/02 | Boron, LePore & Associates, Inc. | Structured as a two-step tender offer at $16 per share; valued at about $193.2 million total; 1 million stock options converted | Pharmaceutical Technologies & Services |

| Date | Acquired Entity | Consideration | Segment |
|------|-----------------|---------------|---------|
| 08/28/02 | Atlantes Services | Financial terms not disclosed | Automation & Information Services |
| 11/05/02 | KVM Technologies | Financial terms not disclosed | Automation & Information Services |
| 01/02/03 | Syncor International Corporation | Approximately 12.5 million Common Shares, valued at approximately $780 million, to Syncor stockholders and Syncor's outstanding stock options were converted into options to purchase approximately 3.0 million Common Shares; assumed approximately $120 million in debt. | Pharmaceutical Technologies & Services |
| 10/01/03 | Gala Biotech | Acquired the remaining 42% of Gala for $15.5 million in cash | Pharmaceutical Technologies & Services |
| 10/29/03 | The Intercare Group | Cash offer, plus assumption of $150 million in debt; valued at $530 million | Pharmaceutical Technologies & Service |
| 12/23/03 | Medicap Pharmacies Inc. | Financial terms not disclosed | Pharmaceutical Distribution and Provider Services |
| 2/17/04 | Beckloff Associates | Financial terms not disclosed | Pharmaceutical Technologies & Service |
| 7/7/04 | ALARIS Medical Systems | Tender offer for ALARIS common stock at $22.35 per share; at $2 billion total; approximately $358 million in debt incurred | Clinical Technologies & Services |

**Cardinal's Note Offerings**

245.    Defendants were also motivated to inflate Cardinal's stock price and maintain the stock price at inflated levels in order to complete $1.3 billion in note offerings. As defendant Miller noted in the July 31, 2003 conference call, after Cardinal had completed a $500 million offering, "[o]bviously, we didn't need the $500 million immediately, but felt it was prudent to take advantage of very favorable market conditions."

246.    During the Class Period, Cardinal completed three note offerings, as follows:

| DATE | OFFERING | TERMS | PROCEEDS | PURPOSES |
|------|----------|-------|----------|----------|
| 02/12/2001 | Note | 6.75% Notes Due 2011 | $500,000,000 | To repay indebtedness |
| 03/11/2002 | Note | 4.45% Note Due 2005 | $300,000,000 | To repay indebtedness and for general corporate purposes, and for early redemption of Bindley debt |
| 06/16/2003 | Note | 4.0% Note Due | $500,000,000 | For general corporate |

| 2015 | purposes including working capital, capital expenditures, acquisitions, investments and repurchases of debt and equity securities |
|---|---|

247.    These offerings were necessary and used, in part, to repay Cardinal's indebtedness. As of December 31, 2001, Cardinal had an outstanding debt of approximately $1.96 billion. Additionally, Cardinal's subsidiaries had an outstanding debt of $611.20 million.  The offerings, which benefited from Cardinal's high stock price and favorable image among investors, were also necessary, as defendants acknowledged, to generate working capital and cover capital expenditures, acquisitions and investments.  Specifically, as noted above, Cardinal's acquisition spree would not have been possible without the cash infusions supported by defendants' fraud.

**Maintaining Cardinal's Investment Grade Ratings**

248.    Defendants were further motivated to keep the Company's stock trading at artificially high levels to achieve and maintain investment grade commercial ratings.  By achieving investment grade ratings, Cardinal and the defendants were eligible to gain access to commercial paper.  The commercial paper market was a market composed of unsecured, short-term loans issued by corporations, typically for financing accounts receivables and inventories.  Such loans – or commercial paper – are usually issued at a discount reflecting prevailing market interest rates.

249.    To trade in this market, however, Cardinal needed to present itself as financially sound – and that meant not revealing the truth about the Company's financial results and business. As Cardinal's then CFO Mike Losh said during the December 13, 2004 conference call:

> We definitely are committed to maintaining investment-grade ratings.  We think there are a couple of reasons for this.
>
> One, when you get to be noninvestment-grade, not only are there the costs of money costs, but we think there are certain hidden costs that you have to deal with that we do not think that is appropriate for us to ever put ourselves in that position. Also, we want to regain access to the commercial paper market.  So on a longer-term basis, we are targeting the return to an A- debt rating level.

250.     Defendants also touted Cardinal's commercial paper program in its annual reports. By June 30, 2001, the commercial paper program at Cardinal provided for issuance of up to $1.5 billion in credit facilities and Cardinal had $26.3 million outstanding relating to short-term credit facilities. The $1.5 billion was pursuant to unsecured bank facilities, of which $750 million was set to expire on March 27, 2003, and the other $750 million of which was set to expire on March 31, 2004. In FY 2003, when Cardinal's stock was trading at artificially inflated levels, the expiration dates were extended to March 26, 2004 and March 27, 2008.

251.     As of June 30, 2002 and June 30, 2003, while Cardinal's stock price and status were boosted by defendants' fraud, the Company's senior debt ratings from Moody's, S&P and Fitch were A2, A and A, and Cardinal's commercial paper ratings were A-1, P-1 and F-1, respectively. After the truth about defendants' fraud began to be revealed, however, Cardinal's debt ratings were downgraded by S&P, Moody's and Fitch to BBB, Baa3 and BBB+, respectively. Its commercial paper ratings were also downgraded to A-3, P-3 and F2, respectively. Critically, rating outlooks were downgraded, as defendants knew they would be, to "negative," "on review for possible further downgrading" and "negative," respectively.

**The Individual Defendants and Corporate Insiders Personally Profited from the Fraudulent Scheme**

252.     While defendants were issuing the fraudulent statements identified herein about Cardinal's financial results and business, the Individual Defendants sold at least 774,156 shares of Cardinal stock – typically only days after issuing favorable albeit false, statements about the Company – for insider trading proceeds of $49.7 million. *See* Insider Trading Chart attached as Exhibit B. Notwithstanding the Individual Defendants' knowledge about the ongoing fraud and their duties as officers and directors of the Company to disclose adverse material facts before trading in Cardinal stock, the Individual Defendants personally profited from the artificial inflation in Cardinal's stock price which their fraudulent scheme created.

253.    The Individual Defendants were remarkably successful in timing their trades, capturing peak prices when selling. The average trading price for Cardinal stock in the 90 days after defendants' fraud was revealed – July 26, 2004 through October 23, 2004 – was only $44.31 per share. In sharp contrast, the Individual Defendants unloaded their stock at prices as high as $72.38 in 2001 and $75.00 in 2004. Both the timing and volume of their trades were suspicious.

254.    Defendant Robert Walter personally sold 593,910 shares of Cardinal stock for insider trading proceeds of $38.19 million, thereby profiting from the artificial inflation in Cardinal's stock price which defendants' fraudulent scheme had created. Walter's reported insider trading during the Class Period is detailed below:

| Transaction Date | Shares Sold | Price | Proceeds |
| --- | ---: | --- | ---: |
| 12/13/2000 | 22,500 | $63.42 | $1,426,949 |
| 03/01/2001 | 32,100 | $67.33 | $2,161,292 |
| 03/01/2001 | 7,500 | $65.88 | $494,100 |
| 03/01/2001 | 7,500 | $67.66 | $507,450 |
| 03/01/2001 | 7,500 | $67.83 | $508,725 |
| 03/01/2001 | 3,750 | $67.43 | $252,863 |
| 03/02/2001 | 9,150 | $66.72 | $610,488 |
| 03/02/2001 | 7,500 | $66.68 | $500,100 |
| 03/09/2001 | 15,000 | $67.53 | $1,012,949 |
| 03/13/2001 | 7,500 | $66.23 | $496,725 |
| 03/13/2001 | 7,500 | $66.66 | $499,950 |
| 05/08/2001 | 34,900 | $66.50 | $2,320,850 |
| 05/08/2001 | 22,100 | $66.70 | $1,474,070 |
| 05/08/2001 | 9,800 | $66.80 | $654,640 |
| 05/08/2001 | 5,000 | $66.90 | $334,500 |
| 05/08/2001 | 1,600 | $66.55 | $106,480 |
| 05/08/2001 | 900 | $66.52 | $59,868 |
| 05/08/2001 | 400 | $66.53 | $26,612 |
| 05/08/2001 | 200 | $66.84 | $13,368 |
| 05/08/2001 | 100 | $66.75 | $6,675 |
| 01/28/2002 | 30,000 | $66.57 | $1,997,100 |
| 01/30/2002 | 10,000 | $65.07 | $650,700 |
| 01/31/2002 | 10,000 | $65.81 | $658,100 |
| 01/31/2002 | 7,720 | $65.71 | $507,281 |
| 01/31/2002 | 500 | $65.91 | $32,955 |
| 03/07/2002 | 50,000 | $65.95 | $3,297,500 |
| 03/07/2002 | 18,700 | $65.45 | $1,223,915 |
| 03/07/2002 | 15,000 | $66.00 | $990,000 |

| Transaction Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 03/07/2002 | 10,000 | $65.97 | $659,700 |
| 03/07/2002 | 5,000 | $65.20 | $326,000 |
| 03/07/2002 | 1,300 | $65.30 | $84,890 |
| 09/12/2002 | 100,000 | $65.80 | $6,580,000 |
| 01/29/2003 | 133,190 | $57.90 | $7,711,701 |
| **Total** | **593,910** | | **$38,188,496** |

255.    Walter's insider trading was not part of any general or specific pre-planned pattern of stock sales, but was timed to profit from the artificial inflation in Cardinal's stock price.[8] He sold at an average share price of $64.30, 40% higher than the average trading price of the Company's stock after the fraud was revealed.  In the two years prior to the Class Period, Walter sold just 152,344 shares of Cardinal stock for proceeds of just $6.3 million, only 14% of his Class Period sales. Based on defendant Walter's Forms 4 filed with the SEC, as of Walter's final Class Period trade, he had sold 21% of his Cardinal stock holdings.  Additionally, Walter's sales were suspiciously well-timed. He sold at an average share price of $64.30, 45% higher then the average trading price of the Company's stock after the fraud was revealed.

256.    Defendant Walter's trades should also be viewed in the context of the trading behavior of his son, Matthew, who was placed on the Cardinal Board of Directors by his father in May 2002.  In the course of a single day, June 13, 2003, Matthew Walter sold 120,000 shares of his Cardinal stock at prices between $61.70 and $62.26 for insider trading proceeds of $7,436,454.[9]

---

[8]    *After* the Class Period and revelation of the fraud, defendant Walter agreed to enter into a pre-determined trading plan.  Indeed, according to a Form 4 filed by Walter on April 11, 2005, "[t]he sale reported on this Form 4 was effected pursuant to a 10b5-1 plan established by the reporting person on March 1, 2005, when the reporting person was not aware of material non-public information about the Company."

[9]    In addition to using his power and influence at Cardinal, derived in large part from ability to report strong growth and financial results, to place his son on the Board of Directors, defendant Walter directed Cardinal to do substantial business with companies owned by his children, including inChord Communications, Inc. and Bound Tree Medical.

257.     Defendant George Fotiades personally sold 67,814 shares of Cardinal stock for insider trading proceeds of $4,678,159, also capitalizing on the artificial inflation in Cardinal's stock price created by defendants' fraud.  Based on defendant Fotiades' Forms 4 filed with the SEC, as of Fotiades' final Class Period trade, he had sold 61.3% of his Cardinal stock holdings.  Fotiades' insider trading was not part of any general or specific pre-planned pattern of stock sales, but was timed to profit from the artificial inflation in Cardinal's stock price.  Fotiades' insider trading is detailed below:

| Transaction Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 12/13/2000 | 5,562 | $63.45 | $352,909 |
| 05/30/2001 | 17,300 | $72.10 | $1,247,330 |
| 05/30/2001 | 808 | $72.38 | $58,483 |
| 04/29/2002 | 4,144 | $68.59 | $284,237 |
| 04/30/2002 | 40,000 | $68.38 | $2,735,200 |
| **Total** | **67,814** | | **$4,678,159** |

258.     Moreover, Fotiades' sales were suspiciously well-timed.  He sold at an average share price of $68.99, 56% higher than the average trading price of the Company's stock after the fraud was revealed.  Thus, his sales were not merely unusual in amount, but also were timed to take advantage of the increases in the price of Cardinal's stock that immediately followed defendants' false statements and reports and recommendations of securities analysts, who based their favorable investment ratings on information provided by defendants concerning Cardinal's financial results.

259.     Defendant Gary Jensen personally sold 10,357 shares of Cardinal stock for insider trading proceeds of $743,984 in a span of less than two months during 4Q 2004, also benefiting from the artificial inflation in Cardinal's stock price.  Based on defendant Jensen's Forms 4 filed with the SEC, as of Jensen's final Class Period trade he had sold 95.7% of his Cardinal stock holdings.  Jensen's insider trading was not part of any general or specific pre-planned pattern of stock sales, but

was timed to profit from the artificial inflation in Cardinal's stock price. Jensen's reported insider trading during the Class Period is detailed below[10]:

| Transaction Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 3/8/2004 | 2,638 | $67.45 | $177,933 |
| 3/8/2004 | 1,100 | $67.42 | $74,162 |
| 3/8/2004 | 600 | $67.44 | $40,464 |
| 5/3/2004 | 6,019 | $75.00 | $451,425 |
| **Total** | **10,357** | | **$743,984** |

260. Like Fotiades, Jensen timed his trades well, completing his insider trading only weeks before the truth about defendants' fraud began to leak out and selling his shares at an average price of $71.83, 62% higher than the average post-Class Period trading price of Cardinal stock.

261. Defendant Mark Parrish sold 16,032 shares of Cardinal stock for insider trading proceeds of $972,835. Based on defendant Parrish's Forms 4 filed with the SEC, as of Parrish's final Class Period trade he had sold 90.9% of his Cardinal stock holdings. As with the other defendants, Parrish's insider trading was not part of any general or specific pre-planned pattern of stock sales, but was timed to profit from the artificial inflation in Cardinal's stock price. Parrish sold at an average price of $60.58, 37% higher than the average post-Class Period trading price of Cardinal stock. Parrish's insider trading is set forth below:

| Transaction Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 5/12/2003 | 8,235 | $57.75 | $475,571 |
| 1/26/2004 | 4,097 | $63.80 | $261,389 |
| 1/26/2004 | 3,700 | $63.75 | $235,875 |
| **Total** | **16,032** | | **$972,835** |

262. Defendant James Millar sold 86,043 shares of Cardinal stock during the Class Period for insider trading proceeds of $5,152,292. Based on defendant Millar's Forms 4 filed with the SEC,

---

[10] Jensen only began reporting his insider trading activity with the SEC on January 10, 2003.

as of Millar's final Class Period trade he had sold 43.9% of his Cardinal stock holdings.  Millar's reported insider trading during the Class Period is detailed below:

| Transaction Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 3/01/2001 | 18,000 | $67.14 | $1,208,519 |
| 5/16/2001 | 7,900 | $69.05 | $545,495 |
| 5/16/2001 | 297 | $69.25 | $20,567 |
| 2/11/2002 | 15,200 | $65.60 | $997,120 |
| 2/11/2002 | 411 | $65.61 | $26,966 |
| 4/28/2003 | 31,200 | $53.20 | $1,659,840 |
| 4/28/2003 | 7,700 | $53.21 | $409,717 |
| 4/28/2003 | 5,035 | $53.25 | $268,114 |
| 4/28/2003 | 300 | $53.18 | $15,954 |
| **Total** | **86,043** | | **$5,152,292** |

263.    Millar's insider trading was not part of any general or specific pre-planned pattern of stock sales, but was timed to profit from the artificial inflation in Cardinal's stock price.  In the two years prior to the Class Period, Millar sold 22,125 shares of Cardinal stock for proceeds of $969,952, only 17 % of his Class Period sales.  Millar's insider trading was also suspiciously well-timed and he sold at an average price of $59.88, 35% higher than the post-Class Period price of Cardinal stock.

264.    The named defendants were not the only insiders to profit from the fraud.  In addition to the Individual Defendants, other Cardinal executives who were required to report sales to the SEC dumped at least 1.43 million of their shares during the Class Period at artificially inflated prices for total proceeds of $95.85 million.  Ronald Labrum, an Executive Vice President, and Stephen Thomas, Pyxis Group President, exemplify the pattern of insider trading:  both traded in the spring of 2004, just months before the truth about defendants' fraud was revealed and in patterns not consistent with their trading history.  Labrum collected $5,571,065 in just three trades, selling 84,599 shares.  Thomas reaped $2,962,950 on sales of 46,500 shares.[11]

------

[11]    Thomas left the Company in June 2004, just prior to defendant and former CFO Richard Miller's abrupt resignation.

265. All told, defendants, their families and Cardinal insiders sold 2,208,614 million shares of Cardinal Health stock at artificially inflated prices for a total of ***$145,582,00*** in improper proceeds. The highly suspicious amount and timing of the insider trading supports a strong inference that corporate insiders were trading with knowledge of the fraud, and sought to capture the stock's inflated value before the market could absorb the true information regarding the Company's financial results and prospects.

266. At the same time as the Individual Defendants were engaging in this lucrative insider trading to benefit from their fraudulent scheme, Cardinal routinely announced stock buy backs – using Company money to buy Cardinal shares on the open market – to divert attention from the executives' profiteering. The effect of the suspiciously timed stock buy backs was to maintain the inflated stock value, further support the appearance that the Company was doing well and minimize any scrutiny into defendants' insider trading.

**Executive Compensation**

267. In addition to the strong motivation provided by lucrative insider selling, the Individual Defendants were highly motivated by the terms of their employment agreements, which tied their compensation directly to Cardinal's reported financial results and the performance of the Company's stock. A large portion of each of the Individual Defendants' compensation package was dependent upon Cardinal posting favorable financial results. In addition to maintaining their employment positions, the personal wealth of each of the Individual Defendants was dramatically enhanced by the reported business and business performance of Cardinal, as well as the Company's stock price and market capitalization, all of which were inflated by defendants' misleading statements and material omissions. Defendant Walter alone pocketed more than ***$136 million in total compensation*** from FY 2000 through FY 2004. Defendant Fotiades pocketed $48.9 million

and defendant Millar reaped more than $43.6 million.[12] Defendant Miller was rewarded with more than $15 million for his role in the scheme. In total, the Individual Defendants took in more than $245 million in incentive-based compensation during the Class Period.

268. Pursuant to Cardinal's FY 2000 Proxy dated September 18, 2000, the Board of Directors established fixed guidelines relating to executive compensation. Among the guiding principles was that executives receive "pay-for-performance" and be rewarded for positive "corporate, business unit and individual performance." Primary, of course, was continuing to report strong growth and added value for shareholders.

269. These guidelines provided that certain Cardinal executives were paid under the "Performance-Based Incentive Compensation Plan." This plan was created specifically to address the fact that the Budget and Reconciliation Act of 1993 prohibited Company tax deductions on salaries for employees earning more than $1 million. Incentive-based compensation, however, did not count toward the million dollar limitation.[13] Cardinal's SEC filings confirmed: "consistent with the Company's philosophy of linking total compensation to stock performance for all of its executive officers, a significant portion of Mr. Walter's overall compensation package is comprised of stock incentives." In other words, other than a base salary, virtually all of the Individual Defendants' compensation was based on maintaining Cardinal's inflated stock price and thus contingent on covering-up the Company's increasingly dismal financial performance and failure to adjust to market changes.

_____

[12]     This excludes the compensation awarded to Fotiades and Millar for FY 2004, because it was not publicly reported.

[13]     Although the plan was renewed on a yearly basis, the definition of which employees were covered by the plan changed from year to year. For FY 2000, defendants Walter, Millar and Fotiades were covered; in FY 2001, defendants Walter, Millar, Fotiades and Miller were covered; in FY 2002 and FY 2003, defendants Walter, Millar and Fotiades were covered; and, in FY 2004, the plan covered defendants Walter, Fotiades and Miller.

270.     Based on the reported performance of Cardinal, the Individual Defendants each received the maximum possible incentive compensation, through salary, cash bonuses and options during the Class Period.

271.     Defendant Walter reaped an astounding $136 million in total compensation from FY 2001-FY 2004.  His bonuses and option awards alone totaled more than $132 million.

| Year | Salary | Bonus Awarded | Other Compensation | Options Awarded (estimated value)[14] | All Other Compensation | Total Compensation (including option value) |
|------|--------|---------------|--------------------|---------------------------------------|------------------------|---------------------------------------------|
| FY 2001 | $968,847 | $1,828,493 | $139,729 | 272,384 ($20,000,000) | $213,585 | $23,150,654 |
| FY 2002 | $1,000,000 | $2,701,370 | $173,545 | 440,529 ($33,300,000) | $208,938 | $7,383,853 |
| FY 2003 | $1,015,144 | $2,112,135 | $111,374 | 486,009 ($36,600,000) | $36,473 | $39,875,126 |
| FY 2004 | $1,037,500 | 0 | $112,363 | 507,086 ($34,500,000) | $12,349 | $35,662,212 |
| Total | $4,021,491 | $6,641,998 | $537,011 | $124,400,000 | $471,345 | $136,071,845 |

272.     Walter's yearly compensation also included $511,525 set aside in FY 2001-FY 2004 for taxes to cover the personal use of a Company airplane by him, his family and associates, as well as $333,711 in insurance premiums paid by the Company to benefit a trust for Walter's family. [15]

273.     In sum, defendant Walter received more than $136 million in cash and stock from Cardinal during the Class Period, virtually all incentive-based and above and beyond his standard salary.

---

[14]     The value of the option awards is based on the median of the potential realizable value as reported by Cardinal in the Company's corresponding Proxy statements.

[15]     Lead Plaintiffs are aware that defendant Walter and former Director Bindley retained shares in Grantor Retained Annuity Trusts, or GRATs.  To the extent any defendant or insider leveraged or traded securities through derivatives of their Cardinal holdings, lead plaintiffs allege that such transactions should have been publicly reported, and served as a personal motivation for such insiders to maintain and inflate Cardinal's stock price.

274. As the charts below demonstrate, the other Individual Defendants were also rewarded well beyond their base salaries as a result of their role in the fraudulent scheme and Cardinal's reported results and stock performance during the Class Period.

### Richard Miller

| Year | Salary | Bonus Awarded | Options Awarded (estimated value) | All Other Compensation | Total Compensation (including option value) |
|---|---|---|---|---|---|
| FY 2001 | $339,231 | $288,115 | 39,723 ($2,850,000) | $32,450 | $3,509,796 |
| FY 2002 | $371,361 | $343,000 | 41,233 ($4,116,000) | $309,729 | $5,140,090 |
| FY 2003 | $396,309 | $247,555 | 44,686 ($3,365,000) | $34,789 | $4,043,653 |
| FY 2004 | $407,400 | 0 | 52,134 ($3,550,000) | $8,624 | $3,966,024 |
| Total | $1,514,301 | $878,670 | $13,881,000 | $385,592 | $16,659,563 |

### George Fotiades

| Year | Salary | Bonus Awarded | Options Awarded (estimated value) | All Other Compensation | Total Compensation (including option value) |
|---|---|---|---|---|---|
| FY 2001 | $491,410 | $340,360 | 60,530 ($4,450,000) | $167,167 | $5,448,937 |
| FY 2002 | $495,692 | $498,482 | 67,915 ($5,100,000) | $1,052,667 | $7,146,841 |
| FY 2003 | $531,633 | $387,412 | 250,000 ($18,800,00) | $35,957 | $19,755,002 |
| FY 2004 | $622,692 | 0 | 225,000 ($16,000,000) | $11,278 | $16,633,970 |
| Total | $2,141,427 | $1,226,254 | $44,350,000 | $1,267,064 | $48,984,750 |

### James Millar

| Year | Salary | Bonus Awarded | Options Awarded (estimated value) | All Other Compensation | Total Compensation (including option value) |
|---|---|---|---|---|---|
| FY 2001 | $590,385 | $702,894 | 94,578 $6,900,000) | $32,450 | $8,225,729 |
| FY 2002 | $634,491 | $807,393 | 100,955 ($7,600,000) | $1,003,479 | $10,045,363 |
| FY 2003 | $668,248 | $582,133 | 320,000 ($24,100,000) | $36,437 | $25,386,818 |
| FY 2004 | n/a[16] | n/a | n/a | n/a | n/a |
| Total | $1,893,124 | $2,092,420 | $38,600,000 | $1,072,366 | $43,657,910 |

---

[16] Defendant Millar's FY 2004 salary and bonuses were not reported by Cardinal.

275.     In total, defendants Walter, Miller, Fotiades and Millar collected more than *$245 million in incentive-based compensation* while perpetrating their fraud on the investing public.[17]

**Employment Agreements and Promotions**

276.     Individual defendants Walter, Miller and Fotiades each took advantage of the reported performance of Cardinal's business and stock – driven by their false statements and omissions – to renegotiate their employment agreements and guarantee themselves additional job security and compensation.  Notably, after being placed on Cardinal's Board of Directors by his father in May 2002, Matthew Walter was immediately assigned to the Compensation Committee.  Although Cardinal claimed that Matthew Walter did not have oversight of his father's executive compensation, he was admittedly involved in assessing the compensation of other executives, including defendants Miller and Fotiades which would serve as the benchmark for his father's lucrative employment agreements during the Class Period.  All of these defendants' employment agreements provided for extremely generous severance packages, the golden parachute for when their fraud was revealed.

277.     Defendants Fotiades, Millar, Jensen and Parrish were all rewarded for their role in the fraud with significant Class Period promotions within Cardinal's executive ranks.  Fotiades rose to Executive Vice President and Chief Operating Officer.  Millar was promoted to President and CEO of Cardinal's Healthcare Products segment.  Jensen became Cardinal's Principal Accounting Officer.  Parrish was promoted to Chief Executive Officer of Cardinal's Pharmaceutical Distribution business.

---

[17]     Cardinal did not publicly report salary or bonus information for defendants Jensen or Parrish, however, given the Company's reported approach to compensation, it is likely that these defendants as well had the opportunity to and received incentive-based compensation for in excess of their base salaries.

These promotions were accomplished through each of the defendants' deception and false public reports of financial and business success.

**GAAP Violations, Cardinal's Restatement and Post-Class Period Admissions**

278.    As detailed herein, the Cardinal Defendants' blatant violations of GAAP, motivation to meet revenue and earnings estimates, restatement of Class Period financial results, admission that the Company's financial statements were inaccurate and acknowledgement that Cardinal lacked adequate internal controls and post-Class Period disclosures are all further evidence of the Cardinal Defendants' scienter.

**DEFENDANTS' FALSE FINANCIAL REPORTING AND GAAP
VIOLATIONS DURING THE CLASS PERIOD**

279.    During the Class Period, the Cardinal Defendants caused Cardinal to violate GAAP and SEC rules by intentionally misclassifying zero-margin bulk sales – normally excluded by Cardinal from its profitable Operating Revenue – as Operating Revenue to give the false and misleading impression that Cardinal was still achieving double digit Operating Revenue growth when, in fact, that revenue was shrinking.  Throughout the Class Period, the Cardinal defendants improperly booked bulk sales as operating revenue in the following manner: (a) by improperly classifying bulk shipment orders from Cardinal's own inventory as Operating Revenue; (b) by improperly classifying bulk shipment orders intentionally or arbitrarily held by Cardinal for more than 24 hours as Operating Revenue; and (c) by arbitrarily and improperly classifying zero-margin bulk shipment orders as Operating Revenue when Cardinal merely substituted the Company's manufacturing order for a customer's order.

280.    Furthermore, the Cardinal defendants also caused Cardinal to violate GAAP and SEC rules by committing various accounting improprieties that the Cardinal defendants used to improperly manage earnings so that they could achieve security analysts estimates.  These accounting manipulations included:

(a)     Improper recording of contingent gains related to litigation against vitamin manufacturers;

(b)     Improper accounting for its balance sheet reserves and accrual adjustments;

(c)     Failure to disclose Cardinal's accounting practice concerning the timing of its recognition of its cash discounts;

(d)     Improper recognition of revenue in its Automation and Information Services Segment related to its Pyxis subsidiary prior to its being earned and realizable;

(e)     Improper accounting for its merger-related special charges and its restructuring special charges; and

(f)     Improper accounting for the securitization of its Pyxis receivables.

281.    Moreover, contrary to representations and certifications, Cardinal has now admitted it was plagued by grossly deficient internal and financial controls that made the bulk shipment as Operating Revenue, accounting improprieties to manage earnings and balance sheet irregularities possible.

282.    Cardinal included its false financial statements and results in press releases and in its SEC filings.  The SEC filings represented that the financial information presented therein was a fair statement of Cardinal's financial results and that the results were prepared in accordance with GAAP.

283.    These representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, nor was the financial information a "fair representation" of Cardinal's financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

284.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular

time. Regulation S-X, 17 C.F.R. §210.4-01(a)(1), states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure that would be duplicative of disclosures accompanying annual financial statements.

**Mischaracterizing Revenue and Inadequate Disclosures Regarding Revenue**

285.    During the Class Period, the Cardinal Defendants improperly booked zero-margin bulk sales as Operating Revenue to give investors the false and misleading impression Cardinal was achieving revenue growth. Within Cardinal's Pharmaceutical Distribution division, in violation of GAAP and SEC regulations, the Cardinal Defendants consistently included revenues derived from bulk shipments in Cardinal's Operating Revenue because revenue from that business was an important index of Cardinal's financial performance and growth prospects. Indeed, throughout the Class Period, defendants referred to Cardinal's purported Operating Revenues as the "driver of its growth" or as "fueling" growth.

286.    Under GAAP, as set forth in Financial Accounting Standards Board ("FASB") Statement of Concepts No. 1, one of the fundamental objectives of financial reporting is that it provides accurate and reliable information concerning an entity's financial performance during the period being presented. FASB Statement of Concepts No. 1 ¶42 provides:

> Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

287.    Moreover, GAAP, in Accounting Principles Board Opinion ("APB") No. 22, *Disclosure of Accounting Policies* ¶7 (April 1972), provides that the usefulness of financial statements in making economic decisions depends significantly upon the user's understanding of the

accounting policies followed by a company. In fact, GAAP states that information about the

accounting policies adopted by a reporting company is "essential" for financial statement users. *Id.*,

¶18. Accordingly, GAAP, in ¶12 of APB No. 22 provides:

> In general, the disclosure should encompass important judgments as to appropriateness of principles relating to recognition of revenue and allocation of asset costs to current and future periods; in particular, it should encompass those accounting principles and methods that involve any of the following:
>
> a.  A selection from existing acceptable alternatives;
>
> b.  Principles and methods peculiar to the industry in which the reporting entity operates, even if such principles and methods are predominantly followed in that industry;
>
> c.  Unusual or innovative applications of generally accepted accounting principles (and, as applicable, of principles and methods peculiar to the industry in which the reporting entity operates).

288.  Under SEC Regulations, Item 7 of Form 10-K and Item 2 of Form 10-Q,

Management's Discussion and Analysis of Financial Condition and Results of Operations

("MD&A"), require the issuer to furnish information required by Item 303 of Regulation S-K, 17

C.F.R. §229.303. In discussing results of operations, Item 303 of Regulation S-K requires the

registrant to:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.

The instructions to Item 303(a) further state:

> The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results . . . .

289.  In addition, the SEC, in its May 18, 1989 Interpretive Release No. 34-26831, has

indicated that registrants should employ the following two-step analysis in determining when a

known trend or uncertainty is required to be included in the MD&A disclosure pursuant to Item 303

of Regulation S-K:

A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have a material effect on the registrant's financial condition or results of operation.

290.    The MD&A requirements are intended to provide, in one section of a filing, material historical and prospective textual disclosure enabling investors and other users to assess the financial condition and results of operations of the registrant, with particular emphasis on the registrant's prospects for the future.  As Securities Act Release No. 33-6711 states:

The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance.  MD&A is intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company.

291.    MD&A Item 303 states:

To the extent that the financial statements disclose material increases in net sales or revenues, provide a narrative discussion of the extent to which such increases are attributable to increases in prices or to increases in the volume or amount of goods or services being sold or to the introduction of new products or services.

And further states:

Where the consolidated financial statements reveal material changes from year to year in one or more line items, the causes for the changes shall be described to the extent necessary to an understanding of the registrant's businesses as a whole . . . .

According to Securities Act Release No. 33-6349:

It is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company.

292.    Nonetheless, in violation of both GAAP and SEC rules, by recognizing zero-margin bulk sales as Operating Revenue to conceal that the Company was not achieving revenue growth, Cardinal's Class Period Forms 10-K and 10-Q failed to disclose known trends and uncertainties related to the Company's reported Operating Revenue.  Specifically it failed to disclose that it was (a) improperly classifying Bulk in Stock Revenue as Operating Revenue and (b) improperly

classifying Bulk Deliveries as Operating Revenue pursuant to the implementation of new internal revenue classification policies that the Company enacted in the 2Q 2002 under which the Company recognized bulk shipments as Operating Revenue if the shipment remained in the Company's possession for more than 24 hours and bulk shipments it intercepted from its customers just-in-time inventory management systems. These omissions that Cardinal was recognizing zero-margin bulk sales as Operating Revenue caused Cardinal's financial statements during the Class Period to be false and misleading as it artificially inflated Cardinal's reported Operating Revenue and it did not adequately disclose the source of the Company's reported growth in revenue.

293. The Pharmaceutical Distribution segment's primary business involves buying cases in full (bulk) from pharmaceutical manufacturers and breaking them down into customized orders and delivering them to provider customers (*e.g.*, buying pharmaceuticals from Pfizer and selling them in smaller amounts to CVS and Rite Aid). Prior to and during the Class Period, this business utilized a "buy and hold" type of model, in which Cardinal purchased inventory from the manufacturers prior to price increases, held the inventory and then sold the pharmaceuticals to providers subsequent to the price increases. Under this model, the Pharmaceutical Distribution segment would generate its margins in large part based upon on the appreciation in the inventory.

294. Throughout the Class Period and with increasing frequency, the Pharmaceutical Distribution segment also engaged in bulk transactions in which it ships products to customers in the same bulk form in which it was received by the manufacturer rather than breaking the products down into smaller, customized orders. Cardinal's reported Bulk Revenue was purportedly comprised of all Bulk Deliveries sales and Bulk in Stock sales.

295. Bulk Deliveries sales refers to revenue the Pharmaceutical Distribution business derives from acting as an intermediary between manufacturers and retail customers in the ordering and subsequent delivery of pharmaceutical products in bulk. It is a service provided as a courtesy to

certain warehousing customers who are permitted to use Cardinal's ordering system to place bulk orders. By way of example, Cardinal places orders for a certain customer directly with the manufacturer who in turn either ships the products directly to the customer's warehouse or the product is shipped to Cardinal's docks and Cardinal promptly ships it on to the customer's warehouse. The products are never intended to be included in Cardinal's inventory. Cardinal merely submits the order to the manufacturer and processes the payment from the customer.

296.    During the Class Period, the Cardinal Defendants purported to report all Pharmaceutical Distribution segment revenues from Bulk Deliveries on a separate line from the segment's and the Company's Operating Revenue. As Bulk Deliveries had very little financial impact on Cardinal's Operating Earnings – the transactions were generally pass-through with zero or immaterial margin – and as the amount of Bulk Deliveries could fluctuate widely from quarter to quarter through circumstances the Company could not control, Bulk Deliveries revenue was not a reliable or accurate barometer of Cardinal's true revenue growth.

297.    Beginning in 1998, as a result of Cardinal's Bulk Deliveries sales placing pressure on Cardinal's reported gross margin, the Pharmaceutical Distribution division began reporting revenue in two separate categories: "Operating Revenue" and "Bulk Deliveries to Customer Warehouses and Other" ("Bulk Deliveries"). Thereafter, due to the recognition that Bulk Deliveries had little or no impact on Cardinal's growth and Operating Earnings, Cardinal calculated its reported revenue growth based only upon its reported Operating Revenue. Throughout the Class Period, the Cardinal Defendants heralded the Company's reported Operating Revenue as a key driver of the Company's operating earnings and revenue growth.

298.    Bulk in Stock revenue is similar to Bulk Deliveries, where, as a courtesy, customers were permitted to place bulk orders using Cardinal's ordering system. During the Class Period, however, Cardinal's Pharmaceutical Distribution division would routinely intercept the bulk orders

and fill them with pharmaceuticals from Cardinal's general inventory rather than placing an order with the manufacturer. In turn, Cardinal would simply replace the amount shipped to the customer with an order of its own to the manufacturer. Again, these transactions were characterized by quarter-to-quarter fluctuations outside the Company's control and zero or low margin for Cardinal. Despite the fact that Bulk in Stock transactions were a form of Bulk Deliveries, throughout the Class Period, defendants included Bulk in Stock sales in Operating Revenue.

299.    Ultimately, in Cardinal's restated FY 2004 Form 10-K filed on October 26, 2004, defendants admitted that Cardinal had overstated its Operating Revenue and understated its Bulk Revenue during the Class Period. In addition to acknowledging that Cardinal's prior financial statements were materially inaccurate, Cardinal confirmed that Bulk Revenue, as opposed to Operating Revenue, is revenue derived from the following sources:

(a) deliveries to customer warehouses whereby the Company acts as an intermediary in the ordering and delivery of pharmaceutical products;

(b) delivery of products to the customer in the same bulk form as the products are received from the manufacturer;

(c) warehouse to customer warehouse or process center deliveries; or

(d) deliveries to customers in large or high volume full case quantities.

300.    According to the restatement, Cardinal's Bulk Deliveries Revenue for FY 2002, FY 2003 and FY 2004 was $13.7 billion, $15.4 billion and $18.0 billion, respectively. Defendants had originally reported its Bulk Deliveries as $6.7 billion and $6.3 billion for 2002 and 2003 in its previous publicly reported financial statements. In addition, Cardinal's Bulk Deliveries revenue for FY 2001 had also been underreported by $2.82 billion.

301.    The chart below shows the impact the classification of Bulk Revenue versus Operating Revenue had on Cardinal's financial statements for FY 2001-FY 2004:

| (in billions) | Fiscal Year-End 2002 | Fiscal Year-End 2003 | Fiscal Year-End 2004 |
|---|---|---|---|
| **As Reported** | | | |

| | | | |
|---|---|---|---|
| Operating Revenue | $44.40 | $50.50 | $42.00 |
| Bulk Deliveries | $6.70 | $6.30 | $6.10 |
| Combined Revenue | -- | -- | $16.90 |
| **Total Revenue** | $51.10 | $56.80 | $65.00 |
| Year over Year Operating Revenue Growth Rate | 15% | 14% | N/A[18] |
| **Per Restatement** | | | |
| Operating Revenue | $37.40 | $41.40 | $47.00 |
| Bulk Revenue | $13.70 | $15.40 | $18.00 |
| **Total Revenue** | $51.10 | $56.80 | $65.00 |
| Year over Year Operating Revenue Growth Rate | (3%) | (7%)[19] | N/A |
| **Overstatement of Operating Revenue** | **$7.00** | **$9.10** | **$7.40[20]** |

302.    The graph below shows the overstatement of Operating Revenue for each quarter during the Class Period.

---

[18]    During the Class Period, Cardinal reported its revenue based upon two classifications: Operating Revenue and Bulk Revenue. Beginning 4Q 2004, Cardinal changed its reporting method and no longer provided a break-down of its revenue and thereafter only reported revenue on a combined basis. As Cardinal changed its method of reporting revenue, Cardinal did not report a year over year growth rate in its Operating Revenue as it had done in the previous periods.

[19]    Restated Year over Year Growth in Operating Revenue compares restated FY 2003 Operating Revenue to originally reported FY 2002 Operating Revenue.

[20]    FY 2004 overstatement is based on the first three quarters of the fiscal year. Cardinal's restatement failed to provide a quarterly breakdown of Operating Revenue. The overstatement is based on Cardinal's reported Bulk Revenue ballooning from $6.1 billion at the end of 3Q 2004 to $18 billion for FY 2004. Assuming Cardinal recorded on average $4.5 billion of Bulk Revenue per quarter, which would amount to $13.5 billion for 1Q-3Q 2004 versus the $6.1 billion previously reported, results in an overstatement of Operating Revenue of $7.4 billion.



303. The chart below demonstrates the impact the classification of Bulk Revenue versus Operating Revenue had on Cardinal's reported financial results for its largest division, the Pharmaceutical Distribution business for FY 2001-FY 2004.

| Pharmaceutical Distribution & Provider Services (in billions)[21] | Fiscal Year-End 2001 | Fiscal Year-End 2002 | Fiscal Year-End 2003 | Fiscal Year-End 2004 |
|---|---|---|---|---|
| **As Reported** | | | | |
| Operating Revenue | $27.80 | $36.20 | $41.20 | $34.20 |
| Bulk Deliveries | $8.00 | $6.70 | $6.10 | $6.00 |
| Combined Revenue | -- | -- | -- | $14.00 |
| Year over Year Operating Revenue Growth Rate | 30% | 16% | 14% | N/A [?] |
| **Per Restatement** | | | | |

---

[21] The footnotes for the chart demonstrating the impact of the classification of Bulk Revenue versus Operating Revenue had on Cardinal's Financial Statements as a whole apply equally to this chart.

| | | | | |
|---|---|---|---|---|
| Operating Revenue | $25.00 | $29.30 | $31.90 | $36.20 |
| Bulk Revenue | $10.90 | $13.70 | $15.40 | $18.00 |
| Year over Year Operating Revenue Growth Rate | 17% | (6%) | (12%) | N/A |
| **Overstatement of Operating Revenue** | **$2.80** | **$6.90** | **$9.30** | **$7.40** |

304.     The following graph demonstrates the overstatement of the Pharmaceutical

Distribution business for each quarter during the Class Period.



305.     *Bulk in Stock* – During the Class Period, the Cardinal Defendants failed to disclose

that Cardinal had been including Bulk in Stock revenue in its Operating Revenue in violation of

GAAP and SEC rules.  Consequently, Cardinal overstated its Operating Revenue by approximately

$21.1 billion – $2.8 billion for FY 2001, $5.6 billion for FY 2002, $6.1 billion for FY 2003 and

approximately $6.6  billion for 1Q-3Q 2004.  The failure to disclose that Cardinal was including

revenue derived from bulk orders in its Operating Revenue caused Cardinal's financial statements

during the Class Period to be false and misleading because: (a) Cardinal's reported Operating Revenue and the associated growth of that revenue was artificially inflated; and (b) Cardinal's financial statements failed to provide accurate information regarding the source of growth in Operating Revenue and thus failed to disclose known adverse trends and conditions in violation of Item 303 of Regulations S-K, 17 C.F.R. §339.303. Set forth below are graphs which demonstrate the actual versus the reported growth rates for the Company's total Operating Revenue and the Pharmaceutical Distribution business revenue for each quarter during the Class Period.



Cardinal Health Reported vs. Actual Operating Revenue Growth Rate

The FY '02 - FY '04 overstatement in Bulk in Stock Revenue and the total Bulk Revenue for 1Q - 3Q for FY '04 are calculated based upon an assumption of an evenly quarterly breakdown.



Cardinal Health Reported vs. Actual Operating Growth in its Pharmaceutical Distribution business

The FY '02 - '04 overstatement in Bulk in Stock Revenue and the total Bulk Revenue for 1Q - 3 Q for FY '04 are calculated based upon an assumption of an evenly quarterly breakdown

306.     Cardinal's December 2003 *Investor* newsletter, filed with the SEC on Form 8-K on December 16, 2003, Cardinal, for the first time, broke down its Operating Revenue from its Pharmaceutical Distribution business into two separate categories: "Direct Store Door" ("DSD") sales and "Bulk in Stock" sales.  Prior to this announcement, Cardinal only reported Operating Revenue on a combined basis.  Indeed, it was not until this disclosure that investors learned that any bulk orders were being included in Operating Revenue.[22]  According to the *Investor*, in FY 2003 alone $5.6 billion, 15%, of the $38 billion in reported distribution business Operating Revenue was, in fact, derived from bulk order transactions.

_____

[22]     As discussed above, beginning in 1998, Cardinal reported bulk deliveries separate from Operating Revenue which were a different type of zero-margin sales district from bulk in stock sales revealed for the first time in December 2003.

307. Defendants' public statements, including Cardinal's Class Period Forms 10-K and 10-Q, prior to this point failed to disclose that the Company's reported Operating Revenue growth was, in material part, achieved by improperly reporting revenues from bulk shipments as Operating Revenues. As Lehman Brothers analyst Lawrence Marsh reported, the fact that bulk revenue was classified as Operating Revenue could effectively "change the perception as to how fast the company is growing."

308. The ability of Cardinal to derive any profit from Bulk in Stock sales was reduced dramatically during the Class Period as pharmaceutical manufacturers converted to a just-in-time model. As a result, Cardinal was not able to retain a significant inventory from which to fill bulk deliveries and such orders increasingly could only be filled via placing concurrent orders with pharmaceutical manufacturers. Cardinal was simply placing orders for customers for zero or little margin. As the change in the business model caused pressure on Cardinal's margins, defendants finally disclosed that they had been including Bulk in Stock sales in Cardinal's Operating Revenue and thereafter encouraged investors to only look to DSD sales to determine revenue growth. In the December 2003 issue of *Investor*, defendants stated:

> DSD volumes and associated revenues represent what customers are buying for their pharmacies to meet consumer prescription demand. ***In addition, DSD is the primary earnings driver for the company's pharmaceutical distribution business. As such, DSD sales represent the best basis for evaluating the ongoing performance of its drug distribution business.*** Due to the changing complexity of the sales mix in pharmaceutical distribution, the company will provide this measure on a going-forward basis to ensure investors fully understand the trends and future potential of this business.

309. Defendant's belated December 2003 disclosure still was not accurate. First, defendants still failed to disclose that Bulk in Stock revenue was being reported as Operating Revenue. Second, defendants failed to disclose the true amount of the revenue the Company derived from bulk orders. According to the December 2003 disclosure, Cardinal's FY 2003 Bulk Revenue was $11.7 billion – $6.1 billion for Bulk Deliveries and $5.6 billion Bulk in Stock. However, in

Cardinal's restatement filed on October 26, 2004, defendants admitted that Cardinal's FY 2003 Bulk Revenue was actually $15.4 billion. Thus, the December 2003 disclosure still understated bulk revenue by $3.7 billion. Ultimately, in its restatement, defendants finally acknowledged that all revenue derived from the Company's bulk shipment, whether it was Bulk Deliveries sales or Bulk in Stock sales, should have been reported as Bulk Revenue rather than Operating Revenue.

310.    *Bulk Deliveries* – During the Class Period, defendants improperly classified bulk shipments as Operating Revenue based upon the Company's revenue classification policies enacted in FY 2002. As now known, defendants overstated Cardinal's Operating Revenue by at least $5.2 billion – approximately $1.4 billion for FY 2002, $3 billion for FY 2003 and $0.8 billion for FY 2004.

311.    Beginning in November 2001 (2Q 2002), as the Company's revenue growth faltered, the Cardinal Defendants instituted new and undisclosed internal policies concerning classification of revenue. Under the new policies, revenue was classified as Operating Revenue or Bulk Deliveries based upon how long the product was in the Company's possession prior to being shipped. For example, the bulk shipment was classified as Operating Revenue as long as it was held for 24 hours. In addition, a second policy instituted by the Cardinal Defendants provided that customer orders for bulk shipments filled from Cardinal's own inventory were deemed to be Operating Revenue rather than Bulk Deliveries because Cardinal would intercept the order which had been placed with the manufacturer prior to Cardinal receiving the bulk order. Cardinal's new revenue classification policies were not disclosed to the public.

312.    Even worse than not disclosing these new policies was how the Cardinal Defendants abused the policies to classify Bulk Deliveries as Operating Revenue based solely upon how long the product was in the Company's possession prior to being shipped. If the product was in Cardinal's possession for more than 24 hours prior to being shipped, then it was classified as Operating

Revenue regardless of the substance (or other characteristics) of the transaction. This arbitrary and undisclosed policy meant that bulk order transactions, where Cardinal simply acted as an intermediary and derived no profit from the transactions, could be recognized as Operating Revenue instead of Bulk Deliveries merely because it remained within Cardinal's possession for 24 hours or more.

313. Beginning in 2Q 2002 and continuing through 4Q 2004, Cardinal improperly recognized $3.368 billion in Operating Revenue due to this arbitrary practice, including $1.227 billion in revenue the Cardinal Defendants have admitted was improperly recognized as a result of bulk sales intentionally being held more than 24 hours simply to fall under this new policy.

314. As a result of classifying Bulk Deliveries as Operating Revenue, purportedly pursuant to the 24 hour rule, the Cardinal Defendants overstated Cardinal's Operating Revenue by at least $2.141 billion – $466 million in FY 2002, $1 billion in FY 2003 and $675 million in FY 2004. The annual breakdown of defendants' improper accounting under the 24 hour rule is as follows:

| (in millions) | Fiscal Year End 2002 | Fiscal Year End 2003 | Fiscal Year End 2004 |
|---|---|---|---|
| First Quarter | -- | $208 | $191 |
| Second Quarter | $156 | $200 | $187 |
| Third Quarter | $155 | $360 | $148 |
| Fourth Quarter | $155 | $232 | $149 |
| **Total** | **$466** | **$1,000** | **$675** |

315. The $1.227 billion in improperly reported Operating Revenue based on the intentional manipulation of the 24 hour rule occurred in FY 2002 and FY 2003 as follows:[23]

---

[23] Defendants' intentional misstatements of Cardinal's Operating Revenue, including the manipulation of the Company's 24 hour rule, are material. The SEC released Staff Accounting Bulletin ("SAB") No. 99, Materiality, during August 1999. SAB No. 99 specifically addresses intentional misstatements stating that in certain circumstances *intentional immaterial misstatements are unlawful and that registrants must comply with SEC regulations*:

| (in millions) | Fiscal Year End 2002 | Fiscal Year End 2003 |
|---|---|---|
| First Quarter | -- | -- |
| Second Quarter | $82 | $673 |
| Third Quarter | -- | $140 |
| Fourth Quarter | $332 | -- |
| **Total** | **$414** | **$813** |

316.   Pursuant to Cardinal's second undisclosed, new revenue policy, customer orders for bulk shipments filled from Cardinal's inventory were reported as Operating Revenue rather than Bulk Deliveries because Cardinal intercepted the order, filled it from the Company's inventory even though it was placed with the manufacturer prior to Cardinal's receiving the bulk order.  Under this internal policy, as long as Cardinal technically placed the order for the products prior to the customer officially placing its bulk shipment order (even if it was 10 minutes prior thereto), then the revenue associated with the order was considered to be Operating Revenue instead of Bulk Deliveries regardless of the substance (or other characteristics) of the transaction.  It is noteworthy that the Cardinal Defendants used their customers just-in-time inventory management system to intercept the order *i.e.*, they would use these just-in-time systems to determine when their customers were about to place orders with the manufacturers, place the order themselves with the manufacturer and then fill the order from Cardinal's inventory.  By abusing this just-in-time bulk order policy, the Cardinal Defendants improperly booked zero-margin bulk sales as Operating Revenue.

317.   Beginning in 3Q 2002 and continuing through 3Q 2004, Cardinal improperly recognized Operating Revenue pursuant to the just-in-time bulk order policy.  During the Class

[Registrants] must make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets of the registrant and must maintain internal accounting controls that are sufficient to provide reasonable assurances that, among other things, transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP....  Accordingly, ***failure to record accurately immaterial items, in some instances, may result in violations of the securities laws***.

Period, Cardinal overstated its Operating Revenue by at least $1.802 billion – $482 million in FY 2002, $1.202 billion in FY 2003 and $118 million in FY 2004. The chart below identifies defendants' admitted quarterly overstatement of Operating Revenue under the just-in-time bulk order policy:

| (in millions) | Fiscal Year End 2002 | Fiscal Year End 2003 | Fiscal Year End 2004 |
|---|---|---|---|
| First Quarter | -- | $351 | $13 |
| Second Quarter | -- | $265 | $74 |
| Third Quarter | $157 | $252 | $31 |
| Fourth Quarter | $325 | $334 | -- |
| **Total** | **$482** | **$1,202** | **$118** |

318. The Cardinal Defendants have admitted that Cardinal's FY 2001-FY 2004 financial statements were inaccurate and restated its FY 2002-FY 2004 financial statements due to these violations of both GAAP and SEC rules.

**Other Accounting Improprieties**

319. In addition to improperly classifying zero-margin bulk sales as Operating Revenue, the Cardinal Defendants also managed the Company's reported earnings through various accounting manipulations implemented so the Company could hit securities analysts' expectations.

**Improper Recording of Settlement Proceeds**

320. During the Class Period, the Cardinal Defendants violated GAAP by improperly and prematurely recording $22 million of expected lawsuit settlement proceeds prior to a settlement or judgment being reached in the litigation.

321. A fundamental tenet of GAAP is that "[i]n assessing the prospect that as yet uncompleted transactions will be concluded successfully, a degree of skepticism is often warranted." FASB Concepts Statement No. 5 ¶81. Accordingly, "as a reaction to uncertainty, more stringent requirements historically have been imposed for recognizing revenues and gains than for recognizing

expenses and losses, and those conservative reactions influence the guidance for applying the recognition criteria to components of earnings." *Id*.

322.    More specifically, GAAP requires that "[c]ontingencies that might result in gains usually are not reflected in the accounts since to do so might be to recognize revenue prior to its realization." Statement of Financial Accounting Standards No. 5 Accounting for Contingencies ¶ 17 (March 1975).

323.    In May 2000, Scherer, a company acquired by Cardinal in 1998, filed a civil antitrust lawsuit against certain vitamin manufacturers for amounts overcharged in prior years ("Vitamin Litigation").  Cardinal did not enter into a settlement agreement with the vitamin manufacturers until 4Q 2002 and thereafter began to receive settlement payments from the different manufacturers. During the course of the litigation, the Cardinal Defendants arbitrarily recorded $22 million in expected proceeds as a reduction of cost of goods sold – $10 million in 2Q 2001 – prior to when a settlement had even been reached and before any such payment had been made.

324.    The Cardinal Defendants' premature recognition of possible settlement proceeds improperly allowed Cardinal to meet analyst estimates in 2Q 2001 and 1Q 2002.  Had Cardinal not recorded the two initial gains when it did, it would have fallen $0.02 short of Wall Street analysts' earnings targets in both 2Q 2001 and 1Q 2002.  The Cardinal Defendants' premature recording of a contingent gain violated GAAP.  Furthermore, recording of the potential proceeds as a reduction of cost of goods sold rather than as a special charge resulted in an overstatement of Cardinal's operating earnings in 2Q 2001 and 1Q 2002 in addition to the overstatement in Cardinal's net income for these periods.

325.    In the October 26, 2004 restatement, the Cardinal Defendants acknowledged the improper recognition of the Vitamin Litigation proceeds and restated Cardinal's FY 2001 and FY 2002 financial statements due to the Cardinal Defendants' accounting violation.  Finally, Cardinal

reversed the $22 million it recorded prematurely and inappropriately as cost of goods sold and properly recorded the $22 million as a special charge it to the Company's 4Q 2002 results.

**Improper Reserve Accounting and Accrual Adjustments**

326. Throughout the Class Period, the Cardinal Defendants improperly accounted for Cardinal's balance sheet reserves and accrual adjustments and in doing so overstated the Company's net income by $64.2 million in violation of GAAP.

327. In Cardinal's amended Form 10-K FY 2004 filed on October 26, 2004, the Cardinal Defendants acknowledged that in connection with the Company's balance sheet reserves and accrual adjustment there were various situations prior to and throughout the Class Period where the amount of its reserves, the timing of its reserves and the timing of its reserve adjustments could not be substantiated or were in error due to various GAAP violations.

328. Cardinal's restatement included the correction of numerous errors related to the misapplication of GAAP in connection with the Company's balance sheet reserves and accrual adjustments, including the following types of errors: corrections to reduce reserve accounts made in periods subsequent to the period in which the excess had been identified by the Company; a last-in, first-out (LIFO) inventory adjustment; and a correction related to Cardinal's accounting for its dividends.

329. The chart below summarizes the effect of these various GAAP violations related to Cardinal's balance sheet reserves and accrual adjustments had on Cardinal's net income for FY 2000 – FY 2004.

| (in millions) | Fiscal Year 2000-2001 | Fiscal Year End 2002 | Fiscal Year End 2003 | Fiscal Year End 2004 |
|---|---|---|---|---|
| First Quarter | ($6.80) | ($3.10) | ($6.90) | ($4.80) |
| Second Quarter | ($6.80) | ($2.70) | $2.60 | ($4.90) |
| Third Quarter | ($6.80) | $6.50 | ($14.50) | ($5.70) |
| Fourth Quarter | *($6.80) | $8.30 | ($11.90) | -- |
| **Total** | **($27.10)** | **$9.00** | **($30.70)** | **($15.40)** |

\* Average based on full year adjustment

330.    Cardinal's restatement due to these various GAAP violations decreased the Company's reported net income for FY 2000-3Q 2004 by $64.2 million.

**Failure to Disclose the Company's Recognition of Cash Discounts**

331.    Throughout the Class Period, the Cardinal Defendants failed to disclose the Company's practice of accelerating its receipt and recognition of cash discounts earned from suppliers for prompt payment in certain reporting periods in order to obtain a benefit in reported operating results.  The failure to disclose this practice violated GAAP and SEC rules.

332.    In connection with its payments to its vendors (pharmaceutical manufacturers), certain of its vendors offered Cardinal discounts for the accelerated payment of invoices.  Despite the fact that Cardinal did not necessarily sell the inventory associated with these discounts, during the Class Period the Cardinal Defendants would recognize these cash discounts as a reduction of cost of products sold promptly upon payment of the invoice.  The Cardinal Defendants routinely engaged in the practice of accelerating payment of vendor invoices at the end of certain reporting periods in order to accelerate the recognition of cash discounts.  The effect of this practice was an improvement in Cardinal's operating results for the reporting period as it lowered Cardinal's reported cost of products sold.  The Cardinal Defendants did not disclose this accounting practice or the improper benefits the Company received from this practice.  This nondisclosure caused Cardinal's financial statements to be false and misleading as it did not provide an accurate and reliable portrait of Cardinal's operating results.  *See* FASB Statement of Concepts No. 1 ¶42; APB No. 22 ¶¶7, 12; Item 303 of Regulation S-K.

333.    Additionally, a basic concept of accounting is the "matching principle."  This principle is based upon matching revenues generated in a period with the expenses incurred to generate that revenue to ensure a fair presentation of an entity's financial results.  FASB Statement

of Concepts No. 6 ¶¶134-152.  The Cardinal Defendants' practice of recognizing cash discounts promptly upon payment of vendor invoices also violated this fundamental principle as it did not accurately match the true cost of Cardinal's inventory to the actual revenue that inventory would generate.  Under the matching principle, the true cost of the inventory, including any discounts, should not be recognized until the inventory is ultimately sold and revenue is recorded in connection with the sale.

334.    In its restatement, Cardinal provided additional disclosures concerning its recognition of cash discounts, including indicating the effect this practice had on reported earnings during the Class Period.  The Cardinal Defendants acknowledged that Cardinal was changing its accounting method to record the discounts as a component of inventory cost as opposed to recognizing the discounts promptly upon payment of the invoices and took a charge of $38.5 million as a cumulative effect of the long-delayed change in the Company's accounting practice.  Although the Cardinal Defendants characterized the charge as a change in accounting principle, throughout the Class Period as described above, GAAP required income to be matched that expenses which generated the income.  As such, the Cardinal Defendants' prior practice constituted a violation of GAAP, not a change in accounting principle.

**Improper Recognition of Revenue**

335.    During the Class Period, the Cardinal Defendants further violated GAAP by improperly recognizing revenue in Cardinal's Automation and Information Services Segment related to the Company's Pyxis subsidiary prior to its being earned and realizable.  Not only did Cardinal Defendants' improper recognition of revenue from the Pyxis subsidiary violate GAAP, it is directly contrary to Cardinal's own announcement that it would discontinue that practice.  On October 10,

2001, the Company conducted a conference call to discuss, among other items related to Pyxis, a change as to when it recognized revenue on installation contacts.[24]

336.     Cardinal's Automation and Information Services segment offers a mix of products and services for use by hospitals and other health care facilities.  It develops, manufactures, leases, sells and services point-of-use systems that automate the distribution and management of medications and supplies.  This segment includes Pyxis Corporation which leases point-of-use systems which automate the distribution management and control of medications.  The change in revenue recognition methodology was purportedly due to an evolving manufacturing business model within the Pyxis subsidiary from a simply "build-to-inventory" model to a more complex "build-to-order" model as a result of more customization of the products and increased manufacturing complexities.  Furthermore, as the business model evolved, the written agreements between Cardinal and its customers required customer acceptance after installation of the equipment prior to Cardinal being entitled to payment from the customer.  In connection with the change in accounting, Cardinal took a one-time charge of $70 million, which represented revenue that it had recognized prior to July 1, 2001 that had not yet reached the installation phase of the sales process.

337.     GAAP, as described by FASB Statement of Concepts No. 5 ¶¶83-84, requires that revenue be both earned and realizable (collectible) prior to recognition.  Per SAB No. 101, Revenue Recognition in Financial Statements, revenue is generally realized or realizable and earned when all of the following criteria are met:

- Persuasive evidence of an arrangement exists,

- Delivery has occurred or services have been rendered,

---

[24]     On October 16, 2001, Morgan Stanley issued a report by analyst Michael Fitzgibbons noting that Cardinal changed the practice of recognizing revenue when products were delivered shortly after the contract was signed to when installation was complete.

- The seller's price to the buyer is fixed or determinable, and

- Collectibility is reasonably assured.

Furthermore, SAB 101 provides that:

> After delivery of a product or performance of a service, if uncertainty exists about customer acceptance, revenue should not be recognized until acceptance occurs. Customer acceptance provisions may be included in a contract, among other reasons, to enforce a customer's rights to (1) test the delivered product, (2) require the seller to perform additional services subsequent to delivery of an initial product or performance of an initial service (e.g., a seller is required to install or activate delivered equipment), or (3) identify other work necessary to be done before accepting the product. The staff presumes that such contractual customer acceptance provisions are substantive, bargained-for terms of an arrangement. Accordingly, when such contractual customer acceptance provisions exist, the staff generally believes that the seller should not recognize revenue until customer acceptance occurs or the acceptance provisions lapse.

338. Despite the October 10, 2001 pronouncement to discontinue recognizing revenue upon receipt of products by the customer and new internal policies against this practice, its written agreements with its customers and GAAP, under which Cardinal was not permitted to recognize revenue until after installation had taken place and the customer had accepted the equipment, Cardinal, nonetheless, during the Class Period, prematurely recognized revenue in connection with the sales of its Pyxis automation equipment. In certain instances, equipment confirmation documents were intentionally executed prior to the installation of the equipment. Revenue was then recognized based upon the date of the equipment confirmation. In Cardinal's FY 2004 10-K, the Cardinal Defendants admitted that:

> Some equipment confirmations, particularly in some sales regions, had been prematurely executed by customers at the request of certain Company employees, including certain situations where inducements to the customer (such as deferral of payments) were offered to obtain premature execution.

339. These false confirmations were generally executed in the last few weeks of the fiscal quarter, while installations not were completed until the following quarter.

340. The Automation and Information Services segment was an important segment to Cardinal's bottom line reported earnings. While this segment provided the Company with less than

2% of its operating revenue per year, this segment contributed 11% and 12% of the Company's reported Operating Earnings for FY 2002 and FY 2003, respectively. This was due to the large margins associated with the products and services sold by this segment. The gross margin in the Automation and Services segment for FY 2002 and FY 2003 was 37% and 40%, respectively, compared to the Pharmaceutical Distribution which, for 2002 and 2003 had gross margins of 3% per year.

341. The significance of the improper revenue recognition was finally acknowledged in Cardinal's FY 2004 Form 10-K:

> ***Net impact of this premature revenue recognition was assessed as of June 30, 2004 based upon interviews of customers as of June 30, 2004 representing a substantial percentage of the segment's end of quarter reported revenues resulting in approximately 10.8% of revenue in the last 10 days of the quarter being recognized prematurely (based upon an extrapolation)***. The Company recorded an $8.3 million reduction of revenue and a $5.3 million reduction of operating earnings during the fourth quarter fiscal 2004 to adjust for premature revenue recognition that was determined to have occurred within that quarter. These revenues and operating earnings will be recognized in the first quarter fiscal 2005.
>
> ***The Company does not maintain accounting records that allow it to determine the precise impact of this matter on prior quarters.*** However, during the investigation there was sufficient data accumulated independent of the accounting systems to estimate the impact using a variety of methods. These methods were utilized solely to test the materiality of prior periods and are not necessarily indicative of what the actual results would have been. If the results of the June 30, 2004 interviews were applied to prior years (i.e., utilizing the 10.8% exception rate) as was utilized in the fourth quarter fiscal 2004 adjustment, the net increase (decrease) on revenue and operating earnings for fiscal 2002 and each previously reported quarter of fiscal 2003 and 2004, and the related percentage of the Automation and Information Services segments reported amounts, would have been as follows:

| (in millions) | Revenue | % Change | Operating Earnings | % Change |
|---|---|---|---|---|
|  |  |  |  |  |
| FISCAL 2002 | ($8.30) | (1.5)% | ($5.30) | (2.5)% |
|  |  |  |  |  |
| FISCAL 2003 |  |  |  |  |
| First Quarter | $2.60 | 1.9% | $1.70 | 3.6% |
| Second Quarter | $0.20 | 0.1% | $0.10 | 0.1% |
| Third Quarter | ($0.30) | (0.2)% | ($0.20) | (0.3)% |

| (in millions) | Revenue | % Change | Operating Earnings | % Change |
|---|---|---|---|---|
| Fourth Quarter | ($3.80) | (1.9)% | ($2.40) | (2.8)% |
| | | | | |
| Total Year | ($1.30) | (0.2)% | ($0.80) | (0.3)% |
| | | | | |
| FISCAL 2004 | | | | |
| First Quarter | $3.70 | 2.6% | $2.40 | 4.5% |
| Second Quarter | $0.10 | 0.0% | -- | 0.0% |
| Third Quarter | ($1.90) | (1.1%) | ($1.20) | (1.7)% |
| | | | | |
| Year-To-Date | $1.90 | 0.4% | $1.20 | 0.6% |

*Using different estimation methods than the methodology used to derive the table above, the percentage change in operating earnings for the periods noted above would range from less than 1% to a high of 6.6%. There were two quarters in which the estimated impact was over 5% (first quarter fiscal 2003 negative impact of 6.6% and third quarter of fiscal 2004 negative impact of 5.5%).*

342.     Thus, by the Company's own admission, Cardinal's net income from its automation and Information Services segment, which constituted 11% - 12% of Cardinals Operating Earnings, was overstated by 1% to 6.6% from 1Q 2002 to 3Q 2004.  Despite the materiality that this manipulation had on Cardinal's operating earnings during the Class Period, the Cardinal Defendants admitted that they could not restate the Company's financial statements as a result of this intentional GAAP violation due to its failure to maintain adequate records.

**Excessive Special Charges**

343.     Another method the Cardinal Defendants used to manipulate earnings during the Class Period was to improperly overstated numerous special charges in violation of GAAP.  By overstating special charges, the Cardinal Defendants understated Cardinal's normal recurring expenses either in the same quarters Cardinal overstated its special charges or in subsequent quarters, thereby reporting inflated Operating Earnings.

344.     Expenses related to normal recurring activities should be expensed as incurred whereas a special charge involves the creation of a liability or reserve due to a loss contingency.  In

respect to accounting for contingencies, GAAP, as set forth in FASB Statement of Financial

Accounting Standard ("SFAS") No. 5 ¶8, states:

> An estimated loss from a loss contingency . . . shall be accrued by a charge to income if both of the following conditions are met:
>
> > a.      Information available prior to issuance of the financial statements indicates that it is probable that an asset has been impaired or a liability has been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.
> >
> > b.      The amount of loss can be reasonably estimated.

345.     Whenever a special charge is established, a liability (or reserve) is created in an

amount approximating future cash outflows associated with that charge. In later periods, the reserve

will generally be decreased (and income increased) when either cash is paid or the company no

longer needs the reserve. In either case, reducing reserves is completely unrelated to the company's

actual performance and it increases the company's income in the period the reversal takes place.

346.     A special charge is reported as a separate component of income from continuing

operations. To be considered a special charge, the charge should be for an event that is either

unusual in nature or infrequent in occurrence. ABP No. 30 ¶¶ 21 – 22 defines the terms "unusual in

nature" and "infrequency in occurrence" as follows:

> *Unusual Nature.* The specific characteristics of the entity, such as type and scope of operations, lines of business, and operating policies should be considered in determining ordinary and typical activities of an entity. ***The environment in which an entity operates is a primary consideration in determining whether an underlying event or transaction is abnormal and significantly different from the ordinary and typical activities of the entity.*** The environment of an entity includes such factors as the characteristics of the industry or industries in which it operates, the geographical location of its operations, and the nature and extent of governmental regulation. ***Thus, an event or transaction may be unusual in nature for one entity but not for another because of differences in their respective environments.*** Unusual nature is not established by the fact that an event or transaction is beyond the control of management.

*      *      *

*Infrequency of Occurrence.* For purposes of this Opinion, ***an event or transaction of a type not reasonably expected to recur in the foreseeable future is considered to occur infrequently.*** Determining the probability of recurrence of a particular event or transaction in the foreseeable future should take into account the environment in which an entity operates. Accordingly, a specific transaction of one entity might mean that criterion and a similar transaction of another entity might not because of different probabilities of recurrence. ***The past occurrence of an event or transaction for a particular entity provides evidence to assess the probability of recurrence of that type of event or transaction in the foreseeable future.***

347.     By accounting for an item as a special item, it provides companies with opportunities to: (a) shift "normal" operating expenses that otherwise would have been recorded in future periods to the current period; or (b) transform the nature of such expenses from a normal operating expense (which reduces reported net earnings) to a special charge, which often is excluded from reported net earnings from continuing operations.

348.     Here, Cardinal took large special charges every year since FY 1996 due to the Company's merger-related activities and to its restructuring activities. These special items appear on a separate line on Cardinal's income statement – separate and distinct from its normal recurring costs that are accounted for in Cardinal's selling, general and administrative expenses. Cardinal repeatedly features its net earnings excluding special charges in its earnings announcements.

349.     Commenting on the problems that arise when abusing the use of restructuring changes, as former SEC chairman Arthur Levitt stated in a speech given on September 28, 1998:

> Problems arise, however, when we see large charges associated with companies restructuring. These charges help companies "clean up" their balance sheet - giving them a so-called "big bath."
>
> Why are companies tempted to overstate these charges? When earnings take a major hit, the theory goes Wall Street will look beyond a one-time loss and focus only on future earnings.
>
> And if these charges are conservatively estimated with a little extra cushioning, that so-called conservative estimate is miraculously reborn as income when estimates or future earnings fall short.
>
> When a company decides to restructure, management and employees, investors and creditors, customers and suppliers all want to understand the expected effects. We need, of course, to ensure that financial reporting provides this

information.  But this should not lead to flushing all the associated costs – and maybe a little extra – through the financial statements.

350.     Below is a breakdown of Cardinal's merger-related special charges and its restructuring special charges during the Class Period.  Its merger-related special charges include charges for the following: employee-related costs; distribution center consolidation; other exit costs; other integration costs; and other special charges.  Cardinal's restructuring-related special charges include charges for the following: employee-related costs; manufacturing and other closures; asset impairments; and other special charges.

| (in millions) | Merger-Related Charges | Restructuring Charges | Total Special Charges |
|---|---|---|---|
| | | | |
| 1Q – 3Q FY 2004 | $23.60 | $25.10 | $48.70 |
| FY 2003 | $74.40 | $67.00 | $141.40 |
| FY 2002 | $131.90 | $18.00 | $149.90 |
| FY 2001 | $118.10 | $11.80 | $129.90 |
| Total | $348.00 | $121.90 | $469.90 |

351.     In addition to the above charges during the Class Period, Cardinal also took similar special charges prior to the Class Period as follows: FY 2000 – $64.7 million; FY 1999 – $146.6 million; FY 1998 – $57.8 million; FY 1997 – $50.9 million; and FY 1996 – $67.3 million.

352.     Given the multitude and magnitude of charges as well as categories of costs to which those charges appear, Cardinal's special charges are neither unusual in nature nor infrequent in occurrence.  Cardinal engaged in numerous acquisitions on an ongoing basis and even publicized that a major source of its growth strategy involved making acquisitions.  Cardinal further frequently engaged in restructuring activities.  Indeed, in a report dated May 28, 2003, an analyst with Citigroup Smith Barney, commenting about a possible boost to current and future earnings because of numerous special charges, made the following remarks: "We believe this is a valid concern. *Restructuring charges are clearly a factor when analyzing the financials of any company that has been as acquisitive as Cardinal Health has been in recent years* . . . and we believe that this needs

to be monitored closely going forward." Accordingly, Cardinal improperly accounted for these items as special charges rather than as normal, recurring charges in reporting its results in violation of GAAP.

**Understatement of Receivables through the Securitization of Pyxis Receivables**

353.     During the Class Period, the Cardinal Defendants improperly accounted for a securitization of the Company's Pyxis receivables as an off-balance sheet transaction, causing Cardinal's account receivables and its outstanding debt to be understated, in violation of GAAP.

354.     Securitization is the process by which financial assets are transformed into negotiable securities. A company will aggregate or pool a group of similar assets such as loans or mortgages (in this case lease receivables) and place them in a trust. Thereafter, the trust then sells the negotiable securities for which the loans or leases serve as collateral. Only if structured correctly can the assets and liabilities associated with the securitization transaction be removed from a company's balance sheet.

355.     A company may enter into a securitization arrangement as opposed to entering into a secured financing arrangement only if certain conditions are met. In a secured financing arrangement, a company borrows funds and the loans or leases serve as collateral (it is similar to a mortgage where the mortgage is secured by the house). In order for a transaction to be considered a securitization arrangement, it must reflect a "true sale" as opposed to a financing arrangement. Under SFAS No. 140, Accounting for Transfers and Serving of Financial Assets and Extinguishment of Liabilities, a securitization transaction may only be considered for off-balance sheet treatment if the company has surrendered control, effectively, as well as legally, over the assets, and the assets have been isolated from the company and its creditors, even in the event of bankruptcy. If any of the above are not met, then the company must account for transaction as secured borrowing. SFAS No. 140, ¶¶9-12.

356.     Here, in connection with the change in Cardinal's revenue recognition related to the Pyxis subsidiary, the Cardinal Defendants engaged in a securitization transaction in FY 2002 involving its sales-lease portfolio.  Cardinal created a wholly owned special purpose vehicle, Pyxis Funding LLC ("Pyxis Funding") and through Pyxis Funding it began selling its Pyxis sales-type lease receivables.  As a result, Pyxis Funding sold approximately $150 million of the lease receivables during 1Q 2002.  The receivables were sold with recourse (as opposed to non-recourse).  When a receivable is sold with recourse, it means that the selling party – Cardinal – agrees to make good any receivables not collectible.   SFAS No. 140, ¶113. This means that the risk of non-collection remained with Cardinal as if the receivables had remained on Cardinal's books.

357.     Given the risk of non-collection remained with Cardinal, the proper and conservative accounting treatment required Cardinal to treat this transaction as a secured borrowing and to account for it on its balance sheet.  By accounting for the sale of the Pyxis receivables as an off-balance transaction, defendants violated GAAP.  Accordingly, during the Class Period, Cardinal's Health's accounts receivables and its outstanding debt were understated.

**Cardinal's Violations of SEC Regulations Due to Its Inadequate Internal Controls**

358.     In addition to the foregoing improper accounting practices, the Company also suffered from a chronic and systematic breakdown of its internal accounting controls throughout the Class Period, which tendered Cardinal's financial reporting inherently corrupt, subject to manipulation and unreliable, and this problem resulted in materially false and misleading financial statements.

359.     In this regard, the Cardinal Defendants failed to design and implement an internal control system over the Company's financial reporting processes and this failure allowed the Cardinal Defendants, in violation of GAAP, to improperly report zero-margin pharmaceutical distribution Bulk Revenue as Operating Revenues, to omit to disclose accounting policies relating to

its revenue classification and the methods used for such classification, to improperly record contingent gains related to the Vitamin Litigation, to improperly account for it balance sheet reserves and accrual adjustments, to improperly account for cash discounts and to improperly recognize revenue in its Automation and Information Services Segment prior to its being earned and realizable.

360.     Section 13(b)(2) of the Exchange Act states, in pertinent part, that every reporting company must: "(A) make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; [and] (B) devise and maintain a system of internal controls sufficient to provide reasonable assurances that . . . transactions are recorded as necessary . . . to permit preparation of financial statements in conformity with [GAAP]."  These provisions require an issuer to employ and supervise reliable personnel, to maintain reasonable assurances that transactions are executed as authorized, to record transactions on an issuer's books and, at reasonable intervals, to compare accounting records with physical assets.

361.     The Cardinal Defendants have now been forced to acknowledge that Cardinal's disclosure controls and procedures through June 30, 2004 were inadequate.  In Cardinal's FY 2004 Form 10-K filed on October 26, 2004, the Cardinal Defendants admitted:

> [T]he Company's independent auditor identified and communicated to the Company's management and the Audit Committee a "material weakness" (as defined under standards established by the American Institute of Certified Public Accountants) in the Company's entity level controls relating to the Company's control environment through June 30, 2004. Specifically, the Company's independent auditor communicated that its conclusion was based on the following:
>
> -     bulk sales revenue recognition policy was inappropriately applied to certain sales in several quarters during fiscal 2003 and 2002;
>
> -     errors or lack of substantiation with respect to the amount of certain reserves and the timing of the release of certain reserves;
>
> -     lack of effective communication relating to balance sheet reserves and bulk sales treatment; and

-       restatement of the Company's financial statements for prior fiscal years and corresponding expanded disclosures with respect to those years.

In addition, *the Company's independent auditor stated that the circumstances described above raised questions regarding whether the overall tone set by the Company's management clearly communicated a strong commitment to sound financial reporting practices.*

Further, the independent auditor concluded that a material weakness existed with respect to the timing of revenue recognition within the Company's Automation and Information Services segment.

362.    Cardinal's lack of adequate internal controls rendered the Company's Class Period financial reporting inherently unreliable and precluded the Company from preparing financial statements that complied with GAAP.[25] Nonetheless, throughout the Class Period, the Company regularly issued quarterly and annual financial statements without ever disclosing the existence of the significant and material deficiencies in its internal accounting controls and the Cardinal Defendants falsely asserted that Cardinal's financial statements complied with GAAP.

---

[25]    Cardinal's internal control deficiencies continued past FY 2004. In Cardinal's 2Q 2005 Form 10-Q, filed on February 9, 2005, defendants admitted:

Based on the evaluation of the effectiveness of the Company's disclosure controls and procedures as of December 31, 2004, . . . the Company's principal executive officer and principal financial officer have concluded that, although progress has been made and further corrective actions have been implemented during the quarter to the Company's controls, as identified above, the Company will not be in a position to adequately and thoroughly assess whether the identified weaknesses have been resolved until the Company conducts its fiscal-year-end processes and reviews. The Company continues to take corrective actions with respect to the Company's disclosure controls and procedures. As such, *the Company's principal executive officer and principal financial officer were unable to conclude that the material weaknesses described above were corrected as of December 31, 2004, and as such, such officers were unable to conclude that the Company's disclosure controls and procedures were effective as of December 31, 2004.* Therefore, the Company's principal executive officer and principal financial officer have concluded that their prior determination as of September 30, 2004 that material weaknesses exist and that the Company's disclosure controls and procedures were not effective continues to apply as of December 31, 2004.

**Cardinal's Restatement is an Admission of Falsity**

363.    As detailed below, the fact that Cardinal revised and restated downward its net income and provided additional important disclosures is an admission that the financial statements originally issued to investors and the public were false and that the misstatements were material.

364.    Pursuant to GAAP, as set forth in APB No. 20, the type of restatements and revisions announced by Cardinal were to correct for material errors in previously issued financial statements. APB No. 20 ¶¶7-13.  The restatement of past financial statements is a disfavored method of recognizing an accounting change as it dilutes confidence by investors in the financial statements, it makes it difficult to compare financial statements and it is often difficult, if not impossible, to generate the numbers when restatement occurs.  *Id.* ¶14.  Thus, GAAP provides that financial statements should only be restated in limited circumstances, *i.e.,* when there is a change in the reporting entity, there is a change in accounting principles used or to correct an error in previously issued financial statements.  Cardinal's restatements and revisions were not due to a change in reporting entity or a change in accounting principle, but rather to errors in previously issued financial statements. Thus, the restatements and revisions were an admission by the Cardinal Defendants that Cardinal's previously issued financial results and its public statements regarding those results were false and misleading.

**Cardinal's Financial Statements Violated Fundamental Concepts of GAAP**

365.    Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including violation of the following fundamental accounting principles:

(a)    The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements.  (APB No. 28 ¶10);

(b)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions.  (FASB Statement of Concepts No. 1 ¶34);

(c)     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources.  (FASB Statement of Concepts No. 1 ¶40);

(d)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general.  (FASB Statement of Concepts No. 1 ¶50);

(e)     The principle that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance. (FASB Statement of Concepts No. 1 ¶42);

(f)     The principle that financial reporting should be reliable in that it represents what it purports to represent.  That information should be reliable as well as relevant, is a notion that is central to accounting.  (FASB Statement of Concepts No. 2 ¶¶58-59);

(g)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions.  (FASB Statement of Concepts No. 2 ¶79); and

(h)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent.   (FASB Statement of Concepts No. 2 ¶¶95, 97).

366.     Further, the undisclosed adverse information concealed by the Cardinal Defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

### ERNST & YOUNG'S PARTICIPATION IN THE SCHEME AND ISSUANCE OF FALSE FINANCIALS

367.     E&Y, a firm of certified public accountants, was engaged by Cardinal to provide independent auditing and accounting services commencing May 8, 2002 through the end of the Class Period.  E&Y's Columbus, Ohio office, was engaged to examine and report on Cardinal's financial statements for FY 2002-FY 2004, to perform review services on Cardinal's interim fiscal years FY 2003 and FY 2004 results and to provide significant consulting, tax and due diligence services throughout the Class Period.  As a result of the far-reaching scope of services provided by E&Y, E&Y personnel were intimately familiar with Cardinal's business, including Cardinal's classification of revenue between its Operating Revenue and its Bulk Revenue and the methods used for such classification, its disclosures concerning its accounting practices related to the payment of its cash discounts, its revenue recognition practice in its Automation and Information Services Segment and its balance sheet reserve and accrual adjustments.

368.     E&Y participated in the wrongdoing alleged herein in order to retain Cardinal as a client and to protect the fees it received from Cardinal.  E&Y was appointed as Cardinal's independent auditor on May 8, 2002.  Prior to the retention of E&Y, Cardinal's auditors were from

the now defunct firm of Arthur Andersen. Despite the connection with scandal-plagued Arthur Andersen, Cardinal's lunchtime business was a unique opportunity for the accounting firms vying for the account. Specifically, the Cardinal account promised to be extremely lucrative. In FY 2000 alone, Cardinal paid its then auditors Arthur Andersen $11.4 million in auditing and consulting fees, by far the most of any of central Ohio's 15 largest publicly traded companies.

369.   A large portion of the services provided by E&Y is related to work performed by the firm outside the scope of the financial statements audits and E&Y has been known to require its audit partners to obtain a certain amount of consulting fees from the clients whose books they audit.[26] For example, during the Class Period, E&Y also provided services to Cardinal for the following other services: due diligence services related to mergers and acquisitions, audit-related research and assistance and employee benefit plan audits; tax advice and planning services and other services related to matters such as litigation assistance and internal audit services. In FY 2002 and FY 2003, $2.6 million out of the $4.9 million in total fees E&Y received from Cardinal and $5.1 million out of $8.9 million in total fees E&Y received from Cardinal, respectively, related to non-audit services performed by the CPA firm. In the spring of 2002 alone, E&Y billed Cardinal $1.7 million for the auditors pre-engagement review after prior auditor Arthur Andersen had been dismissed.

370.   During the Class Period, Cardinal was one of if not the largest client of E&Y's Columbus, Ohio office. As a result of E&Y's relationship with the Cardinal Defendants, E&Y received $27.1 million dollars in fees for auditing, consulting, tax and due diligence services during

---

[26]   In fact, in an article on March 14, 2002, *The Wall Street Journal* reported that a former E&Y partner disclosed that E&Y had set a quota for him to obtain $3 million more a year in revenue from his audit clients by selling them additional consulting services provided by E&Y.

the Class Period or related to Class Period work.[27]  These fees were particularly important to the partners in E&Y's Columbus, Ohio office whose incomes and bonuses were dependent on the continued business from Cardinal.

**E&Y's False Statements as to Cardinal's FY 2002-FY 2003 Financial Statements**

371.   E&Y falsely represented that Cardinal's financial results for FY 2002 and FY 2003 were presented in accordance with GAAP and that E&Y's audits and reviews of Cardinal's financial statements had been performed in accordance with GAAS.  E&Y also consented to the incorporation of its false report on Cardinal's financial statements in Cardinal's Forms 10-K for FY 2002 and FY 2003, which were filed with the SEC.  E&Y's issuance of and multiple consents to reissue materially false reports on Cardinal's FY 2002-FY 2003 financial statements were themselves violations of GAAS.

372.   The SEC has stressed the importance of meaningful audits being performed by independent accountants:

> [T]he capital formation process depends in large part on the confidence of investors in financial reporting.  An investor's willingness to commit his capital to an impersonal market is dependent on the availability of accurate, material and timely information regarding the corporations in which he has invested or proposes to invest.  The quality of information disseminated in the securities markets and the continuing conviction of individual investors that such information is reliable are thus key to the formation and effective allocation of capital.  ***Accordingly, the audit function must be meaningfully performed and the accountants' independence not compromised***.

*Relationships Between Registrants and Independent Accountants*, SEC Accounting Series Release No. 296, 1981 SEC LEXIS 858, at *8-*9 (Aug. 20, 1981).

---

[27]   E&Y billed Cardinal and received $13.3 million for FY 2004 alone, including fees collected on additional procedures implemented as a result of the Audit Committee's internal review commenced in April 2004.

373.     GAAS, as approved and adopted by the AICPA, relate to the conduct of individual audit engagements.  Statements on Auditing Standards (codified and referred to as AU §___) are recognized by the AICPA as the interpretation of GAAS.

374.     With respect to Cardinal's financial statements for FY 2002 (ended June 30, 2002), E&Y represented, in a report dated August 6, 2002 and included in the Company's FY 2002 Form 10-K, the following:

> We conducted our audit in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

> In our opinion, the fiscal 2002 consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Cardinal Health, Inc. and subsidiaries as of June 30, 2002, and the consolidated results of their operations and their cash flows for the year then ended in conformity with accounting principles generally accepted in the United States. Also, in our opinion, the related fiscal 2002 financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

375.     With respect to Cardinal's financial statements for FY 2003 (ended June 30, 2003), E&Y issued a nearly identical audit report dated July 30, 2003 and included in the Company's FY 2003 Form 10-K:

> We conducted our audits in accordance with auditing standards generally accepted in the United States.  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements.  An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.  We believe that our audits provide a reasonable basis for our opinion.

> In our opinion, the fiscal 2003 and 2002 consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of the Company as of June 30, 2003 and 2002, and the consolidated results of their operations and their cash flows for the years then ended in conformity with

accounting principles generally accepted in the United States. Also, in our opinion, the related fiscal 2003 and 2002 financial statement schedules, when considered in relation to the basic consolidated financial statements taken as a whole, present fairly in all material respects the information set forth therein.

376.    E&Y also signed off on and approved Cardinal's quarterly financial results prior to their issuance to the public during the Class Period. According to Cardinal's 2002 Proxy Statement filed on October 10, 2002, the audit fees billed by E&Y in connection with FY 2002 were for

> professional services rendered in connection with the audit of the Company's financial statements for the fiscal year ended June 30, 2002. ***Such services included a review of financial statements included in the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2002,*** and statutory audits of various international subsidiaries.

377.    Cardinal's 2003 and 2004 Proxy Statements filed on October 9, 2003 and November 5, 2004, respectively, made similar representations that the audit fees paid to E&Y included fees paid for the review of financial statement's included in Cardinal's quarterly reports on Form 10-Q.

378.    E&Y's report and approval of the financial results were false and misleading due to its failure to comply with GAAS and because Cardinal's financial statements were not prepared in conformity with GAAP so that issuing the report or approving of Cardinal's quarterly financial results was in violation of GAAS and SEC rules. E&Y knew its report and approval of the financial statements would be relied upon by the Company as well as by present and potential investors in Cardinal's stock.

**E&Y Ignored the Audit Evidence It Gathered**

379.    GAAS, as set forth in AU §326, Evidential Matter, requires auditors to obtain sufficient competent evidential matter through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit:

> In evaluating evidential matter, the auditor considers whether specific audit objectives have been achieved. The independent auditor should be thorough in his or her search for evidential matter and unbiased in its evaluation. In designing audit procedures to obtain competent evidential matter, he or she should recognize the possibility that the financial statements may not be fairly presented in conformity with generally accepted accounting principles or a comprehensive basis of

accounting other than generally accepted accounting principles. In developing his or her opinion, the auditor should consider relevant evidential matter regardless of whether it appears to corroborate or to contradict the assertions in the financial statements. To the extent the auditor remains in substantial doubt about any assertion of material significance, he or she must refrain from forming an opinion until he or she has obtained sufficient competent evidential matter to remove such substantial doubt, or the auditor must express a qualified opinion or a disclaimer of opinion.

AU §326.25 (footnotes omitted).

380.    E&Y's responsibility, as Cardinal's independent auditor, was to obtain "[s]ufficient competent evidential matter . . . to afford a reasonable basis for an opinion regarding the financial statements under audit" as to "the fairness with which they present, in all material respects, financial position, results of operations, and its cash flows in conformity with generally accepted accounting principles." AU §§110.01, 150.02.

381.    In violation of GAAS, and contrary to the representations in its report on Cardinal's financial statements, E&Y did not obtain sufficient, competent, evidential matter to support Cardinal's assertions regarding its classification of revenue between its Operating Revenue and its Bulk Revenue and the methods used for such classification, its disclosures concerning its accounting practices related to the payment of its cash discounts, its revenue recognition practice in its Automation and Information Services Segment and its balance sheet reserve and accrual adjustments.

**E&Y Ignored Numerous Red Flags**

382.    As one of the largest audit firms in the world, E&Y was well aware of the strategies, methods and procedures required by GAAS to conduct a proper audit. Also, E&Y knew of the audit risks inherent at Cardinal and in the industries in which Cardinal operated because of the comprehensive services it provided to Cardinal during much of the Class Period and its experience

with many other clients.[28]  In connection with Cardinal's operations, E&Y had virtually limitless

access to information concerning the Company's true operations as:

- E&Y had been Cardinal's auditor since 2002, when its Columbus office first obtained the Cardinal engagement from Arthur Andersen;

- Prior to its appointment as Cardinal's independent auditor, E&Y had provided internal audit services for Cardinal as well as provided the Company with tax and consulting services;

- Prior to accepting the Cardinal engagement in April 2002 (after prior auditor Arthur Andersen was released in connection with disclosures regarding Arthur Andersen's role in securities frauds, including Enron and WorldCom) E&Y performed an extensive due diligence review, billing Cardinal $1.7 million for the review work;

- E&Y representatives were present at Cardinal's headquarters and divisions frequently during the Class Period;

- E&Y provided Cardinal with substantial non-audit services to Cardinal.  In FY 2002 and FY 2003, 52% and 57%, respectively, of E&Y's fees related to non-audit services provided to Cardinal.  E&Y was reticent to object to Cardinal's accounting for fear of not only losing audit fees but also the lucrative non-audit services as well;

- E&Y had frequent conversations with Cardinal management and employees about the Company's operations and financial statements;

- E&Y audited and reviewed Cardinal's financial statements during the Class Period and knew or should have known that Cardinal's financial statements were not accurate or prepared in compliance with GAAP or GAAS; and

- E&Y also audited some of Cardinal's largest customers and competitors, including AmeriSource Bergen, and was familiar with the pharmaceutical distribution business and the significant changes to the pharmaceutical distribution market.

383.  E&Y's intentional failure to comply with GAAS in E&Y's performance on the

Cardinal audits rose to the level of deliberate recklessness, as the following paragraphs demonstrate.

---

[28]  Upon the appointment of E&Y as Cardinal's new auditor, Jim Bachman, the managing partner of E&Y's Columbus office pointed to its experience in the health-services industry as a major reason for its selection.  He said in an article appearing in *The Columbus Dispatch* on May 9, 2002 announcing the change in auditors that "'[w]e are proud that Cardinal Health has recognized our expertise and leadership serving many of the same components in the health sciences industry, including biotech, medical devices and pharmaceuticals.'"

E&Y abandoned its role as independent auditor by turning a blind eye to each of the above indications of improper accounting, including Cardinal's classification of revenue between its Operating Revenue and its Bulk Revenue and the methods used for such classification, its disclosures concerning its accounting practices related to the payment of its cash discounts, its revenue recognition practice in its Automation and Information Services Segment and its balance sheet reserve and accrual adjustments. Despite this knowledge, E&Y did not insist upon adjustments to Cardinal's audited financial statements. Pursuant to GAAS, E&Y should have issued a qualified or adverse report, or it should have insisted that Cardinal comply with GAAP. Furthermore, E&Y should have refused to approve Cardinal's quarterly financial results.

384.    As to its audits of Cardinal during the Class Period, E&Y was required to perform its audit in conformity with the Statement of Accounting Standard ("SAS") No. 99, Consideration of Fraud in a Financial Statement Audit, which includes auditing for misstatements arising from the misappropriation of assets. E&Y failed to comply with SAS No. 82 in its audit of Cardinal's financial statements. During the course of its audit of Cardinal's financial statements during the Class Period, E&Y knew of or should have discovered the irregularities which caused Cardinal's operating revenue and financial results to be misstated for years. The very risk of fraud was a potential reportable condition which should have been reported to the audit committee and possibly senior management.

385.    E&Y's failure to adequately perform its audit procedures to identify the improprieties alleged herein and its failure to report the problems permitted the accounting irregularities and improprieties to continue over a period of at least five years, leading to false and misstated financial statements.

386.     Furthermore, E&Y recklessly disregarded numerous red flags that should have alerted E&Y that Cardinal's financial statements were materially false and misleading, including the following:

- For over ten years Cardinal touted year-to-year 20% revenue growth and relied on continuing acquisitions to fuel revenue and earnings;

- Management was aggressive in its practice of committing to meet or beat Wall Street estimates. Indeed, Cardinal's management remained committed to maintaining an astounding 20% growth rate in its Operating Revenue;

- Negative financial results could hinder Cardinal's ability to make acquisitions, which was an important part of Cardinal's growth strategy. During the Class Period, the Cardinal Defendants used more than 36 million shares of artificially inflated Company stock to make acquisitions;

- E&Y received a large percentage of its total fees for non-audit work. In FY 2003, for example, a large portion of E&Y's fees were derived from providing Cardinal with due diligence services related to its acquisitions. In FY 2003, E&Y provided Cardinal with $3.2 million – or 36% of its total fees – in "audit-related services." Audit-related services are fees for due diligence services related to mergers and acquisitions, audit-related research and assistance and employee benefit plan audits;

- Arthur Andersen, Cardinal's prior auditor, had been implicated in a substantial number of massive accounting frauds, including Enron and WorldCom, involving improper revenue recognition;

- Cardinal intentionally engaged in improper behavior to manipulate its accounting results, including by purposely holding bulk shipments beyond the 24 hour mark so that pursuant to Cardinal's own internal policy, such shipments were classified as Operating Revenue instead of Bulk Deliveries, and by falsifying equipment confirmation documents in order to prematurely recognize revenue prior to installation;

- Cardinal's management failed to place appropriate importance on display an internal controls and the financial reporting process. In Cardinal's restatement it admitted that in addition to its other internal control issues E&Y had "raised questions regarding whether the overall tone set by the Company's management clearly communicated a strong commitment to sound financial reporting practices";

- By FY 2001, the market for pharmaceutical distribution was dramatically changing as pharmaceutical companies severely limited the opportunity for distributors, such as Cardinal, to profit from rising prices for drug products. This change would reduce if not eliminate Cardinal's opportunities for high-margin

sales of pharmaceuticals to retailers and other wholesalers and would put pressure on the Company's operating revenues and earnings;

- By no later than FY 2002, Cardinal was actively trying to convert pharmaceutical companies to a fee for service model whereby these companies would pay Cardinal for its services, a conversion effort strongly resisted by the pharmaceutical companies;

- Cardinal's accounting was being questioned. For example, after Cardinal announced that it had recorded the settlement proceeds from the Vitamin Litigation as a contingent gain in its annual report for year end June 30, 2002, filed with the SEC on September 29, 2002, Walter Schuetze, a former chief accountant for the SEC, was quoted in an article about the accounting maneuver published in *The Wall Street Journal* on April 2, 2003 as follows: "'That's abracadabra accounting . . . . Cardinal should not have recognized a receivable and a gain until June 2002 [after the actual settlement]. Before then, it was all a matter of speculation . . . . Cardinal's actions explains what is meant by the term earnings management. This is diddling the numbers'";

- During 1Q 2002, the Cardinal Defendants reportedly changed the method by which revenue for Pyxis transactions were recognized to prevent the premature recognition of revenue – the exact issue which occurred after E&Y was retained as auditor. As a result of the changed policy, Cardinal took a one time charge of $70 million, which represented revenue recognized prior to July 1, 2001 where no Pyxis equipment had been installed;

- Going into FY 2001, Cardinal's reported financial results evidenced a trend of increasing Bulk Deliveries revenue that suddenly and inexplicably reversed itself during the Class Period;

- In October of 2003, the SEC initiated an informal inquiry into Cardinal's accounting practices, including its accounting treatment of settlement proceeds Cardinal received related to its Vitamin Litigation and its classification of revenue as either Operating Revenue or Bulk Revenue;

- Cardinal's internal revenue policies, including the 24 hour rule and bulk order policy adopted in 2Q 2001, did not comply with GAAP and were contrary to Cardinal's public statements regarding the classification of Operating Revenue versus Bulk Deliveries revenue;

- Accounting problems were highly prevalent in Cardinal's industry, including large restatements or admissions of accounting improprieties by pharmaceutical manufacturers such as Bristol-Myers, distributors such as McKesson and customers such as Rite Aid;

- The Individual Defendants' salaries, bonuses and options were tied, in large part, to Cardinal's reported financial results and the performance of the Company's stock, thus motivating the Individual Defendants to artificially inflate Cardinal's reported Operating Revenue and earnings;

- The employment agreements at Cardinal for the Individual Defendants contained huge incentive-based bonus structures which were tailored to reward each executive for achieving earnings and revenue targets; and

- Management was unusually aggressive in its practice of committing to meet or beat Wall Street estimates. Throughout the Class Period, Cardinal management regularly increased the Company's revenue and earning projections and assured analysts and investors that the Company would hit the numbers.

387. Many of these red flags mirrored the risk factors E&Y was required to consider according to AU §316, Fraud in a Financial Statement Audit, including:

- Unusually rapid growth or profitability, especially compared with that of other companies in the same industry;

- Specific indicators as to include a motivation for management to engage in fraudulent financial reporting;

- An excessive interest by management in maintaining or increasing the entity's stock price or earnings trend through the use of unusually aggressive accounting practices;

- A practice by management of committing to analysts, creditors and other third parties to achieve what appears to be unduly aggressive or clearly unrealistic forecasts;

- Domination of management by a single person or small group without compensating controls such as effective oversight by the board of directors or audit committee;

- Management failing to display an appropriate attitude towards internal controls and the financial reporting process;

- Claims against the entity or its senior management alleging fraud or violations of securities laws; and

- Management setting unduly aggressive financial targets and expectations for operating personnel.

388. Here, E&Y did not miss just one item or two items, but numerous items, so that revenue and income were misstated during the Class Period. In fact, its mischaracterizing of revenue artificially inflated its Operating Revenue – a key indicator of the Company's Operating Growth – by $7 billion (or 14%) and $9.1 billion (or 16%) for FY 2002 and FY 2003, respectively. There was not just one form of manipulation, but several, most of which involve revenue classification or

recognition, which E&Y was aware of, or which E&Y would have been aware of had they not recklessly ignored numerous red flags.

**E&Y Failed to Identify Material Weaknesses in Internal Controls**

389.    E&Y, as auditors, were obligated to assess Cardinal's internal disclosure, financial and accounting controls and whether such controls had been placed in operation, were effective and complied with the Sarbanes-Oxley Act, including controls to provide assurance about the safeguarding of assets, financial reporting, operations and compliance with regulations. E&Y was required to evaluate whether poor controls might lead to or contribute to the risk that fraud might not be detected.

390.    Internal controls are essential to a company's financial reporting, as adequately designed internal controls provide a company with reasonable assurance on the reliability of financial reporting, the effectiveness and efficiency of operations, and compliance with applicable laws and regulations. AU §319.06. Under auditing standards, as set forth in §319.02[29]:

> In all audits, the auditor should obtain an understanding of internal control sufficient to plan the audit by performing procedures to understand the design of controls relevant to an audit of financial statements and determining whether they have been placed in operation.

391.    If an auditor identifies any material weaknesses in a company's internal controls during an audit, then the auditor must communicate these weaknesses to the company's audit committee. AU §325. Further, the auditor should identify any limitations related to the internal

---

[29]    The original SAS which formed the basis for AU §319 was SAS No. 55, Consideration of Internal Control in a Financial Statement Audit, issued in 1988. AU §319 was amended in 1995 by SAS No. 78, which applies to audits of financial statements of periods beginning after January 1, 1997. This standard applies to E&Y's audits conducted for FY 2001 and thereafter. AU §319 was further amended by SAS No. 94 issued May 2001 for audits of financial statements for periods beginning after June 30, 2001. This standard applies to E&Y's audits conducted for FY 2002 and thereafter. A key requirement under both standards is that an auditor is obligated to assess the company's internal controls.

control weaknesses in his or her audit opinion in accordance with the procedures proscribed by the professional standards.

392. Defendants have admitted to there being "significant deficiencies" in Cardinal's disclosure controls and procedures during the Class Period and further that the Company's disclosure controls and procedures through June 30, 2004 were inadequate. In Cardinal's restated Form 10-K filed on October 26, 2004, defendants admitted in part:

> [T]he Company's independent auditor identified and communicated to the Company's management and the Audit Committee a "material weakness" (as defined under standards established by the American Institute of Certified Public Accountants) in the Company's entity level controls relating to the Company's control environment through June 30, 2004. Specifically, the Company's independent auditor communicated that its conclusion was based on the following:
>
> - bulk sales revenue recognition policy was inappropriately applied to certain sales in several quarters during fiscal 2003 and 2002;
>
> - errors or lack of substantiation with respect to the amount of certain reserves and the timing of the release of certain reserves;
>
> - lack of effective communication relating to balance sheet reserves and bulk sales treatment; and
>
> - restatement of the Company's financial statements for prior fiscal years and corresponding expanded disclosures with respect to those years.
>
> In addition, the Company's independent auditor stated that the circumstances described above raised questions regarding whether the overall tone set by the Company's management clearly communicated a strong commitment to sound financial reporting practices.
>
> Further, the independent auditor concluded that a material weakness existed with respect to the timing of revenue recognition within the Company's Automation and Information Services segment.

393. Despite E&Y's "clean" audit report during the Class Period and approval of Cardinal's interim financial statements and press releases, Cardinal admitted to the following: issuing false financial statements and press releases containing false financial results for FY 2002-FY 2004; understating its operating expenses and overstating its income during the Class Period;

artificially inflating its reported Operating Revenue and thereby its Operating Growth for at least FY 2002 - FY 2004 and to significant deficiencies in Cardinal's internal controls.

394.     Moreover, in October 2003, the SEC initiated an informal inquiry into Cardinal's accounting.  The informal inquiry was converted to a formal investigation in May 2004.  The SEC's investigation is focused on the following areas: the accounting treatment settlement proceeds Cardinal received related to the Vitamin Litigation; the classification of revenue as either Operating Revenue or Bulk Revenue within Cardinal's Pharmaceutical Distribution business and the methods used for such classification; and the compensation of specific current and former officers of Cardinal.

395.     In light of the SEC's inquiry, in April 2004 Cardinal's Audit Committee of the Board of Directors commenced its own internal review of Cardinal's accounting practices.   The investigation focused on the following areas: the classification of sales to customer warehouses between Operating Revenue and Bulk Deliveries within Cardinal's Pharmaceutical Distribution segment; the Company's disclosures related to Cardinal's practice of accelerating its receipt and recognition of cash discounts earned from supplier for prompt payment in certain reporting periods; the timing of revenue recognition within the Company's Automation and Information Services Segment; and certain of the Company's balance sheet reserve and accrual adjustments.  The Audit Committee's investigation led to the restatement of Cardinal's financial statements for FY 2000 - FY 2003 and the first three quarters of FY 2004.

396.     While Cardinal has officially restated its financial statements, the Audit Committee's internal investigation is still ongoing.  Accordingly, Cardinal has indicated that the restatement itself may not be correct or final and that Cardinal may in fact be required to issue additional restatements for the same time period covered by the original restatement.

397. The U.S. Attorney's Office for the Southern District of New York has also initiated an inquiry against Cardinal relating to the revenue classification issue.

398. The restatement, the U.S. Attorney's inquiry, the SEC investigation and the Audit Committee's internal review all involve periods that Cardinal's financial results had been audited and/or reviewed by E&Y and for which E&Y had issued unqualified opinions and approved of Cardinal's publicly announced results.

**E&Y's Audit Violated Fundamental Concepts of GAAS**

399. E&Y's failure to adequately perform its audit procedures to identify the improprieties alleged herein and its failure to report the problems permitted the accounting irregularities and improprieties to continue over a period of five years, leading to false and misstated financial statements. Due to E&Y's false statements and failure to identify and modify its report to identify Cardinal's false financial reporting, E&Y violated the following GAAS standards:

      (a)    The first general standard is that the audit should be performed by persons having adequate technical training and proficiency as auditors;

      (b)    The second general standard is that the auditors should maintain an independence in mental attitude in all matters relating to the engagement;

      (c)    The third general standard is that due professional care is to be exercised in the performance of the audit and preparation of the report;

      (d)    The first standard of field work is that the audit is to be adequately planned and that assistants should be properly supervised;

      (e)    The second standard of field work is that the auditor should obtain a sufficient understanding of internal controls so as to plan the audit and determine the nature, timing and extent of tests to be performed;

(f)     The third standard of field work is that sufficient, competent, evidential matter is to be obtained to afford a reasonable basis for an opinion on the financial statements under audit;

(g)     The first standard of reporting is that the report state whether the financial statements are presented in accordance with GAAP;

(h)     The second standard of reporting is that the report shall identify circumstances in which GAAP has not been consistently observed;

(i)     The third standard of reporting is that informative disclosures are regarded as reasonably adequate unless otherwise stated in the report; and

(j)     The fourth standard of reporting is that the report shall contain an expression of opinion or the reasons why an opinion cannot be expressed.

400.     This is not the first time in recent months and years that E&Y has been involved in a complete audit failure that has ended up costing investors hundreds of millions of dollars.  E&Y has been sanctioned in administrative proceedings before the SEC for its failure to comply with auditor independence rules and "improper professional conduct" with respect to its audit of PeopleSoft, Inc. On April 16, 2004, Chief Administrative Law Judge Brenda P. Murray found that:

- "EY had no procedures in place that could reasonably be expected to deter violations and assure compliance with the rules on auditor independence with respect to business dealings with audit clients. . . .  As an expert in audits, EY knew or should have known that a worldwide firm with thousands of employees could not rely on voluntary compliance.  The fact that EY relied on self-interested people to voluntarily raise independence issues and to file forms where positive responses would cause a loss of income are strong indications that EY was negligent";

- [D]uring the relevant period, EY's day-to-day operations were profit-driven and ignored considerations of auditor independence in business relationships with PeopleSoft";

- "[T]he evidence shows that EY has an utter disdain for the Commission's rules and regulations on auditor independence";

- "[T]he persuasive evidence in this record is that EY is neither implementing, nor does it have in place, policies and procedures that can reasonably be expected to

ensure compliance with independence rules in business dealings with audit clients";

- "EY and PeopleSoft saw the health care industry as a lucrative market for their products and services and they embarked on Health Care Initiative to make sales. Major health care providers, mainly hospitals, are large users of computer software programs. Beginning in November 1998, EY began meeting with PeopleSoft's senior management on what could be done to improve each company's share of the health care portion of the services industry market";

- "I reject EY's defense that the Commission's rules on auditor independence are so vague as to defy interpretation, and that EY made a good faith attempt to comply with them. Rules 2-01 and 2-02 of Regulation S-X and Section 602.02.g of the Codification are clear and unambiguous. EY understood the independence rules in 1995, because it agreed to abide by them. . . . *SEC v. Ernst & Young,* Civil Action No. 3-91-2267-X (N.D. Tx. 1995)";

- "Despite EY's strong denials, the evidence shows that the firm paid only perfunctory attention to the rules on auditor independence in business dealings with a client, and that EY reliance on a 'culture of consulting' to achieve compliance with the rules on auditor independence was a sham. EY has offered no promises of future compliance";

- "Here considerable evidence shows that EY partners acted recklessly and negligently in committing willful and deliberate violations of well-established rules that govern auditor independence standards in connection with business relationships with an audit client. EY's misconduct was blatant and occurred after the Commission and a court accepted EY's representations that it would observe the very same auditor independence rules, that it now claims are too vague to be followed. There is nothing in this record that shows that EY is willing to accept the auditor independence rules applicable to business relationships with audit clients"; and

- "I find that the record demonstrations that it is in the public interest for the Commission to exercise its authority as a means of obtaining compliance with the Commission's independence rules. I therefore will suspend EY from accepting audit engagements for new SEC registrant audit clients for a period of six months. *In the Matter of Ernst & Young LLP*, Initial Decision Release No. 249, Administrative Proceeding File No. 3-10933.

401. The Administrative Proceeding is just the latest in a series of scandals involving E&Y. These scandals are pertinent to show, under Federal Rule of Evidence 404(b), the knowledge and absence of mistake on E&Y's part. E&Y has repeatedly violated the federal securities laws, in large part, because for many years the top management of E&Y has deliberately encouraged a culture of non-compliance with both GAAS and GAAP to accommodate the interests of E&Y's

clients in helping them inflate their reported financial results, thereby circumventing the requirements of its profession, SEC rules that public accountants maintain their independence from their clients and their obligation to be public watchdogs and not client advocates.

402.     As a result of this firm-wide culture of client accommodation, E&Y has been implicated in many prior major financial scandals involving public companies, including HealthSouth (which has recently been investigated by the SEC involving $2.7 billion in improper entries); American Continental (Lincoln Savings, the financial empire of convicted criminal Charles Keating, which falsified its financial statements while cheating 23,000 mostly elderly persons out of their life savings); Cendant (where the company restated and eliminated over $500 million of profits and several top executives were convicted of securities fraud, E&Y paid $335 million to settle shareholder suits and two E&Y partners were sanctioned by the SEC and barred from public company audit work for life (but remain employed by E&Y)); AOL Time Warner (a multi-billion dollar accounting scandal, currently the subject of major SEC/DOJ investigations into phony revenues generated by bogus e-commerce advertising deals and where E&Y audited the books of ***both*** AOL and Time Warner); Provident Financial and Huntington Bancshares (two E&Y financial institution clients which recently massively restated profits previously reported with E&Y's approval); Sprint and other major companies (where E&Y created fraudulent and abusive tax shelters to allow corporate executives to avoid paying taxes on huge stock option profits, shelters the IRS has now disallowed, resulting in a major government investigation of E&Y).

403.     Few accounting firms have been implicated in as many public company financial scandals as E&Y. Involvement in this many scandals and regulatory proceedings over this many years is neither coincidence nor bad luck. It is the result of a firm consciously circumventing the rules and procedures required of public accountants to comply with their ethical and legal

obligations that are necessary to enable them to serve their public trust/watchdog role as mandated by law.

## PROXIMATE LOSS CAUSATION/ECONOMIC LOSS

404. During the Class Period, as detailed herein, defendants engaged in a scheme to deceive investors and the market and a course of conduct that artificially inflated Cardinal's stock price and operated as a fraud or deceit on Class Period purchasers of Cardinal stock by misrepresenting the Company's financial results, business success, ability to adapt to changes in the pharmaceutical distribution market and its future business prospects. Defendants achieved this façade of success, growth and strong future business prospects by misrepresenting Cardinal's Operating Revenue and understating the Company's Bulk Deliveries revenue. Over 15 consecutive quarters, 1Q 2001-3Q 2004, defendants improperly inflated Cardinal's reported Operating Revenue by more than *$26 billion*. At the same time, Cardinal's Bulk Deliveries revenue during the Class Period was understated by more than 42%, approximately *$26 billion*. Later, however, when defendants' prior misrepresentations and fraudulent conduct was disclosed and became apparent to the market, Cardinal stock fell precipitously as the prior artificial inflation came out of Cardinal's stock price. As a result of their purchases of Cardinal stock during the Class Period, lead plaintiffs' and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

405. By improperly reporting billions of dollars in Bulk Deliveries as Operating Revenues – a key factor in evaluating Cardinal's financial health and success – the defendants presented a misleading picture of Cardinal's business and prospects. Thus, instead of truthfully disclosing during the Class Period that Cardinal's track record of growth and business success was fading, defendants caused Cardinal to falsely report double-digit growth rates in Operating Revenue and presented shrinking Bulk Deliveries revenue as evidence of Cardinal's thriving distribution business

and adaptation to changing market conditions. During the Class Period, defendants repeatedly emphasized Cardinal's Operating Revenues, including: "***The company reported very strong operating revenues up 24 percent to a record $7.7 billion***"; "***Increasing demand for Cardinal's pharmaceutical distribution and medical-surgical products and services fueled a 35 percent increase in operating revenues to a record $10.3 billion in the third quarter from $7.7 billion a year ago***"; "***I can't remember an internal growth rate even remotely as high, at any time in the company's history***"; and "***Operating revenues, the main driver of the company's improved operating earnings, increased 27 percent in the fourth quarter to a record $10.3 billion from $8.1 billion in the year-earlier period***." *See* ¶¶63, 72, 75 and 80.

406. In addition, defendants constantly reiterated the purportedly strong growth rate for the Company's Pharmaceutical Distribution business: "***Revenues from the pharmaceutical-distribution portion of the segment grew 19 percent and continued to outpace the industry in all customer categories***"; "***The company's largest segment, Pharmaceutical Distribution and Provider Services, led the revenue performance, growing 20 percent overall and generating 22 percent growth in its full-line pharmaceutical distribution business***"; and "***Total revenues grew 17 percent to $9.4 billion, led by strong growth in the pharmaceutical distribution and specialty distribution businesses***." *See* ¶¶91, 97 and 132. These claims of "record" results caused and maintained the artificial inflation in Cardinal's stock price throughout the 15-quarter Class Period and until the truth was later revealed to the market.

407. The Cardinal Defendants' fraudulent scheme and manipulative acts, however, did not end with the overstatement of Operating Revenue and underreporting of Bulk Deliveries. Throughout the Class Period, defendants took a series of steps to artificially boost Cardinal's reported earnings whenever it appeared that the Company might not meet the financial projections they had made to investors and analysts. The reason: to maintain and inflate Cardinal's stock price.

Specifically, in the Company's 2Q 2001 and 1Q 2002 financial reports, defendants improperly included a total of $22 million in proceeds purportedly from the settlement of a vitamin antitrust suit in Cardinal's publicly reported results. The settlement, however, had not occurred and the potential proceeds from the litigation could not properly be so recognized and reported. Nevertheless, defendants' manipulations allowed Cardinal to meet the earnings estimates they had fostered when Cardinal, otherwise, would have missed its financial projections in both quarters. Defendants also overstated Cardinal's reported net income by $64 million by manipulating balance sheet reserves and accrual adjustments. Defendants improperly and prematurely recognized tens of millions of dollars in revenue from purported sales of the Company's Pyxis drug delivery systems, despite specific public statements that the Company had discontinued the practice. Finally, defendants manipulated the timing when cash discounts on pharmaceutical purchases were recognized and overstated so-called special charges in order to understate expenses and inflate earnings. Combined, these practices impacted Cardinal's reported revenue and earnings throughout the Class Period, allowing defendants to claim that they had "hit the numbers," meeting Cardinal's final projections, and demonstrated to investors and the market that Cardinal was successful and adapting to the changing distribution market.

408. Concurrent with the concealment of bulk sales in Operating Revenue and earnings manipulations, defendants also mislead investors by asserting that Cardinal's conversion to the fee-for-service distribution model was proceeding smoothly and the Company was successfully adapting to the new manufacturer-distributor relationship. Despite the fact that Cardinal was not successfully converting its manufacturing clients to fee-for-service arrangements, defendants assured investors and the markets that: "*Cardinal continued to enter into an inventory management agreements with manufacturers, whereby we are compensated on incentive basis to help manufacturers better match their shipments with market demand*"; "*Revenue growth was strong with some important*

*new relationships being established . . . moves us more from a supplier of products to a solutions provider*"; "***In the last several months, we have [] made a tremendous amount of progress in accelerating the transition occurring in drug distribution. In fact, since our last earnings call we have reached a number of important agreements with pharmaceutical manufacturers that demonstrates the move to a new type of pricing margin relationship with our manufacturer partners***"; "***I believe we've turned the corner in pharmaceutical distribution business, and we've seen strong evidence this quarter to support that conclusion***"; "***[W]e're making significant progress with our branded manufacturer customers at this point";*** and "***We have agreements with everybody today and those agreements are going to continue to get refined and we will continue to see improvements in our business as a result***."

409.    Finally, while repeatedly making egregious accounting manipulations, defendants sought to distance themselves from ongoing accounting scandals at other companies and assured investors that they practiced "***conservative accounting***," were "***intimate with the [financial] numbers***" and that "***the integrity and reliability of [Cardinal] begins and ends with the people at the top of the Company***."  Defendants' assurances that they employed accurate and conservative accounting included:  "***As you have come to expect from Cardinal, there are no surprises and our accounting is sound***"; "***[At] Cardinal we have straightforward transaction, we have consistently utilized conservative accounting policies and procedures***"; "***Cardinal Health has a long-standing reputation for conservative accounting and financial transparency";*** and "***Those who have followed our company for a long time understand the strength of our commitment to broad and open financial disclosure and honest accounting.***"

410.    Defendants' false and misleading statements had the intended effect and caused Cardinal stock to trade at artificially inflated levels up to $75.00 per share throughout the Class

Period. *See* ¶¶61, 70, 78, 87, 100, 116, 130, 140, 148, 161, 170, 180, 189, 191, 197 and Stock Chart attached as Exhibit A.

411.    Beginning May 14, 2004, defendants were forced to publicly disclose that: (a) the SEC and U.S. Attorney General's Office had launched formal investigations of Cardinal's revenue recognition practices, including the improper classification of Bulk Deliveries revenue as Operating Revenue, during FY 2001-FY 2003; (b) Cardinal's Audit Committee had also commenced an investigation into the Company's revenue recognition practices; (c) 4Q and FY 2004 financial results would fall short of projections due to the Cardinal Defendants inability to transition the Pharmaceutical Distribution business to the fee-for-service model; and (d) as a result of Cardinal's improper financial reporting practices, defendant and then CFO Richard Miller was forced to resign. These public revelations indicated that there had been prior falsification of Cardinal's financial results due to accounting manipulations, that Cardinal had failed to successfully adapt to changes in the pharmaceutical distribution market and, thus, the Company's prospects for business success and earnings growth for FY 2004 and beyond were severely diminished. As investors and the market became aware that Cardinal's prior financial results had been falsified and that Cardinal's actual business prospects, which had long been obfuscated by the scheme to inflate reported earnings and Operating Revenue and false statements regarding the Company's successful adaptation to the fee-for-service distribution model, were, in fact, poor, the prior artificial inflation came out of Cardinal's stock price, damaging investors.

412.    As a direct result of defendants' admissions and the public revelations regarding the truth about Cardinal's previously reported financial results and its actual business prospects going forward, Cardinal's stock price plummeted 41%, on unusually high volume, falling from $74.73 on May 13, 2004 to $44.00 per share on July 27, 2004, including one day drops of $17.16 per share and $6.47 per share on July 1, 2004 and July 27, 2004, respectively. These drops removed the inflation

from Cardinal's stock price, causing real economic loss to investors who had purchased the stock during the Class Period. Analysts following the Company were shocked by these adverse revelations, reporting: "*Either, A, they're cooking the books . . . or, B, it's just fraud up and down the line to fix the earnings*"; "*Usually when [the CFO] leave[s], there's something more going on . . . . My guess is there is something else coming down of a more serious nature*"; "*On several occasions over the last few earnings conference calls, management has confidentially spoken about [Cardinal's] pioneering role in engaging into dialogue with manufacturers to switch to a FFS [fee-for-service] model. In reality, the progress on these FFS agreements appear way behind schedule*"; and "*[T]hese discoveries and conclusions reveal a management team that on specific occasions chose to classify or present its performance in ways that would enhance the appearance but not necessarily provide full and fair disclosure*." In sum, as the truth about defendants' prior misstatements and fraudulent conduct and Cardinal's actual financial business performance was revealed, the Company's stock price plummeted, the artificial inflation came out of the stock and lead plaintiffs and other members of the Class were damaged, suffering economic losses of up to $28.75 per share.

413. The 41% decline in Cardinal's stock price near and at the end of the Class Period was a direct result of the nature and extent of defendants' prior misstatements and fraudulent conduct finally being revealed to investors and the market. The timing and magnitude of Cardinal's stock price declines negate any inference that the loss suffered by lead plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct. During the same period in which Cardinal's stock price fell 41% as a result of defendants' fraud being revealed, the Standard & Poor's 500 securities index was virtually unchanged, losing no value, and the Standard & Poor's 500 Healthcare Index (without Cardinal), comprised of public corporations in Cardinal's industry peer group, lost

only 5.5% of its value. The economic loss, *i.e.*, damages, suffered by lead plaintiffs and other members of the Class, was a direct result of defendants' fraudulent scheme to artificially inflate Cardinal's stock price and the subsequent significant decline in the value of Cardinal's stock when defendants' prior misrepresentations and other fraudulent conduct was revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
### FRAUD-ON-THE-MARKET DOCTRINE

414.    At all relevant times, the market for Cardinal's securities was an efficient market for the following reasons, among others:

(a)    Cardinal's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, Cardinal filed periodic public reports with the SEC and the NYSE;

(c)    Cardinal regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Cardinal was followed by numerous securities analysts employed by major brokerage firms who wrote reports, which were distributed to the sales force and certain customers of their respective brokerage firms. Each of those reports was publicly available and entered the public marketplace.

415.    As a result of the foregoing, the market for Cardinal's securities promptly digested current information regarding Cardinal from all publicly available sources and reflected such information in Cardinal's stock price. Under these circumstances, all purchasers of Cardinal's securities during the Class Period suffered similar injury through their purchase of Cardinal's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR EXISTS FOR DEFENDANTS' STATEMENTS

416. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The specific statements pleaded herein either were not identified as "forward-looking statements" when made or were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Cardinal who knew that those statements were false when made.

## LEAD PLAINTIFFS' CLASS ACTION ALLEGATIONS

417. Lead plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on behalf of a class consisting of purchasers of Cardinal's publicly traded securities during the Class Period who were damaged by defendants' fraud (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

418. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Cardinal's common stock was actively traded on the NYSE. While the exact number of Class members is unknown to lead plaintiffs at this time and can only be ascertained through appropriate discovery, lead plaintiffs believe that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified

from records maintained by Cardinal or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

419.    Lead plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class were similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

420.    Lead plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

421.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    Whether statements made by defendants to the investing public during the Class Period misrepresented and omitted material facts about the business, operations and financial results of Cardinal; and

(c)    To what extent the members of the Class have sustained damages and the proper measure of damages.

422.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

# FIRST CLAIM

## Violation of Section 10(b) of the Exchange Act and Rule 10b-5
## Promulgated Thereunder Against All Defendants

423. Lead plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

424. During the Class Period, defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including lead plaintiffs and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of Cardinal's securities; and (c) cause lead plaintiffs and other members of the Class to purchase Cardinal's securities at artificially inflated prices and, as a result, suffer economic losses when the truth about defendants' fraud was revealed. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

425. Defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Cardinal's securities in violation of §10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

426. In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X, 17 C.F.R. §§210.01, *et. seq.*, and

Regulation S-K, 17 C.F.R. §§229.10, *et. seq.*, and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition, revenue and earnings so that the market price of the Company's securities would be based on truthful, complete and accurate information.

427.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Cardinal as specified herein.

428.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices and a course of conduct as alleged herein in an effort to assure investors of Cardinal's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Cardinal and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Cardinal's securities during the Class Period.

429.    The Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (a) the Individual Defendants were high-level executives and directors at the Company during the Class Period; (b) the Individual Defendants were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; and (c) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

430.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such defendants' material misrepresentations and omissions were done knowingly or recklessly and for the purpose and effect of concealing Cardinal's financial results, operating condition and business prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by defendants' misstatements and omissions regarding the Company's financial results and operations throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

431.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Cardinal's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Cardinal's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements trade by defendants, or upon the integrity of the market in which the securities trade and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, lead plaintiffs and the other members of the Class acquired Cardinal securities during the Class Period at artificially inflated prices and were damaged thereby.

432.     At the time of said misrepresentations and omissions, lead plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had lead plaintiffs and the other members of the Class and the marketplace known of the true financial condition and business prospects of Cardinal, which were not disclosed by defendants, lead plaintiffs and other

members of the Class would not have purchased or otherwise acquired their Cardinal securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

433. By virtue of the foregoing, defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

434. As a direct and proximate result of defendants' wrongful conduct, lead plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of the Exchange Act Against the Individual Defendants and Cardinal

435. Lead plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

436. The Individual Defendants acted as controlling persons of Cardinal within the meaning of §20(a) of the Exchange Act as alleged herein. Cardinal controlled all of its employees and each of the Individual Defendants. By virtue of their high-level positions, and their ownership and contractual rights, participation in and awareness of the Company's operations and intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which lead plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by lead plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

437. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

438. As set forth above, Cardinal and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Cardinal Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, lead plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, lead plaintiffs pray for relief and judgment, as follows:

A. Determining that this action is a proper class action, designating lead plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and lead plaintiffs' counsel as lead counsel;

B. Awarding compensatory damages in favor of lead plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding lead plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Lead plaintiffs demand a trial by jury.

DATED:  April 22, 2005

MURRAY MURPHY MOUL + BASIL LLP
JOSEPH F. MURRAY (0063373)
GEOFFREY J. MOUL (0070663)
BRIAN K. MURPHY (0070654)


*/s/ Joseph F. Murray*
JOSEPH F. MURRAY

326 S. High Street, Suite 400
Columbus, OH  43215
Telephone:  614/469-0400
614/469-0402 (fax)
E-mail:  murray@mmmb.com

Liaison Counsel

LERACH COUGHLIN STOIA GELLER
        RUDMAN & ROBBINS LLP
WILLIAM S. LERACH
HENRY ROSEN
TOR GRONBORG
401 B Street, Suite 1600
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
E-mail:  henryr@lerachlaw.com
            torg@lerachlaw.com

LERACH COUGHLIN STOIA GELLER
        RUDMAN & ROBBINS LLP
LESLEY E. WEAVER
SHIRLEY H. HUANG
100 Pine Street, 26th Floor
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)
E-mail:  lesleyw@lerachlaw.com
            shirleyh@lerachlaw.com

Lead Counsel for Plaintiffs

CAULEY, BOWMAN, CARNEY
   & WILLIAMS, LLP
S. GENE CAULEY
P.O. Box 25438
Little Rock, AR  72221-5438
Telephone:  501/312-8500
501/312-8505 (fax)

Counsel for New Mexico

S:\CasesSD\Cardinal Health Secs\CPT00019922-2.doc

<u>DECLARATION OF SERVICE BY UPS DELIVERY</u>

I, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 401 B Street, Suite 1600, San Diego, California 92101.

2.      That on April 22, 2005, declarant served by UPS, next day delivery, the **CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** to the parties listed on the attached Service List.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on April 22, 2005, at San Diego, California.



*/s/ Diana L. Houck*
DIANA L. HOUCK

## Counsel For Defendant(s)

Paul P. Eyre
Baker & Hostetler LLP
666 Fifth Avenue
New York, NY  10103
   212/589-4200
   212/589-4201 (Fax)

Mark A. Johnson
Baker & Hostetler LLP
Capitol Square, Suite 2100
65 East State Street
Columbus, OH  43215-4260
   614/228-1541
   614/462-2616 (Fax)

Brian G. Selden
J. Todd Kennard
J. Kevin Cogan
Jones Day
325 John H. McConnell Blvd., Suite 600
Columbus, OH  43215-2673
   614/469-3939
   614/461-4198 (Fax)

Geoffrey J. Ritts
John M. Newman, Jr.
Jones Day
901 Lakeside Avenue, North Point
Cleveland, OH  44114
   216/586-3939
   216/579-0212 (Fax)

John R. Gall
Squire, Sanders & Dempsey L.L.P.
1300 Huntington Center
41 South High Street
Columbus, OH  43215-6197
   614/365-2700
   614/365-2499 (Fax)

Robert H. Hotz
Christopher T. Schulten
Akin Gump Strauss Hauer & Feld LLP
590 Madison Avenue
New York, NY  10022-2524
   212/872-1000
   212/872-1002 (Fax)

**Counsel For Plaintiff(s)**

S. Gene Cauley
Cauley Bowman Carney & Williams, LLP
P.O. Box 25438
Little Rock, AR 72221-5438
  501/312-8500
  501/312-8505(Fax)

Jeffrey W. Lawrence
Sylvia Wahba Keller
Luke O. Brooks
Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
100 Pine Street, Suite 2600
San Francisco, CA 94111-5238
  415/288-4545
  415/288-4534(Fax)

William S. Lerach
Darren J. Robbins
Ramzi Abadou
Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
401 B Street, Suite 1600
San Diego, CA 92101-4297
  619/231-1058
  619/231-7423(Fax)