**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **IN RE: CARDINAL HEALTH INC.** | : | |
| **SECURITIES LITIGATIONS,** | : | |
| | : | **Case No. C2-04-575** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **JUDGE ALGENON L. MARBLEY** |
| | : | |
| | : | |
| **THIS DOCUMENT RELATES TO:** | : | **Magistrate Judge King** |
| **All Securities Actions** | : | |

## OPINION AND ORDER

## I. INTRODUCTION AND SUMMARY

Plaintiffs, investors in Cardinal Health, Inc. ("Cardinal" or "the Company") bring securities fraud actions against Cardinal, Cardinal executives, Robert D. Walter, George L. Fotiades, Richard J. Miller, James F. Millar, Gary S. Jensen, and Mark Parrish (collectively, the "Individual Defendants"[1]), and Cardinal's independent auditor, accounting firm Ernst & Young ("E&Y").  Plaintiffs allege that from 1998 through 2002, while Cardinal's pharmaceutical distribution unit underwent a reorganization, the corporation engaged in an elaborate accounting scheme designed to artificially inflate its earnings and conceal debt.   Further, Plaintiffs allege that E&Y, hired as the Company's independent auditor in 2002, aided Cardinal in perpetuating its fraudulent accounting.

---

[1]Plaintiffs allege that the Individual Defendants, Cardinal's Senior Executives, "directed and approved" Cardinal's alleged fraud, culminating in the artificial inflation of Cardinal's stock price.

Cardinal and the Individual Defendants filed a joint motion to dismiss Plaintiffs'

Complaint under Federal Rules of Civil Procedure 12(b)(6) and 9(b) and the Private Securities

Litigation Reform Act of 1995 ("PSLRA"), alleging that Plaintiffs failed to state a claim upon

which relief can be granted.  Defendants Miller, Millar, and Jensen, and E&Y also filed separate

motions dismiss Plaintiffs' Complaint under Rules 12(b)(6) and 9(b) and the PSLRA.  Plaintiffs

filed a Motion to Strike Defendants' Appendixes ## 58-60, 64-65, and 70, as well as any and all

arguments relying on these Appendixes in Defendants' various motions to dismiss.

This Court holds that: (1) Plaintiffs allegations of Defendants' accounting fraud, insider

trading, motive, and opportunity were sufficient to state a § 10(b) claim against the Corporation

and all of the various Individual Defendants except Defendant Jensen, and Defendants failed to

show they were entitled to the protection of the statutory safe harbor for certain allegedly

fraudulent forward-looking statements upon which Plaintiffs relied; (2) Plaintiffs stated § 20(a)

claims against the Corporation and all of the Individual Defendants except Defendant Jensen; (3)

Plaintiffs' failed to state a §10(b) claim against Defendant E&Y because their allegations that

E&Y had intimate knowledge of Cardinal's fraudulent activities and that E&Y had failed to

adhere to GAAP and GAAS rules did not establish the necessary inference of scienter required

under the law.

Defendants' motions are **GRANTED** in part and **DENIED** in part.  The following

motions are **GRANTED**: (1) Cardinal Defendants' Motion to Dismiss as to Defendant Jensen;

(2) Defendant E&Y's Motion to Dismiss.  The following motions are **DENIED**: (1) Cardinal

Defendants' Motion to Dismiss as to Cardinal and Defendants Walter, Fotiades, Miller, Millar

and Parrish; (2) Defendant Miller's Motion to Dismiss; (3) Defendant Millar's Motion to

Dismiss. Plaintiffs' Motion to Strike is **GRANTED** in part and **DENIED** in part.[2]

## II. BACKGROUND[3]

This case involves a securities class action lawsuit brought on behalf of all persons and entities who purchased Cardinal's publicly traded securities between October 24, 2000 and July 26, 2004, inclusive (the "Class Period").[4] The Complaint alleges that all Defendants knowingly or recklessly disregarded errors in Cardinal's methods of revenue recognition, and that, through their public misrepresentations about the Company's Operating Revenue, Defendants fraudulently induced Plaintiffs to purchase Cardinal stock at artificially inflated prices in violation of Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder by the Securities Exchange Commission ("SEC"), including Rule 10b-5, 17 C.F.R. § 240.10b-5. The Complaint further alleges that the Individual Defendants are liable as "controlling persons" of Cardinal, under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).[5]

---

[2]Because the Defendants' various motions to dismiss rely on a common basis of underlying factual allegations and because the Defendants have raised common arguments in support of dismissal of the consolidated amended complaint, the Court will consolidate its ruling on each of the various motions to dismiss in this single opinion.

[3]These facts were primarily drawn from the Plaintiffs' Complaint, along with undisputed facts offered by the Defendants in their Motions to Dismiss, where appropriate, to present a true, accurate and more comprehensive accounting of the factual background relevant to these motions.

[4]Lead Plaintiff, Pension Fund Group ("PFG"), purchased Cardinal common stock during the Class Period, as set forth in its certification previously filed with the Court, and allegedly suffered damages. Though ten different Plaintiffs moved to be appointed Lead Plaintiff in the instant litigation, the Court appointed PFG Lead Plaintiff on January 26, 2005. *See In re Cardinal Health, Inc. Sec. Litig.*, 226 F.R.D. 298 (S.D. Ohio Jan. 26, 2005).

[5]At all relevant times, Cardinal's fiscal year ran from July 1 to June 30. Hereinafter, fiscal year will be abbreviated FY (*i.e.*, FY 2001 for fiscal year 2001) and fiscal quarter will be abbreviated Q (*i.e.* 1Q 2002 for first quarter of fiscal year 2002).

## A. Defendants

The Complaint asserts causes of action against numerous defendants. The defendants have been grouped together based on their roles and the claims asserted against them. The first such group, which is collectively referred to as "the Cardinal Defendants," includes Cardinal and the following six individuals who were either Cardinal directors or members of the Company's senior management during the Class Period: Robert D. Walter, George L. Fotiades, Richard J. Miller, James F. Millar, Gary S. Jensen, and Mark Parrish.[6] The roles and responsibilities of each of these six individuals during the Class Period, as alleged in the Complaint, are described below.

### 1. Robert Walter

Defendant Robert D. Walter ("Walter") founded Cardinal, and served, at all relevant times, as the Chairman and Chief Executive Officer ("CEO") of the Company. During the Class Period, Walter prepared and signed the Company's SEC filings, issued statements in press releases and led the Company's conference calls with analysts and investors, representing himself as one of the primary persons with knowledge about Cardinal's business, financial reports, and business practices. In conjunction with each of Cardinal's public financial statements filed with the SEC beginning in the Company's September 30, 2002, Form 10-K for FY 2002, Walter signed a certification pursuant to § 302 of the Sarbanes-Oxley Act, attesting that he had reviewed the contents of the filing to confirm that the "report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading." During the Class

---

[6]As noted above, these six individuals are referred to collectively herein as the "Individual Defendants."

Period, Walter received $136 million in total compensation, with bonuses and option awards

totaling more than $132 million.[7] Further, during the Class Period, Walter sold 593,910 shares of

his personal Cardinal stock for proceeds of $38.19 million.

### 2. George L. Fotiades

During the Class Period, Defendant George L. Fotiades ("Fotiades") served as the

President and CEO of Cardinal's Life Science Products and Services division, overseeing

Cardinal's Pharmaceutical Technologies and Services segment. In February 2004, Fotiades was

promoted to Executive Vice President and Chief Operating Officer ("COO") of Cardinal.

Further, throughout the Class Period, Fotiades was a member of the Executive Operating

Committee (the "EOC"), a committee led by Walter, which met monthly to discuss Cardinal's

business, operations and finance. Fotiades participated in the preparation of the Company's SEC

filings and press releases, and took part in in the Company's conference calls with analysts and

investors. During the Class Period, Fotiades received $48,984,750 in total compensation. Further,

during the Class Period, Fotiades sold 65,960 shares of his personal Cardinal stock for proceeds

of $4.68 million and obtained bonuses and option awards worth more than $46 million.

### 3. Richard J. Miller

Defendant Richard J. Miller ("Miller") served as Cardinal's Executive Vice President,

Chief Financial Officer ("CFO") and Principal Accounting Officer from March 1999 through July

2004. Prior to that time, Miller had served as Cardinal's acting CFO since August 1998, and as a

---

[7]Walter's annual compensation also included a $511,525 set-aside in FY 2001-FY 2004 for taxes to cover his, his family, and his associates' personal use of the Company airplane, as well as $333,711 in insurance premiums paid by the Company to benefit a trust for Walter's family. *See* Complaint ¶ 272.

Controller and Vice President from August 1995 through March 1999. Before joining Cardinal, Miller had been a partner with Deloitte & Touche with over thirteen years of financial and accounting experience; he is a certified public accountant ("CPA") and holds a bachelor's degree in accounting from Ohio State University. Miller prepared and signed the Company's SEC filings, issued statements in press releases and participated in the Company's conference calls with analysts and investors. Like Walter, in conjunction with each of Cardinal's public financial statements filed with the SEC beginning in the Company's September 30, 2002, Form 10-K for FY 2002, Walter signed a certification pursuant to § 302 of the Sarbanes-Oxley Act. Defendant Miller left Cardinal in July 2004. Upon his resignation, Miller admitted that "[c]ertain financial reporting practices and judgments that occurred during my tenure as CFO have come under scrutiny in the ongoing investigations." During the Class Period, Miller received $16,659,563 in total compensation, $15.4 million of which were incentive-based bonuses and option awards.

#### 4. James F. Millar

Defendant James F. Millar ("Millar") served as the Executive Vice President and President and COO of Cardinal's Pharmaceutical Distribution segment from the beginning of the Class Period through December 2002, at which time Millar was promoted to President and CEO of the Company's Healthcare Products Segment. In February 2004, Millar was again promoted, this time to the position of Executive Director, Strategic Initiatives. Moreover, throughout the Class Period, Millar was a member of Cardinal's EOC. Miller participated in the preparation of the Company's SEC filings and press releases, and participated in the Company's conference calls with analysts and investors, representing himself as one of the primary persons with knowledge about Cardinal's pharmaceutical distribution business, financial reports and outlook

and business practices. During the Class Period, Millar received $43,657,910 in total compensation. Further, during the Class Period, Millar sold 86,043 shares of his personal Cardinal stock for proceeds of $5.15 million and obtained incentive-based bonuses and option awards worth more than $41.76. million.

### 5. Gary S. Jensen

Defendant Gary S. Jensen served as the Senior Vice President of Audit and Financial Services, Corporate Controller and Principal Accounting Officer for fiscal years 2003 and 2004, throughout the Class Period, and until February 2005, at which point he was asked to resign following Cardinal's internal review in connection with investigations of the Company's accounting practices by both the SEC and the U.S. Attorney's Office. Though Plaintiffs contend that a Cardinal spokesperson acknowledged that Jensen's resignation was "tied to the audit over how the company classifies revenue from its pharmaceutical distribution business," the Cardinal Defendants counter that Jensen's resignation was, in fact, voluntary. During the Class Period, Jensen sold 10,357 shares of his personal Cardinal stock for proceeds of $743,984.

### 6. Mark Parrish

Defendant Mark Parrish ("Parrish") was promoted to Chairman and CEO of Cardinal's Pharmaceutical Distribution business in August 2004. Prior to that time, Parrish had served as the Executive Vice President and Group President of the Pharmaceutical Distribution businesses in which he was responsible for Cardinal's pharmaceutical and specialty distribution businesses and reported directly to Defendant Millar. Further, in fiscal year 2003, Parrish became a member of Cardinal's EOC. Parrish participated in the preparation of the Company's SEC filings and press releases, and participated in the Company's conference calls with analysts and investors. During

the Class Period, Parrish sold 16,032 shares of his personal Cardinal stock for proceeds of $972,835.

### 7. Cardinal

Defendant Cardinal is generally recognized as one of the three largest distributors of pharmaceutical products in the United States.  Headquartered in Dublin, Ohio, Cardinal employs more than 55,000 people on six continents and produces annual revenue of nearly $75 billion. Cardinal divides its business into four reporting units: (1) Pharmaceutical Distribution and Provider Services; (2) Medical Products and Services; (3) Pharmaceutical Technologies and Services; and (4) Clinical Technologies and Services (formerly known as Automation and Information Services).  Plaintiffs' allegations primarily involve Cardinal's oldest and historically largest segment, Pharmaceutical Distribution and Provider Services, which moves pharmaceutical products from manufacturers to retailers and from which Cardinal derives approximately 85% of its revenues.  Despite Cardinal's reputation as a leader in the pharmaceutical industry, by July 27, 2005, the end of the Class Period, the Company's stock price had dropped 41% to $44.00 per share.

### 8. Ernst & Young

Plaintiffs, however, do not place the blame solely on Cardinal and the Individual Defendants; they also allege that E&Y, serving as Cardinal's independent auditor, assisted the Company "in orchestrating or profiting from [its alleged] fraud."  On May 8, 2002, E&Y received $2.31 million from Cardinal for pre-engagement services, and took on Cardinal's multi-million dollar account after Arthur Anderson ("AA"), Cardinal's previous long-term auditor, imploded

under the weight of its involvement in massive alleged accounting frauds.[8]

A large portion of E&Y's services related to work that fell outside the scope of financial statements audits.  In fact, in addition to auditing, during the Class Period, E&Y provided Cardinal with the following services: (1) due diligence services related to mergers and acquisitions, audit-related research and assistance and employee benefit plan audits; (2) tax advice and planning services; and (3) other services related to matters such as litigation assistance and internal audit services.[9].

E&Y made no public statement relating to Cardinal until September 30, 2002 when Cardinal filed its 10-K for FY 2002, containing its audited financial statement.   E&Y certified Cardinal's FY 2002 financial results, previously audited by AA.  The only other public statement E&Y made during the Class Period was its audit opinion with respect to Cardinal's financial statements for FY 2003, which was published in Cardinal's 2003 10-K filed on September 29, 2003.[10]  Over the course of the Class Period, E&Y received a total of $27.1 million in fees from

---

[8]Prior to retaining E&Y, Cardinal's auditors were from the now defunct firm of Arthur Andersen ("AA").  AA's "accounting frauds" included, among others, the highly publicized frauds in the WorldCom and Enron cases.  *See In re MCI Worldcom, Inc. Sec. Litig.*, 191 F. Supp. 2d 778 (S.D. Miss. 2002); *see In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549 (S.D. Tex. 2002).  Despite its connection with scandal-plagued AA, Cardinal's account was lucrative.  In FY 2000 alone, Cardinal paid AA $11.4 million in auditing and consulting fees, by far the most of any central Ohio's 15 largest publicly-traded companies.

[9]In FY 2002 and FY 2003, $2.6 million of the $4.9 million in total fees E&Y received from Cardinal, and $5.1 million out of the $8.9 million in total fees E&Y received from Cardinal, respectively, related to the firm's performance of various non-audit services.

[10]In its audit opinions for both FY 2002 and FY 2003, E&Y explained the roles of the Company and its auditors, noting that the financial statements were "[t]he responsibility of the Company's management."  E&Y averred that it had conducted an audit of Cardinal's year-end financial statements in accordance with GAAS and believed that those financial statements "present[ed] fairly, in all material respects, the consolidated financial position of Cardinal Health, Inc." at the respective audit dates (June 30, 2002 and June 30, 2003).  Further, E&Y

-9-

Cardinal, which was one of the largest clients of E&Y's Columbus, Ohio office. E&Y's fees were particularly important to the partners in E&Y's Columbus, Ohio office whose incomes and bonuses depended on Cardinal's continued business. Plaintiffs contend that, from the time it became Cardinal's auditor, through the end of the Class Period, E&Y ignored obvious red flags and blindly certified Cardinal's financial statements knowing that, in reality, Cardinal had intentionally misstated its financials to maintain an artificially inflated stock price.

### B. Plaintiffs' Allegations

### 1. Cardinal's Operating Model - Shifting from B+H to FFS

The timing of the instant litigation is significant as the Class Period coincides with a monumental shift in the pharmaceutical distribution business' operating model. As such, background information on this transition period is integral to the parties' dispute.

At the start of the Class Period, Cardinal and its major pharmaceutical distribution competitors operated through a "buy-and-hold" (B+H) model. Under a B+H model, pharmaceutical distributors "buy" pharmaceuticals from manufacturers and "hold" those products for a period of time before re-selling them to retailers.[11] Through successful B+H acquisitions,

---

explained that the Company's fiscal 2000 and 2001 statements were audited by AA, and that E&Y had performed certain limited procedures with respect to those statements "but had not been engaged to audit, review, or apply any [other] procedures to the Company's financial statements" and did not "express an opinion or any other form of assurance" on those financial statements taken as a whole.

[11]In its 2003 Form 8-K, Cardinal explained the B+H model in detail and discussed the ways in which the buy-and-hold model allowed drug distributors, like Cardinal, such successful growth. Cardinal representatives wrote:

[Under the buy-and-hold model, m]argins were earned by distributors based largely on the amount of inventory bought and held, and to a lesser extent, on fees collected for the unique distribution requirements of the individual pharmaceutical products. In an

Cardinal expanded its regional markets and customer base. Cardinal took advantage of the rapidly rising drug prices in the 1990s, and, accordingly, from the early 1990s through the year 2002, Cardinal regularly reported annual growth exceeding 20%.[12]

Nevertheless, Cardinal's ability to continue such significant growth was sharply curtailed in FY 2001. By that time, the pharmaceutical distribution market was effectively divided between three major companies: Cardinal, McKesson Corporation, and AmerisourceBergen Corporation. In fact, when Cardinal made a $2.2 billion acquisition of Bindley Western Industries, Inc. in February 2001, and AmeriSource Health Corporation made a $2.4 billion merger with Bergen Brunswig Corporation in March 2001, the top three distributors effectively controlled 90% of the entire pharmaceutical distribution business. Investors realized that Cardinal's distribution business would soon face increasing pressure on its profit margins as the top three distribution companies battled each other for the same market.[13]

Though the traditional B+H model had functioned well for many years, as the

environment where inventory was appreciating at a rate greater than the cost of carrying, distributors were encouraged to carry more and more inventory. Large inventory stocks drove margins through price appreciation and manufacturer incentives, with the resulting profitability more than covering distribution costs for all products. With knowledge of distributors' willingness to buy and hold inventory, manufacturers also periodically offered deals or incentives to carry even more inventory, exacerbating the large supplies of inventory in the channel.

[12]Cardinal mainly profited from the inflation in pharmaceutical prices between the date the products were purchased from manufacturers and the date the same products were sold to retailers.

[13]The consolidation of the distributor market was matched by a consolidation in the retail pharmacy market in which mass retailers like CVS Corporation and Walgreen Company succeeded in capturing enormous shares of the market. These mass retailers began to use their burgeoning power to limit price increases, negotiate directly with pharmaceutical manufacturers, and bypass the big distributors by purchasing discounted and generic drugs directly from specialty wholesalers instead.

pharmaceutical business became increasingly complex, it became less efficient. On the one hand, pharmaceutical manufacturers could place their products into the retail market without significant line-item distribution expenses, and retailers, institutions, and other customers could receive those products with, at most, only minor markups. On the other hand, manufacturers were partially deprived of the advantage of their own price increases as B+H distributors would sell their existing inventory at the new, higher cost before buying more from the manufacturer. Over time, this latter dynamic led manufacturers to restrict the flow of pharmaceuticals to distributors like Cardinal – limiting the ability of these distributors to profit from B+H.

Cardinal was one of the first to recognize this changing dynamic, advising investors in February 2003 that the market was beginning to transition to Inventory Management Agreements ("IMAs") under which wholesalers would be compensated not through investment in an inflationary product, but rather through negotiated fees for inventory management and distribution services – a "fee-for-service" (FFS) model.[14] Under the FFS model manufacturers pay a negotiated fee to Cardinal for the Company to distribute their products. Accordingly, manufacturers sell and ship their products to Cardinal and other pharmaceutical distributors only when there is a corresponding retail request. Thus, instead of making bulk shipments to the distributors without regard for demand, Cardinal began to make shipments only when they had an

_____

[14]In the May 2003 issue of <u>The Cardinal Health Investor</u>, the Company characterized IMAs writing, "IMAs, which are agreements negotiated between pharmaceutical manufacturers and distributors, are an attempt to balance manufacturing production with actual prescription demand by retailers and consumers. IMAs, which often contain provisions limiting the distributor's inventory investments, are an important part of doing business as a pharmaceutical distributor. The channel can operate more efficiently, and costs to eventual patients can be contained." *See* Complaint ¶ 156.

-12-

order to fill – "just-in-time" (JIT) shipments.[15]

Though Cardinal was considered to be a "pioneer" in the B+H to FFS business-model migration,[16] analysts were skeptical about whether the Company would be able to continue to generate returns.  Facing increasingly intense competition and margin pressure and losing the ability to profit from rising drug prices, investors turned their focus to whether Cardinal could continue to grow its revenues and earnings in the changing market.  Cardinal began negotiations with several manufacturers, and in October 2003, eight months from its initial announcement of the possibility of a shift to IMAs, Cardinal disclosed that it had finalized its first largely FFS contract with drug manufacturing giant, Merck.  Moreover, Cardinal revealed that it was "in active negotiations" on 47 other potential additional FFS contracts as of January 2004 and confirmed that the Company's entire distribution process was "in transition."

## 2. Corporate Acquisitions and Note Offerings

At the same time that Cardinal underwent a switch from a B+H to an FFS model, the Company also began to expand its other business segments through both acquisition efforts and

---

[15]Defendants argue that what Plaintiffs refer to as "JIT" transactions are more properly labeled "anticipatory ordering."  Nevertheless, the system described is the same under both Plaintiffs' and Defendants' classifications.  This system is one in which Cardinal uses its electronic ordering and inventory systems to anticipate when customers will need additional product, then order that product so as to have it available in Cardinal's inventory.  As with product that Cardinal sold as Bulk from Stock, product that Cardinal used for anticipatory ordering is considered to be a part of Cardinal's inventory.

[16]Cardinal, however, was not the only pharmaceutical distributor to shift from a B+H to an FFS model.  Defendants mention that McKesson and Amerisource Bergen, like Cardinal, changed their business models during the Class Period to respond to manufacturers' efforts to control the distribution channel.  Defendants note that McKesson's stock dropped from $34.33/share on June 30, 2004 to $30.27/share on July 6, 2004 (11.8% drop), and that Amerisource Bergen's stock declined from $59.78/share on June 30, 2004 to $54.00/share on July 6, 2004 (9.7% drop).

internal growth, making pharmaceutical distribution a smaller part of Cardinal's overall revenues and earnings. In fact, during the four years covered by the putative class period, Cardinal acquired twenty-four companies, and the percentage of Cardinal's earnings that came from pharmaceutical distribution declined from 52% to 46%. Further, to finance these acquisitions, Cardinal exchanged over 36 million shares of Cardinal stock (valued at over $3.0 billion) and expended more than $656 million in cash.

During the Class Period, Cardinal also completed three separate note offerings, raising $1.3 billion. These note offerings "were necessary and used, in part, to repay Cardinal's indebtedness (as of December 31, 2001, Cardinal had an outstanding debt of approximately $1.96 billion, and Cardinal's subsidiaries had an outstanding debt of $611.20 million)." Plaintiffs allege that "Cardinal's acquisition spree would not have been possible without the cash infusions" from the note offerings.

Cardinal's acquisitions and note offerings allowed the Company's stock to continue to trade at high levels. As such, over the course of the Class Period, Cardinal achieved and maintained investment grade commercial ratings. By achieving investment grade ratings, Cardinal was eligible to gain access to commercial paper,[17] and Cardinal's participation in the commercial paper program provided for issuance of up to $1.5 billion in credit facilities by June 30, 2001. That $1.5 billion was pursuant to unsecured bank facilities, $750 million of which were set to expire on March 27, 2003, and the other $750 million of which were set to expire on March

---

[17]The "commercial paper market" is composed of unsecured, short-term loans issued by corporations, typically for financing accounts receivables and inventories. Such loans – or commercial paper – are usually issued at a discount reflecting prevailing market interest rates. To trade on this market, however, "Cardinal needed to present itself as financially sound." *See* Complaint ¶ 249.

31, 2004.  In FY 2003, because of Cardinal's high stock value, the expiration dates were extended

to March 26, 2004 and March 27, 2008.  During a December 13, 2004 conference call, the

Company's then CFO, Mike Losh,[18] said,

> We are definitely committed to maintaining investment grade ratings. . . One, when you
> get to be noninvestment-grade, not only are there the costs of money costs, but we think
> there are certain hidden costs that you have to deal with that we do not think that is
> appropriate for us to ever put ourselves in that position.  Also we want to regain access to
> the commercial paper market.  So on a longer-term basis, we are targeting the return to an
> A- debt rating level.

Complaint ¶ 249.  By FY 2004, however, Cardinal's stock price dropped, and Cardinal's debt and

commercial paper ratings were downgraded far below the A- level.

### 3.  Bulk Deliveries and Operating Revenue

The parties' dispute centers on Plaintiffs' allegations of Cardinal's fraudulent or misstated

accounting.  Plaintiffs' allege that over the four-year Class Period, Cardinal's numerous

accounting misstatements allowed the Company to overstate its revenues by approximately $26

billion.[19]  *See* Complaint ¶¶ 56-58, 63-66, 72-76, 80-85, 88-95, 97-105, 108-14, 118-28, 132-38,

141-46, 150-51, 153-59, 163-68, 171-78, 181-87, 191-95, 199-223.  To provide the necessary

background, a brief discussion of Cardinal's basic accounting policies follows.

Cardinal's Pharmaceutical and Distribution and Provider Services ("Pharmaceutical

---

[18]Mike Losh replaced Defendant Miller as Cardinal's CFO in 2004.

[19]At oral argument on February 6, 2006, Plaintiffs explained that the $26 billion consisted
of 3 separate components: (1) $21 billion was bulk from stock sales; (2) $3.8 billion was derived
from the 24-hour rule; and (3) $1.8 billion came out of the interception of orders from just-in-
time inventory.  Plaintiff explained, "it's our position that [Cardinal] restated all that money."
The Court must construe the facts in the light most favorable to the Plaintiffs at this stage of this
litigation.  As such, though the Cardinal Defendants dispute the accuracy of the foregoing
numbers, the Court shall adopt them in analyzing the Defendants' various motions to dismiss.

Distribution") primarily sells pharmaceutical products to its customers through "direct store door" ("DSD") sales.[20] Not all of Cardinal's sales, however, are made in small shipments directly to retailers' store doors. Customers who operate their own warehouses sometimes order products in bulk. On some occasions, Cardinal receives these bulk orders and fills them from the company's own inventory. On other occasions, however, Cardinal receives bulk orders under terms that its customers have previously negotiated with manufacturers. For these orders, while Cardinal does not bear the risk of the transaction, Cardinal also has no significant opportunities to derive a profit from it. In 1998, to account for these non-DSD sales, Cardinal began to report its revenue in two separate categories: (1) "Operating Revenue"; and (2) "Bulk Deliveries to Customer Warehouses and Other" ("Bulk Deliveries").[21]

Cardinal differentiated between "Operating Revenue" and "Bulk Deliveries" solely by

---

[20]In a DSD sale, Cardinal receives a shipment from a manufacturer in bulk, takes that shipment into its own inventory, and holds that inventory until products are ordered by and delivered to a retailer or some other customer.

[21]In this type of transaction, Cardinal acted as an "intermediary" instead of selling products out of its own inventory. In its FY 1998 10-K Cardinal explained,

> Along with other companies in its industry, the Company has begun reporting as revenue bulk deliveries made to customers' warehouses, whereby the Company acts as an intermediary in the ordering and subsequent delivery of pharmaceutical products. All years presented have been reclassified to include these bulk deliveries as revenue (previously only the service fees related to such bulk deliveries were reported as revenue; such service fees were not significant in any period presented). Fluctuations in bulk deliveries result largely from circumstances that are beyond the control of the Company, including consolidation within the chain drugstore industry, decisions by chains to either begin or discontinue warehousing activities, and changes in policy by manufacturers related to selling directly to chain drugstore customers. Due to the insignificant margins generated through bulk deliveries, fluctuations in their amount have no significant impact on operating earnings.

See Def.'s Motion to Dismiss at 9.

-16-

considering how long the product was in the Company's possession prior to its being shipped. If Cardinal possessed the product for more than 24 hours before its shipment, the proceeds were classified as "Operating Revenue"; however, if Cardinal possessed the product for less than 24 hours before its shipment, the Company considered those proceeds to be "Bulk Deliveries."[22]

The Individual Defendants touted Cardinal's reported Operating Revenue as "the main driver" of the Company's growth rate. Further, investors and analysts considered Operating Revenues to be crucial in ascertaining the success of Cardinal's conversion to an FFS model. Over the course of the Class Period, in their SEC filings and press releases, Defendants highlighted their steady Operating Revenue as a strong indicator that Cardinal was successfully increasing its market, expanding its customer base, migrating sales from no margin Bulk Deliveries to profitable direct-store business, and, most importantly, adapting well to the shifting drug distribution market.

Unlike Operating Revenue, Cardinal's Bulk Deliveries were unpredictable and provided little or no margin. Hence, most investment analysts did not consider them to be good indicators of Cardinal's growth. Further, the market interpreted escalating Bulk Deliveries as a sign that Cardinal was not successfully converting pharmaceutical manufacturers from a B+H to an FFS model because, with most Bulk Deliveries, the large pharmaceutical retailers used Cardinal only as an intermediary, significantly limiting the Company's earnings potential.

### 4. SEC Inquiries Begin

From FY 2000 through FY 2003, Cardinal's press releases and SEC filings made it appear

---

[22]Both Plaintiffs and Defendants refer to Cardinal's decision to classify its revenue based on this 24-hour cut-off period as the "24-hour rule."

to be a thriving company. Considering its burgeoning Operating Revenue, which increased at least 10 percent each quarter, Cardinal seemed to be making an easy transition to an FFS model. In actuality, however, Cardinal was not as successful as its numbers suggested, and on October 9, 2003, Cardinal disclosed that the SEC had opened an informal inquiry into its accounting practices.[23] Primarily, the SEC sought information about the Company's accounting treatment of $22 million that it had received in settling anti-trust litigation with various vitamin manufacturers (the "Vitamin Litigation").

### 5. Vitamin Litigation Settlement

The Vitamin Litigation began in May 2000, when Scherer, a company acquired by Cardinal in 1998, filed a civil antitrust lawsuit against a group of vitamin manufacturers alleging that certain of its raw material suppliers and others had unlawfully conspired to fix wholesale vitamin prices. During the Class Period, Scherer entered into a series of multi-tiered settlement agreements with the various vitamin manufacturers under which Cardinal received settlement payments of $35.3 million by June 30, 2002. Cardinal recognized $22 million of these proceeds

---

[23]Cardinal's release stated:

Cardinal Health, Inc. announced today that it has received a request for information from the [SEC] in connection with an informal inquiry. The request seeks historical financial and related information, including information pertaining to the accounting treatment of $22 million recovered from vitamin manufacturers who were found to have overcharged the company. The company is highly confident in its accounting and financial disclosure practices, and intends to cooperate fully and provide all information required to satisfy the request.

See Complaint ¶ 171.

in two allotments disclosed specifically in its September 30, 2002 10-K filing.[24]  In its 2002 10-K,

the Company disclosed for the first time that, in the second quarter of fiscal 2002 (before E&Y

became its outside accounting firm) it had booked $10 million and $12 million reductions,

respectively, in the cost of goods sold, to reflect anticipated recoveries for claims it had asserted

in the course of the Vitamin Litigation.

Six months later, critics began to question Cardinal's accounting treatment of the first $22

million of the Vitamin Litigation settlement.  On April 2, 2003, The Wall Street Journal published

a "Heard on the Street" column challenging Cardinal's decision to recognize those anticipated

recoveries before an actual settlement agreement had been reached.[25]  Though the article

---

[24]Cardinal wrote:

> During the fourth quarter of fiscal 2002, the Company recorded income from net
> litigation settlements of $11.3 million.  These settlements included a $13.3 million
> special item resulting from the recovery of antitrust claims against certain vitamin
> manufacturers for amounts overcharged in prior years.  The recovery totaled $35.3
> million, of which $22 million had previously been recorded ($10.0 million in the second
> quarter of fiscal 2001 and $12.0 million in the first quarter of fiscal 2002).  The amounts
> previously recorded were reflected as a reduction of cost of goods sold, which is
> consistent with the classification of the original overcharge, and were based on the
> minimum amounts estimated to be recoverable based on the facts and circumstances
> available at the time they were recorded.  While the Company still has pending claims
> against other manufacturers, the amount of any future recovery is not currently estimable.
> Any future recoveries will be recorded as a special item in the period when a settlement
> is reached.

Cardinal recorded "[t]hese pricing adjustments . . . as a reduction of cost of goods sold,
consistent with the classification of the original overcharge," during the second quarter of FY
2001 and 1Q 2002.  Cardinal's total recovery from vitamin manufacturers resulting from the
Vitamin Litigation was $144.7 million.  See Def.'s Motion to Dismiss at 22.

[25]The article's lead paragraph suggested that Cardinal had prematurely recognized the
settlement proceeds.  Jonathon Weil, Cardinal Health's Accounting Raises Some Questions,
WALL ST. J., Apr. 2, 2003, at C1.  ("Don't count your chickens before they hatch. Yet new
disclosures in Cardinal Health, Inc.'s latest annual report suggest that is what the drug

acknowledged that Cardinal had subsequently entered into binding settlement agreements and had received payments in the amount of $35.5 million by the end of FY 2002, the article suggested that Cardinal had recognized the $22 million prematurely to avoid falling short of analysts' quarterly earnings estimates.

As established above, the SEC was also concerned that Cardinal may have prematurely recognized that $22 million in order to meet analyst estimates, in violation of Generally Accepted Accounting Principles ("GAAP").[26] The Audit Committee of Cardinal's Board of Directors, assisted by independent counsel, began its own internal review of the Company's accounting procedures in April 2004. On May 6, 2004, the SEC converted its informal inquiry of Cardinal's accounting into a *formal* investigation, while Cardinal's Audit Committee continued to work with independent counsel to review the Company's financial reporting. Further, Cardinal disclosed that the SEC and Audit Committee investigations were no longer limited to the Company's accounting treatment of the $22 million from the Vitamin Litigation settlement.

Nonetheless, Cardinal's problems did not end with SEC and Audit Committee investigations. On June 21, 2004, as part of the SEC formal investigation, Cardinal received a

─────────────────────

wholesaler has done not just once, by twice, independent accounting specialists say.").

[26]GAAP rules are the "basic postulates and broad principles of accounting pertaining to business enterprises, approved by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants (AICPA)." *See Sec. & Exchange Comm'n v. Price Waterhouse*, 797 F. Supp. 1217, 1222 n. 17 (S.D.N.Y. 1992). These rules apply to the preparation of regular reports such as 10-K and 10-Q form statements that publicly traded corporations must file annually or quarterly with the SEC. *See Enron*, 235 F. Supp 2d. at 753. "'In the event there is no official pronouncement, the consensus of the accounting profession, as manifested in textbooks, for example, determines GAAP." *See id.* (quoting *Providence Hosp. of Toppenish v. Shalala*, 52 F.3d 213, 218 n. 7 (9th Cir. 1995)). GAAS "are standards prescribed by the Auditing Standards Board of the AICPA for the conduct of auditors in the performance of an examination." *Id.*

subpoena, including a request for the production of documents relating to its revenue

classification policies, and specifically those policies used in the Company's pharmaceutical

distribution segment.[27]  Further, the State Attorney General of New York, Eliot Spitzer,

commenced an inquiry allegedly relating to the Company's revenue classification.  On July 30,

2004, Cardinal announced both the subpoena and the Spitzer inquiry to the public.

### 6. The October 2004 Restatement

On September 13, 2004, due to its discussions with the SEC and the Spitzer investigation,

Cardinal announced its plans to restate its financial statements for FY 2001 through FY 2003 and

the first three quarters of FY 2004.  The Company reversed its previous recognition of estimated

recoveries from the Vitamin Litigation and recognized the income from such recoveries as a

"special item" in the period it received the cash from the manufacturers.  Moreover, Cardinal

decided to delay its announcement of its FY 2004 financial results until it had both completed its

restatement and changed its accounting policies.

On October 26, 2004, more than three months after the end of the Class Period, Cardinal

issued  its delayed 4Q and FY 2004 results and filed a Form 10-K (the "Restatement") in which

the Company restated certain items to correct past errors and announced changes in other

accounting policies on a prospective basis, without restating past results.  In the Restatement,

Cardinal announced its decision to change its accounting policies to abandon the distinction

between "Operating Revenues" (which included bulk sales out of Cardinal's inventory) and "Bulk

Deliveries to Customer Warehouses."  From the fourth quarter of FY 2004 forward, Cardinal

---

[27]The SEC's subpoena specifically requested information about Cardinal's classification
of "Operating Revenue" and "Bulk Deliveries to Customer Warehouses and Other."

classified all sales of pharmaceutical products as "Operating Revenue."  For FY 2002 through FY 2004, Cardinal reclassified all of the revenues it had previously reported and consolidated them in a single revenue line.  Cardinal stated, "[t]he reclassifications have no effect on previously reported total revenue, related cost of products sold, net earnings or earnings per share," and assured analysts that the "only impact of the reclassification" was on "previously reported growth rates."

Also on October 26, 2004, during a conference call with investors and analysts, Mike Losh, admitted that the Company had misclassified $23.5 billion over three years.  He also revealed, among other things, that the Audit Committee had concluded that over the past few years, Cardinal had based its revenue classifications on its 24-hour rule, and that, at certain, specifically identified times, the Company had intentionally held Bulk Deliveries for more than 24 hours so as to label them high margin Operating Revenues instead. These transactions, Losh admitted, had caused the Company to overstate its Operating Revenues by $813 million in FY 2003 and to understate its Bulk Deliveries to Customer Warehouses by $414 million in FY 2002. Further, Losh conceded that Cardinal was feeling the pressure of the pharmaceutical distribution business model transition to an FFS model.

Moreover, Cardinal restated its FY 2001 and FY 2002 financials to shift its recognition of the Vitamin Litigation settlement into later quarters, in particular, adding $22 million to the cost of goods sold in the relevant quarters in 2001 and 2002 and recording the $22 million as an income item in its fourth quarter 2004 results.

### C. The Parties' Dispute

On April 22, 2005, Lead Plaintiff, PFG, filed a Consolidated Amended Complaint (the

"Complaint") alleging that, during the Class Period, Defendants engaged in a scheme to defraud Plaintiffs by knowingly or recklessly disregarding errors in revenue recognition, and, through their public misrepresentations about Cardinal's Operating Revenue, fraudulently induced Plaintiffs to purchase Cardinal's stock at artificially inflated prices.

In summary, Plaintiffs' Complaint alleges the following: (1) Defendants materially misrepresented Cardinal's revenues and earnings in violation of GAAP as evidenced by the Company's press releases and SEC filings concerning revenues and earnings from FY 2000 through FY 2004, and Individual Defendants' statements that routinely highlighted "increased revenues" over consecutive periods; (2) though Cardinal represented that its financial statements were prepared in compliance with GAAP, they were not: (a) Cardinal's financial statements mis-characterized Operating Revenues and made inadequate disclosures regarding revenue classification procedures; (b) Cardinal improperly and prematurely recognized $22 million of expected lawsuit settlement proceeds prior to a settlement being reached in the Vitamin Litigation; ©) Cardinal used improper reserve accounting and improper accrual adjustments to overstate the Company's net income by $64.2 million in violation of GAAP;[28] (d) Cardinal failed to disclose the Company's recognition of cash discounts earned from suppliers for prompt

---

[28]In its October 2004 10-K, Cardinal restated the Company's balance sheet reserves and accrual adjustments. Cardinal Defendants acknowledged that in connection with the Company's balance sheet reserves and accrual adjustments, there were various situations prior to and throughout the Class Period where the amount and timing of its reserves as well as the timing of its reserve adjustments could not be substantiated. In the end, Cardinal's restatement due to these various reserve and accrual adjustments decreased the Company's reported net income for FY 2000-3Q 2004 by $64.2 million. *See* Complaint ¶¶ 219-22.

payment;[29] (e) Cardinal improperly recognize Bulk Deliveries as Operating Revenue by

manipulating its use of the 24-hour rule; (f) Cardinal understated its regular expenses by making

excessive "special charges";[30] (g) Cardinal engaged in illegal off-balance sheet transactions,

understating its receivables through securitization of Pyxis receivables;[31] (h) Cardinal violated

---

[29]In prior reporting periods, Cardinal treated its cash discounts received from vendors for prompt payment as a "Reduction of the Cost of Goods Sold," recognizing the discount immediately.  Beginning in FY 2004, however, Cardinal announced it would change its treatment of its cash discounts, considering them a component of inventory cost rather than reductions in the cost of products sold.  As such, Cardinal *postponed* its recognition of the cash discounts until the Company had sold the associated products.

Plaintiffs allege that Cardinal should have always used the latter method of recognizing cash discounts, and that its failure to do so until 2004 constituted a GAAP violation. Nonetheless, Cardinal did not restate fiscal periods prior to FY 2004 because it believed that it was simply switching from "one acceptable accounting method" to another, more preferable, but also acceptable, accounting method.  E&Y concurred in Cardinal's judgment, providing a letter that was attached as an exhibit to Cardinal's 10-K agreeing that Cardinal had changed "to an acceptable alternative method, which, based on [Cardinal's] business judgment to make this change and for the stated reason [in the 10-K, was] preferable" in Cardinal's circumstances.

[30]In FY 2001 and FY 2002, Cardinal recorded "special charges" of $149.9 million and $141.4 million respectively for merger-related and restructuring costs.  Plaintiffs argue that Cardinal inflated its "special charges" to enable the Company to understate its normal recurring expenses either in the same quarters Cardinal overstated its special charges, or in subsequent quarters, thereby reporting inflated Operating Earnings.

In support of its Complaint about these "special charges," Plaintiffs cite: (1) a 1998 speech made by the SEC's Chairman explaining how merger and restructuring services could be abused, and (2) a 2003 analyst report observing that restructuring charges are "clearly a factor" in analyzing a company as "acquisitive as Cardinal Health had been in recent years" and suggesting that "this needs to be monitored closely."

[31]Finally, Plaintiffs argue that during the Class Period, the Cardinal Defendants improperly accounted for a securitization of the Company's Pyxis receivables in 1Q 2002 as an off-balance sheet transaction, causing an understatement of Cardinal's account receivables and its outstanding debt in violation of GAAP.

Plaintiffs contend that in connection with the change in revenue recognition related to Pyxis, Cardinal Defendants engaged in a securitization transaction in FY 2002 involving its sale-lease portfolio that is not a "true sale" under SFAS standards.  *See supra* note 94.  Plaintiffs argue that to sell Pyxis receivables, Cardinal created a wholly-owned special purpose vehicle ("SPV"), Pyxis Funding LLC, and that through that SPV, Cardinal sold approximately $150 million in Pyxis sales-type lease receivables during 1Q 2002, all of which were sold *with*

SEC regulations due to its inadequate internal controls; (i) Cardinal had ineffective internal mechanisms to dissuade Defendant misconduct; and (3) Cardinal's financial statements artificially inflated the net income and earnings of Cardinal and caused Plaintiffs to suffer significant financial losses.

The Plaintiffs' Complaint identifies all of Cardinal Defendants' allegedly false and misleading statements occurring over the course of the Class Period in 105 pages.  *See* Complaint ¶¶ 55-238.  The Plaintiffs allege that Cardinal Defendants made these misleading statements in forward-looking statements, press releases, conference calls, and corporate documents, and they aver that analysts relied on these statements in their reports to the market.  The Plaintiffs' Complaint is meticulously detailed.

On August 22, 2005, the Individual Defendants, and Defendant Cardinal, jointly brought a Motion to Dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6), staying all discovery pursuant to 15 U.S.C. § 78u-4(b)(3)(B).[32]  Also on August 22, 2005, Defendant E&Y brought its own Motion to Dismiss the Complaint.  Defendants deny the existence of a scheme to defraud and maintain that Cardinal's drop in stock value was primarily due to the Company's transition from a B+H to an FFS model.  Further, they assert that Plaintiffs fail to plead scienter

---

*recourse*.  Plaintiffs allege that because the risk of non-collection remained with Cardinal, in the form of Pyxis Funding LLC (a Cardinal subsidiary), the proper conservative accounting treatment required Cardinal to treat the transaction as a "secured borrowing," accounted for on the Company's balance sheet.  Further, Plaintiffs aver that Cardinal's classification of the sale of the Pyxis receivables as an *off-balance sheet transaction* violated GAAP and allowed Cardinal to fraudulently understate both its accounts receivables and outstanding debt.

[32]The rule reads, "(B) In any private action arising under this chapter, all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party."  *See* 15 U.S.C. § 78-4(b)(3)(B).

and do not connect Defendants' alleged fraud to any true market loss. The Court conducted oral argument on these motions on February 6, 2006.

### III. STANDARD OF REVIEW

It is settled law that a court may not grant a defendant's Rule 12(b)(6) motion to dismiss unless it appears beyond doubt that the claimant can prove no set of facts supporting its claim which would entitle it to relief. *See H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 249-50 (1989); *Windsor v. The Tennessean,* 719 F.2d 155, 158 (6th Cir. 1983). The purpose of Rule 12(b)(6) is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true. *See Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993).

In considering a Rule 12(b)(6) motion to dismiss, the Court must assume as true all well-pleaded facts, and must draw all reasonable inferences in favor of the non-movant. *Murphy v. Sofamor Danek Group, Inc.,* 123 F.3d 394, 400 (6th Cir. 1997). "In the securities context, Rule 12(b)(6) dismissals are difficult to obtain because the cause of action deals primarily with fact-specific inquiries such as materiality." *See Grossman v. Novell, Inc.*, 120 F.3d 1112, 1118 (10th Cir. 1997) (internal quotations and citations omitted). Nevertheless, "courts do not hesitate to dismiss securities claims pursuant to Rule 12(b)(6) where the alleged misstatements or omissions are plainly immaterial, or where the plaintiff has failed to allege with particularity, circumstances that could justify an inference of fraud under Rule 9(b)." *Id.* (citations omitted). The issue in reviewing the sufficiency of a complaint is not whether the plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support its claim. *See Scheuer v. Rhodes*, 416 U.S. 232 (1974).

-26-

## IV. ANALYSIS

### *I. Plaintiffs' Motion to Strike Defendants' Appendices and Any Arguments Arising Therefrom*

The parties are not in agreement as to what materials outside the Complaint the Court may

properly consider in ruling on Cardinal Defendants' motion to dismiss. Cardinal Defendants have

attached 70 appendices to their brief in support of their Motion to Dismiss. In response, Plaintiffs

have filed a Motion to Strike certain of these documents arguing that they are not properly subject

to judicial notice.[33] Because these matters relate to the general issue of what documents (if any)

outside the pleadings the Court may consider in ruling upon Cardinal Defendants' 12(b)(6)

motion, the Court will address them first before proceeding to the substantive merits of the

motions to dismiss.

#### A. Standard for Motion to Strike

Rule 12(f) permits the court to strike from a pleading "any insufficient defense or any

redundant, immaterial, impertinent, or scandalous matter." FED. CIV. R. PROC. 12(f).[34] The Sixth

_____

[33]Plaintiffs have moved to strike the following exhibits and any references Defendants make to them: (1) Appendix # 58: December 28, 2001 Form 10-K of AmerisourceBergen; (2) Appendix # 59: 2003 Amerisource Bergen Annual Report; (3) Appendix # 60: June 10, 2004 Form 10-K of McKesson Corporation; (4) Appendix # 61: August 17, 2001 WR Hambrecht & Co. analyst report; (5) Appendix # 62: August 20, 2001 Credit Suisse/First Boston analyst report; (6) Appendix # 66: July 1, 2004 Baird analyst report; (7) Appendix # 64: October 24, 2003 Baird analyst report on McKesson; (8) Appendix # 65: January 23, 2004 Baird analyst report on McKesson; (9) Appendix # 67: September 14, 2004 A.G. Edwards analyst report; (10) Appendix # 70: Amy Tsao, "A Common Cold for Drug Distributors? News of Cardinal Health's poor earnings surprised the Street, which fears rivals McKesson and AmerisourceBergen may not be immune," *Business Week Online*, July 2, 2004.

[34]Rule 12(f) states:

Upon motion made by a party before responding to a pleading or, if no responsive pleading is permitted by these rules, upon motion made by a party within 20 days after the service of the pleading upon the party or upon the court's own initiative at any time,

Circuit has held that "because of the practical difficulty of deciding cases without a factual record it is well-established that the action of striking a pleading should be sparingly used by the courts. It is a drastic remedy to be resorted to only when required for the purposes of justice."[35]  *Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir. 1953) (citations omitted). Though many courts disfavor motions to strike for fear that they serve only to delay, they can also expedite cases by removing "unnecessary clutter."  *See Heller Fin., Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1293 (7th Cir. 1989).

### 1. Judicial Notice of Public Documents

When considering a motion to dismiss, courts should generally not consider matters outside the pleadings.  *Weiner v. Klais & Co.*, 108 F.3d 86, 88-89 (6th Cir. 1997).  In securities fraud cases, however, courts may consider the full text of SEC filings, prospectuses, and analysts' reports regardless of whether they are attached to a plaintiff's complaint (in part or in whole) as long as they are *integral* to statements within the complaint.  *See Albert Fadem Trust*, 334 F. Supp. 2d 985, 995 (S.D. Ohio 2004) (Marbley, J.); *see also, In re Royal Appliance Sec. Litig.*, 1995 WL 490131, at *2 (6th Cir. Aug. 15, 1995) (emphasis added); *see also, In re Keithley Instruments, Inc. Sec. Litig.*, 268 F. Supp. 2d 887 (N.D. Ohio 2002).  Furthermore, a court may

---

the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.

FED. RULE CIV. PRO. 12(f).

[35]Courts interpret "the interests of justice" to include such concerns as ensuring speedy trials, trying related litigation together, and having a judge who is familiar with the applicable law try the case." *See Heller Fin., Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1293 (7th Cir. 1989).

consider any matters of which a court may take judicial notice without converting a party's motion to dismiss into a motion for summary judgment. *Id.* (referencing *Weiner*, 108 F.3d at 89); *see also Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999)).

Whether a document is considered integral is within the court's discretion and is guided by Federal Rule of Evidence 201.[36]  *In re UnumProvident Corp. Sec. Litig.*, 2005 WL 2206727 (E.D. Tenn. Sept. 12, 2005) (finding that a court may take judicial notice of a statement if the court finds that its reliability is "not subject to reasonable dispute") (referencing *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 360-61 (6th Cir. 2001)).  When considering public documents in the context of a motion to dismiss, however, the court may not accept a document to decide facts that are in dispute.  *See In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 592 (N.D. Ohio 2004) (citing *Hennessy v. Penril Datacomm Networks*, 69 F.3d 1344, 1354-55 (7th Cir. 1995) (holding district court properly refused to take judicial notice of Form 10-K to decide a fact in dispute)).

## 2. Appendices ## 58, 59, 60, 64, 65, 70

The Court agrees that Plaintiffs do not reference the contents of Cardinal Defendants' Appendices ## 58, 59, 60, 64, 65, and 70 in the Complaint.  Therefore, this Court may take judicial notice of these documents *only* if it finds: (1) that they are public documents integral to the parties' dispute; and (2) that the documents do not ask the Court to adopt disputed facts as

---

[36]Federal Rule of Evidence 201 permits the Court to take judicial notice of facts that are "not subject to reasonable dispute in that [they are] either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  FED. RULE EVID. 201(b).  A district court *must* take judicial notice "if requested by a party and supplied with the necessary information."  *Id*. at 201(d).  A court may take such notice "at any stage of the proceeding."  *Id*. at 201(f).

true.  *See Keithley Instruments*, 268 F. Supp. 2d at 887.

Appendixes ## 58, 59, and 60 consist of the annual reports and Form 10-K's of

AmerisourceBergen ("AmBerg"), and McKesson Corporation for certain years within the Class

Period.  *See supra* note 33.   Appendixes ## 64, and 65 are certain Baird analysts' reports on

McKesson Corporation ("McKesson").  *See id*.  Cardinal Defendants submit the Appendixes as

evidence of widespread financial problems faced by the drug distribution business during the

Class Period.  AmBerg and McKesson are Cardinal's two top competitors; therefore, Cardinal

asserts that the companies' financial situations, as presented in their annual reports and 10-K's,

provide support for Cardinal Defendants' theory that a general market downturn, not fraudulent

misstatements, caused Cardinal's stock price to drop.

Courts may consider the full text of SEC filings, prospectuses, and analysts' reports

regardless of whether they are attached to a plaintiff's complaint (in part or in whole) as long as

they are *integral* to statements within the complaint.  *See Albert Fadem*, 334 F. Supp. 2d at 995

(emphasis added).  Such documents are generally "capable of accurate and ready determination

by resort to sources whose accuracy cannot reasonably be questioned." *see* FED. RULE EVID.

201(b).  Because this Court finds Cardinal Defendants' theory that Cardinal's stock drop was due

to a general downturn in the drug distribution market integral to the parties' dispute, the Court

**DENIES** Plaintiffs' motion to strike Appendices ## 58, 59, 60, 64, and 65 and any arguments

arising therefrom.

Appendix # 70 is a Business Week Online article from July 2, 2004.  Among other things,

the article cites the industry switch from a B+H model to a JIT model as being responsible for the

drop in Cardinal's stock price, as well as the downward trend of both AmBerg and McKesson's

stock prices. The article reads:

> Beginning in late 2003, the [drug distribution] industry pushed to change the payment system for distributing medical products (drugs, devices, and other supplies) to customers (hospitals, doctors' offices, etc.). Wholesalers essentially want "fee-for-service" deals with manufacturers that would create less volatility in profit margins. However, the switchover to such contracts could remain problematic. The dramatic hit to Cardinal suggests other wholesalers are pretty deep in the woods, . . .Cardinal had expected many customers to have agreed to [the] new contracts by now. Instead, the majority are still in negotiations.

*See* Amy Tsao, "A Common Cold for Drug Distributors? News of Cardinal Health's poor earnings surprised the Street, which fears rivals McKesson and AmBerg may not be immune," *Business Week Online*, July 2, 2004.

In the context of a motion to dismiss, a court may not accept an otherwise reliable public document to decide facts that are in dispute. *See FirstEnergy Corp.*, 316 F. Supp. 2d at 592. Cardinal Defendants rely on Tsao's argument that the switch from a B+H business model to a FFS business model caused financial problems for *all* drug distribution companies, not just Cardinal. Plaintiffs, however, contend that Cardinal's stock price dropped because of the Company's fraud, not because of a general market downturn. As such, Cardinal Defendants urge the Court to accept the truth of the matters asserted in the article to decide factual disputes in their favor. Because this is an improper use of documents, the Court **GRANTS** Plaintiffs' motion to strike Appendix # 70 and any arguments related thereto.

### 3. Appendices ## 61, 62, 66, 67

Appendices ## 61, 62, 66, and 67 are various analysts' reports regarding the financial outlook of Cardinal. *See supra* note 33. In considering a motion to dismiss, a court may not "assume the truth of the statements cited by defendants [in Appendices], or accept the inferences asserted by defendants . . .based on [those statements]." *See FirstEnergy Corp.*, 316 F. Supp. 2d

at 592.  Plaintiffs concede that they cite Appendices ## 61, 62, 66, and 67 in their Complaint.

They contend, however, that the Court may examine these exhibits "for the sole purpose of

determining whether particular statements were made," and posit that Cardinal Defendants

unlawfully ask the Court to assume the truth of the statements they cite in the Appendixes.

Plaintiffs argued that Cardinal's fraud was the impetus for the Company's significant drop

in stock price.  Cardinal Defendants cite the analysts' reports to counter that "financial analysts

long have lauded Cardinal's management team and Cardinal's strong market positions."

Plaintiffs aver that this statement directly contradicts Plaintiffs' allegations that Cardinal

Defendants' malfeasance stunned investors and materially impacted the Company's earnings.

Nevertheless, because Plaintiffs cited to the Appendixes in their Complaint, and because the

dispute over the effect of Cardinal's fraud is certainly integral to the instant litigation, the Court

**DENIES** Plaintiffs' motion to strike these appendixes and any arguments related thereto.

### 4. Jensen Motion at 8-9

In addition to the Plaintiffs' motion to strike the foregoing appendixes, Plaintiffs also ask

the Court to strike Cardinal Defendants' argument in Defendant Jensen's Motion to Dismiss

asserting that Defendant Jensen voluntarily resigned from Cardinal.  In their Complaint, Plaintiffs

allege that a source informed them that Jensen was *forced* to resign from Cardinal as a result of

his involvement in the Company's accounting fraud.

After Congress' enactment of the PSLRA, in assessing whether a plaintiff has offered

"facts giving rise to a *strong inference*" of defendants' *scienter*, "plaintiffs are entitled only to the

most plausible of competing inferences."  *Id*.; *see Miller v. Champion Enter. Inc.*, 346 F.3d 660,

673 (6th Cir. 2003) (citing *Helwig*, 251 F.3d at 553).  Both sides present plausible arguments as to

-32-

the reasons Jensen left Cardinal.  Therefore, to advance the purpose of the PSLRA, the Court should not adopt Plaintiffs' view of the facts without also considering the merits of Cardinal Defendants' assertions.  Therefore, without adopting either side's assessment of why Jensen left Cardinal, the Court **DENIES** Plaintiffs' motion to strike the contents of Jensen Motion at 8-9, allowing both sides' arguments to remain on the record.[37]

### II. Cardinal Defendants' Motion to Dismiss

### A. Section 10(b) and Rule 10b-5 Claims

Cardinal Defendants first contend that the Court must dismiss Plaintiffs' claims pursuant to Section 10(b) of the Exchange Act on the following grounds: (1) Plaintiffs' fail to plead that any Defendant possessed scienter, particularly in light of the heightened pleading standard mandated by the PSLRA, 15 U.S.C. § 78u-4 and controlling Sixth Circuit law; (2) the Complaint does not state a claim based upon any of Cardinal's alleged accounting misstatements; (3) the Complaint fails to plead loss causation as to any of the seven "improprieties" they enumerate in the Complaint; and (4) the Complaint does not allege particularized facts sufficient to state a claim based upon Cardinal's transition to a new business model.

Section 10(b)[38] of the Exchange Act and Rule 10b-5 promulgated thereunder prohibit

---

[37]The Court also notes that, though Sixth Circuit precedent on the issue is unclear, both the Third and the Fifth Circuit have found that resignations of key officers from defendant corporations are insufficient to show that those officers acted with the requisite scienter to commit the alleged securities fraud.  *See In re Great Atl. & Pac. Tea Co. Inc. Sec. Litig.*, 103 Fed. Appx. 465 (3d Cir. 2004); *see also, Abrams v. Baker Hughes, Inc.*, 282 F.3d 424, 434 (5th Cir. 2002).  Considering the above precedent, whether Jensen resigned from Cardinal *voluntarily* is not significant to the Court's determination of whether the Plaintiffs adequately pled facts raising a strong inference of Cardinal Defendants' scienter.

[38]According to the Supreme Court, "the basic aim of the antifraud provisions [in Section 10(b)] is to 'prevent rigging of the market and to permit operation of the natural law of supply

"[f]raudulent, material misstatements or omissions in connection with the sale or purchase of a

security." *See PR Diamonds v. Chandler*, 91 Fed. Appx. 418, 426 (6th Cir. 2004) (citing *Morse*

*v. McWhorter*, 290 F.3d 795, 598 (6th Cir. 2002)).  In order to state a claim under Section 10(b)[39]

of the Exchange Act and Rule 10b-5[40] promulgated thereunder, a plaintiff must allege: (1) that

---

and demand.'"  *See Ernst & Ernst*, 425 U.S. at 205 n. 25.

> [39]Section 10 of the Exchange Act provides:
>
> It shall be unlawful for any person, directly or indirectly, by the use of any means or
> instrumentality of interstate commerce or of the mails, or of any facility of any national
> securities exchange. . .
> (b) To use or employ, in connection with the purchase or sale of any security registered
> on a national securities exchange or any security not so registered, any manipulative or
> deceptive device or contrivance in contravention of such rules and regulations as the
> Commission may prescribe as necessary or appropriate in the public interest or for the
> protection of investors.

15 U.S.C. § 78j.

> [40]Rule 10b-5, prescribed by the SEC under Section 10(b) of the Exchange Act, provides:
>
> It shall be unlawful for any person, directly or indirectly, by the use of any means or
> instrumentality of interstate commerce, or of the mails or of any facility of any national
> securities exchange,
> (a) To employ any device, scheme, or artifice to defraud
> (b) To make any untrue statement of a material fact or to omit to state a material fact
> necessary in order to make the statements made, in the light of the circumstances under
> which they were made, not misleading, or
> ©) To engage in any act, practice, or course of business which operates or would operate
> as a fraud or deceit upon any person, in connection with the purchase or sale of any
> security.

17 C.F.R. § 240.10b-5.  The scope of Rule 10b-5 is "coextensive" with the coverage of Section
10(b).  *See United States v. O'Hagan*, 521 U.S. 642, 651 (1997).  By enacting these rules,
"Congress tried to 'substitute a philosophy of full disclosure for the philosophy of *caveat emptor*
and thus to achieve a high standard of business ethics in the securities industry.'" *See Affiliated
Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).  Further, the Supreme Court has
indicated that the statute should be "construed 'not technically and restrictively, but flexibly to
effectuate its remedial purposes.'" *See id.* at 151.

defendants made a false statement or omission of material fact; (2) in connection with a purchase or sale of securities; (3) scienter; (4) reliance; and (5) damages. *See In re Comshare, Inc. Secs. Litig.*, 183 F.3d 542, 548 (6th Cir. 1999).

Prior to the enactment of the PSLRA, the pleading requirements for stating a claim under Section 10(b) were governed by Federal Rule of Civil Procedure 9(b). *See In re Telxon Sec. Litig.*, 133 F. Supp. 2d, 1025 (N.D. Ohio 2000) (citing *DiLeo v. Ernst & Young*, 901 F. 2d 624, 627 (7th Cir. 1990)). Rule 9(b) provides: "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally." FED. R. CIV. PRO. 9(b).

Originally, the Rule 9(b) heightened pleading requirement (requiring a plaintiff to plead fraud with particularity) was meant to curb any possible vexatious litigation under Rule 10b-5. *See Comshare*, 184 F.3d at 548 (citing *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 739-44 (1975). In 1995, however, Congress concluded that Rule 9(b) had "not prevented the abuse of the securities laws by private litigants." *Id.* (citing H.R. Conf. Rep. No. 104-369 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 818).[41] "Indeed, Congress echoed the concerns expressed by the Supreme Court in *Blue Chips*, noting that frivolous securities fraud litigation 'unnecessarily increase[s] the cost of raising capital and chill[s] corporate disclosure [and is] often based on

---

[41]"Congress echoed the concerns expressed by the Supreme Court in *Blue Chip Stamps* [*v. Manor Drug Stores*, 421 U.S. 723, 739 (1975)] noting that frivolous securities fraud litigation 'unnecessarily increase[s] the cost of raising capital and chill[s] corporate disclosure, [and is] often based on nothing more than a company's announcement of bad news, not evidence of fraud.'" *See Comshare*, 183 F.3d at 548 (alterations in original) (quoting S.Rep. No. 104-98 (1994), reprinted in 1995 U.S.C.C.A.N. 679, 690).

nothing more than a company's announcement of bad news, not evidence of fraud." *Id.* (citing S. Rep. No. 104-98 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 690). Thus, on December 22, 1995, Congress passed the PSLRA,[42] which, amends the Exchange Act and applies to private class actions brought pursuant to the Federal Rules of Civil Procedure. *See* 15 U.S.C. §§ 77k, 77l, 77z-1, 77z-2, 78a, 78j-1, 78t, 78u, 78u-4, 78u-5.

Adding to the Rule 9(b) requirement that plaintiffs state their fraud allegations with particularity, the PSLRA requires a plaintiff's to, "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission, or made on information and belief, . . . [to] state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

---

[42]The PSLRA states, in relevant part:

> (b) Requirements for securities fraud actions
>   (1) Misleading statements and omissions.
>   In any private action arising under this chapter in which the plaintiff alleges that the defendant -
>   (A) made an untrue statement of a material fact; or
>   (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.
>   (2) Required state of mind.
>   In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b) (2005). Further, the PSLRA provides that if a plaintiff fails to meet the above requirements, a court may, on any defendant's motion, dismiss the complaint. *See Id.* § 78u-4(b)(3).

**1. Whether the Complaint Sufficiently Alleges Facts
Establishing a "Strong Inference" of Scienter**

Courts consider scienter the most difficult element of a 10(b) and 10b-5 claim for

plaintiffs to plead under the PSLRA; therefore, should the Court find that Plaintiffs' Complaint

does not adequately plead the scienter element of their Section 10(b) and Rule 10b-5 claims, it

must grant Cardinal Defendants' motion to dismiss. *See PR Diamonds*, 91 Fed. Appx. at 426.

The parties' dispute centers on whether the Plaintiffs' Complaint adequately pleads scienter. As

such, before getting to the merits of Plaintiffs' allegations, the Court will first examine the

meaning of "scienter" in the securities fraud setting. If the Court finds that the Plaintiffs have

established scienter, then it may consider whether Plaintiffs have adequately pled the other

elements of their prima facie case.

**a. "Scienter" under the PSLRA**

The Supreme Court has defined "scienter" as "a mental state embracing intent to deceive,

manipulate, or defraud." *Ernst & Ernst*, 425 U.S. at 193 n. 12. In securities fraud claims based

on statements of present or historical fact – such as the claims Plaintiffs bring in this case –

scienter consists of *knowledge* or *recklessness*. *PR Diamonds*, 91 Fed. Appx. at 426 (citing

*Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001) (en banc)). The Sixth Circuit defines

"recklessness" as "highly unreasonable conduct which is an extreme departure from the standards

of ordinary care. While the danger need not be known, it must be at least so obvious that any

reasonable man would have known of it." *See id*. (citing *Mansbach v. Prescott, Ball & Turben*,

598 F.2d 1017, 1025 (6th Cir. 1979)). Recklessness is "a mental state apart from negligence and

akin to conscious disregard." *Id*. (citing *Comshare*, 183 F.3d at 550).

Next, the Court must examine the special requirements for pleading scienter in federal

-37-

securities fraud claims such as this. As with all fraud claims, Federal Rule of Civil Procedure 9(b) applies to pleading a defendant's state of mind, allowing that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." *PR Diamonds*, 91 Fed. Appx. at 426. Through the passage of the PSLRA, however, Congress heightened the standard of pleading scienter in a securities fraud case. *See supra* Part IV.*II*.A.1.a. The PSLRA provides that if a plaintiff fails to meet its requirements, a court may, on any defendant's motion, dismiss the complaint. *See* 15 U.S.C. § 78u-4(b)(3); *PR Diamonds*, 91 Fed. Appx. at 427. As courts have noted, "the PSLRA did not change the scienter that a plaintiff must prove to prevail in a securities fraud case but instead changed what a plaintiff must *plead* in his complaint in order to survive a motion to dismiss." *See Comshare*, 183 F.3d at 548-49.

As the foregoing authorities make clear, a plaintiff may survive a motion to dismiss by pleading with particularity facts giving rise to a strong inference that the defendant acted with knowledge or recklessness. *See PR Diamonds*, 91 Fed. Appx. at 427. In other words, not only must the complaint make particular factual allegations but the inference of scienter which those allegations generate must be strong. *Id.*; *see Comshare*, 183 F.3d at 550 (citing *Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1024 (6th Cir. 1979) (emphasis added)). In *Helwig*, the Sixth Circuit provided a definitive explanation of the meaning of a "strong inference," instructing:

> Inferences must be reasonable and strong- but not irrefutable. "Strong inferences" nonetheless involve deductive reasoning; their strength depends on how closely a conclusion of misconduct follows from a plaintiff's proposition of fact. Plaintiffs need not foreclose all other characterizations of fact, as the task of weighing contrary accounts is reserved for the fact finder. Rather, the "strong inference" requirement means that plaintiffs are entitled only to the *most plausible* of competing inferences.

251 F.3d at 553 (emphasis added). The PSLRA does not change the Rule 12(b)(6) maxim that

-38-

when an allegation is capable of more than one inference, it must be construed in the plaintiff's favor. *Id.* ("Our willingness to draw inferences in favor of the plaintiff remains unchanged by the PSLRA."). The "strong inference" requirement, however, means that a plaintiff is entitled to only the most plausible of competing inferences. *Id.*

Moreover, the *Helwig* Court enumerated factors which, though not exhaustive, may be probative of scienter in securities fraud actions:

(1) insider trading at a suspicious time or in an unusual amount;
(2) divergence between internal reports and external statements on the same subject;
(3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;
(4) evidence of bribery by a top company official;
(5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;
(6) disregard of the most current factual information before making statements;
(7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;
(8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and
(9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

251 F.3d at 552 (citing *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 196 (1st Cir. 1999)).[43]

### b. Applying the Scienter Standard

The Sixth Circuit employs a "totality of the circumstances analysis" whereby the facts argued *collectively* must give rise to a strong inference of at least recklessness. *See PR Diamonds*, 91 Fed. Appx. 427 (citing *Telxon*, 133 F. Supp. 2d at 1026 ("Thus, the Sixth Circuit employs a form of 'totality of the circumstances' analysis; this Court, accordingly, declines to examine plaintiffs' allegations in piecemeal fashion, and will instead assess them collectively to

---

[43]While the Sixth Circuit qualified that it found this list "while not exhaustive, at least helpful in guiding securities fraud pleading," it acknowledged that a plaintiff seeking to survive a motion to dismiss should draw upon these factors where applicable. *Helwig*, 251 F.3d at 552.

determine what inferences may be drawn therefrom.")).

Plaintiffs maintain that the Complaint in its entirety, establishes a strong inference that, throughout the Class Period, the Cardinal Defendants either knew or were at least reckless in disregarding serious accounting improprieties at Cardinal and the effect that such improprieties had on the Company's financial condition.  Specifically, Plaintiffs argue that, when considering the following factors in their totality, a strong inference of the Defendants' scienter arises: (1) the nature and magnitude of the accounting improprieties at Cardinal; (2) the Individual Defendants' access to Cardinal's financial information by virtue of their positions at the Company; (3) the fact that the accounting improprieties occurred in "key areas of focus"; (4) the Individual Defendants' motives and opportunities to commit fraud; and (5) other red flags potentially signaling Cardinal's accounting errors.

Accordingly, in the following discussion, this Court examines each of Plaintiffs' scienter allegations.  *See PR Diamonds*, 91 Fed. Appx. at 429.  As the Sixth Circuit has noted, "recklessness in securities fraud is an untidy case-by-case concept, [which] necessarily involves a sifting of allegations in the complaint."  *Id*. (citing *Helwig*, 251 F.3d at 551 (citing *Mansbach*, 598 F.2d at 1025)).  Accordingly, this Court "sifts" Plaintiffs' allegations individually, and then aggregates the "nuggets of inference" they generate, concluding in the end that a strong inference of scienter arises and finding that Plaintiffs have pled facts that create a strong inference of scienter.

### i. Accounting Improprieties

Plaintiffs contend that their allegations of Cardinal's improper accounting practices and internal control deficiencies comprise circumstantial evidence supporting a strong inference of the

Defendants' scienter. The alleged accounting improprieties include: (1) the mis-classification of bulk deliveries as operating revenue in FY 2001 through FY 2003; (2) the premature recognition of $22 million gained from the Vitamin Litigation settlement in FY 2002; (3) the decision to change Cardinal's revenue recognition policy for its Pyxis business in FY 2002; (4) balance sheet reserve and accrual adjustments in the Company's 2004 10-K; (5) as announced in the 2004 10-K, the Company's decision to change its method of accounting for cash discounts received from vendors for prompt payment; (6) the mis-classification of an unidentified amount of expenses as "special charges" related to mergers and acquisitions; and (7) improper off-balance sheet transactions.

In *Comshare*, the Sixth Circuit held that GAAP violations are, by themselves, insufficient to establish scienter for a securities fraud claim. 183 F.3d at 553. Nonetheless, in later cases, the Sixth Circuit recognized that an inference of knowledge or recklessness may be drawn from allegations of accounting violations that are so "simple, basic, and pervasive in nature, and so great in magnitude, that they should have been obvious to a defendant." *See PR Diamonds*, 91 Fed. Appx. at 430 (finding that plaintiffs' allegations as to defendants' GAAP violations were of "such a great magnitude" that they rose to create a strong inference of defendants' scienter); *FirstEnergy Corp.*, 316 F. Supp. 2d at 598 (the fact that defendants' accounting practices resulted in such enormous overstatements of revenue for several years further supported an inference of scienter). In addition, in *PR Diamonds*, the court acknowledged that many other courts consider GAAP violations relevant to establishing scienter when those violations were significant. *See In re SmarTalk Teleserv., Inc. Sec. Litig.*, 124 F. Supp. 527, 539 (S.D. Ohio 2000) (finding that when viewed in light of the magnitude of the overstatements, the nature of the accounting

-41-

principles violated, and the importance of the contracts to which these principles were applied, plaintiffs' allegations of GAAP violations rose to create a strong inference of scienter); *Telxon*, 133 F. Supp. 2d at 1031 (the nature and number of defendants' accounting manipulations, when coupled with the magnitude of the difference between the originally reported financial disclosures and their restatements, convinced the court that the plaintiffs had adequately alleged scienter); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 644 (E.D. Va. 2000) ("But this is not to say that a misapplication of accounting principles or a restatement of financials can never take on significant inferential weight in the scienter calculus; to the contrary, when the number, size, timing, nature, frequency, and context of the misapplication or restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor of scienter."); *see In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F. Supp. 2d 290, 294 (S.D.N.Y. 1999) ("[P]laintiffs allege 'in your face facts,' that cry out, 'how could [defendants] not have known that the financial statements were false.'"); *Rehm v. Eagle Fin. Corp*, 954 F. Supp. 1246, 1256 (N.D. Ill. 1997) (finding that plaintiffs' allegations about defendants' GAAP violations were of great enough magnitude that, when combined with the other available circumstantial evidence, they raised a strong inference of defendants' scienter).

First, Cardinal Defendants contend that despite the trend signaled by *PR Diamonds*, *Telxon*, and its progeny, GAAP violations alone do not constitute scienter.  Nevertheless, Cardinal Defendants argue that should this Court consider the Cardinal Defendants' GAAP violations in its scienter analysis, many of Plaintiffs' allegations do not even amount to actual

GAAP errors, altogether negating any inference of scienter.[44]  Plaintiffs, counter, however, that Cardinal's GAAP misstatements were *so* egregious in terms of "number, size, timing, frequency and context," that they are more than sufficient to create a strong inference of scienter.

Although *Comshare* sets forth the prevailing view in this Circuit that GAAP violations do not ipso facto establish scienter, as it is factually inapposite, *Comshare* does not control here.  *See id*. at 542.  *Comshare* was a consolidated securities fraud action arising from the company's restatement of certain financial statements after it had acknowledged that its original financial statements had contained a number of recognition errors.  *See id*.  The errors were based on a British subsidiary's violation of company policy and GAAP principles that proscribed the inclusion in financial statements of revenue from sales that were not assured.  *See id*.[45]  The subsidiary had been recognizing revenues from sales that were conditioned by side letter agreements allowing the buyer to back out of the sale under certain circumstances.  *See id*.  When Comshare discovered the undisclosed agreements, it was forced to announced that it had

---

[44]For instance, Cardinal Defendants contend that Cardinal's decision to classify its revenues as Bulk Deliveries or Operating Revenue based on the "24-hour" rule was not a GAAP violation, but merely the misapplication of a valid GAAP method.  As such, they argue that the market was *not* misled as to whether Cardinal followed GAAP.

[45]After reviewing the subsidiary's audit, Comshare disclosed that "it initiated a detailed review 'after discovery of letters setting forth conditions to certain orders in the United Kingdom, which the Company had not been made aware of at the time the revenue was recognized,'" and that it was now aware of approximately $4 million in such orders.  *Comshare*, 183 F.3d at 546.  "After this announcement, the price of Comshare stock fell from 18.5 on August 6, 1996 to a trading low of 10.75 on August 7, 1996, and eventually closed at [11.9]."  *Id*.  In its Form 10-K for 1996, Comshare stated: "In connection with the Company's [FY 1996] year end audit, the Company discovered side letters setting forth conditions to certain foreign orders in violation of the Company's revenue recognition policies. . . Corrective actions have been taken, including management changes, personnel terminations and other disciplinary actions and the establishment of new orders procedures."  *Id*.

overstated its recognized revenue causing the market value of its stock to drop significantly. *See id*.

The plaintiff-shareholders brought claims of securities fraud under 10(b) based on Comshare's accountings errors in addition to bare allegations demonstrating the company's motive and opportunity to commit fraud. *See id*. The district court, however, granted the defendants' motion to dismiss, finding that the plaintiff-shareholders had failed to plead facts establishing that the subsidiary's GAAP violations constituted "knowing misrepresentation" by the defendants. *Id*. at 554. The court of appeals affirmed the district court's ruling, holding, "[p]laintiffs have failed to plead facts that show that the revenue recognition errors at Comshare's UK subsidiary should have been obvious to Comshare or that Comshare consciously disregarded 'red flags' that would have revealed the errors prior to their inclusion in public statements." *Id*.

In this case, Plaintiffs' allegations arise from Cardinal's own GAAP violations, as opposed to a recently acquired subsidiary's violations, like those alleged in *Comshare*. 183 F.3d at 554. Though it is conceivable that Comshare was unaware of the details of agreements entered into by a foreign subsidiary, it is less likely that Cardinal was unaware that it had consistently manipulated its 24-hour rule to overstate its Operating Revenue consistently for *four years* to create inflated Operating Revenues of approximately *$26 billion*. Further, in *Comshare*, aside from their claims based on the subsidiary's accounting violations, plaintiff-shareholders' only other allegations were based on Comshare's "motive" and "opportunity" to commit fraud, which in isolation, *cannot* establish a strong inference of recklessness. *See id*. at 549 (". . . we conclude that plaintiffs may plead scienter in § 10b and 10b-5 cases by alleging facts giving rise to a strong inference of recklessness, but *not* by alleging facts merely establishing that a defendant had the

-44-

motive and opportunity to commit securities fraud.") (emphasis added).  In the case sub judice,

however, Plaintiffs have alleged 200 pages of circumstantial evidence in addition to allegations of

motive and opportunity, making their case stronger than that of the Comshare plaintiffs.

Further, in addition to being distinguishable from *Comshare*, the facts of the instant

litigation resemble more closely those of cases in which courts found that, when combined with

plaintiffs' other allegations, GAAP violations provided the strong inference of recklessness

required to establish scienter.  *MicroStrategy,* 115 F. Supp. 2d at 620[46] (finding allegations that

defendants had overstated the company's revenues by $66 million over *three* years were

egregious enough to support an inference of scienter); *Telxon*, 133 F. Supp. 2d at 1029 (finding

overstatement of revenues by over $20 million in a single quarter and the fact that company

reported profits when it should have reported losses to provide a strong inference of scienter);

*Rehm*, 954 F. Supp. at 1246; *SmarTalk*, 124 F. Supp. 2d at 539.

The Plaintiffs' allegations are parallel to those of plaintiffs in *SmarTalk*.  124 F. Supp. 2d

at 527.  In *SmarTalk*, plaintiff-shareholders sued defendant SmarTalk alleging that, over the

course of two years, the company's officers and directors had overly-inflated SmarTalk's stock

price by presenting a false picture of the company through its SEC filings, press releases, and

conference calls with analysts and investors.  *See id*. at 531.  The plaintiffs alleged a number of

accounting violations, which they listed in their complaint.[47]  *Id*. at 532.  Further, plaintiffs

---

[46]Though *MicroStrategy* is a non-binding Eastern District of Virginia case, because the magnitude of the accounting errors alleged are comparable to those in this case, this Court is persuaded by the *MicroStrategy* court's analysis.  *See* 115 F. Supp. 2d.

[47]In summary, plaintiff-shareholders alleged the following accounting errors: (1) improper categorization of at least $88.9 million of intangible assets purchased during Cardinal's acquisition efforts; (2) "big bath" accounting that allowed SmarTalk to inflate later period

-45-

alleged that the SmarTalk defendants engaged in insider trading of 2.7 million shares of stock to raise $63 million in profits for themselves.  Finally, during the relevant time period, SmarTalk acquired at least two companies and raised $180 million in capital through a "convertible notes offering and an equity offering."  *See id*. at 533.

The court held that the plaintiffs "adequately alleged widespread and varied accounting errors that led to a drastic overstatement of  SmarTalk's financial success," supporting an inference of scienter.  *Id*. at 540; *see, e.g. Rehm*, 954 F. Supp. 1255-56 ("the more serious the error, the less believable are [corporate] defendants' protests that they were completely unaware of [the corporation's] true financial status and the stronger is the inference that defendants must have known about the discrepancy").  Moreover, the court held that "irrespective of whether the [defendants'] accounting errors violated GAAP, the substance of the alleged errors smacks of fraud, and strengthens the inference of scienter."  *Id*. at 540.

As in *SmarTalk*, Plaintiffs here make a number of detailed violations based on Cardinal's

_____

earnings by improperly transferring expenses incurred in these later periods back into the charge preciously recorded as capital expenses rather than operating expenses; (3) accounting for acquisitions in 1997 involving the issuance of SmarTalk shares by improperly using the share price on the day of the announcement, rather than the three-day average of the share prices spanning the announcement of the transaction resulting in a lower acquisition cost to SmarTalk - thereby reducing amortized goodwill expenses by $7 million; (4) improperly reporting as capital expenses at least $10.9 million in marketing expenses paid to manufacturers and retailers to carry SmarTalk's product thereby spreading the expense associated with these items over a number of years rather than properly incurring those expenses in FY 1997 and the first and second quarters of FY 1998; (5) improperly recognizing the deferred revenues and breakage revenues of the companies SmarTalk acquired in 1997; (6) failing to write off impaired or uncollectible accounts receivable; (7) creating a sham sale of SmarTalk's money-losing call center operations at a price of $20 million to a related party that had no prior material operations or assets and thus lacking in any ability to pay.  Plaintiffs alleged that because of these accounting errors, SmarTalk's stock prices were significantly overinflated.  *SmarTalk*, 124 F. Supp. at 532.

accounting misstatements.[48]  Moreover, like the *SmarTalk* plaintiffs, Plaintiffs in this case do not

end their allegations with GAAP violations; they also allege that, when considered together, the

Individual Defendants' insider trading, the presence of red flags evidencing overinflated

revenues, and the sheer magnitude of the actual fraud point to a strong inference of scienter.  *See

id*.

Hence, this Court finds Plaintiffs' allegations to be at least as "widespread and varied" as

those of the *SmarTalk* plaintiffs.  *See id*.  Further, though Cardinal Defendants counter that

Plaintiffs' allegations are not even *actual* GAAP violations, just as in *SmarTalk*, the substance of

the errors strengthens the inference of scienter, and accounting errors of the type here have been

held to be sufficient to establish scienter.  *See id*. at 540; *see also PR Diamonds*, 91 Fed. Appx. at

430.[49]

---

[48]In summary, Plaintiffs allege that: (1) Cardinal's financial statements mis-characterized Operating Revenues and made inadequate disclosures regarding revenue classification procedures; (2) Cardinal improperly and prematurely recognized $22 million of expected lawsuit settlement proceeds prior to a settlement being reached in the Vitamin Litigation; (3) Cardinal used improper reserve accounting and improper accrual adjustments to overstate the Company's net income by $64.2 million in violation of GAAP; (4) Cardinal failed to disclose the Company's recognition of cash discounts earned from suppliers for prompt payment; (5) Cardinal improperly recognize Bulk Deliveries as Operating Revenue by manipulating its use of the 24-hour rule; (6) Cardinal made excessive special charges; (7) Cardinal understated its receivables through securitization of Pyxis receivables; and (8) Cardinal violated SEC regulations due to its inadequate internal controls.

[49]Cardinal Defendants also argue that the Sixth Circuit holds that the magnitude of financial fraud does not contribute to an inference of scienter.  *See Fidel v. Farley*, 392 F.3d 220 (6th Cir. 2004) (quoting *SCB Computer Tech*., 149 F. Supp. 2d 334, 359 (W.D. Tenn. 2001)).  The Court recognizes other courts' concern that relying on magnitude of GAAP errors to establish scienter would require speculation prohibited by the PSLRA.  *See Reiger v. Price Waterhouse Coopers LLP*, 117 F. Supp. 2d 1003, 1034 (S.D. Cal. 2000) ("Inferring scienter from the magnitude of fraud invites a court to speculate as to the existence of specific (but unpled and unidentified) warning signs that show the accountant acted with scienter.  To travel from magnitude of fraud to evidence of scienter, the court must blend hindsight, speculation, and

-47-

**ii. Access to Information**

To buttress their argument that the Individual Defendants' knew of or recklessly disregarded adverse information about Cardinal when making representations about the Company to the public, Plaintiffs point to the Individual Defendants' high-level positions in the Company. Plaintiffs state, "Defendants Walter, Miller, Fotiades, Millar and Parrish also routinely communicated with analysts and investors during the Class Period and represented that they were informed of and knowledgeable about Cardinal's business and finances, specifically including the Company's accounting for revenue and fee-for-service in the Pharmaceutical Distribution business." *See* Complaint ¶ 226. Essentially, Plaintiffs contend that the Individual Defendants' positions, in combination with their representations that "they had intimate knowledge" of the Company, are enough to create a strong inference of scienter.

Courts may presume that high-level executives are aware of matters related to their business' operation where the misrepresentations or omissions pertain to "central, day-to-day operational matters. " *See In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 325-26 (S.D.N.Y. 2001). Fraudulent intent, however, "*cannot* be inferred merely from the Individual Defendants' positions in the Company and alleged access to information." *see PR Diamonds*, 91 Fed. Appx. at 432 (finding that where the plaintiffs' allegations turned largely on obscure accounting issues at the company's subsidiary, the court could not rely on defendant's high-level

---

conjecture to forge a tenuous chain of inferences."). Nonetheless, *Fidel* and *SCB Computer Tech.*, the cases on which Cardinal Defendants rely, both establish that magnitude of accounting errors alone cannot establish scienter on the part of an *outside auditor*, not the company or the company's *executive officers*. *See* 392 F.3d 220 (6th Cir. 2004); *see also,* 149 F. Supp. 2d at 359. As such, Cardinal Defendants have not found significant support for their contention that, when combined with Plaintiffs' other allegations, the Court may not consider the magnitude of Cardinal's GAAP violations in its scienter analysis.

-48-

positions in the company to infer that they knew or could have known of the errors) (emphasis added). The Plaintiff's Complaint itself must allege specific facts or circumstances reflecting the Individual Defendants' knowledge. *Id.* Without more, Plaintiffs fail to state with particularity facts giving rise to a strong inference of scienter – the PSLRA requirement. *Id.*; *see also Alaska Elecal. Pension Fund v. Adecco S.A.*, 371 F. Supp. 2d 1203, 12116-17 (S.D. Cal. 2005) (though allegations regarding the individual defendants' positions in the company may give rise to a 'reasonable inference' those defendants were aware of the falsity of the Company's statements, they do not satisfy the PSLRA's pleading requirements); *In re Peritus Software Servs. Inc. Sec. Litig.*, 52 F. Supp. 2d 211, 228 (D. Mass. 1999) (finding that general allegations that a defendant, through his board membership or executive position, had actual knowledge of false statements or reckless disregard for the truth are insufficient to raise a strong inference of scienter).

In this case, Cardinal Defendants argue, and this Court agrees, that Plaintiffs' allegations appear to be no more than conclusory allegations based on the Individual Defendants' high-level positions. *See Comshare*, 183 F.3d at 553 (a defendant cannot be considered a participant in a company's securities fraud simply because of his or her executive title or position within that company). In their Opposition Motion, Plaintiffs argue that even if the Court can infer no wrongful intent from a job title alone, the Court should be able to infer scienter from a defendant's job title *combined* with that defendant's assurance that he is "knowledgeable" of the company and "responsible" for the its financial statements. In support of their argument, Plaintiffs point to a number of specific statements made by the Individual Defendants in press releases and during conference calls, all of which they believe show that the Individual Defendants were at least reckless in not recognizing Cardinal's fraud. *See* Complaint ¶¶ 229-37.

-49-

Rather than repeat each of the Plaintiffs' allegations verbatim, this Court finds that Plaintiffs' allegations are too broad and conclusory to establish scienter. The Second Circuit has held that "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud" and that "as long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects. . ." *In re Xerox Corp. Sec. Litig.*, 165 F. Supp. 208, 216 (2d Cir. 2001).[50] In this case, Plaintiffs' allegations lump all the Individual Defendants together, stating that their positions as high-level executives show that they must have misled investors as to Cardinal's financial health. Plaintiffs' efforts to cite particular Cardinal press releases and statements that *support* these conclusory allegations still do not raise their allegations to the heightened level of specificity required by the PSLRA.

### iii. Areas of Focus

Plaintiffs seek to draw additional support for a strong inference of the Cardinal Defendants' scienter by claiming that Cardinal's accounting improprieties occurred in areas of the

---

[50]Though Plaintiffs cite *Xerox Corp*., the case does not support Plaintiffs' argument that the Individual Defendants' positions analyzed against the backdrop of their misstatements rises to the level of scienter. 165 F. Supp. at 216. Instead, the Plaintiffs may be mistakenly relying on the dictum, which states that "[t]he court in *In re Fine Host Corp. Sec. Litig.*, 25 F. Supp. 2d 61 (D.Conn. 1998) found that similar allegations were sufficient to state a claim under § 20(a)." *Id*. at 220 (finding that plaintiffs' claims that, because of their positions of control and authority, individual defendants were able to and did control the contents of the company's financial statements, establishing scienter under § 20(a)). Nonetheless, though this Court must analyze Plaintiffs' § 20(a) claims, it can only do so *after* having completed its analysis of Plaintiffs' 10(b) and 10b-5 claims.

business that the Company had specifically identified as targets of intense focus for the Company – areas in which the Company felt pressure to show continued growth.

In this case, Plaintiffs contend that, to showcase Cardinal's successful to transition from a B+H to an FFS model, the Company improperly booked zero-margin sales as Operating Revenue "to give investors the false and misleading impression Cardinal was achieving revenue growth." *See* Complaint ¶ 285. Plaintiffs allege that because Cardinal Defendants had consistently highlighted "Operating Revenue" as the "main driver of its growth,"[51] Cardinal Defendants' inflation of this area of focus for both analysts and investors implies scienter. *See id*. ¶¶ 293-99.

Plaintiffs' allegations resemble those of plaintiffs in *Telxon*. *See* 133 F. Supp. 2d at 1029. In *Telxon*, the court considered a variety of circumstances indicating defendants' scienter, including allegations of motive and opportunity, large restatements of the defendant company's financial disclosures, and accounting manipulations of substantial magnitude. *Id*. Another factor the court considered, however, was "[t]he fact that Telxon and its officers were in a very difficult position, facing *unusual pressures* to perform during the class period, and stood to benefit substantially from a performance record which matched the healthy ones [a company executive] continually projected to the public." *Id*. (emphasis added). In that case, the pressures to make public statements reflecting profitable performance stemmed from the company's need to "stave off" another company's take-over efforts and an ensuing proxy-battle. *Id*. at 1028.

This Court has already found that Plaintiffs sufficiently alleged that Cardinal Defendants'

_____

[51]As noted above, Cardinal's Bulk Deliveries has "very little financial impact on Cardinal's Operating Earnings – the transactions were generally pass-through with zero or immaterial margin – and as the amount of Bulk Deliveries could fluctuate widely from quarter to quarter through circumstances the Company could not control, Bulk Deliveries revenue was not a reliable or accurate barometer of Cardinal's true revenue growth." *See* Complaint ¶ 296.

GAAP violations, particularly its overstatement of Operating Revenue, suggested a strong inference of scienter. *See supra* Part IV.*II*.A.1.b.i. Moreover, in this case, Cardinal was under severe scrutiny while adjusting to the significant changes in the pharmaceutical distribution market, much like Telxon had faced unusual pressure to perform in avoidance of competitors' take-over efforts. *See Telxon*, 133 F. Supp. 2d at 1029. Thus, this Court determines that because Operating Revenues were analysts' and investors' primary area of focus during Cardinal's operating model transition, Cardinal's alleged manipulation of these areas raises a strong inference of Cardinal Defendants' scienter.

### iv. Motive & Opportunity

Next, Plaintiffs argue that the Complaint alleges that Cardinal Defendants had motives and opportunities to defraud investors. These allegations, Plaintiffs maintain, when considered *together* with the other allegations in the Complaint, support a strong inference of knowledge or reckless disregard on the part of Cardinal Defendants.

"[T]he bare pleading of motive and opportunity does not, *standing alone*, constitute the pleading of a strong inference of scienter." *See PR Diamonds*, 91 Fed. Appx. at 434 (citing *Comshare*, 183 F.3d at 551) (emphasis added). "While it is true[, however,] that motive and opportunity are not substitutes for a showing of recklessness, they can be catalysts to fraud and so sere as external markers to the required state of mind." *Id*. (citing *Helwig*, 251 F.3d at 550). "[F]acts regarding motive and opportunity may be relevant to pleading circumstances from which a strong inference of fraudulent scienter may be inferred, and may, on occasion, rise to the level of reckless or knowing conduct." *Id*. (citing *Comshare*, 183 F.3d at 551 (internal quotation and citation omitted)). Therefore, while bare allegations of motive and opportunity, without more, are

insufficient to establish scienter, the Court must assess whether such allegations, considered in conjunction with the remainder of Plaintiffs' allegations raise an inference of recklessness or knowing disregard. *See id.* (referencing *Telxon*, 133 F. Supp. 2d at 1028).

Opportunity to commit fraud "entail[s] the means and likely prospect of achieving concrete benefits by the means alleged." *PR Diamonds*, 91 Fed. Appx. at 434 (citing *In re Criimi Mae, Inc. Sec. Litig.*, 94 F. Supp. 2d 652, 660 (D. Md. 2000) (internal quotations and citations omitted)). With respect to the Individual Defendants' opportunities to engage in fraud, there can be little doubt that they could have, had they wanted to, committed such acts. *See id.*; *see, e.g., San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos. Inc.*, 75 F.3d 801, 813 (2d Cir. 1996) ("There is no doubt that defendants as a group had the opportunity [to manipulate stock prices] . . . [because they] held the highest positions of power and authority within the company."). Therefore, the more compelling question in this case is whether the Complaint alleges *motives* on the part of Cardinal Defendants from which the Court could infer a knowing or reckless state of mind. *See PR Diamonds*, 91 Fed. Appx. at 435.

In order to demonstrate motive, a plaintiff must show "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Id.* (citing *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 621 (4th Cir. 1999)). A perusal of the cases cited by both parties shows that courts distinguish general motives common to most corporations and executives from more specific "motives to commit fraud." *See Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996) (finding that because all corporate managers share a desire for their companies to appear successful "a generalized motive which could be imputed to any publicly-owned, for-profit endeavor, is not sufficiently concrete for purposes of inferring scienter"). The

-53-

Plaintiffs allege that Defendants had the following motives: (1) motive to profit from insider

trading; (2) motive to receive significant incentive-based executive compensation packages; and

(3) motive to meet analysts' expectations so as to preserve Cardinal's position as one a successful

and profitable company.  The Court will examine each of these motives, and determine whether,

considered in conjunction with the remainder of Plaintiffs' allegations, they raise a strong

inference of scienter.

### 1)  Insider Sales[52]

In addition to considering them to be a *Helwig* "red flag," courts also consider a plaintiff's

allegations that the individual defendants engaged in insider trading to be a motive to commit

fraud.  By trading on inside information, executives stand to profit from what may turn out to be

other shareholders' losses.

The Complaint alleges that the Individual Defendants were motivated to commit the

alleged fraud, in part, because they were able to benefit from the resulting inflation of Cardinal's

stock price.  Plaintiffs allege that during the Class Period, the Individual Defendants sold at least

774,156 shares of Cardinal stock, for proceeds of $49.7 million; they argue that the magnitude

---

[52]In Plaintiffs' Opposition Motion, Plaintiffs raise an argument that the Individual Defendants' sales are also an "independent basis for liability" under Rule 10b-5.  They cite *SEC v. Zandford*, for the proposition that "neither the SEC nor this Court has ever held that there must be a misrepresentation . . . in order to run afoul of the [1934] Act."  *See* 535 U.S. 813, 820 (2002).  Plaintiffs contend that because the Complaint alleges that each of the Individual Defendants sold large amounts of stock at suspicious times to maximize their personal profit, Defendants' insider trading should be considered an independent basis for liability.  Nonetheless, Plaintiffs did not raise this argument in their Complaint, and, as Defendants correctly assert, "an opposition brief is not a substitute for an amendment of the pleadings."  *See* Def.'s Reply at 76 (citing *Cline v. Rogers*, 87 F.3d 176, 184 (6th Cir. 1996)).  As such, this Court will not consider Plaintiffs' insider sales claims as an independent basis for Cardinal Defendants' liability under the securities laws.

and timing of these sales of stock – independent of any sales in the context of an offering – by themselves raise a strong inference of scienter.

Indeed, "[i]nsider trading at a suspicious time or in an unusual amount comprises one of the 'fixed constellations of facts that courts have found probative of securities fraud." *See Helwig*, 251 F.3d at 552; *FirstEnergy Corp.*, 316 F. Supp. 2d at 599 (noting that insider selling at an opportunistic time supports an inference of fraudulent intent to mislead the market for personal gain, and insider sales made when a company's stock price is near an all time high are probative of scienter). The "mere pleading of insider trading, [however,] without regard to either context or strength of the inferences to be drawn, is not enough." *See Greebel*, 194 F.3d at 198; *see also Maldonado v. Dominguez*, 137 F.3d 1, 9-10 (1st Cir. 1998). Courts should not "infer fraudulent intent from the mere fact that some officers sold stock . . . Instead, [p]laintiffs must allege that the trades were made at times and in quantities that were suspicious enough to support the necessary strong inference of scienter." *In re Burlington Coat Factory Sec. Litig.*, 113 F.3d 1410, 1424 (3d Cir. 1997) (stock sales did not permit an inference of scienter because only three of the five defendants sold stock, plaintiffs provided information on the total stock holdings of only one defendant, who had traded only 0.5% of his holdings, and plaintiffs failed to plead facts indicating whether such trades were "normal and routine"for the defendants, and whether the trading profits were substantial in comparison to their overall compensation) ; *see, e.g., Greebel*, 194 F.3d at 197 ("Unusual trading or trading at suspicious times or in suspicious amounts by corporate insiders has long been recognized as probative of scienter."); *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 540 (3d Cir. 1999) (stock sales did not permit an inference of scienter where three of the five individual defendants sold no stock during the class period and those who did trade, sold only

small percentages of their stock); *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1124 (1st Cir.

1996) ("[T]he mere fact that insider stock sales occurred does not suffice to establish scienter.");

*MicroStrategy,* 115 F. Supp. at 644.

Nevertheless, if the executive officers' stock sales were "unusual in scope or timing," they

may support an inference of scienter. *See Burlington Coat Factory*, 114 F.3d at 1424. Courts

generally consider the following factors in analyzing allegations of insider trading: (1) whether

the alleged trades were 'normal or routine' for the insider; (2) whether profits reaped "were

substantial enough in relation to the compensation levels for any of the individual defendants so

as to produce a suspicion that they might have had an incentive to commit fraud"; and (3)

whether, in light of the insider's total stock holdings, the sales are unusual or suspicious.

*MicroStrategy*, 115 F. Supp. 2d at 644 (citing *Burlington Coat Factory*, 114 F.3d at 1423).

There is no bright line test, however, as to the amount or percentage of stock that must be

sold to constitute a "suspicious amount" – nor should there be, for, in the end, the determination

of whether insider sales were "suspicious" is highly context-specific and depends on the other

allegations offered in the Complaint.[53]  Courts have classified stock sales as unusual or suspicious

based on a variety of factors, which include "the amount of profit from sales," "the portion of

---

[53]Compare the following cases: *Provenz v. Miller*, 102 F.3d 1478, 1491 (9th Cir. 1996)
(holding that 20 percent of individual defendant's holding raised an inference of scienter);
*Schlagal v. Learning Tree Int'l*, 1998 U.S. Dist. LEXIS 20306, at *49 (C.D. Cal. Dec. 29, 1998)
(holding that total proceeds from insider sales of $10.6 million raised inference of scienter); *In re
MTC Elec. Techs. S'holders Litig.*, 898 F. Supp. 974, 980 n. 4 (E.D.N.Y. 1995) (holding that
stock sales by one defendant of approximately 8,000 shares for profit of $173,000 raised strong
inference of fraudulent intent); *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 987 (9th
Cir. 1999) (holding that collective sales of 10 percent insufficient to raise strong inference of
conscious fraud); *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 53 (2d Cir. 1995) (holding that sale
by one defendant of 11 percent of holdings, in light of absence of any sales by other defendants,
undermined Plaintiffs' allegations of scienter).

stockholdings sold," "the change in volume of insider sales," "and the number of insiders selling." *See Rothman v. Gregor*, 220 F.3d 81, 94 (2d Cir. 2000) (citing *Oxford Health Plans*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) ($78 million profit from sale of 1.2 million shares during the class period is "massive by any measure"); *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85 (2d Cir. 1999) (president and CEO of company sold 40 percent of his stock holdings in a company while making optimistic statements about company's financial position); *In re Quintel Entm't Inc. Sec. Litig.*, 72 F. Supp. 2d 283, 296 (S.D.N.Y. 1999) (sales by corporate insiders represented 156 percent increase over total insider sales for fourteen months prior to start of the class period); *San Leandro*, 75 F.3d at 814 (company officer's $2 million profit from company stock sales did not suffice to prove motive, because no other company executives sold their shares during the relevant period). Hence, the Court will consider Plaintiffs' allegations against each Individual Defendant separately to determine whether it appears unusual or suspicious against the backdrop of the foregoing three-factor analysis.

### I) Defendant Walter

Plaintiffs allege that Defendant Walter personally sold 539,910 shares of Cardinal stock for insider trader proceeds of $38.19 million during the Class Period. Walter's reported insider trading during the Class Period is detailed below.

| Transaction Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 12/13/2000 | 22,500 | $63.42 | $1,426,949 |
| 03/01/2001 | 32,100 | $67.33 | $2,161,292 |
| 03/01/2001 | 7,500 | $65.88 | $494,100 |
| 03/01/2001 | 7,500 | $67.66 | $507,450 |
| 03/01/2001 | 7,500 | $67.83 | $508,725 |
| 03/01/2001 | 3,750 | $67.43 | $252,863 |

| | | | |
|---|---:|---:|---:|
| 03/01/2001 | 9,150 | $66.72 | $610,488 |
| 03/02/2001 | 7,500 | $66.68 | $500,100 |
| 03/02/2001 | 15,000 | $67.53 | $1,012,949 |
| 03/09/2001 | 7,500 | $66.23 | $496,725 |
| 03/13/2001 | 7,500 | $66.66 | $499,950 |
| 03/13/2001 | 34,900 | $66.50 | $2,320,850 |
| 05/08/2001 | 22,100 | $66.70 | $1,474,070 |
| 05/08/2001 | 9,800 | $66.80 | $654,640 |
| 05/08/2001 | 5,000 | $66.90 | $334,500 |
| 05/08/2001 | 1,600 | $66.55 | $106,480 |
| 05/08/2001 | 900 | $66.52 | $59,868 |
| 05/08/2001 | 400 | $66.53 | $26,612 |
| 05/08/2001 | 200 | $66.84 | $13,368 |
| 05/08/2001 | 100 | $66.75 | $6,675 |
| 05/08/2001 | 30,000 | $66.57 | $1,997,100 |
| 01/28/2002 | 10,000 | $65.07 | $650,700 |
| 01/30/2002 | 10,000 | $65.81 | $658,100 |
| 01/31/2002 | 7,720 | $65.71 | $507,281 |
| 01/31/2002 | 500 | $65.91 | $32,955 |
| 03/07/2002 | 50,000 | $65.95 | $3,297,500 |
| 03/07/2002 | 18,700 | $65.45 | $1,223,915 |
| 03/07/2002 | 15,000 | $66.00 | $990,000 |
| 03/07/2002 | 10,000 | $65.97 | $659,700 |
| 03/07/2002 | 5,000 | $65.20 | $326,000 |
| 03/07/2002 | 1,300 | $65.30 | $84,890 |
| 09/12/2002 | 100,000 | $65.80 | $6,580,000 |
| 01/29/2003 | 133,190 | $57.90 | $7,711,701 |
| **Total** | **593,910** | | **$38,188,496** |

First, Cardinal Defendants posit that, for Defendant Walter, as well as for each of the other

Individual Defendants, Plaintiffs mistakenly lumped the Defendants' "stock options" sales together with his other trading.  Cardinal Defendants contend that Plaintiffs' calculations are erroneous because courts do not view executives' decisions to exercise imminently expiring stock options to be "suspicious."  In other words, Cardinal Defendants insist that Plaintiffs incorrectly argue that "exercising options and selling stock out of personal holdings" is a "distinction without a difference" when in fact, courts recognize that options are part of many executives' standard compensation package and that there is nothing "suspicious" in exercising an option before it expires.  *See, e.g. Advanta Corp.*, 180 F.3d at 54; *Burlington Coat Factory*, 114 F.3d at 1424; *Friedman v. Rayovac Corp.,* 291 F. Supp. 2d 845, 855 (D. Wis. 2003); *In re Century Bus. Serv. Secs. Litig.*, 2002 WL 32254513, at *7 n. 17 (N.D. Ohio June 27, 2002).  Cardinal Defendants also aver that because Plaintiffs fail to show that compensation at Cardinal was higher than that of its corporate peers, they incorrectly label Individual Defendants' exercise of options "relevant," "unusual," and "suspicious."

This Court agrees that most courts do not view an executive's decision to exercise his stock options before they expire as evidence of fraudulent insider trading.[54]  Nonetheless, in their Motion to Dismiss, Cardinal Defendants confirm that Walter made approximately 31% of his

---

[54]This stock options issue is somewhat complex.  Essentially, Cardinal Defendants argue that Plaintiffs lump the Individual Defendants' decision to exercise their stock options as akin to regular trading activity, when, in fact, there is nothing fraudulent about exercising one's stock option before it expires.  Cardinal Defendants are correct in arguing that the market does *not* ask executives to buy and hold stock options indefinitely.  If an executive buys an option at $10.00 per share which expires one year later at $56.00 per share, he should certainly be allowed to profit from the sale of that option before its expiration.  Nonetheless, should the executive strategically arrange to sell its option long before its expiration because he knows inside information that would lead him to believe that his company's stock price would drop before he had a chance to exercise his option, courts might consider that somewhat suspicious – a "pump and dump" scheme.

sales during the Class Period through exercising stock options set to expire in 2002 and 2004. That leaves 69% of his other sales activity to be unrelated to exercising his stock options, and all 69% of these sales, if inconsistent with Walter's past trading activity, could be considered suspicious.

Moreover, Cardinal Defendants argue that Plaintiffs' chart fails to account for Walter's stock *purchases* during the Class Period. They contend that any "fair analysis" would more properly measure the net proceeds from trading activity during the relevant period, accounting for the significant portion of the sale proceeds that were offset by the amounts Walter paid during the same period for acquired shares, including open-market purchases, option exercises and relevant payroll taxes associated with his option purchases." Def.'s Motion to Dismiss at 46. Cardinal Defendants, however, cite no authority for this technical dispute.[55]

Further, Cardinal Defendants argue that the fact that Walter actually *purchased* 40,000 shares during the Class Period, augurs against an inference of scienter, "as no rational person would acquire stock whose price was misleadingly propped up." *See* Def.'s Motion to Dismiss at 51; *see Century Bus.*, 2002 WL 32254513 at *8 (finding it improbable that defendant would seek to increase his wealth by purchasing stock at inflated prices); *Schuster v. Symmetricon, Inc.*, 2000 WL 33115909, at *8 (N.D. Cal. Aug. 1, 2000) (purchase of stock at allegedly inflated prices undermined a finding of scienter); *Morse*, 200 F. Supp. 2d at 853 (company's decision to reinvest in its own stock undermined scienter, since it would make no sense to knowingly purchase at inflated prices); *Mathews v. Centex Telemgmt., Inc.*, 1994 WL 269734, at *8 (N.D. Cal. June 8,

_____

[55]In total, Cardinal Defendants argue that Plaintiffs failed to account for approximately $12.2 million of shares Defendant Walter acquired during the Class Period.

-60-

1994) ("It would have made no sense to purchase that stock if defendants knew the prices to be inflated."). Cardinal Defendants also argue that the fact that Defendant Walter did not sell stock in the last 18 months of the Class Period points against scienter. Cardinal Defendants rely on a number of cases, particularly from the Ninth Circuit, for the proposition that, "[i]f Walter intended to inflate the price of Cardinal shares in order to cash in, his trading pattern certainly did not reflect this." *See* Def.'s Motion to Dismiss at 44; Def.'s Reply at 24; *see In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1093-94 (9th Cir. 2002) (rejecting insider trading allegation where most of the sales occurred more than a year before the press release announcing the damaging news); *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 313 (D.N.J. 2001) ("a broad temporal distance between stock sales and a disclosure of bad news defeats any inference of scienter").

The Court agrees with the Ninth Circuit that, in some cases, a broad temporal distance between stock sales and a disclosure of bad news defeats any inference of scienter; however, the Court does not believe the principle applies to the case sub judice. *See Vantive Corp.*, 283 F.3d at 1093-94. The magnitude of the Individual Defendants' sales must be viewed along a continuum where maximum profits and total loss of control are at one end, and minimum profits and maximum retention of control are at the other. *See MicroStrategy*, 115 Fed. Supp. 2d at 646. In *MicroStrategy*, however, "the fact that the point on this continuum that the Individual Defendants chose to draw did not entail near-total divestment of their total holdings in MicroStrategy [stock did] not preclude an inference of an intent on the Individual Defendants' part to profit from fraud *and* maintain control of the Company." *Id*. Similarly, in this case, Cardinal Defendants mistakenly assume that the only motive probative of scienter is the Individual Defendants' motive to "cash out" fully by divesting themselves of their stake in the Company. To this end, Cardinal

-61-

Defendants highlight the fact that, in addition to his sales, Defendant Walter *purchased* 40,000 shares during the Class Period. This Court is persuaded, however, that "the calculus is clearly more complicated [because] 'an insider may not always trade all his shares in the company for which he possesses the inside information; the trader may hold on to a portion of his shares to hedge against the unforeseen or to obscure the insider trading from the SEC.'" *Id*. at 647 (citing *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1307, 1427 (9th Cir. 1994)). Thus, the Court does not agree with Cardinal Defendants that Walter's purchase of 40,000 shares – a trifling amount when compared with the 593,910 he sold – cuts against any unusual or suspicious trading.

Finally, Cardinal Defendants argue that, irrespective of whether the Court accepts Cardinal Defendants' arguments concerning stock options and stock purchases, Walter's trading activity is still not unusual or suspicious because Walter's "sales during his Class Period followed his pre-established tendency to dispose of a small percentage of his Cardinal holdings within a day or a few days' time when the opportunity presented itself, and then not to sell again for months." *See* Def.'s Motion to Dismiss at 44. Further, they argue that Walter's trading history is "necessarily lumpy" because "his ability to sell stock in any given period has been subject to frequent 'closed windows' based on the company's internal policies relating to trades by officers, acquisitions, and other company business activity." *See id*. at 43; *see In re Tyco Int'l, Inc. Sec. Litig.*, 185 F Supp. 2d 102, 112 n. 6 (D.N.H. 2002) ("Most publicly traded companies have adopted policies which prevent insiders from trading except during narrow windows that are open for only brief periods following the release of accounting information. . . . Given this reality, evidence of insider trading following the release of accounting information is of limited value in determining whether the released information is misleading in most cases because it is equally

-62-

likely that the information is accurate and that the timing of the trades is dictated by the company's insider trading policy.").

Cardinal Defendants also declare that Plaintiffs' incorrectly compare Walter's four years of Class Period trading to his trading in his two years of pre-Class Period trading, and that, in fact, Plaintiffs should have looked at *four* years of pre-Class Period trading.[56]  They argue that "Plaintiffs compound their error by comparing, without adjustment, sales during the 45-month Class Period with sales during the preceding 24-month period," and that "the numbers Plaintiffs derive from comparisons drawn between these two dissimilar periods are meaningless."  Def's Motion to Dismiss at 43.  To the contrary, the Court considers it compelling that Walter's proceeds during the Class Period exceeded his pre-Class Period sales proceeds by more than 600 percent.  In *Quintel Entertainment*, the court drew an inference of scienter when sales by corporate insiders were 156 percent greater than insider sales in the 14 month pre-Class Period. *See* 72 F. Supp. 2d at 296.  Accordingly, regardless of whether Walter's sales are considered against two or four years of pre-Class Period sales, 600 percent is clearly a significant enough jump in trading to suggest that Walter's Class Period trading was unusual and suspicious.

### ii) Defendant Fotiades

---

[56]Cardinal Defendants also claim that Plaintiffs omitted the sale of 26,097 shares on January 1, 1999 from Walter's pre-Class Period total.  *See* Def.'s Motion to Dismiss at 43. However, Plaintiffs counter that, "in accordance with Walter's SEC filing for the sale, [P]laintiffs did not include the transaction because it was for the 'payment of exercise price or tax liability by delivering or withholding securities incident to the receipt, exercise or vesting of a security issued in accordance with Rule 16b-3."  *See* Pl.'s Opposition to Motion to Dismiss at 69-70 n. 25.  Plaintiffs also contend that they were "consistent in not including these transactions as sales," and posit that Cardinal "Defendants' own analysis, at least when it came to asserting that Miller had no stock sales, did not include these types of transactions as sales when they were made during the Class Period."  *Id.*  Regardless of which party's construction of the facts is correct, the Court need not resolve the parties' technical dispute at this stage of the proceedings.

Plaintiffs allege that Defendant Fotiades personally sold 67,814 shares of Cardinal stock for insider trader proceeds of $4,678,158 during the Class Period.  Fotiades' reported insider trading during the Class Period is detailed below.

| Transaction Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 12/13/2000 | 5,561 | $63.45 | $352,909 |
| 05/30/2001 | 17,300 | $71.10 | $1,247,330 |
| 05/30/2001 | 808 | $72.38 | $58,483 |
| 04/29/2002 | 4,144 | $68.59 | $284,237 |
| 04/30/2002 | 40,000 | $68.38 | $2,735,200 |
| Total | 67,814 | | $4,678,159 |

Cardinal Defendants contend that Fotiades' trading is neither unusual nor suspicious because, like Walter, he did not sell stock in the last 27 months of the Class Period.  Nonetheless, just as such claims failed to negate an inference of scienter as to Defendant Walter, so too do they fail to negate such an inference as to Defendant Fotiades.

Next, Cardinal Defendants argue that because the only shares Fotiades sold in the Class Period were made while he was with Cardinal's Life Sciences segment, *before* he became Cardinal's COO, they do not infer scienter.  This Court disagrees; a sale by a high-level officer is still a sale, regardless of whether that officer had not yet risen to the highest echelons of the company.[57]

Finally, Cardinal Defendants argue that Fotiades sold more than twice the number of shares he sold during the Class Period on November 10, 2004, four months after the end of the Class Period, and "after every alleged 'misrepresentation' Plaintiffs alleged had already been

---

[57]Before Fotiades became Cardinal's COO in February 2004, he was a senior executive at Cardinal.

disclosed." *See* Def.'s Motion to Dismiss at 48. They aver that, "[i]f Fotiades really were participating in an artificial inflation of Cardinal's price, one would imagine, he would sell his shares while the inflation was effect." *Id*. Plaintiffs counter that Cardinal Defendants' failure to cite any authority for their proposition that post-Class Period sales negate scienter nullifies their argument. The Court finds that if such sales negated scienter, a defendant in an insider trading case could simply re-sell the options he had acquired cheaply as a means to evade liability.

### iii) Defendant Jensen

Plaintiffs allege that Defendant Jensen personally sold 10,357 shares of Cardinal stock for insider trader proceeds of $743,984 during the Class Period. Jensen's reported insider trading during the Class Period is detailed below.

| Transaction Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 03/08/2004 | 2,638 | $67.45 | $177,933 |
| 03/08/2004 | 1,100 | $67.42 | $74,162 |
| 03/08/2004 | 600 | $67.44 | $40,464 |
| 05/03/2004 | 6,019 | $75.00 | $451,425 |
| **Total** | **10,357** | | **$743,984** |

Plaintiffs state that during the Class Period, Jensen sold 95.7% of his Cardinal stock holdings. *See* Complaint ¶ 259. Cardinal Defendants, however, counter that Defendant Jensen "had a 10b5-1 trading plan during the Class Period, and sold stock during the Period on only two dates." *See* Def.'s Motion to Dismiss at 49. Plaintiffs point out that Jensen "fails to mention that the purported trading plan was "not actually formed until March 5, 2004, and was not filed with the SEC until March 10, 2004, *after* he had dumped over 4,300 shares of Cardinal stock and

immediately before he dumped another 6,000 shares." *See* Pl.'s Opposition at 70 n. 26.

Regardless of whether Jensen's plan was formed *before* or *after* the end of the Class Period,

Plaintiffs also argue that "a 10b5-1 trading plan is typically considered an affirmative defense

used to determine when a person's purchase or sale is not 'on the basis of' material nonpublic

information." *See* 17 C.F.R. § 240.10b5-1.  As it is typically premature to raise affirmative

defenses in a motion to dismiss, this Court will not consider the impact of Jensen's purported

10b5-1 trading plan at this stage of the pleadings.  Because Cardinal Defendants do not contest

Plaintiffs' allegations as to Jensen, other than asserting the 10b5-1 affirmative defense, the Court

finds that Plaintiffs' allegations as to Jensen's trading activities establish an inference of

scienter.[58]

### iv) Defendant Parrish

Plaintiffs allege that Defendant Parrish personally sold 16,032 shares of Cardinal stock for

insider trader proceeds of $972,835 during the Class Period.  Parrish's reported insider trading

during the Class Period is detailed below.

| Transaction Date | Shares Sold | Price | Proceeds |
|---|---|---|---|

---

[58]Defendant Jensen argues that the Court may, at this stage of the litigation, take judicial notice of Jensen's 10b5-1 plan because "its existence was disclosed in a publicly filed document, specifically Cardinal's Form 4 from March 10, 2004."  *See New England Health Care Employees Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003) ("A court that is ruling on a Rule 12(b)(6) motion may consider materials in addition to the complaint if such materials are public records or are otherwise appropriate for the taking of judicial notice.").  Nonetheless, the Court disagrees that Plaintiffs' contention that Jensen may not rest on a 10b5-1 plan enacted *after* the Class Period amounts to mere "quibbling."  *See* Def. Jensen Reply at 7.  This argument is not, as Defendant Jensen argues, "beside the point."  *Id*.  The timing of the plan is crucial because, without a 10b5-1 plan in existence, Jensen's trading activity could very well point to Jensen's effort to dump his Cardinal stock.

-66-

| 05/12/2003 | 18,000 | $67.14 | $475,571 |
| 01/26/2004 | 4,097 | $63.80 | $261,389 |
| 01/26/2004 | 3,700 | $63.75 | $235,875 |
| **Total** | **16,032** | | **$972,835** |

Plaintiffs allege that based on Defendant Parrish's Forms 4 filed with the SEC, as of Parrish's final Class Period trade, he had sold 90.9% of his Cardinal stock holdings.[59]  Even so, Plaintiffs fail to set forth any facts showing that Parrish's pre-Class Period sales were different from his sales during the Class Period.  Consequently, Plaintiffs' allegations that Parrish's sales were "unusual" or "suspiciously" timed, are merely conclusory allegations.  Thus, Plaintiffs have not established scienter as to Parrish's trading activity.

### v) Defendant Millar

Plaintiffs allege that Defendant Millar personally sold 86,043 shares of Cardinal stock for insider trader proceeds of $5,152,292 during the Class Period.  Millar's reported insider trading during the Class Period is detailed below.

| Transaction Date | Shares Sold | Price | Proceeds |
| --- | --- | --- | --- |
| 03/01/2001 | 18,000 | $67.14 | $1,208,519 |
| 05/16/2001 | 7,900 | $69.05 | $545,495 |
| 05/16/2001 | 297 | $69.25 | $20,567 |
| 02/11/2002 | 15,200 | $65.60 | $997,120 |
| 02/11/2002 | 411 | $65.61 | $26,966 |
| 04/28/2003 | 31,200 | $53.20 | $1,659,840 |

---

[59]Though Plaintiffs and Cardinal Defendants disagree as to the number of Parrish's shares, the Court need not and will not resolve this technical issue at this early stage of the litigation.

| 04/28/2003 | 7,700 | $53.21 | $409,717 |
| 04/28/2003 | 5,035 | $53.25 | $268,114 |
| 04/28/2003 | 300 | $53.18 | $15,954 |
| **Total** | **86,043** | | **$5,152,292** |

Plaintiffs argue that, during the Class Period, Millar sold 43.9% of his Cardinal stock trading, none of which was part of any general or specific pre-planned pattern of stock sales. They assert that, when compared to Defendant Millar's two years of pre-Class trading, in which he sold 17% of his stock shares, the approximately 27% jump in sales should be viewed as suspicious. Cardinal Defendants counter that, in fact, Defendant Millar's sales during the Class Period were derived almost entirely from exercising options due to expire in 2002, 2003, and 2004. Further, they contend that when Defendant Millar exercised his options in April 2003, he actually retained 31,000 shares rather than selling them, making him a net acquirer of shares at the end of the Class Period

Other courts have held that a defendant's retention of his stock holdings significantly undermines plaintiffs' assertion of scienter. *See Wilson v. Bernstock*, 195 F. Supp. 2d 619, 638 (D.N.J. 2002); *see also In re Sun Healthcare Group, Inc. Sec. Litig.*, 181 F. Supp. 2d 1283, 1296 (D.N.M. 2002) (insider trading allegations insufficient to plead scienter where insiders collectively purchased more shares than they sold during the class period); *In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 898-99 (W.D.N.C. 2001) (holding that increase in holdings of two insiders during the class period demonstrated the absence of scienter). Considering these other cases persuasive, the Court agrees that the fact that Millar was a net acquirer of shares by the end of the Class Period, points against, though does not wholly negate, a

strong inference of Millar's scienter.

### vi) Defendant Miller

Though Plaintiffs and Cardinal Defendants agree that Defendant Miller sold *no shares* of stock during the Class Period, they are in dispute as to whether Miller's failure to sell a single share of Cardinal stock, in itself, points strongly away from a finding of wrongful intent. Cardinal Defendants rely on a number of cases, including *PR Diamonds*, to support their proposition that, though it may not be dispositive proof against Miller's scienter, his "failure to sell when Plaintiffs allege he had incentive to do so certainly points against scienter." *See* 91 Fed. Appx. at 436. The Cardinal Defendants' reliance on *PR Diamonds*, however, is misplaced. In that case, the court was persuaded that the absence of stock sales by the Individual Defendants "works against, but does not conclusively defeat an inference of scienter." *See id.* at 436 (while the "absence of inside sales dulls allegations of fraudulent motive. . . we have never held that the absence of insider trading *defeats* an inference of scienter") (emphasis added). The *PR Diamonds* court based its finding, in part, on the fact that Plaintiffs' motive allegations in that case suggested that the individual defendants had bought the stock to infuse cash to the company, not to enrich themselves personally. *See id.* In this case, however, though Plaintiffs' allege that the Individual Defendants were struggling to keep up the appearance of Cardinal's growth during a difficult transition period, they also claim that, beyond making the Company appear successful, Cardinal Defendants also wanted to reap profits for themselves.

In the end, without considering the impact of the technical disputes between the parties regarding the timing, amounts, and other minute details of the Individual Defendants' trading activities, the Court finds that, Plaintiffs' allegations against Defendants Walter, Fotiades, Jensen,

and Miller, raise a strong inference of scienter and, therefore, survive Cardinal Defendants'

Motion to Dismiss. Though the insider trading allegations Plaintiffs raise against Defendants

Parrish and Millar do not raise a strong inference of scienter, the Plaintiffs' allegations do not rest

on insider trading alone. Thus, before the Court can dismiss Plaintiffs' claims against Parrish and

Millar as too weak to establish the strong inference of scienter required by the PSLRA, it must

first consider the strength of Plaintiffs' other allegations.

### 2) Executive Compensation

Pursuant to Cardinal's FY 2000 Proxy dated September 18, 2000, the Board of Directors

established fixed guidelines relating to executive compensation, and among the guiding principles

was that executives would receive "pay-for-performance" and be rewarded for positive "corporate

business unit, and individual performance." Plaintiffs allege that Cardinal Defendants were

motivated to recklessly over-inflate Cardinal's stock price because the terms of their employment

agreements tied their compensation directly to Cardinal's reported financial results and the

performance of the Company's stock. Plaintiffs allege that based on the reported performance of

Cardinal during the Class Period, the Individual Defendants each received the maximum possible

incentive compensation through salary, cash bonuses, and options.[60] Plaintiffs argue that because,

in total, Defendants Walter, Miller, Fotiades, and Millar collected more than $245 million in

incentive-based executive compensation while perpetrating their fraud on the investing public,

their compensation package points to their scienter.[61]

---

[60]Plaintiffs created charts that detail the executive compensation earned during the Class Period by Defendants Walter, Miller, Fotiades, and Millar. *See* Complaint ¶¶ 271-74.

[61]Plaintiffs contend that "Cardinal did not publicly report salary or bonus information for defendants Jensen or Parrish, however, given the Company's reported approach to

Cardinal Defendants contend that Plaintiffs' allegations fail as a legal matter because, according to *PR Diamonds*, "a plaintiff may not establish an inference of wrongful intent merely by showing that an executive had motive and opportunity (e.g., an executive position and a compensation package) to commit fraud." 91 Fed. Appx. at 435. Defendants argue that, to make these types of allegations, a plaintiff "must allege that the executive was driven by something more than a personal profit motive or producing a higher share price for the benefit of investors," because precedent has clearly established that, "[a]ll corporate managers share a desire for their companies to appear successful. That desire does not comprise a motive for fraud . . . Neither does an executive's desire to protect his position within a company or increase his compensation." *See id*. Cardinal Defendants also aver that the Sixth Circuit has been definitive "motive and opportunity" to commit fraud cannot establish the necessary strong inference of scienter, and that Plaintiffs' arguments fall squarely into the category of "motive." *See id*.[62]

---

compensation, it is likely that these [D]efendants as well had the opportunity to and received incentive-based compensation for in excess of their base salaries." Complaint, ¶ 275 n. 17. "The issue in reviewing the sufficiency of a complaint is . . . whether the claimant is entitled to offer evidence to support its claim," and claimants are not entitled to rest on conclusory allegations. *See Scheuer*, 416 U.S. at 232. As such, where Plaintiffs conclude that because the other Individual Defendants' received lucrative executive compensation packages, Defendants Jensen and Parrish must have as well, the Court finds these allegations to be overly conclusory and lacking in factual support.

[62]Cardinal Defendants also contend that "Plaintiffs' factual recitations are lacking." They argue that Plaintiffs allege, for example, that Walter was awarded 486,009 options in fiscal year 2003 that had a value of $36,600,000, and that Plaintiffs state that their pleaded value represents that "median of the potential realizable value as reported by Cardinal in the Company's corresponding Proxy statements." *See* Complaint ¶ 271, n. 14. However, Defendants aver that "Plaintiffs are playing with the numbers" and that Cardinal's proxy statement for 2003 shows that Walter was awarded options with a strike price of $67.90." They argue that the proxy then shows the value of those options under three scenarios: (1) a 0% stock price appreciation for the option term; (2) a 5% stock price appreciation for the option term; and (3) a 10% stock price appreciation for the option term. They contend that Plaintiffs arrived at their "median" by

A careful reading of *PR Diamonds* reveals that Cardinal Defendants' interpretation is inaccurate.  The *PR Diamonds* court actually held that "*bare allegations* of motive and opportunity, without more, are insufficient to establish scienter."  *See* 91 Fed. Appx. at 435.  By presenting specific facts tying the Individual Defendants' compensation to company performance, Plaintiffs do more than just present "bare allegations."  Further, Plaintiffs rely upon a number of cases in which other courts have held that the magnitude of a defendant's compensation package, together with other factors, may provide a heightened showing of motive to commit fraud.  *See Florida State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 661 (8th Cir. 2001); *Am. West,* 320 F.3d at 944 (strong inference of scienter because defendants' eligibility for stock options and executive bonuses were based principally on the company's financial performance); *In re Metawave Communications Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1071 (W.D. Wash. 2003) ("Scienter can be established even if there were no sales of stock by officers during the class period, if there were other motives for fraud, such as receiving benefits tied to the company's financial performance."); *In re Wellcare  Mgmt. Group Sec. Litig.*, 964 F. Supp. 632, 639 (N.D.N.Y. 1997) ("[T]he Court will not disregard, as irrelevant, allegations that incentive compensation was affected by the alleged fraudulent conduct.").  In their reply, Defendants merely repeat their arguments about the insufficiency of Plaintiffs' allegations; however, they do not dispute the foregoing precedent.  As such, the Court is persuaded that though it does not amount to a *strong* inference of scienter, in this case, the Court may consider Plaintiffs'

_____

dropping the low number and averaging the larger two, "which is neither sound mathematics nor sound pleading."  See Def.'s Motion to Dismiss at 55 n. 5.  Nonetheless, it is unnecessary to get to the heart of these complex mathematical issues at this stage of the proceedings.  As such, the Court considers the Plaintiffs' allegations as evidence, though not dispositive evidence, of scienter.  The parties' dispute over the specific facts should be dealt with at trial.

motivation to keep Cardinal's stock price high in order to profit from their executive compensation packages in analyzing scienter.

### 3) Meeting Analysts' Expectations

Finally, Plaintiffs also allege that Cardinal was motivated to engage in fraud to meet analysts' expectations as to its performance, particularly during its transition from a B+H model to an FFS model. Courts have found that this type of "general allegation, though relevant, adds little by itself to the scienter calculus, because these are motives 'possessed, to a certain degree, by every corporate officer." *See MicroStrategy*, 115 Fed. Supp. 2d at 648; *see also, In re Stratosphere Corp. Sec. Litig.*, 1 F. Supp. 2d 1096, 1116 (D. Nev. 1998). Similarly, in this case, Plaintiffs' allegations that Cardinal Defendants wanted to maintain a high credit rating and prove its ability to transition in a shifting market, are not probative of scienter.[63]

### v. Red Flags

Finally, Plaintiffs contend that the Cardinal Defendants knowingly or recklessly disregarded numerous red flags indicating Cardinal's improper accounting practices, GAAP violations, and internal control deficiencies. "Specific factual allegations that a defendant ignored red flags, or warning signs that would have revealed the accounting errors prior to their inclusion

---

[63]Plaintiffs also allege that Cardinal Defendants were motivated, in part, by a desire to maintain a high credit rating, however, most courts hold that allegations pertaining to "a company's desire to maintain a high bond or credit rating [does not] qualif[y] as a sufficient motive for fraud . . . because if scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *See MicroStrategy*, 115 F. Supp. 2d at 648; *San Leandro,* 75 F.3d at 814; *In re Crystal Brands Sec. Litig.*, 862 F. Supp. 745, 749 (D. Conn. 1994) (holding that allegations of a motive to "maintain good relations with suppliers, retailers and lenders . . . pertain to virtually any company that manufactures and distributes goods" and are therefore inadequate).

in public statements may support a strong inference of scienter." *See Comshare*, 183 F.3d at 553-54; *see also, Miller v. Material Sciences Corp.*, 9 F. Supp.2d 925, 928-29 (N.D. Ill. 1998) ("Deliberately ignoring 'red flags'. . . can constitute the sort of recklessness necessary to support § 10(b) liability.").  On the other hand, "ignoring red flags may indicate that a defendant was merely negligent, not reckless.  Courts typically look for multiple, obvious red flags before drawing an inference that a defendant acted intentionally or recklessly."  *See PR Diamonds*, 91 Fed. Appx. at 431.

Red flags in this case would be "circumstances that would have put the [d]efendants on notice that [Cardinal's] financial statements and press releases contained material misstatements or omissions, or at least would have given them reasons to question the veracity of the statements." *See PR Diamonds*, 91 Fed. Appx. at 432 (citing *Comshare*, 183 F.3d at 553).  The *Helwig* factors, while not an exhaustive, are red flags probative of scienter in securities fraud actions:

> (1) insider trading at a suspicious time or in an unusual amount;
> (2) divergence between internal reports and external statements on the same subject;
> (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;
> (4) evidence of bribery by a top company official;
> (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;
> (6) disregard of the most current factual information before making statements;
> (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;
> (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and
> (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

251 F.3d at 552 (citing *Greebel*, 194 F.3d at 196).

Cardinal Defendants argue that Plaintiffs suggestion that "the Court brush aside the

-74-

absence of a *Helwig* factor is . . . nonsense." *See* Def.'s Reply to Motion to Dismiss at 19; *see Helwig*, 251 F.3d at 552 (citing *PR Diamonds*, 91 Fed. Appx. 495 (going through *Helwig* factors one by one, and affirming dismissal on scienter grounds immediately after recognizing "[f]ew of these factors emerge"); *Miller*, 346 F.3d at 672-73 (affirming dismissal where three *Helwig* factors at issue were too weak to support an inference of scienter); *Albert Fadem*, 334 F. Supp. 2d at 1008 n. 24 (noting that plaintiffs' failure even to mention the *Helwig* factors was "telling" that none of the "usual indicia" of securities fraud was present in the case).

Four of the nine *Helwig* factors are altogether inapplicable to this case: (1) Plaintiffs concede that there was no bribery of top Cardinal officials; (2) Plaintiffs do not allege the "overly-sophisticated disclosure of information"; (3) Plaintiff do not point to the quick settlement of ancillary lawsuits; and (4) Plaintiffs identify no conflicts of interest among directors. Cardinal Defendants ask the Court to regard the absence of these factors as pointing *against* an inference of scienter. 251 F.3d at 552. Before concluding that the absence of one of the list of factors defeats an inference of scienter, the Court will closely examine each of the *Helwig* factors that *is* present to determine whether they combine to create a strong inference of scienter.

### 1) Insider Trading

Plaintiffs allege that each of the Individual Defendants engaged in suspicious or unusual trading activity over the course of the Class Period and that their trading, considered in its totality, establishes an inference of scienter except with respect to Defendants Parrish and Millar. *See supra* Part IV.II.A.1.b.iv.1). Thus, the Court must also consider the Individual Defendant's alleged insider trading in its analysis of whether the *Helwig* factors imply scienter.

### 2) Divergence Between Internal Reports and External Statements on the Same Subject

Plaintiffs attempt to satisfy the second *Helwig* factor by suggesting that the Individual Defendants were either "aware" or "should have been aware" of the alleged fraudulent nature of various financial statements when they were issued because of the Individual Defendants' high-ranking positions, coupled with their certifications that each defendant was closely involved in Cardinal's business affairs, accounting and financial reporting.  As further support, Plaintiffs cite all of Cardinal Defendants'  monthly committee meetings and personal calls and statements made to industry analysts over the course of the Class Period.  Plaintiffs conclude that because "allegations errors and improprieties that are significant in nature and magnitude" support an inference of reckless or knowing misconduct," their allegations clearly establish the existence of this second *Helwig* factor.  *See FirstEnergy Corp.*, 316 F. Supp. 2d at 598.

Cardinal Defendants argue, and this Court agrees, that the Plaintiffs may not rest on such conclusory allegations to establish a "divergence" between external reports and internal statements.  In total, Plaintiffs allege a $26 billion difference between Cardinal's reported financials and their *actual* financials.[64]  Though it has yet to be proven whether or not this figure is in fact *accurate*, the Court need not decide this issue on a motion to dismiss.  This Court, therefore, finds that the alleged divergence between the Company's reported and actual financials resulting from the misstatements implies scienter.

### 3) Closeness in Time of the Allegedly Fraudulent Statement or Omission and the Later Disclosure of Inconsistent Information

Plaintiffs allege that Cardinal Defendants disregarded current information before issuing their allegedly fraudulent statements.  Cardinal Defendants, however, argue that Plaintiffs'

---

[64]*See supra* note 19 (discussing Plaintiffs' analysis of their allegation that Cardinal's accounting errors amounted to $26 billion).

Complaint pleads the issue in a "conclusory fashion without providing supporting numbers or identifying specific items of information supposedly disregarded." Def.'s Motion to Dismiss at 53. In *Comshare*, Plaintiffs alleged that Cardinal Defendants "were aware of, or were recklessly indifferent to" the revenue recognition errors. *See* 183 F.3d at 553. Nonetheless, the court found that where plaintiffs had alleged no facts to show that Cardinal Defendants *knew* or *could have known* of the errors, or that their regular procedures should have alerted them to the errors sooner, Plaintiffs' allegations did not imply scienter. *See id*. Similarly, in this case, the Court finds that as Plaintiffs' allegations do not provide specific indications that Defendants should have known about the errors, Plaintiffs may not rest on their conclusory allegations that the existence of errors implies *recklessness*.

### 4) Disregarding Current Factual Information Before Making Statements

Plaintiffs aver that Cardinal Defendants disregarded current information before issuing their allegedly fraudulent statements. Again, the Cardinal Defendants counter, and the Court agrees, that Plaintiffs' allegations are merely conclusory, accompanied by no factual support.

### 5) Defendants' Self-Interested Motivation to Save Their Salaries or Jobs

As established above, the Court finds that Plaintiffs sufficiently alleged that Cardinal Defendants had a motive to artificially inflate the purchase price of Cardinal's stock, in part, because of their incentive-based compensation, and ostensibly, their self-interest in saving their jobs. *See supra* Part IV.*II*.A.1.b.iv.2). Because Plaintiffs have successfully alleged Cardinal Defendants' executive compensation as a possible motive for fraud, this Court will also view it as a suggestive red flag.

### c. Conclusion

As Plaintiffs stated during oral argument, the scienter analysis in these types of securities fraud cases is akin to looking at a painting.  Though one or two brush strokes may be more powerful up close, to fully appreciate the painting, the viewer must step back to take in the "big picture."  Applying this analogy to the facts in this case, the Complaint viewed *in toto* the conclusion that Plaintiffs have met their burden under the PSLRA, pleading sufficient facts to raise a strong inference that the Cardinal Defendants acted with the requisite scienter. Specifically, the Complaint's allegations as to: (1) Cardinal's GAAP violations; (2) the Individual Defendants' various motives to commit fraud, in particular, their insider trading, and incentive-based executive compensation packages; (3) Plaintiffs' allegations highlighting Operating Revenues as an area of focus for Cardinal which Cardinal Defendants had overstated by approximately $26 billion; and (4) Plaintiffs' sufficient allegations of a number of *Helwig* factors cumulatively raise a strong inference that the Cardinal Defendants acted intentionally, consciously, or, at the very least, recklessly, in violation of the securities laws.

Because the Court finds that the Plaintiffs have alleged scienter, the Court must now analyze whether Plaintiffs have established the other elements of a prima facie case of securities fraud.  *See Comshare*, 183 F.3d at 548.  Cardinal Defendants do not dispute that Plaintiffs' Complaint establishes both reliance and damages.  *See* Pl.'s Reply at 82.[65]  Accordingly, to make

---

[65]Looking at Cardinal Defendants' Motion to Dismiss as well as their Reply, Plaintiffs' Opposition correctly asserts that, through their silence, Cardinal Defendants' concede that Plaintiffs adequately pled both *reliance* and *economic loss (damages)*.  To plead reliance, a plaintiff need only allege that, "but for the fraud, the plaintiff would not have engaged in the transaction at issue."  *In re Daou Sys., Inc., Sec. Litig.*, 411 F.3d 1006, 1025 (9th Cir. 2005).  Plaintiffs specifically pled reliance, alleging that but for the fraud they "would not have purchased or otherwise acquired their Cardinal securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid."  *See* Complaint ¶ 432.  To plead economic loss, a plaintiff need only provide "notice of

out a prima facie case, Plaintiffs must successfully plead the following: (1) that Defendants made a false statement or omission of material fact; (2) in connection with a purchase or sale of securities. *See Comshare*, 183 F.3d at 548.

## 2. Particularity of Fraud Allegations

Cardinal Defendants argue that Plaintiffs' Complaint must be dismissed under Rule 12(b)(6) for failing to allege false or misleading statements or material omissions made by Defendants with the particularity required by both Rule 9(b) and the PSLRA. Def.'s Motion to Dismiss at 28. The Plaintiffs must plead fraud with particularity under Rule 9(b) while also establishing facts demonstrating each statement's falsity, each statement's speaker, and why each statement was false when made. *See* 15 U.S.C. § 78u-4(b)(1); *Century Bus.*, 2002 WL 32254513 at *12; *Helwig*, 251 F.3d at 550; *Gupta v. Terra Nitrogen Corp.*, 10 F. Supp. 2d 879, 885 (N.D. Ohio 1998). Under the PSLRA, a plaintiff pleading on information and belief also must allege all facts on which that belief is based. *See* 15 U.S.C. § 78u-4(b)(1); *Century Bus.*, 2002 WL 32254513 at *12; *Telxon*, 133 F. Supp. 2d at 1025. This requirement may be satisfied in two ways: (1) a plaintiff can plead "the who, what, when, where and how: the first paragraph of any newspaper story"; or (2) a plaintiff can satisfy the requirement through "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *See Telxon*, 133 F. Supp. 2d at 1025 (quoting *DiLeo*, 901 F.2d at 627); *Lucent Tech., Inc.*, 363 F.

---

what the relevant economic loss might be." *Dura Pharm., Inc. v. Broudo*, 125 S. Ct. 1627, 1634 (2005). Plaintiffs have also pled the relevant economic loss, providing that as a result of disclosures regarding defendants' misrepresentations and omissions, "the Company's stock price plummeted, the artificial inflation came out of the stock and lead plaintiffs and other members of the class were damaged, suffering economic losses of up to $28.75 per share." *See* Complaint ¶ 412.

Supp. at 715 (citing *Lum*, 361 F.3d at 233-24; *Seville Indus. Machinery*, 742 F.2d at 791) (holding that a plaintiff satisfied Rule 9(b) by pleading which machines were the subject of alleged fraudulent transactions and the nature and subject of the alleged misrepresentations)).  "Plaintiffs also must allege who made a misrepresentation to whom and the general content of the misrepresentation."  *Id*.  Thus, to plead adequately the falsity of Cardinal's financial results reported in statements to the market via press releases and during analyst conference calls, and included in SEC filings, the Complaint need only identify the exact statements or the content Plaintiffs allege were false and misleading, the identity of the speakers, the date on which the statements were made, and the reasons the statements were false.  *See SmarTalk*, 124 F. Supp. 2d at 538.

Plaintiffs' Complaint devotes 105 pages,[66] to presenting a detailed description of Cardinal Defendants' allegedly false statements or omissions of material fact.  In their Motion to Dismiss, Cardinal Defendants argue the following: (1) Plaintiffs' Complaint has not sufficiently pled fraud allegations with respect to each Individual Defendant; (2) Plaintiffs' Complaint does not state a claim based upon any of Cardinal's alleged accounting misstatements; and (3) Plaintiffs' Complaint does not allege particularized facts sufficient to state a claim based on Cardinal's transition from a B+H to an FFS business model.

### a. Particularity of Fraud Allegations with Respect to Each Defendant

Cardinal Defendants argue that Plaintiffs' allegations fail as a matter of law because Plaintiffs do not specify their allegations with respect to each Individual Defendant.  They

---

[66]Complaint ¶¶ 55-237 describe, in detail, Cardinal Defendants' allegedly false statements or omissions of material fact.

contend that a plaintiff "is required to meet the Rule 9(b) and PSLRA standards as to *each* defendant against whom securities fraud is alleged" and that the Fifth Circuit has "explained the PSLRA's prohibition on clumping in some detail."  *See* Def.'s Motion to Dismiss at 61; *see Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d at 353, 364-65 (5th Cir. 2004) ("These PSLRA references to 'the defendant' may only reasonably be understood to mean 'each defendant' in multiple defendant cases as it is inconceivable that Congress intended liability of any defendant to depend on whether they were all sued in a single action or were each sued alone in several separate action.")).

The Plaintiffs, however, contend that they have adequately pled fraud as to each Individual Defendant under the auspices of the "group-published information doctrine" (the "Doctrine").  The Doctrine is a presumption, applied in some circuits, which allows plaintiffs to hold a corporation's officers and directors liable for false statements found in collectively published documents.  *See Century Bus.*, 2002 WL 32254513 at *13.  The Doctrine reasons that, "[i]n cases of corporate fraud where the false and misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other 'group-published information,' it is reasonable to presume that these are the collective actions of the corporate officers. . ."  *See id*. (citing *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1440 (9th Cir. 1987) (citations omitted)).  Under the Doctrine, a plaintiff fulfills the particularity requirement "by pleading the misrepresentations with particularity and[,] where possible[,] the roles of the individual defendants. . ." *See City of Monroe Employees Retirement Sys. v. Bridgestone Corp.*, 399 F.3d 651, 689 (6th Cir. 2005) (citing *Wool*, 818 F.2d at 1440 (finding that the Doctrine is premised on the presumption that "[i]n cases of corporate fraud where the false or misleading

-81-

information is conveyed in prospectuses, registration statements, annual reports, press releases, or other 'group-published information,' it is reasonable to presume that these are the collective actions of the officers")).

Cardinal Defendants argue that a plaintiff's vague allegations *must* fail if the plaintiff fails to attribute them to specific directors, grouping directors together as "Defendants" instead.  *See Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993); *Rich v. Maidstone Fin. Inc.*, 2001 WL 286757, *7 (S.D.N.Y. Mar. 23, 2001).  Further, Defendants argue, based on *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, that the Doctrine could not have survived Congress' passage of the PSLRA because pleading in such a manner "cannot withstand the PSLRA's specific requirement that the untrue statements or omissions be set forth with particularity as to 'the defendant' and that scienter be pleaded with regard to 'each act or omission' sufficient to give 'rise to a strong inference that the defendant acted with the required state of mind.'"  *See* 365 F.3d at 364-65.

Though Defendants' prudential argument may have appeal, it has been specifically rejected by the Sixth Circuit.  *See Century Bus.*, 2002 WL 32254513 at *12-13 (though "[d]efendants argue that the Sixth Circuit has not adopted the [Doctrine] at any point after the Reform Act and that, without [the Doctrine], the plaintiffs have failed to allege particularized facts demonstrating false statements by each defendant," the court found "that the [Doctrine] survived the passage of the PSLRA and has continuing viability in the Sixth Circuit" ).  The *Century Bus.* court was guided by a number of cases from both inside of and outside of the Sixth

Circuit, all of which recognized the continued validity of the Doctrine. *See id.*[67]

This Court finds that the group-published doctrine does not eviscerate the specificity required by the PSLRA. When high level executives with access to information who signed the corporate documents being questioned for their validity at trial, Plaintiffs should be allowed to attribute those documents to the signors. *See Century Bus.*, 2002 WL 32254513 at *14 (citing *Benedict*, 23 F. Supp. 2d at 762-63) (holding that conclusory allegations were sufficient as to inside directors with involvement in the day-to-day affairs of the corporation). The standards for

---

[67]In *Century Bus.*, the Sixth Circuit stated:

Plaintiffs note that, while the Sixth Circuit has not addressed the applicability of the Doctrine after the passage of the PSLRA, a plethora of district court decisions from within [the Sixth Circuit] supports the plaintiffs' position. *See, e.g. SmarTalk*, 124 F. Supp. 2d at 545; *Benedict v. Cooperstock*, 23 F. Supp. 2d 754, 762 (E.D. Mich. 1998) (accepting group-published information doctrine). Moreover, the vast majority of cases decided nationwide also have recognized the [D]octrine. *See, e.g., In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 17 (D.D.C. 2000); *In re Oxford Health Plans*, 187 F.R.D. at 142; *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1340-41 (S.D. Fla. 1999); *In re Livent, Inc.*, 78 F. Supp. 2d 194, 219 (S.D.N.Y. 1999); *In re BankAmerica Corp.*, 78 F. Supp. 2d 976, 987 (E.D. Mo. 1999); *Robertson v. Strassner*, 32 F. Supp. 2d 443, 446 (S.D. Tex. 1998); *In re Digi Int'l, Inc. Sec. Litig.*, 6 F. Supp. 2d 1089 (D. Minn. 1998); *Zuckerman v. Foxmeyer Health Corp.*, 4 F. Supp. 2d 618, 627 n. 4 (N.D. Tex. 1998); *In re Stratosphere Corp. Sec. Litig.*, 1 F. Supp. 2d 1096, 1108 (D. Nev. 1998); *In re Health Mgmt., Inc. Sec. Litig.*, 970 F. Supp. 192, 208 (E.D.N.Y. 1997).


*See* 2002 WL 32254513 at *13. At oral argument, Counsel for Defendants Millar and Jensen, James J. Benjamin, argued that in *City of Monroe v. Bridgestone Corp.*, though the Sixth Circuit declined to reach the question of whether the Doctrine survives the PSLRA, it made clear that since the passage of the PSLRA, most courts no longer recognize the Doctrine as viable in the context of securities fraud cases. *See* 399 F.3d at 689-90. Nonetheless, when it ruled on *City of Monroe*, the Sixth Circuit did not address the viability of the Doctrine. *Id.* at 690 ("We need not decide here the current viability of the group-published doctrine because resolution of that question is not required to decide the case."). Moreover, the court declined to overturn its previous affirmation of the Doctrine's viability in *Century Business*. *See id*. As such, this Court disagrees with Defendants' arguments that Plaintiffs may *not* rely on the Doctrine in this case.

applying the Doctrine are relatively lenient.  *Id*.  Thus, in this case, the Court finds that, under the relatively lenient group-pleading standards, Plaintiffs are entitled to the group-published information presumption to all Individual Defendants except Defendant Jensen.

Defendants Walter, Fotiades, Miller, Millar, and Parrish were all high-level executives, responsible for day-to-day operations and issues relating to Cardinal's financial performance.  *See supra* Part.II.A.  They also signed off on Cardinal's corporate disclosure statements or participated in conference calls with analysts and investors.  *Id*.   Though Plaintiffs have alleged facts showing that Defendant Jensen was a high-level executive, they have not shown that he had any involvement in certifying corporate documents to the extent of the other Individual Defendants.  Also, Plaintiffs have not pled facts showing that Jensen ever participated in conference calls with analysts and investors.  Moreover, at oral argument, counsel for Defendant Jensen further convinced the Court that there were not enough facts alleged to link Jensen to Cardinal's corporate misstatements to the extent of his co-Defendants.  And although the Court still finds that Plaintiffs' allegations about Defendant Jensen's insider trading provide some indications of scienter, in their totality, Plaintiffs' Complaint fails to establish that Defendant Jensen should be found responsible for Cardinal's alleged misstatements or omissions.  Accordingly, the Court **GRANTS** Defendant Jensen's Motion to Dismiss.

### b.  Whether Plaintiffs Pled Cardinal's Accounting Misstatements with Particularity

Cardinal Defendants emphasize that Plaintiffs have failed to allege GAAP violations because they have not indicated any true "misstatements" or "omissions" by Cardinal Defendants.  *See* Def.'s Motion to Dismiss 58-87.  Cardinal Defendants' arguments fall short, in part, however, because this Court has already found that the Plaintiffs adequately pled scienter as to Cardinal

Defendants' GAAP violations.  *See supra* Part IV.*II*. A.1.c.

In *Montalvo v. Tripos, Inc.*, plaintiffs, purchasers of stock in a corporation, sued defendants – the corporation, certain corporate officials, and the corporation's outside auditor – alleging that defendants had made false and misleading financial misstatements which, when discovered, led to a significant drop in the company's stock value.  *See* 2005 U.S. Dist. LEXIS 22752, *23-24 (E.D. Mo. Sept. 30, 2005).  Certain defendants moved to dismiss plaintiffs' complaint.  *See id*.  The plaintiffs' complaint set forth "numerous public statements made by the defendants during the class period that the plaintiffs investors believe [gave] rise to a strong inference of scienter because the defendants knew facts or had access to information that suggested that their public statements were not accurate and/or deliberately engaged in making false and misleading statements in order to defraud the investors as to the true financial condition of defendant Tripos."  *See id*. at *15.  The plaintiffs declared that, despite the defendants' knowledge of negative events and accounting irregularities, defendants had continued to forecast extremely positive corporate revenues.  *Id*.  Defendants argued that the purchasers failed to allege securities fraud with the particularity required by the PSLRA.  *Id*.

The *Montalvo* court held that the purchasers had sufficiently alleged that defendants acted with the requisite scienter, properly identified misleading statements and the circumstances under which the statements were made, and adequately pled fraud in connection with defendants' accounting irregularities.  *Id*.  The court reasoned that where plaintiffs had alleged both far-reaching GAAP violations as well as facts showing the evidence of defendants' fraudulent intent, they had met the PSLRA's standards of pleading with particularity.  *Id*.  The *Montalvo* court concluded:

Here the plaintiffs have alleged not only egregious GAAP violations, but also "evidence of corresponding fraudulent intent." They have set out with particularity the material misstatements in the public statements which omitted, among other things, the on-going problems with the software consulting business, and have set forth GAAP violations which defendants do not deny as evidenced by their restatements. Essentially, the amended complaint alleges that defendants knew that certain company assets were impaired and that losses were certain, but that recognizing these losses (during the Class Period) would have lowered the company's stock price and threatened the ability to market and sell its products. . . It is [also] alleged that the "strategic non-disclosures" kept [the defendant company's] stock artificially high, attracting more investors, until the restatements were issued, causing a drastic stock price fall. The plaintiffs have identified specific documents and statements within those documents attributable to the defendants that allegedly artificially inflated [the defendant company's] earnings and net tangible assets by deliberately hiding specific losses that were also identified.

*See id*. at *23-25.

Just as the *Montalvo* plaintiffs' complaint identified a number of examples of allegedly inaccurate statements meant to defraud investors, so too does Plaintiffs' Complaint detail 105 pages of detailed errors. Thus, the Court finds that while the Cardinal Defendants spend considerable time and effort explaining how and why *each* of Cardinal's accounting statements was in fact both legal and proper, at this stage of the litigation, these arguments do not undermine the Plaintiffs' allegations.

### c. Cardinal's Forward-Looking Statements

Cardinal Defendants also argue that Plaintiffs' allegations fail to satisfy the standards of the PSLRA because they are protected by the statutory safe-harbor as "immaterial" forward-looking statements. During the Class Period, Plaintiffs allege that Defendant Cardinal made numerous statements concerning the Company's shift from the B+H to the FFS distribution market, and its effect on Cardinal's business. Cardinal Defendants aver that its statements concerning the Company's changing distribution model constitute inactionable "forward-looking statements" protected by the PSLRA's safe-harbor provision. Def.'s Motion to Dismiss at 83-85;

*see* 15 U.S.C. §§ 78u-5(c)(1)(A), 77z-2(c)(1)(A), 78u-5(c)(1)(A); *see Southland*, 365 F.3d at 371.

They argue that Plaintiffs' arguments mistakenly rely on the following inactionable forward-

looking statements: (1) Cardinal's January 23, 2003 conference call with analysts and investors;

(2) Cardinal's May 2003 Investor; (3) Cardinal's July 31, 2003 conference call with analysts and

investors; (4) Cardinal's January 22, 2004 conference call with analysts and investors; (5)

Cardinal's February 19, 2004 conference call with analysts and investors; (6) Cardinal's April 22,

2004 conference call with analysts and investors. *See* Complaint ¶¶ 142, 156, 164, 182, 187, 192;

*see* Def.'s Reply at 61-76. This Court must examine each of Cardinal Defendants' arguments in

turn.

> A "forward-looking statement," which can be either written or oral, is defined as:
>
> (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure or other financial items;
> (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
> (C) a statement of future economic performance, including any statement contained in a discussion and analysts of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission. . . .

15 U.S.C. § 77z-2(i)(1); *see Southland*, 365 F.3d at 371. To avoid the safe harbor, a plaintiff

must plead facts demonstrating that the statement was made with actual knowledge of its falsity.

15 U.S.C. § 78u-5(c)(1)(B); *Southland*, 365 F.3d at 371.

The safe harbor has two independent prongs: one focusing on the defendant's cautionary

statements, and the other on the defendant's state of mind. 15 U.S.C. §§ 77z-2(c)(1)(A), 78u-

5(c)(1)(A) (1996); 15 U.S.C. §§ 77z-2(c)(1)(B), 77u-5(c)(1)(B) (1996); *Southland*, 365 F.3d at

371. Under the first prong, there is no liability if, and to the extent that, the forward-looking

statement is either: (1) identified as forward-looking and accompanied by meaningful cautionary

-87-

statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement, or (2) immaterial.  15 U.S.C. §§ 77z-2(c)(1)(A), 78u-5(c)(1)(A); *Southland*, 365 F.3d at 372.  Under the second prong, there is no liability if the plaintiff fails to prove that the statement: (1) if made by a natural person, was made with actual knowledge that the statement was false or misleading, or (2) if made by a business entity, was made by or with the approval of an executive officer of that entity with actual knowledge by that officer that the statement was false or misleading.  15 U.S.C. §§ 77z-2(c)(1)(B), 78u-5(c)(1)(B).

Cardinal Defendants are liable only if the statements were "material" and Cardinal Defendants had "actual knowledge" that they were false or misleading, or if the statements were not identified as "forward-looking" and/or lacked meaningful cautionary language.  *See* 15 U.S.C. § 78u-5©)(1).  The Court will now analyze whether any of the following statements are protected by statutory safe harbor.

## I.  Materiality

First, Cardinal Defendants would dismiss their optimistic projections and internal estimates as "soft, puffing statements" that are immaterial as a matter of law.  Def.'s Motion to Dismiss at 83-85; *see San Leandro*, 75 F.3d at 811 (rejecting plaintiffs' contention that general announcement by Phillip Morris that it was 'optimistic' about its earnings and 'expected' Marlboro to perform well required the company to disclose the possibility of adopting an alternative marketing strategy that would hurt short-term earnings); *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) (finding that mere puffery cannot mislead a reasonable investor to believe that a company had irrevocably committed itself to one particular strategy and cannot constitute actionable statements under the securities laws).  "'Soft,' 'puffing' statements . . .

generally lack materiality because the market price of the share is not inflated by vague statements. . . No reasonable investor would rely on these statements, and they are certainly not specific enough to perpetrate a fraud on the market." *In re Royal Appliance Sec. Litig.*, 1995 WL 490131, *3 (6th Cir. Aug. 15, 1995) (quoting *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289 (4th Cir. 1993)).[68]

Under the federal securities laws, a statement is *material* if there is a "substantial likelihood that [it] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *See TSC Indus., Inc.*, 426 U.S. at 449 (emphasis added). "[M]ateriality depends on the significance the reasonable investor would place on the information." *See Basic, Inc. v. Levinson*, 485 U.S. 224, 240 (1988). A court may rule on questions of materiality as a matter of law "if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality. . . ." *Century Bus.*, 2002 WL 32254513 (citing *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 281 n. 11 (3d Cir. 1992)).

The Supreme Court endorses a fact-intensive test of materiality in securities fraud cases. *Helwig*, 251 F.3d at 555 (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988)).[69] Specifically,

---

[68]*See also In re Federal-Mogul Corp. Sec. Litig.*, 166 F. Supp. 2d 559, 562-63 (E.D. Mich. 2001) (following *Royal Appliances* in holding that "vague, optimistic statements" are not material); *Picard Chem., Inc. v. Perrigo Co.*, 940 F. Supp. 1101, 1122 (W.D. Mich. 1996); *cf. Helwig*, 351 F.3d at 560 (refusing to characterize defendants' statements as "puffery").

[69]*Basic Inc. v. Levinson* involved a company's denials of preliminary merger negotiations, which were, in fact, on-going. A panel of the Sixth Circuit reversed summary judgment for the defendant company, holding that "once a statement is made denying the existence of any discussions, even discussions that might not have been made material in the absence of the denial are material because they make the statement untrue." *See Levinson v. Basic Inc.*, 786 F.2d 741, 749 (6th Cir. 1986). On appeal, however, the Supreme Court rejected

"materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Id*. Though *Basic* did not address earnings forecasts or projections, the *Helwig* court found Basic's "articulation of the basic policies underlying securities regulation applicable here as well." *See Helwig*, 251 F.3d at 556.  These policies are that "[t]here cannot be honest markets without honest publicity.  Manipulation and dishonest practices of the market place thrive upon mystery and secrecy." *Id*. (citing *Basic*, 485 U.S. at 230).  Further, the Court added that it "repeatedly has described the fundamental purpose of the Act as implementing a philosophy of full disclosure." *Id*. (citing *Basic*, 485 U.S. at 230) (citation and internal quotations omitted).

In *Helwig*, Defendants also argued that because their economic projections amounted to puffery, they were not actionable under the securities laws. *See* 251 F.3d at 554-55.  The court disagreed, finding that although "plaintiffs had alleged facts to produce a strong inference that defendants knew that the Budget Act could adversely affect their operations. . . [they] simply rested on their disavowals of knowledge while continuing to make favorable earnings predictions." *See id*. at 556.  Moreover, the court concluded that there was a "substantial likelihood that the disclosure of the omitted fact[s] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id*. at 556 (citing *Basic*, 485 U.S. at 231-32).  The court reasoned,

> [I]t cannot be said that Vencor's preliminary appraisals and internal assessments of the Balanced Budget Act were material solely by virtue of their omission. . . [P]laintiffs have

---

the above standard of materiality, explaining that "in order to prevail on a Rule 10b-5 claim, a plaintiff must show that the statements were misleading as to a *material* fact.  It is not enough that a statement is false or incomplete if the misrepresented fact is otherwise insignificant." *See Basic*, 485 U.S. at 238 (emphasis added).

-90-

alleged facts to produce a strong inference that defendants knew that the Budge Act could adversely affect their operations.  Yet defendants simply rested on their disavowals of knowledge while continuing to make favorable earnings predictions.  We concluded that there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."

*Id*.

There are also instances in which courts have found that a defendant's omissions or misstatements were inactionable because they were "too general."  *See In re Ford Motor Company Sec. Litig,* 184 F. Supp. 2d 626.  In *In re Ford*, plaintiffs sued Ford and its executives under Section 10(b) and Rule 10b-5 alleging that the company made misleading statements about the quality and safety of its "Ford Explorer" sport utility vehicles.  *Id.* at 628.

Plaintiffs' theory of liability is premised on Ford's omission of material information which allegedly transformed seemingly innocuous and accurate statements into misleading statements . . . By omitting information about this contingent liability, plaintiffs argue, Ford's accurate statements about sales of Explorers and its bolstering statements regarding corporate responsibility became misleading to investors.

*Id*. at 630.  The court found that plaintiffs had failed to state a claim under Section 10(b) and Rule 10b-5 because "Ford's statements were *general*, . . .[and] did not give rise to a duty to disclose information about a specific problem that may occur in the future," and because "unlike in *Helwig*, where the company's public statement were [sic] directly related to the withheld adverse information, Ford's public statement[s] [sic] do not relate."  *Id*. at 633 (emphasis added).

Moreover, relying on *In re Ford*, this Court determined in *Albert Fadem* that plaintiffs' allegations were, similarly, too general to substantiate plaintiffs' claims.  *See* 334 F. Supp. 2d at 1023.  In *Albert Fadem*, plaintiffs, investors, sued defendant AEP, a company engaged in energy trading, claiming securities fraud based on defendants' allegedly inaccurate financial reporting, among other things.  *Id*. at 993-94.  This Court held that plaintiffs' allegations that defendants'

-91-

statements in the "Risks Related to Our Energy Trading and Wholesale Business" section were too general, and did not give rise to a duty on the part of defendant AEP to disclose anything about the specific subject of reporting to the Trade Press, especially where plaintiffs had not alleged a way in which investors had access to those price indices or used them in their investment decisions.[70] *Id.* at 1023.

This Court finds the instant case more similar to *Helwig* than to *In re Ford* and *Albert Fadem*. Just as plaintiffs in *Helwig* pled detailed facts that could not be considered puffery, in this case, Plaintiffs have alleged 105 pages of specific facts, each of which implies that although Defendants knew that Cardinal's attempted business model transition could adversely affect the Company's financial standing, they recklessly reported accounting misstatements in their SEC filings, their statements to the market, and their statements during conference calls with analysts and investors. *See* Complaint ¶¶ 56-58, 63-66, 72-76, 80-85, 88-95, 97-105, 108-14, 118-28, 132-38, 141-46, 150-51, 153-59, 163-68, 171-78, 181-87, 191-95, 199-223. As such, the Court finds that Cardinal Defendants' statements regarding the Company's transition from a B+H to an FFS distribution model were *not* immaterial puffery.

### ii. Meaningful Cautionary Language

---

[70]Following the devastating corporate scandals occurring in the past decade, most courts now consider statements of corporate optimism with more hesitation. *See Brumbaugh, et al. v. Wave Sys. Corp., et al.*, 2006 Dist. LEXIS 725, at *16 (D. Mass. Jan. 11, 2006) (explaining that the recent trend in cases of securities fraud is for courts to "consider expressions of corporate optimism carefully"). The *Brumbaugh* court noted: "It has been said that the puffing concept in the securities context has all but gone the way of the dodo. . . This observation may be somewhat hyperbolic. Still dismissals on this ground are increasingly rare." *See id.* at *16 n. 11 (internal citations omitted). Hence, this Court will proceed cautiously when examining Defendants' assertions that their enthusiastic statements about Cardinal's growth were "puffery" as opposed to reckless or fraudulent misstatements.

Though the Court has determined that Cardinal's statements about its shifting distribution model were not puffery, they may still be protected by the safe harbor if they constitute forward-looking statements accompanied by "meaningful cautionary language."  Cardinal Defendants argue that each of their alleged "misstatements" related to the future of the Company in the face of the distribution shift and were forward-looking.  The issue, then, is whether the statements were "accompanied by meaningful cautionary language."

The requirement for "meaningful cautionary language" calls for "substantive" company specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors.  *Southland*, 365 F.3d at 372 (citing H.R. Conf. Rep. No. 369, 104th Cong., 1st Sess. 31, 44 (1995)); *see also Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 371-72 (3d Cir. 1993) ("To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions. . . which the plaintiffs challenge.").

In *FirstEnergy*, the court found that, though some of defendants' forward-looking statements were protected by cautionary statements, the cautionary language was "insufficient to bring them within the safe harbor provision."  *See* 316 F. Supp. 2d at 596.  The court cited what it termed "typical example" of defendants' cautionary language, noting:

> This News Release includes forward-looking statements based on information currently available to management.  Such statements are subject to certain risks and uncertainties. These statements typically contain, but are not limited to, the terms 'anticipate,' 'expect,' 'believe,' 'estimate,' and similar words.  Actual results may differ materially due to a number of factors including, but not limited to, the speed and nature of regulatory approvals.

*Id*. n. 9.  The court reasoned that, considering the facts of the plaintiffs' complaint suggesting that defendants had "actual knowledge" of the problems at the defendant Company, the above "vague

-93-

and insipid cautionary language is insufficient to afford the statements protection under [the] PSLRA's safe harbor provision." *Id.* (citing *In re Prudential Sec. Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) (noting that the safe harbor provision provides "no protection to someone who warns his hiking companions to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away")). Such vague language is in sharp contrast to that found sufficiently meaningful in *In re Kindred Healthcare, Inc. Sec. Litig.*, in which the court found that defendants' cautionary warnings specifically admonishing investors about the "actual risks" the defendant company faced brought statements within the protection of the safe harbor. *See* 299 F. Supp. 2d 724, 739 (W.D. Ky. 2004). Accordingly, should this Court determine that Cardinal's alleged warnings failed to intimate that the Company's statements *could be* inaccurate because of the Company's problems transitioning from a B+H to an FFS distribution model, they will be considered "too vague" to be "meaningful cautionary language." *See FirstEnergy Corp.*, 316 F. Supp. 2d at 596. The Court's analysis of Cardinal's statements follows.

### 1) Cardinal's January 23, 2003 Conference Call

Plaintiffs cite Defendant Walter's statement in Cardinal's January 2003 conference call as being a fraudulent misstatement about whether Cardinal was successfully shifting from a B+H to an FFS distribution model.

[D]uring the call, Defendant Walter stated:

I'm happy to report to you another strong quarter for Cardinal overall where we met our goals and market expectations. We positioned ourselves for a second half of fiscal 2003 that will allow us to deliver on a commitment of 20% earnings per share growth with the solid improvement and return on sales and capital and strong cash flow and – cash flow in excess of $1 billion. . . .

I was very pleased with the quarter.  Revenue and earnings were in line with expectations but cash flow in return and committed capital was substantially better than I expected.  I will explain what is driving that in each of our segments. . . . ***The pharmaceutical distribution and provider service segment continued with above-industry revenue growth driven predominantly by a favorable mix towards change, up 17%, and alternate site up 20%***. . . .

I already mentioned that fiscal 2004 revenues will be strong.  Earnings in the second half for the segment will grow a little slower than the first half, but with favorable revenue and expense trends, earning growth rates for FY04 will pick up over the second half of FY03.  Return on sales, capital and cash flow will be very strong.  Now, let me shift to the medical products and service area.  I really like what I see happening here.  Ron [Labrum] and his team have really stepped up the momentum, and you will see it in our second half.  First, there is a new leadership in the distribution business segment and a strong determination to grow our distribution volume.  And we are winning in the marketplace with some very important new contract. . .

The fact is our models are changing a bit, frankly for the better and we want you to understand it. . . ***Cardinal continued to enter into inventory management agreements with manufacturers, whereby we are compensated on incentive basis to help manufacturers better match their shipments with market demand***.

*See* Complaint ¶ 142.

Cardinal Defendants argue that Walter's statements are not actionable because he accompanied them with meaningful cautionary language that protected them under the statutory safe harbor.  *See* Def.'s Reply at 62-65.  They contend that, Plaintiffs conceded as such by remaining silent on the issue their Opposition Motion.  *See* Def.'s Reply at 64.  Further, Cardinal Defendants contend that Plaintiffs have strategically crafted their Complaint, misquoting Walter's statements to give the impression that he had knowingly "misrepresented" the number of customers who had signed new IMA contracts and the actual success of Cardinal's transition.  *See* Def.'s Reply at 62; Pl.'s Opposition at 50.  Cardinal Defendants argue that such manipulative

pleadings make Plaintiffs' allegations immaterial.[71] *See Royal Appliance*, 1995 WL 490131, at

*3-4 (affirming dismissal of plaintiffs' 10(b) claim where alleged misstatements and omissions

were immaterial as a matter of law when the entire text of the document was considered);

*Kaufman v. Trump's Castle Funding,* 7 F.3d 357, 369-77 (3d Cir. 1993) (same); *Field v. Trump*,

_____

[71]In their Reply Motion, Cardinal Defendants write,

Plaintiffs' Opposition cites, but does not quote, Walter's statement in a January 2003 conference call that:

> The fact is our models are changing a bit, frankly for the better and we want you to understand it. . . Cardinal continued to enter into inventory management agreements with manufacturers, whereby we are compensated on an incentive basis to help manufacturers better match their shipments with market demand. . . .

> The first sentence about "ongoing changes in the business market" in fact does not relate to Cardinal's distribution model at all. Instead, as the full text of the transcript makes clear, Walter was discussing Cardinal's general business plans across all four business segments:

> ***The fact is our models are changing a bit, frankly for the better and we want you to understand it***. First, I want to restate our business model because it's working. First, a total focus on health care. The very big and rapidly growing market with plenty of opportunities so we don't feel a need to wander around.

Second, delivers superior execution that drives scale and strong market positions and superior productivity. Third innovate to differentiate. . .

The second sentence Plaintiffs highlight, meanwhile, was part of a larger conversation in which Cardinal explained that IMAs included many concepts, none of which (yet) were identified as fee for service. . . . The conversation explained that Cardinal was reducing its inventories over time. It did not point to fee-for-service as a goal or even a possibility, though – much less represent how many manufacturers entered fee-for-service contracts. . . Given this context, Plaintiffs' assertion that Cardinal in January 2003 was misrepresenting anything at all about fee-for-service makes little sense, and Plaintiffs cannot ignore the full text to pretend that it is so.

*See* Def.'s Reply at 63.

850 F.2d 938, 949 (2d Cir. 1988) (dismissing plaintiffs' 10(b) claim because the omission of

stock price paid to directors was immaterial as a matter of law when it could be readily

determined by reading the entire proxy statement); *Fudge v. Penthouse Int'l Ltd.*, 840 F.2d 1012,

1015-20 (1st Cir. 1988) (dismissing libel and false pretenses claims because, when the entire

article was read the plaintiff could not state a claim as a matter of law).

This Court does not agree that this situation is akin to *Royal Appliance*, *Kaufman*, *Field* or

*Fudge*.  *See* 1995 WL 490131, at *1;  7 F.3d at 357;  850 F.2d at 938; 840 F.2d at 1012.

Plaintiffs' selective pleading of Walter's statements is sufficient to make their allegations

"immaterial as a matter of law."  *See supra* note 72.  Considering the effects of the "missing"

language Defendants added in their Reply motion, the Court does not agree that the Defendants

have adequately protected their statements with meaningful cautionary language intimating the

"actual risks" faced by the Company.  *See FirstEnergy Corp.*, 316 F. Supp. 2d at 596.  As such,

Walter's above statements do not fall under the protection of the statutory safe harbor.

### 2) Cardinal's May 2003 Investor

The Plaintiffs cite the May 2003  issue of The Cardinal Health Investor as including a

number of actionable misstatements.[72]  This issue of the Investor identified several "Hot Topics,"

one of which was the Company's [IMAs] with manufacturers, writing:

IMAs - Our critical role

_____

[72]Plaintiffs cite to the inaugural edition of The Cardinal Health Investor, which was
distributed to investors, potential investors, and analysts.  *See* Complaint ¶ 155.  Cardinal wrote,
"[w]ith The Cardinal Health Investor we are looking to create a tool that will be of interest and
use to you as you consider your investment decisions.  As always, we invite your comments and
look forward to your input as this publication evolves over time."  *See id.*

We've been getting questions about our relationships with pharmaceutical manufacturers lately, particularly in light of "channel stuffing" activities being reported. Manufacturers are looking to better align productivity with health care providers' product demand and, because of this, are offering less inventory for sale into the channel, which you all are aware has had an impact on our trading company business this year.

[IMAs] . . .are an attempt to balance manufacturing production with actual prescription demand by retailers and consumers. IMAs, which often contain provisions limiting the distributor's inventory investment, are an important part of doing business as a pharmaceutical distributor. The channel can operate more efficiently, and costs to eventual patients can be contained.

We look to structure IMAs to achieve similar levels of profitability and improve oru return on capital by reducing the capital that is needed for investment in inventory. That frees up capital for reinvestment either in this business or in other areas of the company. With the diversity of our businesses and attractive investment alternatives, we will deploy the capital returned from these agreements into new opportunities.

Evolution occurring in the marketplace over the past several years can be a positive development for the industry, but also one in which we have to remain diligent in understanding how the structure of these agreements will impart our profit over the next several years. We will continue to utilize our experience and competitive expertise to negotiate individually with manufacturers, but we will always weight the economic value of every product we carry to ensure it is consistent with our profit targets and the value we bring to manufacturers.

We are confident that we can work with manufacturers to meet their needs and also preserve our profit consistent with the influential role we play in the pharmaceutical channel.

See Complaint ¶ 156.

Again, Cardinal Defendants argue that Plaintiffs' silence as to whether the above statement is accompanied by meaningful cautionary language makes it inactionable. See Def.'s Reply at 65. Further, Cardinal Defendants argue that the above statement merely "confirms that the market is in '[e]volution' and that Cardinal recognizes the need to 'remain diligent' in the face of new challenges." See id. Nevertheless, the Court finds that this brief sentence of cautionary language is not specific enough to allow the entire statement the protection of the statutory safe-harbor.

### 3) Cardinal's July 31, 2003 Conference Call

In Cardinal's July 31, 2003 conference call with analysts and investors, Cardinal

Defendants "repeated and addressed information previously made public in the [Company's] July

31, 2003 press release." Complaint ¶ 164. During that call, Defendant Miller stated:

> As expected, Cardinal Health's 4th quarter financial results capped off the year that delivered on the financial commitment that we made to our shareholders at the beginning of the year. Strong revenue growth across all of our business segments drove continued expansion and operating earnings. . . .
>
> Now, let me comment on just a few matters of importance in our various operating segments, beginning with the Pharmaceutical Distribution and Provider Services segment. Strong revenue growth of 14 percent was driven by 42 percent growth from alternate site customers and 11 percent growth from chain customers during the 4th quarter. Incremental revenue from previously announced new customer wins had a positive impact during the quarter and served to offset the expected dampening effect of a slow down in our wholesaler-to-wholesaler trading revenues.

*Id*. Further, Defendant Walter allegedly provided:

> Our solid 4th quarter performance capped another strong year for our company. The financial results for the year were outstanding and we did deliver on our commitments. . . .
>
> . . . In our analyst meeting last August, we forecasted 14 to 17 percent revenue growth and 20 to 22 percent earnings per share growth for Cardinal Health, and our performance was right on target. . . .
>
> Now for some of the highlights from the 4th quarter in fiscal 2003,from my perspective, strong revenue growth across the company, and each segment delivers at or above our expectations. . .
>
> In our Pharmaceutical Distribution business. . .[r]evenue growth was strong with some important new relationships being established that provides us more from a supplier that moves us more from a supplier of products to a solutions provider. . .
>
> First, we are confident that revenues in each of our segment will continue to be strong. An I've already given you some of the reasons for that. Revenue growth for the corporation should be in the mid-teens. So there is a lot of confidence in sales. . . .
>
> [I'm] convinced, after extensive conversations with many of our manufacturing partners, that they are not seeking to pull margins from the distribution partners. . . .
>
> And this has led to the statements I made on the call in April, led to more active conversations at the high level with other manufacturers and I am very pleased with those

conversations and met with the CEOs of some of the major pharmaceutical manufacturers to talk about and make sure they know about distribution and make sure they understand how moving to what I call a closer – a model that has sales in production and closer to demand of the patient.

*Id*.

Cardinal Defendants argue that "[n]either excerpt purports to identify manufacturers who have entered new contracts.  The complete transcript makes clear that with the first sentence Walter is *cautioning* investors about the diminishing margin opportunities that led to the transition."  *See* Def.'s Reply at 66.  Defendants aver that Walter began his statement by saying,

First we have concluded that it's prudent to be more cautious about vendor margins in this environment. . . .we expect strong revenue. . . but as we pulled our budget together for the fiscal year and reviewed recent activity, we came to the conclusion vendor margins will be down when compared to a relatively strong '02 in first half of '03.  Some manufacturers are seeking a distribution relationship that pulls inventory out of the channel when compared to fiscal '02 and fiscal '03.  Their goal is to match production in sales more closely to script demand at the patient level.  Keep in mind, I said some, but not all.  I want to accommodate their needs as we view them as our upstream customer.  And [I'm] convinced, after extensive conversations with many of our manufacturing partners, that they are not seeking to pull margins from the distribution partners.

*Id*.  Cardinal Defendants argue that Walter reiterated his warnings in response to analyst questions, and that Plaintiffs intentionally omitted some of Walter's cautionary language in their pleadings.  *See* Def.'s Reply at 68.  Specifically, they aver that in response to an analyst question about the Company's management of the IMA model, Defendant Walter responded by stating, ". . . Let's put this in perspective, in my conversation I said that the less optimism on buying margin, vendor margin for the next six months affected the overall growth rate of Cardinal's operating earnings by 2-3%. . . ."  *Id*.  They declare that, considering Walter's statements *in context*, Cardinal clearly disclosed  "the difficulties that lay both in the past and the future" and also offered "what Cardinal hoped would be 'perspective'" – amounting to "sound management, not

-100-

deception." *See* Def.'s Reply at 68. The Court does not find that these tidbits of "perspective" amount to meaningful cautionary language sufficient to warn an investor that, despite Cardinal's seemingly successful operating revenues, the Company was still hesitant about its transition to a new distribution model. The above conference call does not fall under the protection of the statutory safe harbor.

### 4) Cardinal's February 19, 2004 Conference Call

On February 19, 2004, Cardinal hosted its Semi-Annual Investor Update Conference during which Defendant Parrish allegedly stated:

> We have seen tremendous organic growth in the business and we're not looking forward maybe projections of winning through large agreement and having to sort of hit one over the fence, if you will, in order to make our numbers. . . .
>
> Our revenue growth is dependable and sustainable. We're going to grow slightly faster than the marketplace because of our mix of mail-order business and alternate-care business. . . .
>
> Now finally, as we have been informing you over the last three quarters, our manufacturers' needs have shifted. It is our inventory management model, with inventory levels that match demand, production efficiencies and increase the safety and security of the U.S. distribution channel.
>
> Finally, as we move through fiscal year 2005, our results will begin to resemble the traditional model for the distribution company, in which earnings grow faster than revenues, the model that you're used to seeing from Cardinal Distribution. . . .
>
> And we're making significant progress with our branded manufacturer customers at this point. . . .
>
> And currently, we have in process 47 manufacturers, representing about 80% of our volume in these negotiations in some phase of these five-step processes.

*See* Complaint ¶ 187.

Cardinal Defendants argue that, in his statements, Parrish neither "misrepresented" the "number of customers" who had signed IMA contracts nor "the actual status of the transition." *See* Def.'s Reply at 74. They opine that, when Parrish mentioned 47 manufacturers "in some phase of these five-step processes" he was not claiming that Cardinal had actually *completed* new

-101-

FFS agreements with each manufacturer, and they contend that Plaintiffs intentionally left out the following clarifying statements made by Parrish:

> This enabled us to enter into the discussions with the manufacturers armed with documentation and supporting evidence to support the process. Working through this discussion was really a five-stage process involving first establishing awareness of the services that we provide. Then we have to educate our partners on the changes that are going on in the marketplace. We then define the terms of the new agreements, which we're calling distribution service agreements, or DSAs. We go through the implementation process of those agreements, and then there's an ongoing refinement.

*See id*. As such, Cardinal Defendants argue that "rather than misstating the transition, Parrish was *explaining* what [the transition] might entail." *Id*. (emphasis added). Nevertheless, the Court does not find that Parrish's side note that the development of IMAs was a long-term "process" amounts to meaningful cautionary language sufficient to protect Cardinal Defendants' statements under the statutory safe-harbor.

### 5) Cardinal's April 22, 2004 Conference Call

On April 22, 2004, Cardinal Defendants hosted another conference call with analysts and investors in which Defendant Fotiades allegedly stated:

> Another important measure of our progress to the just in time business model as seen in our day's inventory on hand, which declined a significant seven days versus the year-ago period, driven largely by distribution. . . .
> So I think these discussions are now moving into a much more informed kind of discussion because, you know, they now know it's real. They're starting to do their own work and it's making good progress. . . *We have agreements with everybody today and those agreements are going to continue to get refined and we'll continue to see improvements in our business as a result.*

*See* Complaint ¶ 192. The Court is not persuaded that Fotiades one-line statement that the IMAs in development would continue to be refined constitutes meaningful cautionary language to protect Cardinal Defendants' statements under the statutory safe-harbor.

### iii.  Actual Knowledge of Misleading Nature of Forward-Looking Statements

The Cardinal Defendants may also be protected by the statutory safe harbor for material statements as long as the Plaintiffs have not adequately alleged Cardinal Defendants' "actual knowledge" of the misleading or false nature of their statements.  *See Helwig*, 251 F.3d at 556. The *Helwig* court compared the common law requirements for fraud to a showing of scienter under federal securities laws.  *See id*. at 558 (citing  *Mansbach*, 598 F.2d at 1024).  Though *Helwig* acknowledges that the comparison is inexact, it is instructive in the Court's analysis of the allegations in this case:

> A defendant who asserts a fact as of his own knowledge or so positively as to imply that he has knowledge, under the circumstances when he is aware that he will be so understood when he knows that he does not in fact know whether what he says is true, is found to have intent to deceive, not so much as to the fact itself, but rather as to the extent of his information.

*See id*. (citing PROSSER AND KEATON ON TORTS 741-42 (5th ed. 1984) (citations omitted)).

Nonetheless, in *Mayer v. Mylod*, the Sixth Circuit held that the truth or falsity of a defendant's misstatements "is not an issue to be decided under Rule 12(b)(6)."  988 F.2d 635 (6th Cir. 1993) (though material statements containing the speaker's opinion are actionable under Section 10(b) of the Securities Exchange Act if the speaker does not believe the opinion and the opinion is not factually well-grounded, this is *not* an issue to be decided under Rule 12(b)(6)).  In *Mayer*, the court continued that "[a]fter an appropriate time for discovery, the defendants will have an opportunity under Rule 56 of the Federal Rules of Civil Procedure to show that no genuine issue of material fact exists and that they are entitled to judgment as a matter of law." *See id*. at 640.  Hence, this Court need not determine Cardinal Defendants' actual knowledge of the truth or falsity of their statements at this stage of the pleadings.  *See id*.  Even so, because the

Court concluded that Plaintiffs adequately pled scienter based on their numerous allegations, the Court finds that Plaintiffs' allegations are, for pleading purposes, sufficient to show scienter as to Cardinal Defendants' forward-looking statements. *See SmarTalk*, 124 F. Supp. 2d at 544 (finding that because the court had determined that plaintiffs had adequately pled scienter based on their allegations of accounting errors together with insider trading, their allegations were, for pleading purposes, sufficient to show scienter for forward-looking statements).

### iv. Liability for Third-Party Statements

Cardinal Defendants also contend that they cannot be held liable for analysts' and reporters' statements regarding Cardinal. *See* Def.'s Reply at 68-70. Specifically, Cardinal Defendants argue that Plaintiffs have pointed to no actionable misstatements in their allegations regarding the October 23, 2003 Morgan Stanley Report or the January 22, 2004 Dow Jones News Service Article Regarding Cardinal. *See id.*; *see* Complaint ¶¶ 175, 183.

Cardinal Defendants assert that, to state a viable securities fraud claim with respect to analysts' statements, the plaintiffs must plead facts demonstrating that the defendants adopted or *entangled* themselves with the statements. *See Albert Fadem*, 334 F. Supp. 2d at 1027 ("courts have determined that companies generally are not liable for forecasts or statements by analysts unless defendants have 'sufficiently entangled [themselves] with the analysts' forecasts [so as] to render those predictions 'attributable to [the issuers]. . .'"). To prove entanglement plaintiffs must allege that defendants used the analysts as "conduits," making false and misleading statements to them in hopes that the analysts would take such information back to the markets and investors would rely on it. *See id.* (citing *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 743 (8th Cir. 2002)). Further, because entanglement is central to fraud allegations, a plaintiff must plead

such allegations with particularity and state who supplied the information to the analyst, how the analyst received the information and how the defendant was entangled with or manipulated the information and the analyst.  *Id.*; *see also Raab v. Gen. Physics Corp.*, 4 F. 3d 286, 288 (4th Cir. 1993).  Accordingly, the pleadings should: (1) identify the specific forecasts and name the insider who adopted them; (2) point to specific interactions between the insider and the analyst which allegedly gave rise to the entanglement; and (3) state the dates on which the acts which allegedly gave rise to the entanglement occurred." *See id; Southland*, 365 F.3d at 353, 372; *Wool*, 818 F.2d at 1439.

In *Albert Fadem*, Plaintiffs attempted to attribute the forecasts and statements of analysts to the defendants in making out their securities fraud claim.  334 F. Supp. at 1027. This Court held that, "[p]laintiffs fail to plead the circumstances surrounding the require 'entanglement' theory with sufficient particularity." *Id*.  This Court based its decision, in part, on plaintiffs' failure to "'point to specific interactions between the insider and the analyst which allegedly gave rise to the entanglement,' regarding the analyst statement," explaining that "[g]eneralized statements such as, '[f]ollowing conversations with management regarding the Company's significant growth in wholesale operations,' are insufficient, as a matter of law, to hold [d]efendants liable for the analysts opinion." *See id.* (internal citations omitted).  This Court explained that "[a]ssuming [d]efendants acted as 'conduits,' if they were unaware of the inaccurate reporting, they cannot be liable for touting [the company's] success to analysts." *Id*.

In this case, in addition to the Morgan Stanley and the Dow Jones Reports, Plaintiffs' Complaint presents a number of different analyst and reporter statements regarding Cardinal as fraudulent misstatements for which Cardinal should incur liability.  Complaint ¶¶ 89-90, 93, 99,

101, 114, 120, 122-23, 134, 143, 175, 183, 209-12, 215-16, 218.  Though Plaintiffs set forth each statement in detail, like the *Albert Fadem* plaintiffs, they fail to provide specific evidence of "entanglement" and do not plead facts showing that the analysts and reporters were "aware" of Cardinal's inaccurate reporting.  *See* 334 F. Supp. at 1027.   Consequently, this Court agrees that Cardinal Defendants cannot be held liable for the allegedly false and misleading statements of various analysts and reporters.[73]

### 3.  Whether the Complaint Fails to Plead Loss Causation as to any of the "Improprieties" Enumerated in the Complaint

Plaintiffs argue that Cardinal Defendants' alleged fraud caused Cardinal's stock to be artificially inflated and that Defendants' alleged misstatements created Plaintiffs' false confidence in Cardinal's performance.  Plaintiffs also argue that Cardinal Defendants' fraud proximately caused their losses because when the Company revealed the truth about its financial struggles and Cardinal's stock price plummeted, Plaintiffs faced billions of dollars in losses.  Cardinal Defendants counter that none of Plaintiffs' allegations adequately establishes a causal connection between an "act or omission" of any Defendant and the "loss for which the Plaintiffs now seek damages," and Defendants argue that "this failure is dispositive as to all of Plaintiff's claims."  *See* Def.'s Motion to Dismiss at 29.

Under § 78u-4(b)(4) of the PSLRA, private plaintiffs must prove that a defendant's securities fraud caused their economic loss.  In relevant part, the statute provides, "[i]n any

---

[73]Additionally, courts have determined that, "[p]eople in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage."  *Albert Fadem*, 334 F. Supp. 2d at 1026 (citing *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129-30 (2d Cir. 1994)).

private action arising under this chapter, the plaintiff shall have the burden of proving that the act

or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff

seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). For loss causation claims, the Federal Rules

require only " a short and plain statement of the claim showing that the pleader is entitled to

relief." *See* FED. RULE CIV. PRO. 8(a)(2). Essentially, a plaintiff needs to allege a drop in stock

price; establish a causal connection; and connect the alleged fraud with the ultimate disclosure

and loss. *See DE & J Ltd. P'ship. v. Conaway*, 133 Fed. Appx. 994, 998-99 (6th Cir. 2005).

The Supreme Court recently interpreted the securities laws' causation requirement in

*Dura*

*Pharmals., Inc. v. Broudo*, a case determining that the 9th Circuit's loss causation pleading

standard was insufficient under the PSLRA. *See* 125 S.Ct. 1627. In *Dura*, the plaintiff

represented a class of individuals who had bought stock in Dura Pharmaceuticals on the public

market between April 15, 1997 and February 24, 1998. *Id*. at 1629. The plaintiffs alleged that,

during that class period, Dura (or its officials) made false statements concerning its profits and

prospects for future approval of its products by the Food and Drug Administration (FDA). *See id*.

at 1627. On February 24, 1998, Dura disclosed to the market that its earnings would be lower

than previously expected (principally due to slow drug sales), and Dura's stock shares lost almost

half of their value, falling from $39 per share to $21 per share. *Id*. at 1630. Later, in November

1998, Dura announced that the FDA had decided *not* to approve its new product, prompting a

further drop in the Company's stock price. *See id*.

The *Dura* plaintiffs argued that, "[i]n reliance on the integrity of the market, [they] . . .

paid artificially inflated prices for Dura securities and . . . suffered damage[s] thereby." *Id*.

-107-

(quotations and emphasis omitted).  Nonetheless, the Supreme Court concluded that this

interpretation of loss causation, if applied, would do more harm than good.  *Id*. at 1631.  First, the

Court found that "at the moment the transaction takes place," the plaintiff must have suffered a

loss to be able to establish a securities loss causation claim.  *Id*.  The most that can be said is that

a higher purchase price can *sometimes* contribute to bringing about a future loss.  *Id*. at 1632.  The

*Dura* Court held that a plaintiff cannot satisfy the PSLRA's loss causation requirement merely by

alleging (and later establishing) that the price of the security on the date of the purchase was

artificially inflated because of defendant's misrepresentation.  *See id*.  The Court reasoned, "[t]o

'touch upon' a loss is not to *cause* a loss, and it is the latter that the law requires," and continued,

"it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a

defendant with some indication of the loss and causal connection that the plaintiff has in mind. At

the same time, allowing a plaintiff to forgo giving any indication of the economic loss and

proximate cause that the plaintiff has in mind would bring about" the strike suits the statutes seek

to avoid.  *See Dura*, 125 S. Ct. at 1632-34 (citing 15 U.S.C. § 78u-4(b)(4)).

Cardinal Defendants aver that Plaintiffs have failed to plead "loss causation" under *Dura*,

arguing that Plaintiffs do no more than allege that they relied on an artificially inflated stock price

that caused their loss.  *See* Def.'s Motion to Dismiss at 31-37.  They declare that though Plaintiffs

set forth a number of allegedly fraudulent misstatements, because they failed to plead facts

showing that Cardinal's subsequent truthful disclosures led to the Company's falling stock price,

they have not established the necessary causal link between the alleged misstatements and the

price decrease required by *Dura*.  *See id*. at 29-31; 125 S. Ct. at 1634.  They contend that similar

claims by plaintiffs in a number of recent cases have been deemed insufficient to plead loss

causation as a matter of law. *See DE & J Ltd.*, 133 Fed. Appx. at 994 (holding that plaintiffs did not plead loss causation where they did nothing more than "note that a stock price dropped after a bankruptcy announcement, never alleging that the market's acknowledgment of prior misrepresentations caused that drop"); *In re Gilead Sec. Litig.*, 2005 WL 264900, *1 (N.D. Cal. Oct. 11, 2005) (holding that plaintiffs did not plead loss causation where the Court was "left to speculate as to what portion of the eventual loss, if any, should be attributed to [defendant's] disclosure or whether the loss was caused by other factors"); *In re Tellium, Inc. Sec. Litig.*, 2005 WL 2090254, *1 (D.N.J. Aug. 26, 2005) (interpreting *Dura* as holding that plaintiffs failed to plead loss causation by alleging a drop in stock price following defendants' announcement of bad news that *did not* disclose the defendants' fraud); *In re Initial Pub. Offering Sec. Litig.*, 2005 WL 1162445, *1 (S.D.N.Y. May 13, 2005) (where plaintiffs alleged that defendants' omissions and misrepresentations artificially inflated share prices, but failed to allege any disclosure by defendants that corrected those omissions or misrepresentations, plaintiffs failed to plead loss causation).

Plaintiffs counter that the case sub judice differs from the foregoing cases because, in this case, Plaintiffs have not just generally pled that they had paid artificially inflated stock price and suffered damages, but instead, have specifically set forth allegations of a causal connection between the stock price drop and the fraud committed.[74]  *See* 125 S. Ct. at 1634.   Considering

---

[74]At oral argument, Plaintiffs' Counsel, Tor Gronborg, laid out the distinguishing factors between the issues in Cardinal and those in *DE & J, Ltd.*  He stated,

> [H]ere is what the plaintiffs [in *DE & J, Ltd.*] failed to do.  First, they never alleged that the fraud became known to the market at any time. . . They said, "we bought stock at an inflated price." They did not estimate what the damages of the alleged fraud were, and they didn't connect the alleged fraud to any disclosure or loss.  Again, the focus was on

Plaintiffs' arguments, the Court agrees that where the Plaintiffs allege that the subject of the misrepresentations and omissions caused their losses, they need not specify "corrective disclosures" causing the decline in stock value. *Daou*, 411 F.3d at 1025 (finding that a plaintiff can establish loss causation by demonstrating a causal connection between the deceptive acts that form the basis of the securities fraud claim and the injury suffered by the plaintiff); *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 307 (S.D.N.Y. 2005) (loss causation adequately pled where announcements that the company could not repay maturing bonds were alleged to disclose defendants' accounting manipulations, even though "the true extent of the fraud was not revealed to the public until [after the class period"); *In re Immune Response Sec.* Litig., 375 F. Supp. 2d 983, 1014 (S.D. Cal. 2005) (in case involving failure to disclose problems with drug study, allegation that press release regarding defendants ending collaboration on the study (but not disclosing any problems) "was a signal to the market that the Company was less than forthcoming about [the drug's] prospects" and was a sufficient allegation of loss causation under *Dura*); *Montalvo*, 2005 U.S. Dist. LEXIS 22752, at *1 (holding that where plaintiffs pled facts establishing that the fact that defendants had missed a "financial milestone" caused their company's stock price to drop, defendants' arguments that plaintiffs had not alleged a *direct connection* between a drop in stock price and the company's accounting restatements did not

_____

whether the fraud itself got disclosed at any time. . . Now let's compare that to what is pled here, the fact is this complaint was written after *Dura*.  We had *Dura's* insight, and again it's short, and clear, so it was not hard to comply with. . . We plead that the fraud was revealed. . . [w]e do identify damages. . . Finally, in the chart we provide in the complaint, we say why each of these drops was linked to the fraud. . . we certainly say here is how each of these drops was connected to the fraud.

*See* Oral Arg. Tr. at 105-06.

defeat plaintiffs' loss causation allegation) (emphasis added); *Sekuk Global Enters. v. KVH Indus. Inc.*, 2005 U.S. Dist. LEXIS 16228, at *48-51 (D.R.I. Aug. 11, 2005) (loss causation adequately pled under *Dura* where alleged disclosure of financial fraud did not specify the basis for the company's decreased revenue); *In re Vicuron Pharm., Inc. Sec. Litig.*, 2005 U.S. Dist. LEXIS 15613, *42-43 (E.D. Penn. July 1, 2005) (in a case regarding false statements about a drug product, allegations that the partial revelation of a Food and Drug Administration letter questioning the efficacy of the drug (but not refusing defendants' false statements) disclosed the fraud and caused a stock loss were held to satisfy the *Dura* loss causation requirement); *In re Bristol-Myers Squibb Sec. Litig.*, 2002 U.S. Dist. LEXIS 5887, *57 (N.D. Cal. Apr. 2, 2002) (holding that no authority supports defendants' argument that "an alleged corrective disclosure must be the linguistic mirror image of the alleged fraud").[75]

---

[75]At oral argument, Plaintiffs submitted a number of recent cases to further support their argument that they have successfully pled loss causation under *Dura*. *See Brumbaugh,* 2006 U.S. Dist. LEXIS 725, at *36 (noting that "*Dura* does not require that a corrective disclosure precede a stock's decline"); *Parker Freeland v. Iridium World Communications, Ltd.*, *et al.*, 2006 U.S. Dist. LEXIS 744, at *18-19 (D.C. Jan. 9, 2006) (interpreting *Dura* narrowly and finding that "reading *Dura* to require proof of a complete, corrective disclosure resulting in a large price decline. . . would allow wrongdoers to immunize themselves with a protracted series of partial disclosures"); *In re CMS Energy Secs. Litig.*, 2005 U.S. Dist LEXIS 31576, at *17 (E.D. Mich. Dec. 7, 2005) (though defendants sought to rebut plaintiffs' theory of loss causation by demonstrating that the price of CMS stock did not drastically increase on any of the days on which the allegedly fraudulent statements were made public, the Court found that "the link between defendants' allegedly fraudulent statements and plaintiffs' decision to purchase CMS stock is severed by a mere showing that the stock prices did not immediately and drastically increase in response to the statements" and held that plaintiffs had adequately alleged loss causation); *Plumbers & Pipefitters Local 572 Pension Fund, et. al. v. Cisco Sys., Inc.*, *et al.*, 2005 U.S. Dist. LEXIS 25398, at *15 (N.D. Cal. Oct. 26, 2005) (after the defendant company's stock fell, plaintiffs successfully pled loss causation under *Dura* by showing that defendants had continued to falsely assure investors and analysts that demand for the company's products remained strong, and that it would meet the previously-forecasted growth levels for the balance of FY 2001 and FY 2002, allowing the company's stock to continue to trade at artificially inflated prices); *In re Retek Inc. Secs.*, *et al.*, 2005 U.S. Dist LEXIS 25986, at *9-11 (Minn. Oct.

In this case, Plaintiffs' Complaint consists of over 200 pages of allegations regarding, among other things, Cardinal Defendants' fraudulent misstatements, accounting violations, and insider trading. Plaintiffs allege a four-year long fraud in which Defendants, increasingly desperate to improve the outlook of Cardinal's transition from a B+H to an FFS distribution model, overinflated the Company's stock price by falsely reporting its operating revenues to misrepresent the Company's progress. Cardinal Defendants note that the Company did not reveal the truth about the Company's accounting violations until issuing its October 26, 2004 Restatement, *after* the Class Period had ended. Nonetheless, this Court is convinced that this issue of timing alone is not enough to defeat Plaintiffs' allegations of loss causation where they have clearly specified causal connections between Cardinal Defendants' misstatements over the four-year Class Period and their resulting damages.

### 4. Conclusion

As established above, the following allegations, taken together, raise the requisite inference of scienter necessary under the PSLRA: (1) Defendants' alleged accounting improprieties; (2) Defendants' alleged manipulation of areas of focus; (3) alleged insider sales by

---

21, 2005) ("While the thread of causation may be long and somewhat tortured, at [the motion to dismiss stage], where the Court must accept as true the allegations in the Amended Complaint," and where the complaint sets forth specific allegations concerning defendants' corrective disclosure and the subsequent fall in the defendant company's stock value, the plaintiffs complied with *Dura*'s analysis of loss causation).

Defendants recently submitted a response to these supplemental authorities first cited by the Plaintiffs at oral argument. In this response, they argue that the Plaintiffs' use of the *Iridium* opinion offers "only ipse dixit assertions of a tie-in between the contents of [Cardinal's releases] and the multiple discrete accounting shortcomings they charge were later revealed." *See* Def.'s Response to Supp. Authorities at 2. Nonetheless, though *Iridium* is distinguishable from this case in that it discussed *Dura* on plaintiffs' motion for class certification, not on a motion to dismiss, its analysis of *Dura*'s requirements is insightful.

Defendants Walter, Fotiades, Jensen, Miller, Millar; (4) the Individual Defendants' executive

compensation packages; (5) and various red flags.  Further, the Plaintiffs pled their allegations

with the particularity required by the PSLRA.  Though the Court also found that Plaintiffs'

allegations regarding Cardinal Defendants' access to information, Defendant Parrish's insider

sales, and Cardinal Defendants' efforts to meet analyst expectations do not raise a strong

inference of scienter, at this stage of the litigation, Plaintiffs have sufficiently pled their prima

facie case of securities fraud, and to dismiss their Complaint based upon an undeveloped record

or the mere possibility of alternative explanations would be premature.

      Hence, the Court **GRANTS** in part and **DENIES** in part Cardinal Defendants' Motion to

Dismiss and **DENIES** the Motions to Dismiss by Defendants Miller and Millar.  The Court

**GRANTS** Cardinal Defendants' Motion to Dismiss as to Defendant Jensen.  As Senior Vice

President of Audit and Financial Services, Corporate Controller and Principal Accounting Officer

for Cardinal from 2003 through 2005, Jensen was employed by Cardinal *after* the bulk of the

alleged accounting fraud occurred.  Thus, Jensen was not involved in the alleged accounting

allegations upon which Plaintiffs rest their Complaint, and the Court finds it appropriate to

**GRANT** Cardinal Defendants' Motion to Dismiss as to Defendant Jensen.  The Court, however,

**DENIES** the motion as to Defendants Walter, Fotiades, and Parrish.

### B. Control Person Claims Under Section 20(a)

      In their Complaint, Plaintiffs also allege claims against the each of the Individual

Defendants and Defendant Cardinal for violations of Section 20(a) of the Exchange Act.  *See* 15

U.S.C. § 77o.  Section 20(a) imposes secondary liability on those persons who "control" the

violators of Sections 10(b).  *Id*; *see, e.g. Albert Fadem*, 334 F. Supp. 2d at 1005 (citing

*Cooperman v. Individual, Inc.*, 171 F.3d 43, 52 (1st Cir. 1999)). "Control person" liability, by its nature, is contingent upon a plaintiff being able to prove a primary violation under section 10(b). *Id.* If plaintiffs do not establish the primary violation, dismissal of their corresponding control person claim would be warranted for that reason alone. *Id.*

This Court had concluded that Plaintiffs have, in fact, sufficiently pled securities fraud as to all Cardinal Defendants, except Defendant Jensen. *See supra* Part IV.*II*.A.2.a. Plaintiffs also adequately allege that each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of Cardinal. Moreover, Plaintiffs maintain that, excluding Defendant Jensen, these Individual Defendants were provided with or had unlimited access to copies of the Company's press releases, public filings, and other statements alleged to be misleading. *See supra* Part IV.*II*.A.4. In light of these pleadings, the Court determines that Plaintiffs have sufficiently pled a § 20(a) claim. *See id.* Accordingly, the Court **DENIES** Cardinal Defendants' Motion to Dismiss Plaintiffs' § 20(a) claims as to Defendants Walter, Fotiades, Miller, Millar, and Parrish. *See FirstEnergy Corp.*, 316 F. Supp. 2d 581; *DE & J Ltd.*, 284 F. Supp. 2d at 750; *Chronimed Inc. Sec. Litig.*, 2002 WL 1016824, *1 (D. Minn. May 16, 2002). Also, finding that Plaintiffs have failed to make out a securities fraud claim against Defendant Jensen,[76] the Court **GRANTS** Cardinal Defendants' Motion to Dismiss Plaintiffs' § 20(a) claims as to Defendant Jensen.

### III. Defendant E&Y's Motion to Dismiss

### A. Plaintiffs' Section 10(b) and Rule 10b-5 Claims

Unlike their broader allegations against the Cardinal Defendant, Plaintiffs' claims against

---

[76]*See supra* Part IV.*II*.A.2-4.

E&Y focus on the alleged GAAP violations in Cardinal's accounting for FY 2002 through FY 2004.  Essentially, Plaintiffs contend that, since being hired as Cardinal's outside auditor in 2002, E&Y consistently performed audits that did not comply with GAAS.  Plaintiffs argue that E&Y's non-compliant audits raise a strong inference that E&Y either knew or recklessly disregarded the fact that Cardinal's materially misleading financial statements enabled the Company to artificially inflate its stock price.  *See* Complaint ¶¶ 367-403.

The same PSLRA pleading standard applicable to the Section 10(b) and Rule 10b-5 allegations against the Defendants applies to Plaintiffs' allegations against E&Y.  *See PR Diamonds*, 91 Fed. Appx. at 438.  However, the meaning of recklessness in securities fraud cases is especially stringent when the claim is brought against an outside auditor.  *Id*. (citing *SmarTalk*, 124 F. Supp. 2d at 514).  Recklessness on the part of an independent auditor entails a mental state "so culpable that it 'approximate[s] an actual intent to aid in the fraud being perpetrated by the audited company.'" *Fidel*, 392 F.3d at 227 (citing *PR Diamonds*, 91 Fed. Appx. at 438; *see also, Decker v. Massey Ferguson, Ltd*., 681 F.2d 111, 121 (2d Cir. 1982); *Pegasus Fund, Inc. v. Laraneta*, 617 F.2d 1335, 1341 (9th Cir. 1980) (auditor's recklessness "must come closer to being a lesser form of intent (to deceive) than merely a greater degree of ordinary negligence") (internal quotations omitted)).  Scienter "requires more than a misapplication of accounting principles"; the plaintiff must prove "that the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts."  *PR Diamonds*, 91 Fed. Appx. at 438 (citing *Worlds of Wonder*, 35 F.3d at 1426 (quoting *SEC v. Price Waterhouse*, 797 F. Supp. 1217,

1240 (S.D.N.Y. 1992)).[77]

There is no accountant/client privilege analogous to that accorded to lawyers.  *See In re Enron*, 235 F. Supp. 2d at 611.  In  *United States v. Arthur Young & Co.*, the Supreme Court held, "[b]y certifying the public reports that collectively depict a corporation's financial status, the independent auditor assumes a public responsibility transcending any employment relationship with the client.  The independent public accountant performing this special function owes ultimate allegiance to the corporation's creditors and stockholders, as well as to the investing public."  *See* 465 U.S. 805, 817-18 (1984).  "Although a major goal of the PSLRA was to limit the exposure of corporations to frivolous strike suits targeting 'deep-pocket' defendants by heightening the pleading standards and imposing procedural hoops, in contrast Congress *expanded* independent public accountants' watchdog duties."  *See id*. (citing Harvey L. Pitt, et al., *Promises Made, Promises Kept: The Practical Implications of the Private Securities Litigation Reform of 1995*," 33 SAN DIEGO L.REV. 845, 848-51 (1996)).  Thus, under 15 U.S.C. § 78j-1-(a)(1), every audit must have "procedures designed to provide reasonable assurance of detecting illegal acts that would have a direct and material effect on the determination of financial

---

[77]Courts have rationalized this higher standard for independent auditors noting that,

[T]he lack of a rational of economic incentive for an independent accountant to participate in fraud, the client's central role in providing information to the accountant, and the complex professional judgment required to perform an audit, make it exceedingly difficult for a securities plaintiff to plead facts suggesting that an independent accountant acted with the deliberate state of mind now required to withstand a motion to dismiss.

*See SCB Computer Tech.*, 149 F. Supp. 2d at 356 (quoting *Reiger*, 117 F. Supp. 2d at 1008).

statement amounts[.]" *See id.*[78]  GAAS and GAAP represent the industry standard for measuring

the performance of an examination by an accountant.  *Id.*; *see also, Escott v. BarChris Const.*

*Corp.*, 283 F. Supp. 643, 703 (S.D.N.Y. 1968); *In re Ikon Office Solutions, Inc.*, 277 F.3d 658,

663 n. 5 (3d Cir. 2002); *SEC v. Arthur Young & Co.*, 590 F.2d 785, 788 n. 2 (9th Cir. 1979).

In summary, "[w]hen the standard of recklessness for an auditor is overlaid with the

pleading requirements of the PSLRA, a simple rule emerges: to allege that an independent

accountant or auditor acted with scienter, the complaint must allege specific facts showing that

the deficiencies in the audit were so severe that they strongly suggest that the auditor must have

been aware of the corporation's fraud."  *See PR Diamonds*, 91 Fed. Appx. at 439 (citing

*SmarTalk*, 124 F. Supp.2d at 514-15 (citing *Hollinger v. Titan Capital Corp.*, 914 F. 2d 1564,

1570 (9th Cir. 1990) and *In re Software Toolworks, Inc.,* 50 F.3d 615, 628 (9th Cir. 1994)); *see*

*also Decker*, 681 F.2d at 120-21; *McLean v. Alexander*, 599 F.2d 1190, 1198 (3d Cir. 1979)

(scienter can be established by a "showing of shoddy accounting practices amounting at best to a

'pretended audit,' or of grounds supporting a representation 'so flimsy as to lead to the conclusion

that there was no genuine belief [in] back of it'") (footnotes omitted).

Once again, the Court must examine Plaintiffs' allegations collectively to determine

whether the Plaintiffs' allegations, when viewed in totality, create a strong inference of Defendant

E&Y's scienter.  *See PR Diamonds*, 91 Fed. Appx. at 439 (citing *Telxon*, 133 F. Supp. 2d at

1026).  Plaintiffs' relevant allegations are that Defendant E&Y: (1)  ignored numerous red flags

---

[78]If an accountant finds an illegal act has taken place, and that it is "of consequence," he
must "as soon as 'practicable' inform the appropriate management personnel of the issuer and
'assure' its audit committee or, if there is no audit committee, its board of directors of its
conclusions."  *See* 15 U.S.C. § 78j-1(b)(1)(B).  That committee or board must notify the SEC
within one day and send a copy of the notice to the accountant.  *See* 15 U.S.C. § 78j-1(b)(3).

that should have alerted E&Y that Cardinal's financial statements were materially false and

misleading; (2) ignored the audit evidence it gathered from FY 2002 through FY 2004 that

suggested Cardinal had consistently overstated its earnings; (3) conducted audits of Cardinal that

violated fundamental concepts of GAAS; (4) were motivated to help Cardinal commit fraud in

order to maintain the Company's high-profit business; and (5) were subject to numerous other

lawsuits from its audits of companies later found to have engaged in financial fraud.  Finally, the

class members contend that these allegations, even if insufficient alone, when viewed in their

entirety, establish that E&Y acted with scienter.[79]  The Court addresses these allegations in turn.

## 1. Red Flags

The class members point to a number of red flags that they should have alerted E&Y to

likely improprieties at Cardinal and conveyed the need for it to engage in a more exacting audit of

the Company's books.  A red flag creating a strong inference of scienter consists of "[a]n

egregious refusal to see the obvious, or to investigate the doubtful."  *PR Diamonds*, 91 Fed.

Appx. at 440 (citing *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (citation and internal

quotation marks omitted)).  Plaintiffs' allege the following red flags: (1) Cardinal's

---

[79]In their Complaint, Plaintiffs also allege that E&Y's failure to identify material
weaknesses in internal controls provides an inference of E&Y's scienter.  Complaint ¶¶ 389-98.
Under auditing standards "the auditor should obtain an understanding of internal controls
sufficient to plan the audit by performing procedures to understand the design of controls
relevant to an audit of financial statements and determining whether they have been placed in
operation."  *Id*. (citing AU § 319.02).  Plaintiffs contend that because E&Y issued a clean audit
report directly before Cardinal Defendants issued their October 2004 Restatement, in which the
Company admitted that its insufficient internal controls played a role in their accounting
misstatements, E&Y clearly failed to comply with AU § 319.02.  Nonetheless, Plaintiffs fail to
plead facts showing that E&Y should have known that Cardinal lacked internal controls *before*
Cardinal issued its 2004 Restatement.  Without such "connecting" facts, Plaintiffs' allegations
are merely bare conclusions.  Hence, the Court does not reach the merits of Plaintiffs' internal
controls argument in this opinion.

managements' disdain for effective internal controls; (2) the rapidly changing market for pharmaceutical distributors; (3) the inability to convert manufacturers to the FFS model over the course of the Class Period; (4) a practice by management of committing to unduly aggressive targets; (5) massive insider trading and incentive-based compensation; (6) numerous accounting errors and irregularities; and (7) E&Y's non-audit related work . *See* Complaint ¶ 387; Pl.'s Opposition at 8.

In *Fidel*, plaintiff, class members, sued Fruit of the Loom (FOTL), individual officers of FOTL, and E&Y, FOTL's outside auditor, for securities fraud, and when the district court granted E&Y's motion to dismiss, the plaintiffs appealed. *See* 392 F.3d at 220. In their appeal, plaintiffs pointed to "numerous 'red flags' that should have placed [E&Y] on notice about financial improprieties occurring at [FOTL]." *See id.* at 228. Among other things, plaintiffs alleged the following red flags: (1) because E&Y worked closely with FOTL as both an auditor and an outside consultant, it maintained a presence at FOTL's headquarters, and was, therefore, well aware of FOTL's problems; (2) E&Y knew of a securities fraud lawsuit filed against FOTL before it had completed its final audit report; (3) E&Y had firsthand knowledge of FOTL's propensity to "skirt financial rules"; (4) E&Y received an anonymous letter detailing some of FOTL's financial misstatements; (5) E&Y had noted in 1996 audit papers that FOTL "demonstrated a trend of significant book to physical losses" over the previous years; (6) E&Y's 1996 audit report revealed that FOTL's reserve for close-out inventory was understated by 30 percent; and (7) FOTL and its management demonstrated numerous risk factors that should have led E&Y to add audit procedures to evaluate these risks. *See id.* at 228-29.

In the case sub judice, Plaintiffs' allegations are nearly identical to those of the plaintiffs'

in *Fidel*.  The *Fidel* court found that the above red flags "[did] not create the inference, much less

a strong inference, that [E&Y], in preparing an audit report of 1998 financial results, acted with

scienter.  *Id*. at 229; *see* 15 U.S.C. § 78u-4(b)(2) (requiring facts "giving rise to a strong inference

that the defendant acted with the required state of mind").[80]  As such, where these red flags were

insufficient to establish E&Y's scienter in *Fidel*, they are insufficient here as well.  *Id*.[81]

Further, in *Fidel*, the Sixth Circuit found that the fact that E&Y served as a consultant to

FOTL and had access to "both confidential documents and upper- and lower-level management"

did not, without more, lend credence to plaintiffs' allegation that E&Y acted with scienter.  *See*

392 F. 3d at 229; *see PR Diamonds*, 364 F.3d at 594 (finding that plaintiffs' claims that defendant

accounting firm had personnel who were regularly present at defendant company's corporate

headquarters throughout the class period with continual access to the company's confidential

business information was *not* sufficiently concrete to raise a strong inference of scienter).

Though the court in *Fidel* acknowledged that "the more an auditor is intertwined with a

company's business, the 'more support an inference of scienter takes on,'" it found plaintiffs'

claims "insufficiently concrete" because "nowhere [did] the class members allege what [E&Y]

might have learned from its access to the company's confidential information, what [E&Y] might

have known based on its consulting engagement, or even what documents [E&Y] reviewed as

---

[80]First the court reasoned that the timing of the red flags pointed against scienter; at least
two of the red flags had occurred in 1996, two years before the audit in question in the case, and
another had occurred well after the audit had been issued.  392 F. 3d at 229.  Further, the court
found that "even with regard to red flags that may have occurred in 1998, there [was] no
indication that [E&Y] knew or could have known that these red flags affected the 1998 financial
results."  *Id*.

[81]At oral argument, when asked to reveal what Defendant E&Y actually *knew* of
Cardinal's fraud, Counsel for Plaintiffs, David Rosen, repeatedly evaded the question.

part of its 'unfettered access.'" *See* 392 F.3d at 229-30.  In this case, Plaintiffs allege that the fact

that E&Y received a large percentage of its total fees for its non-audit work with Cardinal is

evidence that E&Y had to have knowledge of Cardinal's fraud.[82]  As in *Fidel*, this claim, without

more, does not imply E&Y's scienter.

Against the backdrop of *Fidel*, the class members in this case have not pled with the

requisite particularity any facts showing that E&Y knew of or recklessly disregarded these red

flags in conducting its audit.  Because "claims of securities fraud cannot rest 'on speculation and

conclusory allegations'" alone, Plaintiffs' alleged red flags do not create an inference that E&Y

acted with scienter.

## 2. Ignoring Audit Evidence Gathered from FY 2002 through FY 2004[83]

---

[82]For instance, Cardinal notes that, in 2003, a large portion of E&Y's fees were derived from providing Cardinal with due diligence services related to its acquisitions.  In FY 2003, E&Y provided Cardinal with $3.2 million - or 36% of its total fees – in "audit-related services." Audit-related services are fees for due diligence services related to mergers and acquisitions, audit-related research and assistance and employee benefit plan audits."  *See* Complaint ¶ 385.

[83]In their Complaint, Plaintiffs also sought to hold E&Y liable for all of the interim, unaudited financial statements issued by Cardinal on a quarterly basis after E&Y was retained by Cardinal in May 2002.  Plaintiffs try to forge a link between E&Y and Cardinal's interim financial statements by alleging that "E&Y signed off on and approved Cardinal's quarterly financial results prior to their issuance to the public during the Class Period."  Complaint ¶ 376; Pl.'s Opposition at 15.  In support of that allegation, however, Plaintiffs fail to cite any public statements by E&Y offering an opinion with respect to the material accuracy of Cardinal's quarterly financial statements.  Instead, they cite a description of E&Y's work that appears in Cardinal's proxy statements, stating simply that the professional services for which Cardinal had paid E&Y included "a review of financial statements included in the Company's Quarterly Report."  Complaint ¶ 376; Pl.'s Opposition at 16.
Defendant E&Y counters, and the Court agrees that, according to *Fidel*, investors cannot state a claim against outside auditors based on *unaudited* financial statements, and, as such, are limited to claims based on audit opinions actually communicated to the market.  392 F.3d at 235 (rejecting plaintiffs' claim that E&Y had "effectively represented" that it approved of unaudited interim financial results that were published in a registration statement when it had consented to the inclusion of its audit opinion for a prior year in the same registration statement and also

The Plaintiffs also contend that by consistently ignoring GAAS principles while auditing Cardinal's financial statements, E&Y failed to detect Cardinal's GAAP violations, which were so simple, obvious, and large in magnitude[84] that, together, they support a strong inference of E&Y's scienter.

Plaintiffs argue that Cardinal engaged in the following acts of fraudulent accounting, which E&Y ignored: (1) the mis-classification of bulk deliveries as operating revenue in FY 2001

───────────────────

noting that the plaintiff company itself had described the interim financial statements as "unaudited," and that E&Y had never made any statement to investors about the accuracy of those statements); *see also Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998) (holding that there was no basis for plaintiffs' claim that E&Y had endorsed a company's interim financial results where the press release "contained a clear and express warning that no audit had yet been completed"). Moreover, holding E&Y liable for "its alleged implicit endorsement of the unaudited financial figures. . . would effectively revive aider and abettor liability, in contravention of the Supreme Court's holding in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994) (holding that Section 10(b) prohibits "only the making of a material misstatement (or omission) or the commission of a manipulative act"). *See Fidel*, 392 F.3d at 235. Accordingly, the Court will not consider Plaintiffs' claims regarding Cardinal's unaudited interim financial statements.

[84]Though, in their pleadings, Plaintiffs and Defendants dispute whether the Court may consider the magnitude of alleged accounting errors in its analysis, *Fidel* clearly establishes the Sixth Circuit's decision declining "to follow the cases that hold that the magnitude of financial fraud contributes to an inference of scienter on the part of the defendant." *See* 392 F.3d at 231. The Sixth Circuit reasoned that "[a]llowing an inference of scienter based on the magnitude of fraud 'would eviscerate the principle that accounting errors alone cannot justify a finding of scienter.'" *Id.* (citing *SCB Computer Tech.*, 149 F. Supp. 2d at 359); *see Comshare*, 183 F.3d at 553 (holding that the failure to follow accounting standards "is, by itself, insufficient to state a securities fraud claim"). Further, the Court reasoned that considering the magnitude of fraud "would also allow the court to engage in speculation and hindsight, both of which are counter the PSLRA's mandates." *Fidel*, 392 F. 3d at 231; *see Reiger*, 117 F. Supp. 2d at 1013 ("Inferring scienter from the magnitude of fraud invites a court to speculate as to the existence of specific (but unpled and unidentified) warning signs that show the accountant acted with scienter. To travel from magnitude of fraud to evidence of scienter, the court must blend hindsight, speculation, and conjecture to forge a tenuous chain of inferences. . ."). Thus, in this case, the Court will *not* factor the magnitude of Cardinal's alleged fraud into its consideration of whether E&Y acted with scienter.

through FY 2003; (2) the premature recognition of $22 million gained in the Vitamin Litigation

settlement in FY 2002; (3) the decision to change Cardinal's revenue recognition policy for its

Pyxis business in FY 2002; (4) balance sheet reserve and accrual adjustments in Cardinal's 2004

10-K; (5) as announced in Cardinal's 2004 10-K, the decision to change the Company's method

of accounting for cash discounts received from vendors for prompt payment; (6) the mis-

classification of an unidentified amount of expenses as "special charges" related to mergers and

acquisitions to understate Cardinal's regular expenses; (7) improper off-balance sheet transactions

through improperly classifying Pyxis receivables; and (8) Cardinal's October 2004 Restatement.

### a. Cardinal's Classification of Operating Revenue

Plaintiffs attack the method Cardinal used to differentiate between its high-margin

Operating Revenues and its low-margin Bulk Deliveries – the 24-hour rule – in its FY 2002 and

FY 2003 statements.  Plaintiffs argue that Cardinal should have applied the classification

guidelines it adopted in the FY 2004 Restatement during the Class Period, and they claim that

Cardinal's failure to do so caused it to significantly overstate its "Operating Revenue," giving

investors a false impression of the success of the Company's growth in the face of the shifting

pharmaceutical distribution market.  Thus, Plaintiffs contend that the fact that Defendant E&Y

failed to discover Cardinal's "mis-classifications" of revenue in its FY 2002 and FY 2003 audits

raises an inference of Defendant E&Y's scienter.

First, though Plaintiffs argue that Cardinal's internal bulk order policy did not comply

with GAAP, this Court is not convinced that the "24-hour rule" violates fundamental principles of

accounting. Plaintiffs cite various pronouncements[85] which they argue tend to show Cardinal's recklessly or intentionally inaccurate reporting of "Operating Revenue" in violation of the SEC's assertions that financial reporting should be both "accurate" and "reliable." As Defendant E&Y correctly notes, however, these authorities do not provide guidance as to how sales from bulk deliveries should be distinguished from operating revenues, if at all.

Further, from FY 1998, when Cardinal began separating its revenues into two different line items, to FY 2004, when Cardinal issued its Restatement, classifying all revenue as a single line item, Cardinal was at all times forthcoming about its treatment of "Bulk Deliveries" and "Operating Revenues." Hence, it was Defendant Cardinal's use of the "24-hour rule" to manipulate the sales classifying as high-margin "Operating Revenue" that led to investors' false confidence in the Company's growth, not the fact that the 24-hour rule violated GAAP in and of itself. The facts alleged do not show that E&Y could have known that the Company's use of the 24-hour rule during FY 2002 and FY 2003 had artificially inflated Cardinal's "Operating Revenue." Moreover, though Plaintiffs correctly argue that Cardinal's later restated mis-classifications of revenue provides evidence of the *Cardinal* Defendants' scienter, a claim based on "alleged accounting irregularities fails to raise a strong inference of scienter if it alleges no facts to show that Defendants[, *outside auditors,*] knew or could have known of the errors, or that

---

[85]Plaintiffs cite Financial Accounting Standards Board ("FASB") Statement of Concepts No. 1, providing that one of the fundamental objectives of financial reporting is that it provides accurate and reliable information concerning an entity's financial performance during the period presented. Further, Plaintiffs cite GAAP Accounting Principles Board ("APB") Opinion No. 22, *Disclosure of Accounting Policies*, to assert that the usefulness of financial statements in making economic decisions depends significantly on accounting policies followed by a company and that information about the accounting policies adopted by a reporting company is "essential" to financial statement users. *See* Complaint ¶¶ 353-66

their regular accounting procedures should have alerted them to the errors sooner than they actually did." *Fidel*, 392 F.3d at 230 (emphasis added).

### b. Premature Recognition of the Vitamin Litigation Settlement

Plaintiffs assert that Cardinal's premature recognition of $22 million in settlement proceeds from the Vitamin Litigation violated GAAP.  Among other things, Plaintiffs allege that GAAP requires that "[c]ontingencies that might result in gains usually are not reflected in the accounts since to do so might be to recognize revenue prior to its realization." *See* Statement of Financial Accounting Standards No. 5 Accounting for Contingencies (March, 1975).  As such, they argue that Defendant E&Y's FY 2002 and FY 2003 audits of Cardinal's financial statements should have caught such a blatant error, and that, therefore, E&Y acted with scienter.

Defendant E&Y counters that Plaintiffs have not alleged any basis for their assertion that E&Y acted with scienter.  Defendant argues that even assuming the timing of Cardinal's original recognition of the $22 million in revenue violated GAAP, one GAAP violation alone, does not give rise to an inference that E&Y knew that its certification of Cardinal's financial statements (which had already been approved by AA) violated GAAP.  Further, they argue that though Plaintiffs rely upon various GAAP rules to show that a company should not recognize a substantial gain until it can be *certain* that that particular gain will be realized, Cardinal had considered the $22 million in proceeds to be a virtual certainty.[86]  Finally, Defendant E&Y argues

---

[86]E&Y Defendants cite Cardinal's press release following The Wall Street Journal article lambasting the Company's accounting procedures.  The release reads, in part,

> Cardinal Health takes pride in properly accounting for all transactions.  The vitamin overcharge recovery was no different.  The transaction was fully approved by Arthur Andersen, LLP, who were our auditors at the time, and was subsequently approved by our current auditors, [E&Y]. . . The recording of this item was *not* a contingent litigation

Case: 2:04-cv-00575-ALM-NMK Doc #: 227 Filed: 03/27/06 Page: 126 of 145 PAGEID #: 6820

that the fact that Cardinal had fully explained its accounting treatment of the $22 million in its SEC filings, undermines Plaintiffs' fraud allegations.[87] *See Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1210 (11th Cir. 2001) (finding that whether it was right or wrong, full explanation of accounting treatment "significantly undermine[s] any hint of fraud").

The GAAP rules are designed to ensure that public companies, like Cardinal, are truthful in their financial statements, only recognizing income that they are certain to obtain. In that vein, Cardinal's premature recording of the $22 million can be considered a significant breach of GAAP principles. Nonetheless, it is uncontroverted that Cardinal was at all times truthful about its treatment of the Vitamin Litigation settlement. Moreover, once The Wall Street Journal article had revealed Cardinal's methods of accounting to the public, Cardinal further explained its reason for treating the settlement proceeds as it did. In addition to Cardinal's thorough explanations defending the Company's accounting procedures, Plaintiffs have pled no facts alleging that E&Y certified Cardinal's financial statements *knowing* or *recklessly disregarding* the fact that they were fraught with glaring errors. Therefore, E&Y's certification of Cardinal's premature income recognition does not create a strong inference of E&Y's scienter.

---

gain. It was the recognition of an asset related to expected recoveries for vendor overcharges in prior periods. Our assessment of the certainty of a minimum recovery, accepted by our independent auditor and supported by independent legal opinions, was sound and fundamentally conservative.

*See* Complaint ¶ 151.

[87]E&Y Defendants also contend that The Wall Street Journal article announced Cardinal's treatment of the $22 million settlement proceeds to the public long before the Plaintiffs filed their Complaint. They argue that the public's awareness of Cardinal's accounting clearly negated the possibility of fraud.

-126-

### c.  Changes in Cardinal's Revenue Recognition Policy for its Pyxis Business in FY 2002

Cardinal's Automation and Information Services segment offers a mix of products and services for use by hospitals and other health care facilities.  It develops, manufactures, leases, sells and services point-of-use systems that automate the distribution and management of medications and supplies.  This segment includes Pyxis Corporation ("Pyxis") which leases point-of-use systems that automate the distribution management and control of medications.

Beginning in FY 2002, Cardinal changed its revenue recognition for Pyxis so that revenue would not be recognized until *all* of the Company's installation obligations were complete, the equipment was functioning properly, and the customer had accepted it.  In the course of its Audit Committee's internal investigation, however, Cardinal discovered that customers had sometimes been persuaded by Pyxis salespeople to execute equipment confirmations before the equipment had been fully installed.

In its 2004 10-K, Cardinal acknowledged that certain revenue from the sale of Pyxis machines had been prematurely recognized during the Class Period.  The Company was unable to determine precisely how much revenue it had prematurely recognized from improper customer confirmations, but it estimated that in FY 2002, $8.3 million of revenue should have been deterred to a later period, resulting in $5.3 million of operating earnings, and that in FY 2003, the total estimated revenue impact was $1.3 million of revenue and $800,000 of operating earnings.

Plaintiffs argue that the fact that Cardinal had prematurely recognized its Pyxis revenue supports their assertion that Defendant E&Y acted with scienter.  They aver that, if it had correctly performed its duties, E&Y would have undoubtedly discovered Cardinal's fraudulent treatment of Pyxis revenues.  Defendants, however, counter that Plaintiffs fail to plead any

allegations explaining how E&Y would have become aware of any manipulation. Defendants argue that if E&Y had reviewed the improper Pyxis transactions, it would have seen that there were third-party confirmations that the company's installation was complete, and, therefore, that E&Y would have not had a reason to question Pyxis' decision to recognize revenue when it did. *See* SAS No. 99, *Consideration of Fraud in Financial Statement Audit* (2002) (stating that collusion "such as a false confirmation from a third party that is in collusion with management," may cause an "auditor who has properly performed the audit" to conclude that there is persuasive evidence that a particular transaction was properly recorded when, in fact, it was not). Because E&Y's review of Cardinal's treatment of Pyxis revenues would not, on its face, have revealed any accounting misconduct on the part of Cardinal, Plaintiff have failed to plead facts showing that E&Y had scienter in certifying Pyxis' premature revenue recognition.

### d. Balance Sheet Reserves and Accrual Adjustments

In its 2004 10-K, Cardinal restated the Company's balance sheet reserves and accrual adjustments. Cardinal Defendants acknowledged that in connection with the Company's balance sheet reserves and accrual adjustments, there were various situations prior to and throughout the Class Period in which Cardinal could not substantiate either the amount of its reserves or the timing of its reserve adjustments. In the end, Cardinal's restatement due to these various reserve and accrual adjustments decreased the Company's reported net income for FY 2000 through 3Q 2004 by $64.2 million.

Plaintiffs allege that E&Y was reckless in not discovering the above GAAP errors that were later identified and corrected by Cardinal in its October 2004 Restatement. Defendants respond that Plaintiffs fail to allege how E&Y could have known of the existence of these

"relatively minor errors" during the course of the firm's audit work.  Essentially, Defendants allege that the magnitude of these items was so small that E&Y's failure to discover them does not give rise to a strong inference of scienter.  First, they allege that because the 2004 Restatement revealed that Cardinal's 2002 net earnings had been *understated* by $14.5 million, these net earnings could not provide a basis for Plaintiffs' claim that they had been defrauded by artificially *inflated* financial statements.  Second, they argue that, in 2003, the restatement caused a relatively small impact on Cardinal's net earnings, making a 2.2% drop from $1.405 billion to $1.375 billion.

"[T]he magnitude of an erroneous financial statement cause by allegedly fraudulent representations, without more, cannot sustain a finding that an auditor acted with scienter."  *See SCB Computer Tech.*, 149 F. Supp. 2d at 357.  In *Fidel*, the Sixth Circuit held, "[w]e decline to follow the cases that hold that the magnitude of financial fraud contributes to an inference of scienter on the part of the defendant."  392 F.3d at 231; *see SCB Computer Tech.,* 149 F. Supp.2d at 359 (emphasis added).  The *Fidel* Court explained, "[i]nferring scienter from the magnitude of fraud invites a court to speculate as to the existence of specific (but unpled and unidentified) warning signs that show the accountant acted with scienter.  To travel from magnitude of fraud to evidence of scienter, the court must blend hindsight, speculation and conjecture to forge a tenuous chain of inferences. . ."  392 F.3d at 231 (citing *Reiger*, 117 F. Supp. 2d at 1013).  Consequently, as Plaintiffs' claims as to Cardinal's balance sheet reserves and accrual adjustments focus on nothing but the numbers, the Court finds that they are insufficient to raise a strong inference of E&Y's scienter.

### e. Recognition of Cash Discounts

In prior reporting periods, Cardinal treated cash discounts received from vendors for prompt payment as a reduction of the cost of the products sold, recognizing the discount immediately.[88]  Beginning in FY 2004, however, Cardinal announced that it had decided to change its classification of these cash discounts, to treat them as components of inventory cost, rather than as reductions in the cost of products sold.  Thus, Cardinal was able to postpone its recognition of the discount until the Company *actually sold* the associated products.

Cardinal did not retroactively restate its financials prior to FY 2004 because it believed that it had simply switched from "one acceptable accounting method" to another, more preferable, but also acceptable, method.  E&Y concurred in Cardinal's judgment, providing a letter that was attached as an exhibit to Cardinal's 10-K that agreed that Cardinal had changed "to an acceptable alternative method, which, based on [Cardinal's] business judgment to make this change and for the stated reason [in the 10-K, was] preferable" in Cardinal's circumstances.  Plaintiffs allege that Cardinal should have used this different method of recognizing cash discounts all along, and that its failure to do so constituted a GAAP violation.  Plaintiffs assert that E&Y should have, through the auditing process, realized that Cardinal needed to change its method of recognizing these cash discounts and prevented a GAAP violation before it might occur.

The Court, however, finds that Plaintiffs have failed to allege that Cardinal's old method violated GAAP, and, even if it did, that Plaintiffs have inadequately alleged that E&Y *knowingly* certified a Cardinal GAAP violation.  The Supreme Court has acknowledged that accounting rules are subject to a range of reasonable judgments:

---

[88]In FY 2002, this practice of immediately recognizing cash discounts decreased Cardinal's net earnings by $3.3 million.  In FY 2003, however, the same practice benefitted net earnings by $8.8 million.

> Accountants have long recognized that [GAAP] are far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions. [GAAP] rather, tolerate a range of reasonable treatments, leaving the choice among alternatives to management." As a result, "an ethical, reasonably diligent accountant may choose to apply any of a variety of acceptable accounting procedures when that accountant prepares a financial statement.

*Godchaux v. Conveying Techniques, Inc.*, 846 F.2d 306, 315 (5th Cir. 1988) (citing *Thor Power Tool Co. v. Comm'r*, 439 U.S. 522, 544 (1979) (internal citations omitted)); *see also In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 890 (9th Cir. 2001) (noting that there are "19 different GAAP sources, any number of which might present conflicting treatments of a particular accounting question"). An important corollary to the foregoing principle is that changes in a company's method of accounting do *not* constitute an admission that the company had violated GAAP in the past. *See* Accounting Principles Board Opinion No. 20 ("APB") ¶¶ 7, 8 (stating that "[a] change in accounting principle results from adoption of a generally accepted accounting principle different from the one used previously for reporting purposes" and explains that "[a] characteristic of a change in accounting principle is that it concerns a choice among two or more generally accepted accounting principles.")

The Court further finds that Plaintiffs have failed to cite accounting literature, which suggests that Cardinal should have restated its recognition of cash discounts before FY 2004. The Court finds that even if Plaintiffs had properly alleged a GAAP violation, they do not set forth any facts suggesting that E&Y could have known the accounting treatment was incorrect.

### f. Special Charges

In FY 2001 and FY 2002, Cardinal recorded "special charges" of $149.9 million and $141.4 million respectively for merger-related and restructuring costs. Plaintiffs argue that

Cardinal inflated its "special charges"[89] to enable the Company to understate its normal recurring expenses either in the same quarters Cardinal overstated its special charges, or in subsequent quarters, thereby reporting inflated Operating Earnings.  In support of its Complaint about these "special charges," Plaintiffs cite: (1) a 1998 speech made by the SEC's Chairman explaining how merger and restructuring services could be abused,[90] and (2) a 2003 analyst report observing that

---

[89]Plaintiffs' Complaint defines a "special charge" as "a charge for an event that is either unusual in nature or infrequent in occurrence."  "Unusual in nature" and "Infrequency of Occurrence" are defined as follows:

> *Unusual Nature*.  The specific characteristics of the entity, such as type and scope of operations, lines of business, and operating policies should be considered in determining ordinary and typical activities of an entity.  The environment in which an entity operates is a primary consideration in determining whether an underlying event or transaction is abnormal and significantly different from the ordinary and typical activities of the entity.  The environment of an entity includes such factors as the characteristics of the industry or industries in which it operates, the geographical location of its operations, and the nature and extent of governmental regulation.  Thus, an event or transaction may be unusual in nature for one entity but not for another because of differences in their respective environments.  Unusual nature is not established by the fact that an event or transaction is beyond the control of management.

> *Infrequency of Occurrence*.  For purposes of this Opinion, an event or transaction of a type not reasonably expected to recur in the foreseeable future is considered to occur infrequently.  Determining the probability of recurrence of a particular even or transaction in the foreseeable future should take into account the environment in which an entity operates.  Accordingly, a specific transaction of one entity might mean that criterion and a similar transaction of another entity might not be because of different probabilities of recurrence.  The past occurrence of an event or transaction for a particular entity provides evidence to assess the probability of recurrence of that type of event or transaction to the foreseeable future.

*See* Complaint ¶ 346.

[90]On September 28, 1998, SEC Chairman, Arthur Levitt stated in his speech: "Problems arise, however, when we see large charges associated with companies restructuring.  These charges help companies "clean up" their balance sheet – giving them a so-called 'big bath.' . . . And if these charges are conservatively estimated with a little extra cushioning, that so-called conservative estimate is miraculously reborn as income when estimates or future earnings fall

-132-

restructuring charges are "clearly a factor" in analyzing a company as "acquisitive as Cardinal Health had been in recent years" and suggesting that "this needs to be monitored closely."[91]

Plaintiffs posit that, consequently, since 1996, Cardinal "has taken 'special' charges for activities that are similar in nature and thereby does not meet the definition of 'unusual in nature' and 'infrequency in occurrence' under APB No. 30, ¶¶ 21-22.  Plaintiffs contend that "special charges also create a serious potential for abuse by permitting a company to manipulate its financial statements by shifting 'normal' operating expenses that otherwise would have been recorded in future periods into the current period."  Pl.'s Opposition at 29.[92]  They argue that Cardinal's financials strongly indicate "that Cardinal improperly overstated its special charges in order to understate its normal recurring charges either in the same quarter that Cardinal overstated its special charges or in subsequent quarters."  *Id*. at 30.  Defendant E&Y retorts, and the Court agrees, that Plaintiffs' broad allegations do not rise to the necessary of level specificity required by the PSLRA.  Essentially, Plaintiffs have provided no facts that show that E&Y knew that these special charges were Cardinal's efforts at fraudulent "big bath" accounting.

_____

short."  *See* Complaint ¶ 349.

[91]The May 28, 2003 report, written by an analyst with Citigroup Smith Barney, commented about a possible boost to current and future earnings caused by numerous special charges, remarking, "We believe that this is a valid concern.  Restructuring charges are clearly a factor when analyzing the financials of any company that has been as acquisitive as Cardinal has been in recent years. . . and we believe that this needs to be monitored closely going forward."  *See* Complaint ¶ 352.

[92]Plaintiffs declare, "'big bath' behavior takes place when a company is having a bad year a the company decides to restructure to clean up its balance sheet.  Accordingly, the company will take a large restructuring charge.  As a result, companies may include an additional cushion into the special charge.  This extra cushion can then be reversed in future periods when a company's earnings will fall short of estimates in order to meet those estimates."  Pl.'s Opposition at 29.

### g. Off-Balance Sheet Transactions

Plaintiffs also argue that during the Class Period, the Cardinal Defendants improperly accounted for a securitization[93] of the Company's Pyxis receivables in 1Q 2002 as an off-balance sheet transaction, causing Cardinal's account receivables and its outstanding debt to be understated in violation of GAAP.  Plaintiffs contend that in connection with the change in revenue recognition related to Pyxis, Cardinal Defendants engaged in a securitization transaction in FY 2002 involving its sale-lease portfolio that does not qualify as a "true sale" under SFAS standards.  *See supra* note 94.  Plaintiffs argue that to sell Pyxis receivables, Cardinal created a wholly-owned special purpose vehicle ("SPV"), Pyxis Funding LLC and that through that SPV, Cardinal sold approximately $150 million in Pyxis sales-type lease receivables during 1Q 2002,

---

[93]The Complaint provides a good discussion of the basics of "secured transactions" that is helpful to discussing this element of the parties' dispute:

> Securitization is the process by which financial assets are transformed into negotiable securities.  A company will aggregate or pool a group of similar assets such as loans or mortgages . . . and place them in a trust.  Thereafter, the trust then sells the negotiable securities for which the loans or leases serve as collateral.  Only if structured correctly can the assets and liabilities associated with the securitization transaction be removed from a company's balance sheet.

> A company may enter into a securitization agreement as opposed to entering into a secured financing arrangement only if certain conditions are met.  In a secured financing arrangement, a company borrows funds and the loans or leases serve as collateral (it is similar to a mortgage where the mortgage is secured by the house).  *In order for a transaction to be considered a securitization arrangement, it must reflect a "True sale" as opposed to a financing arrangement.  A securitization transaction may only be considered for off-balance sheet treatment if the company has surrendered control, effectively, as well as legally, over the assets, and the assets have been isolated from the company and its creditors, even in the even of bankruptcy.*  If any of the above are not met, then the company must account for transaction as *secured borrowing*.

SFAS No. 140, *Accounting for Transfers and Serving of Financial Assets and Extinguishment of Liabilities.  See* Complaint ¶¶ 354-55.

all of which were sold *with recourse*.[94]  Plaintiffs allege that because the risk of non-collection remained with Cardinal, in the form of Pyxis Funding LLP (a Cardinal subsidiary), proper conservative accounting treatment required Cardinal to treat the transaction as a "secured borrowing," accounting for it on the Company's balance sheet.  Plaintiffs aver that Cardinal's accounting for the sale of the Pyxis receivables as an off-balance sheet transaction, Defendant Cardinal violated GAAP, and understated the Company's accounts receivables and outstanding debt.

Defendant E&Y contends that Plaintiffs fail to plead facts showing that E&Y should be liable for the understated receivables related to Cardinal's Pyxis subsidiary.  E&Y asserts that, "Plaintiffs' allegations fail to demonstrate that Cardinal should have treated the securitization of the Pyxis receivables as a loan instead of a sale" because they "offer no factual basis for their allegation that the transaction was not reported in accordance with GAAP, and because in notes to its FY 2002 statements, Cardinal provided investors with a lengthy explanation of its Pyxis securitization program that does *not* suggest purchasers had general rights of recourse against Pyxis Funding LLC.  Defendant E&Y also avers that Plaintiffs failed to cite any authority for the proposition that "a very limited right of recourse" would somehow preclude Defendant Cardinal from treating the sale of its Pyxis receivables to a third-party investor as a "true-sale."  Moreover, Defendant E&Y counters that, even if the Court should find a GAAP violation occurred, there was no basis "for any claim that investors were materially misled by the way in which the securitization was accounted for," and Plaintiffs failed to allege that Company's 2002 10-K

---

[94]When a receivable is sold "with recourse," it means that the selling party agrees to make good any receivables not collectible and the risk of non-collection remains with the seller, as if the receivables had remained on its books.  *See* SFAS No. 140 ¶ 113; Complaint ¶ 355.

explanation was materially misleading.  Finally, Defendant E&Y argues that Plaintiffs' efforts to classify Cardinal's financial statements as "Enron-style generalizations" do not raise an inference of scienter *in this case*.[95]

Plaintiffs' allegations resemble those made by the lead plaintiffs in the landmark *Enron* litigation.  *See* 235 F. Supp. 2d at 618-19.  In that case, one of plaintiffs' many allegations against Enron's independent auditor, AA, was that by viewing certain transfers of financial assets among its subsidiaries as "true sales" instead of as "secured borrowings," AA recklessly allowed Enron to violate GAAP, SFAS No. 125,[96] Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities.  *See id*.  The plaintiffs' complaint alleged that, as part of a larger pattern of fraud, Enron repetitively engaged in "hedging transactions" that gave the

---

[95]Enron used off-balance sheet deals to obscure the amount of debt the company owed.

[96]SFAS No. 125 permits accounting for transfers of financial assets as sales to the extent that consideration other than beneficial interests is received in exchange, when the transferor has surrendered control over the assets, if the following three conditions are met:

(1) The transferred assets have been isolated from the transferor, i.e., they are beyond the reach of the transferor and its creditors.
(2) One of the following is met:
    (a) The transferee obtains the unconditional right to pledge or exchange the transferred assets.
    (b) The transferee is a qualifying special-purpose entity and the holders of beneficial interests in that entity have the unconditional right to pledge or exchange those interests.
(3) The transferor does not maintain effective control over the transferred assets either through an Offering that obligates the transferor to repurchase or redeem the assets before their maturity or through an Offering that entitles the transferor to repurchase or redeem transferred assets that are not readily obtainable.

*See* SFAS No. 125.

-136-

appearance that a third party was obligated to pay Enron the amount of large losses from its trading investments when, in actuality, the third party was an entity in which Enron had a "substantial economic stake." *See id.* at 622. The *Enron* court found that AA's complicity in Enron's unscrupulous off-balance sheet transactions was indeed reason to find AA liable for securities fraud under Section 10(b). *Id.*

In this case, Plaintiffs' allegations concerning Cardinal's sales of Pyxis receivables do not rise to the level of specificity of those in *Enron*. 235 F. Supp. 2d at 673-86. The Court concludes with Defendant E&Y that Plaintiffs failed to explain adequately how the mislabeling of Pyxis receivables was materially misleading and fraudulent.

### h. Cardinal's October 2004 Restatement

Finally, Plaintiffs allege that, by issuing an October 2004 Restatement of their FY 2002, and 2003 financials, Cardinal conceded that its accounting was materially false and misleading. *See* Pl.'s Opposition at 13. Plaintiffs opine, that Cardinal's October 2004 Restatement was meant for the "correction of [] error[s] in previously issued financial statements," and that "[b]ecause restatements dilute investors' confidence in a company's financial statements and make it difficult to compare financial statements, GAAP allows restatements *only* in limited circumstances." *See* APB No. 20, ¶¶ 7-13, 14 (defining errors as "mathematical mistakes, mistakes in the application of accounting principles, or oversight or misuse of facts that existed at the time the financial statements were prepared"). Plaintiffs rely on *FirstEnergy* for the proposition that the need for a restatement can demonstrate the falsity of a company's previous statement. *See* 316 F. Supp. 2d at 594-95 ("since the purpose of a restatement is to correct an error in a previously-issued financial statement. . . by definition then, a restatement says that the prior financial statement was

false"); *see SmarTalk*, 124 F. Supp. 2d at 505 (assuming that GAAP violations were evidence of the falsity of defendant company's past financial statements). Accordingly, Plaintiffs aver that Cardinal Defendants' October Restatement amounts to "an admission that facts existed at the time the financial statements were prepared that indicated the financial statements were false." Pl.'s Opposition at 16.

Defendant E&Y counters that, despite Plaintiffs' allegations, Cardinal's October Restatement *never* conceded that the classification standards Cardinal used in FY 2002 and 2003 to distinguish between operating revenue and bulk revenue were materially improper. *See* Def.'s Reply at 5. Furthermore, Defendant E&Y contends that "there is no GAAP guidance alleged – nor does any exist – the *prohibits* a company from restating if it chooses to do so to correct even immaterial errors." *See* Def.'s Reply at 13.

Whether there is such a GAAP guidance, the Court agrees with Defendant E&Y that Plaintiffs' claims as to the 2004 Restatement fail to infer scienter because, in their Opposition Motion, Plaintiffs do not "respond to E&Y's argument that they have failed to allege any factual basis for inferring that E&Y was aware, at the time it issued its audit opinions, that Cardinal's FY 2002 and FY 2003 financial statements contained material errors." *Id*. As Plaintiffs have not pled sufficient facts suggesting that Cardinal's alleged errors were discovered during the course of the 2004 investigation, came to E&Y's attention during the course of its FY 2002 or 2003 audits, or were so obviously material that it was reckless for E&Y to issue an unqualified opinion unless those errors were corrected, Cardinal's October 2004 Restatement does *not* imply that Defendant E&Y acted with scienter.

Plaintiffs acknowledge that the above accounting issues may not, on their own, establish a

strong inference of E&Y's scienter. Nevertheless, they argue that the fact that E&Y certified

Cardinal's FY 2002 and FY 2003[97] financial statements despite the clear evidence of the totality

---

[97]With respect to Cardinal's financial statements for FY 2002, E&Y represented, in a report dated August 6, 2002, and included in the Company's FY 2002 Form 10-K, that:

> We conducted our audit in accordance with [GAAS]. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

> In our opinion, the fiscal 2002 consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Cardinal Health, Inc. and [its] subsidiaries as of June 30, 2002, and the consolidated results of their operations and their cash flows for the year then ended in conformity with [GAAP]. Also, in our opinion, the related fiscal 2002 financial statements schedule, when considered in relation to the basic consolidated financial statements taken as a whole presents fairly, in all material respects, the information set forth therein.

*See* Complaint ¶ 374. With respect to Cardinal's financial statements for FY 2003, E&Y issued another, almost identical, audit report dated July 30, 2003, and included in the Company's FY 2003 Form 10-K. The audit report reads:

> We conducted our audit in accordance with [GAAS]. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

> In our opinion, the fiscal 2003 and 2002 consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of the Company as of June 30, 2003 and 2002, and the consolidated results of their operations and their cash flows for the years then ended in conformity with [GAAP]. Also, in our opinion, the related fiscal 2003 and 2002 financial statement schedules, when considered in relation to the basic consolidated financial statements taken as a whole, present fairly, in all material respects, the information set forth therein.

of the above accounting errors, raises an inference of scienter. Nonetheless, this Court finds that as Plaintiffs have failed to allege E&Y's scienter as to any of these alleged mistakes *individually*, their allegations must also fail when considered in their totality.

### 3. Alleged Non-Compliance with GAAS Principles[98]

Next, Plaintiffs contend that E&Y made false and misleading statements by representing that it performed its audits in a manner consistent with GAAS. In support of this claim, Plaintiffs note that for its FY 2002 and FY 2003 audits of Cardinal, E&Y had represented that the Company's financial statements were fair and accurate and comported with GAAP when in fact, they were riddled with red flags. Plaintiffs allege that E&Y's failure to "adequately perform its audit procedures to identify [Cardinal's] improprieties," enabled those improprieties to continue over a period of four years, leading to inaccurate financial statements, and, eventually, a rapidly dropping stock price. Plaintiffs specifically allege that E&Y failed to adhere to a number of

---

*See* Complaint ¶ 375.

[98]The relationship between GAAP and GAAS so far as an auditor is concerned is as follows:

> [SEC] regulations stipulate that. . . financial reports must be audited by an independent certified public accountant in accordance with generally accepted auditing standards [GAAS]. By examining the corporation's books and records, the independent auditor determines whether the financial reports of the corporation have been prepared in accordance with [GAAP]. The auditor than issues an opinion as to whether the financial statements, taken as a whole, fairly present the financial position and operations of the corporation for the relevant period.

*See MicroStrategy*, 115 F. Supp. 2d at 650 n. 60 (citing *Arthur Young*, 465 U.S. at 810. Because E&Y's alleged GAAS violations include its alleged participation in and approval of Cardinal's recognition practices in violation of GAAP, references to E&Y's GAAS violations also include any and all alleged violations of GAAP. *See id.*

specific GAAS principles, listing and describing each of those principles.[99]  The Court has

determined, however, that Plaintiffs have done no more than list these GAAS standards, failing to

specify, who, where, when, or how E&Y actually violated them.  *See Telxon*, 133 F. Supp. at

1025 (quoting *DiLeo*, 901 F.2d at 627) (noting that these elements are crucial to a plaintiff's

pleading).  To that end, Plaintiffs' allegations are no more than a feeble attempt to convert

vaguely pled GAAS violations into evidence of E&Y's scienter.  Such broad allegations are not

enough.  *See SmarTalk*, 124 F. Supp. 2d at 518. ("At most, Plaintiffs' allegations amount to a

speculative attempt to connect generally stated GAAS violations with information discovered

after the fact, in an attempt to create the appearance of recklessness.  This attempt fails.").

### 4. E&Y's Motivation to Keep Cardinal's Business

Plaintiffs also allege that E&Y committed fraud in order to maintain its lucrative Cardinal

account.  Though Plaintiffs have established Cardinal was clearly a profitable client for E&Y,

such claims have failed in the past.  *See Fidel*, 392 F.3d at 232.   In *Fidel*, plaintiffs alleged that

E&Y reaped "significant fees from its relationship with [FOTL] that it did not want to jeopardize

---

[99]Plaintiffs allege that E&Y violated the following GAAS standards: (1) audits should be performed by persons having adequate technical training and proficiency as auditors; (2) auditors should maintain an independence in mental attitude in all matters relating to the engagement; (3) due professional care is to be exercised in the performance of the audit and preparation of the report; (4) an audit must be adequately planned and that assistants should be properly supervised; (5) auditors should obtain a sufficient understanding of a company's internal controls so as to plan the audit and determine the nature, timing and extent of tests to be performed; (6) sufficient, competent, evidential matter must be obtained to afford a reasonable basis for an auditor's opinion on the financial statements subject to audit; (7) an audit report must state whether the financial statements are presented in accordance with GAAP; (8) an audit report shall identify circumstances in which GAAP has not been consistently observed; (9) informative disclosures are regarded as reasonably adequate unless otherwise stated in the report; and (10) an audit report shall contain an expression of auditors' opinions or the reason why such opinions cannot be expressed.  Complaint ¶¶ 399-400.

by calling attention to [FOTL's] poor financial condition." *See id*.  The Sixth Circuit, however,

disagreed, holding that "allegations that the auditor earned and wished to continue earning fees

from a client do not raise an inference that the auditor acted with the requisite scienter." *See id*.

In this case, Plaintiffs allege that because Cardinal was one of E&Y's most lucrative accounts,

paying E&Y $13.3 million for FY 2004 alone, E&Y ignored Cardinal's GAAP violations so it

could continue to receive Cardinal's business.  According to *Fidel*, however, "such claims [only]

set forth a motive for the auditor to have engaged in fraud" and, as a matter of law, "bare

allegations of motive" are insufficient to imply scienter.  *Id*.

### 5. Other Fraud Claims Brought Against E&Y

Finally, Plaintiffs allege that the fact that E&Y has been "sanctioned in administrative

proceedings before the SEC" for failing to comply with auditor independence rules and improper

professional conduct in the past, [makes it] more likely that E&Y had scienter in this case.

Complaint ¶¶ 399-400.[100]  Plaintiffs claim that E&Y's past scandals are "pertinent to show, under

---

[100]Plaintiffs state that on April 16, 2004, in connection with E&Y's audit of PeopleSoft,
Inc., Chief Administrative Law Judge ("ALJ"), Brenda P. Murray found the following, among
other things: "[E&Y] had no procedures in place that could reasonably be expected to deter
violations and assure compliance with" GAAS standards; E&Y relied on self-interested
individuals; E&Y had "utter disdain" for the SEC's rules and regulations on "auditor
independence." *See* Complaint ¶ 400.  In the end, the Administrative Law Judge concluded that
"considerable evidence" showed that E&Y partners acted "recklessly and negligently in
committing willful and deliberate violations of well-established rules that govern auditor
independence standards in connection with business relationships with an audit client."  Further
the ALJ concluded that because E&Y's conduct was blatant, "nothing in the record showed that
the company was willing to accept the GAAS auditor independence rules applicable to business
relationships with audit clients" and that it was "in the public interest for the Commission to
exercise its authority as a means of obtaining compliance with the Commission's independence
rules." *See In the Matter of Ernst & Young, LLP,* Initial Decision Release No. 249, Admin.
Proceeding File No. 3-10933.  In addition, Plaintiffs assert that the PeopleSoft case was just "the
latest in a series of scandals involving E&Y." *See* Complaint ¶ 400. Plaintiffs cite a number of
different "scandals" involving public companies including, HealthSouth, American Continental,

-142-

Federal Rule of Evidence 404(b), the knowledge and absence of mistake on E&Y's part. Plaintiffs also claim that the fact that " few accounting firms have been implicated in as many public company financial scandals as E&Y," is evidence of the firm's efforts to "consciously circumvent the rules and procedures required of public accountants," creating what Plaintiffs' allege is a "firm-wide culture of client accommodation."

The Court finds that Plaintiffs' claims regarding E&Y's "pattern of bad behavior" do not create an inference of scienter.  In *Fidel*, the court noted that plaintiffs relied on settlements that E&Y had made in a case arising from its audits of Cendant Corporation  as evidence that it had engaged in fraud while auditing the financial statements of FOTL.  392 F.3d at 233.[101]  The *Fidel* court rejected this claim, finding that other lawsuits or settlements "are not probative of whether [E&Y] acted knowingly or recklessly in preparing its audit report of [FOTL]" and that such allegations "simply do not create the strong inference required under the PSLRA to show that [E&Y] acted with the required state of mind during its review of FOTL's financial records."  *Id*. Similarly, in this case, where Plaintiffs cite a number of different cases in which E&Y faced shareholder derivative suits for securities fraud, these cases do not amount to a showing that E&Y knowingly or recklessly prepared a fraudulent audit report for Cardinal.

### 6. Conclusion

Plaintiffs rest on nothing more than broad conclusory allegations to assert that E&Y acted

---

Cendant, AOL Time Warner, Provident Financial and Huntington Bancshares, and Sprint.

[101]"The class members allege in their amended complaint that [E&Y] paid $335 million to settle a securities fraud action arising out of its audits of Cendant Corporation and $34 million to compensate investors of Informix."  *Fidel*, 392 F.3d at 233.  Plaintiffs averred that such "quick settlements" in other suits provide evidence that E&Y acted with scienter in preparing its audit report of FOTL.  *See* Complaint ¶ 402.

with scienter in preparing its audit reports.  In *Fidel*, the Sixth Circuit explained that such vague allegations, even when viewed in their totality, "do not create the inference, much less a *strong* inference, that [an auditor] acted with the required state of mind."  *See* 392 F.3d at 234 (emphasis added).  Therefore, as in *Fidel*, in this case, this Court concludes that, in their totality, Plaintiffs' allegations do not raise a strong inference that E&Y acted with scienter in recklessly or knowingly affirming Cardinal's fraudulent accounting for FY 2002 and FY 2003.  *City of Monroe*, 399 F.3d at 683.

Because Plaintiffs' claims do not create a strong inference of Defendant E&Y's scienter, Plaintiffs cannot establish all the elements of their Section 10(b) prima facie case.  Thus, the Court **GRANTS** Defendant E&Y's Motion to Dismiss.

## V.  CONCLUSION

Based on the foregoing discussion, the Court **DENIES** Plaintiffs' Motion to Strike Appendices ## 58, 59, 60, 61, 62, 64, 65, 66, 67, and Jensen's Motion at 8-9 and **GRANTS** Plaintiffs' Motion to Strike Appendix # 70 and any arguments related thereto.  Further, the Court **DENIES** the following: (1) Cardinal Defendants' Motion to Dismiss both Plaintiffs' § 10(b) and Rule 10b-5 claims and Plaintiffs' § 20(a) control person claims; (2) Defendant James F. Millar's Motion to Dismiss both Plaintiffs' § 10(b) and Rule 10b-5 claims and Plaintiffs' § 20(a) control person claims; and (3) Defendant Richard J. Miller's Motion to Dismiss both Plaintiffs' § 10(b) and Rule 10b-5 claims and Plaintiffs' § 20(a) control person claims.  The Court **GRANTS** the following: (1) Defendant Gary S. Jensen's Motion to Dismiss both Plaintiffs' § 10(b) and Rule 10b-5 claims and Plaintiffs' § 20(a) control person claims; and (2) Defendant E&Y's Motion to Dismiss Plaintiffs' § 10(b) and Rule 10b-5 claims.

**IT IS SO ORDERED.**

    __s/Algenon L. Marbley_____
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED: March 27, 2006**