## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

IN RE: CARDINAL HEALTH INC.   :
SECURITIES LITIGATIONS,    :
             :  **Case No. C2-04-575**
    **Plaintiff,**    :
             :
             :  **JUDGE ALGENON L. MARBLEY**
             : **Magistrate Judge King**
             :
**THIS DOCUMENT RELATES TO:**   :
             :
    **All Securities Actions**   :

## <u>OPINION AND ORDER</u>

### I.  INTRODUCTION

This matter is before the Court upon Lead Counsel's request for attorneys' fees arising out of a $600 million settlement between Cardinal Health, Inc. ("Cardinal" or the "Company") and its shareholders.  This is the largest securities class action settlement in the Sixth Circuit, and the attorneys request 24.167% of the settlement in fees, equaling $145 million.

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the Court conducted a fairness hearing, where the parties sought final approval of the $600 million settlement, requested approval of Lead Plaintiff's costs pursuant to 15 U.S.C. § 77z-1(a)(4), and asked the Court to award Lead Counsel reasonable fees and expenses.  The Court subsequently approved the $600 million settlement as "fair, reasonable, and adequate," but reserved the Lead Counsel's request for attorneys' fees ($145 million), attorneys' expenses ($2,241,821,10), and Lead

Plaintiff's costs ($82,452.81[1]), for further consideration.

The Court has considered the parties' briefs, the ten objections, the various studies relating to the award of attorneys' fees in class actions,[2] and the affidavits of Professors Charles Silver and Arthur R. Miller. In addition, the Court has scrutinized the applicable Sixth Circuit precedents and comparable post-PSLRA cases from other Circuits. Based on this research, and for the reasons set forth herein, the Court **AWARDS** Lead Counsel 18% of the class's net recovery in attorneys' fees, **GRANTS** Lead Counsel's request for expenses in the amount of $2,241,821.10, and **GRANTS** Lead Plaintiff's request for expenses in the amount of $82,452.81.

## II. BACKGROUND

This attorneys' fee determination arises from a securities class action lawsuit brought on behalf of all persons and entities who purchased Cardinal's publicly traded securities between

---

[1]PACE Industry Union-Management Pension Fund is to receive $10,830.67, California Ironworkers Field Trust Funds is to receive $14,812.50, and Amalgamated Bank is to receive $56,809.64.

[2]These studies include, but are not limited to: (1) O'Brien, *A Study of Class Action Securities Fraud Cases, 1988-1996* (the "O'Brien Study"); (2) Thomas E. Willging, *et al., Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules* (1996) (the "Willging Study"); (3) Eisenberg & Miller, *Attorney Fees in Class Action Settlements; An Empirical Study*, 1 Journal of Empirical Legal Studies 32 (2004) (the "Eisenberg Study"); (4) Stuart J. Logan, Dr. Jack Moshman & Beverly C. Moore, Jr., *Attorney Fee Awards in Common Fund Class Actions*, 24 Class Action Reports (2003) (the "Logan Study"); (5) Dunbar, Foster, Juneja, & Martin, *Recent Trends III: What Explains Settlements in Shareholder Class Actions?* (NERA, 1995) (The "Dunbar Study"); (6) Foster, Martin, Juneja, and Dunbar, *Trends in Securities Litigation and the Impact of the PSLRA* (1999); (7) Class Action Reports, Vo. 24 167-234: *Attorney Fee Awards in Common Fund Actions* (2003); and Simmons, *Securities Lawsuits: Settlement Statistics for Post-Reform Act Cases* (1999).

October 24, 2000, and July 26, 2004, inclusive (the "Class").[3] The Complaint alleges that all Defendants, including Cardinal, six members of the Company's senior management ("Individual Defendants"),[4] and the accounting firm Ernst & Young ("E&Y"), knowingly or recklessly disregarded errors in Cardinal's methods of revenue recognition. Plaintiffs allege that Defendants, by publicly misrepresenting the Company's operating revenue, fraudulently induced class members to purchase Cardinal stock at artificially inflated prices in violation of § 10(b) of the Securities Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder by the Securities Exchange Commission ("SEC"), including Rule 17 C.F.R. § 240.10b-5.

The Lead Plaintiff in this case is the Pension Fund Group ("PFG"), which is an aggregation of four large and sophisticated pension fund groups with prior securities litigation experience. The member organizations comprising PFG are: (1) New Mexico State Investment Council ("New Mexico"); (2) Amalgamated Bank as trustee for the LongView Collective Investment Fund, LongView 600 Small Cap Collective Fund, LongView VEBA 500 and LongView Quantitative Fund ("Amalgamated"); (3) PACE Industry Union Management Pension Fund ("PACE"); and (4) California Field Ironworkers Trust Funds ("Ironworkers"). Lead Plaintiff, through its Lead Counsel, has vigorously litigated this case and conducted extensive discovery, including reviewing approximately 7.2 million pages of documents, interviewing

---

[3]The Class has been certified as: "All persons (and their beneficiaries) who purchased or otherwise acquired Cardinal Health, Inc. common stock between October 24, 2000, and July 26, 2004 (the "Class Period") inclusive. Excluded from the class are the defendants . . . ."

[4]The Individual Defendants include Robert D. Walter, George L. Fotiades, Richard J. Miller, James F. Millar, Gary S. Jensen, and Mark Parrish.

ninety-eight potential witnesses, and consulting numerous experts.  In addition, in March 2006, Lead Counsel defeated a complex motion to dismiss, upon which the Court issued a one-hundred-forty page decision.[5]  Lead Counsel had the benefit of a prior SEC investigation, which prompted Cardinal to admit to misstating revenue in its financial statements by approximately $1.2 billion.  Through Lead Counsel's work, however, Defendants admitted to misstating revenue totaling approximately $23.5 billion.  In all, Lead Counsel invested 51,970 billable hours in this case.

After litigating the case for nearly three years, Lead Counsel reached a settlement with Defendants after intensive, arm's-length negotiations that extended over several months and involved a nationally recognized mediator, Professor Eric Green.  The agreement provides that Defendants will pay $600 million into a settlement fund, to be distributed to the Class according to a plan of allocation.  Following preliminary approval from the Court, the parties sent notice to all 809,802 potential Class members of the settlement.

On October 19, 2007, the Court held a fairness hearing during which it approved the settlement amount without objection.  On the issue of attorneys' fees, however, ten separate parties filed objections with the Court.  At the fairness hearing, the Court heard oral argument from the parties and objectors relating to Lead Counsel's request for $145 million in attorneys' fees.

_____

[5]Lead Plaintiff defeated Defendants' Motion to Dismiss, except that the Court held that PFG failed to state a § 10(b) claim against Defendant E&Y because its allegations that E&Y had intimate knowledge of Cardinal's fraudulent activities and that E&Y had failed to adhere to GAAP and GAAS rules did not establish the necessary inference of scienter required under the law.  On April 4, 2007, the Court certified the judgment in favor of E&Y for interlocutory appeal.

### III.  ANALYSIS OF REASONABLE ATTORNEYS' FEES

Lead Counsel requests that the Court award 24.167% of the $600 million settlement, or $145 million, in attorneys' fees.  Though Lead Counsel contends that this award is reasonable given the extraordinary settlement, the quality of representation, and awards in other cases, there are ten formal objectors who argue that $145 million exceeds reasonable compensation for the attorneys and unduly dilutes the recovery for the class.[6]

The Court has an obligation to ensure that attorneys' fees are reasonable under both the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act ("PSLRA").  Fed. R. Civ. P. 23(g); 15 U.S.C. § 78u-4.  The first step in this analysis is to determine whether the fee request carries a presumption of reasonableness under the PSLRA.  *See In re Cendant Corp. Litig.,* 264 F.2d 201, 282 (3d Cir. 2001) (holding that ex-ante fee arrangements between Lead Counsel and Lead Plaintiff are accorded a rebuttable presumption of reasonableness).  In this instance, the Court does not attach a presumption of reasonableness to Lead Counsel's request for 24% of the settlement because there was no ex-ante fee agreement between Lead Counsel and Lead Plaintiff.  The next step in the Court's analysis, therefore, is to determine the reasonable amount of attorneys' fees independently.

To make this determination, the Court must first decide whether to award fees based on a percentage of the settlement ("percentage approach") or based on Lead Counsel's lodestar

---

[6] The objectors are: (1) George and Sarah Wagner; (2) Ronald and Vondell Tyler and Susan Browne; (3) the Murphy Family Foundation; (4) William Smith; (5) Pennsylvania Public School Employees' Retirement System; (6) Consulting Fiduciaries, Inc.; (7) New Jersey Division of Investment ("NJ DOI"); (8) New York State Teachers' Retirement System; (9) New York State Common Retirement Fund; and (10) Colorado Public Employees' Retirement Association.

("lodestar approach").  After reviewing the merits of each of these approaches, the Court finds

the percentage approach is more appropriate.  Second, the Court must utilize the *Ramey*

factors—those factors the Sixth Circuit has established for evaluating attorneys' fees—to

evaluate the reasonableness of the request and, if the request is not reasonable, to set an

appropriate award.  *Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d 1188, 1196 (6th Cir. 1974).

Based on this analysis, described in more detail below, the Court finds that the $145 million

request is excessive given the particular facts and circumstances of this case, and instead awards

18% of the Class's net recovery, approximately $108 million before interest, to Lead Counsel.

**A.  Framework for Reviewing Lead Counsel's Request for Attorneys' Fees in PSLRA**

**Cases**

Under the PSLRA, the Court has an "independent obligation to ensure the reasonableness

of any fee request."  *Cendant*, 264 F.3d at 281-82; 15 U.S.C. § 78u-4.[7]  Indeed, in any class

action, Federal Rule of Civil Procedure 23(e) provides that no class action "shall . . . be

dismissed or compromised without the approval of the court."  Accordingly, the Court must

zealously protect the "class's interest by acting as a fiduciary for the class," *In re Rite Aid Corp.*

*Securities Litig.*, 396 F.3d 294, 307 (3d Cir. 2005), while assuring "that counsel is fairly

compensated for amount of work done as well as for results achieved."  *Rawlings v.*

*Prudential-Bache Props., Inc.*, 9 F.3d 513, 516 (6th Cir.1993)).  It is within the Court's

discretion to set the amount of attorneys' fees so that they are reasonable, and the Sixth Circuit

---

[7]The PSLRA confers the lead plaintiff the power to "retain" lead counsel, 15 U.S.C. §
78u-4(a)(3)(B)(v), but it also requires that the court ensure that the "total attorneys' fees and
expenses awarded . . . to counsel for the plaintiff class . . . not exceed a reasonable percentage of
the amount of any damages and prejudgment interest actually paid to the class." *Id.* at § 78u-
4(a)(6).

reviews such an award only for an abuse of discretion.  *In re Sulzer Orthopedics Inc.*, 398 F.3d 778, 780 (6th Cir. 2005).

The Court's obligation to oversee class action settlements largely stems from the recognition that "there is no way for 'the class' to select, retain, or monitor its lawyers in the way that an individual client would, and because of doubts that a typical lead plaintiff . . . is a terribly good agent for the class."  *Cendant*, 264 F.3d at 282.  In the ordinary case, there is a risk of collusion between class counsel and the defendants and "the court is the only disinterested agent capable of protecting the class from its lawyers. . . ."  *Id.*  In such a context, a thorough judicial review of fee requests is both necessary and appropriate to ensure that the interests of absent class members are not compromised. *Id.*

### 1.  Presumption of Reasonableness Given to Ex-Ante Fee Agreements

In the context of PSLRA cases, however, there are provisions that reduce the risk of poor class representation and collusion.  For instance, the PSLRA establishes a detailed procedure for choosing the lead plaintiff, with the intent that the selected plaintiff will be an effective and zealous agent for the class.  The properly selected lead plaintiff, presumptively the plaintiff with the greatest losses, is then charged with selecting and retaining lead counsel, subject to court approval.  *Cendant*, 264 F.3d at 282;15 U.S.C. § 78u-4(a)(3)(B)(v).  Unlike many other class actions, lead plaintiff is usually a sophisiticated institutional investor with the experience to monitor class counsel.

In contrast to the usual method of naming as lead counsel the first attorney to file suit, the PSLRA scheme allows the lead plaintiff to vet and select lead counsel from a pool of qualified attorneys, which should better assure the Court that "counsel selection and retention

were done in the best interests of the class." *Cendant*, 264 F.3d at 282.  Under the watchful eye

of the court, lead plaintiffs could shop the class action to various attorneys.  Competition

between attorneys ensures a market rate for services, and may even drive down fees.  Prospective

plaintiffs' attorneys can quote fees based on their legal skills and the risks, complexity, and

projected outcome of the case.  In turn, lead plaintiff can select the lawyers that it believes will

yield the largest net award for the class.  As a result, the fee agreement is more likely to reflect

the market value of the case.

The benefits of an ex-ante agreement between lead plaintiffs and class counsel at the

outset of litigation are substantial.  In setting fees ex-post, the Court's evaluation of the risk of

recovery, the skill of the attorneys, the complexity of the case, and the merit of the settlement or

award are infected with hindsight bias.  So long as lead plaintiff and lead counsel are of equal

bargaining power and they negotiate at arm's length, an ex-ante agreement can more accurately

reflect the market value of an attorney's services as applied to the particular facts of the case.

Further, agreeing to a fee at the outset will align the interests of the class and the attorneys

throughout the litigation.  Thus, the PSLRA places lead plaintiff, at least ex-ante, in the best

position to fix the compensation of lead counsel.  *See Cendant*, 264 F.3d at 282.

Given the protections embedded in the PSLRA, the Third Circuit has held that courts

"should accord a presumption of reasonableness to any fee request submitted pursuant to a

retainer agreement that was entered into between a properly-selected lead plaintiff and properly-

selected lead counsel."  *Id.* ("[A] court might well feel confident in assuming that a fee

arrangement an institutional investor had negotiated with its lawyers before initiating a class

action maximized those lawyers' incentives to represent diligently the class's interests, reflected

-8-

the deal a fully informed client would negotiate, and thus presumptively was reasonable.")

(quoting Weiss & Beckerman, *Let the Money Do the Monitoring: How Institutional Investors*

*Can Reduce Agency Costs in Securities Class Actions*, 104 Yale L.J. 2053, 2105 (1995)); *see*

*also*, *In re Qwest Communs. Int'l, Inc. Sec. Litig.*, No. 01-cv-01451-REB-CBS, 2006 U.S. Dist.

LEXIS 71267 (D. Colo. Sept. 28, 2006) (adopting the Third Circuit approach); *In re Global*

*Crossing Sec. & ERISA Litig.*, No. 02 MD 1472 (GEL), 225 F.R.D. 436, 466 (S.D.N.Y. Nov. 23,

2004) (same). Thus, if there is an ex-ante fee agreement, the court would still review the fee for

reasonableness, but would employ a "deferential standard of review."[8] *Id.* at 284. This rubric

would not permit a court to abdicate its statutory responsibility to ensure the fees are reasonable,

but instead helps to ensure that the properly selected lead plaintiff, not the court, functions as the

class's primary representative. *Id.* at 282. *But see In re AT&T Corp. Secs. Litig.,* 455 F.3d 160,

169 (3d Cir. 2006) (emphasizing that "the presumption of reasonableness set forth in *Cendant*

does not diminish a court's responsibility to ensure fees do not exceed a reasonable amount" and

cautioning "against affording the presumption too much weight at the expense of the court's

[fiduciary] duty. . . ."); *In re Bristol-Myers Squibb Secs. Litig.*, 361 F. Supp. 2d 229, 237 n.8

(S.D.N.Y. 2005) (declining to give deference to fees stated in retainer agreement between

counsel and lead plaintiff because, among other things, "despite the improvements intended by

the PSLRA, plaintiffs in common fund cases generally remain mere figureheads") (citations and

quotations omitted).

---

[8] Under the Third Circuit's rubric, the presumption of reasonableness could be overcome if: (1) the assumptions underlying the original retainer agreement had been materially altered by significant factual or legal developments that could not have been reasonably foreseen; or (2) the fee agreement is "clearly excessive." *Cendant*, 264 F.3d at 283.

Though the Sixth Circuit has not addressed this approach, this Court strongly endorses applying a presumption of reasonableness to ex-ante fee agreements.  In fact, this Court would take the Third Circuit's reasoning a step further and recommend that courts, in addition to the established requirements, look favorably on the presence of an ex-ante fee arrangement in its decision to approve lead plaintiff and lead counsel.  Alternatively, Congress could amend the PSLRA to mandate lead plaintiffs to enter into a fee arrangement with lead counsel before the court formally approves lead counsel.  Under this approach, sophisticated parties would be encouraged to negotiate fee arrangements without the bias of hindsight, and they could reach presumptively reasonable results that the court can review.  Without these ex-ante agreements, the Court is forced to use flawed markers, such as the lodestar multiplier and the attorneys' request, to approximate the appropriate attorneys' fees without knowing their market value at the outset.

### 2.  Lead Counsel Did Not Negotiate an Ex-Ante Fee Agreement

Although the Court would afford an ex-ante agreement a presumption of reasonableness, unfortunately there is no such agreement in the case *sub judice*.  PFG, the Lead Plaintiff, is composed of four different member organizations that operate by consensus to make litigation decisions.  Each of the four members has a different position about the appropriate attorneys' fees in this case.  Their positions are as follows: (1) PACE agreed to a sliding-scale fee arrangement with Lead Counsel one year *before* the settlement, whereby Lead Counsel would receive 25% of any settlement over $150 million; (2) New Mexico, *after* the settlement was reached, issued a statement from the State's Attorney General stating that the requested percentage is at the "high end of reasonable" and 19% would be more reasonable, but that the

final decision should be made by the Court; (3) Amalgamated, *after* the settlement, stated that it did not object to the requested fee and was leaving the matter to the discretion of the Court; and (4) the Ironworkers agreed to support Lead Counsel's fee request *after* the settlement was reached.  Thus, only one of the four member organizations entered into an ex-ante fee agreement.  Lead Counsel admits that only one of the four member organizations, PACE, entered into a fee agreement before the settlement was reached.  Regardless, it contends that its agreement with PACE is entitled to deference under the PSLRA.  The Court, however, is not as willing to disregard the other three parties that compose the Lead Plaintiff and deem the arrangement with PACE a sufficient ex-ante agreement under the PSLRA.  PACE itself is not Lead Plaintiff and has no authority to act unilaterally on behalf of PFG.  Lead Counsel had the opportunity to negotiate with the other member organizations, to ask the other member organizations to ratify the PACE agreement, or to contract formally with the PFG conglomerate as a whole.  It chose not to undertake any of these measures, however, or was otherwise unsuccessful in garnering an ex-ante agreement from PFG.  The lack of consensus on this issue signals to the Court that all parties were not unified behind PACE's ex-ante evaluation of the attorneys' fees.

Considering the positions of PFG's four member organizations, the Court finds that *after* the settlement, PFG collectively agreed that $145 million in attorneys' fees is not unreasonable. But the Court is wary of relying on this ex-post affirmation to guide its analysis, because ex-post agreements do not provide the same benefits as ex-ante agreements.  As explained above, the PSLRA places a Lead Plaintiff in the best position to align the incentives of class counsel only *prior* to settlement.  Once the Lead Counsel has already negotiated the settlement, agreeing to a

percentage fee can no longer incentivize the attorneys to work in the class's best interests.  *See, e.g., In re HPL Techs., Inc. Secs. Litig.*, 366 F. Supp.2d 912 (N.D. Cal. 2005) ("The earlier a fee arrangement is concluded between lead plaintiff and lead class counsel, the more deference that court should pay to that fee agreement in a common fund case").   Although the ex-post viewpoints of the entities comprising the Lead Plaintiff are helpful in evaluating the quality of the settlement and the efficacy of counsel, they do not assist the Court in understanding the market value of the case.  After the settlement is completed, without competition from other firms, the attorneys may be inclined to ask for as much as they think the Lead Plaintiff will agree to, regardless of the initial risk, amount of work, or benefit to the class.  Additionally, Lead Plaintiff may find little reason to object, as any change in attorneys' fees that may have a large impact on the Class as a whole may only have a marginal impact on each individual entity.  *See Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 52-53 (2d Cir. 2000) (stating that plaintiffs have little incentive to object to attorneys' fees once a settlement has been reached because such an objection would waste resources and only result in a small pro-rata gain if sustained).  Given that there is no ex-ante fee agreement in this case that would trigger the deference envisioned by the PSLRA, the Court must undertake an independent analysis to determine reasonable attorneys' fees based on the Sixth Circuit's *Ramey* factors and comparable PSLRA fee jurisprudence.

### B.  Calculating Reasonable Attorneys' Fees

To determine reasonable attorneys' fees, the Court must engage in a two-part analysis. First, the Court must select a method by which to calculate the attorneys' fees—either the percentage approach or the lodestar approach.  *In re DPL Inc., Sec. Litig.*, 307 F. Supp. 2d 947,

949-51, (S.D. Ohio 2004).  Second, the Court must analyze and weigh the "*Ramey* factors" set

forth in *Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d 1188, 1196 (6th Cir. 1974), to develop an

appropriate fee award using the calculation method selected.  The Court notes that both

calculation methods have their flaws, and the *Ramey* factors do not provide the Court with a

precise calculation by which to determine a reasonable fee.  But given that there is no ex-ante fee

arrangement to guide the Court in setting the fee award, the Court must instead pursue the

imperfect mathematics of justice with the tools available from the Sixth Circuit.

### 1.  The Lodestar Approach Versus the Percentage Approach

Neither the Sixth Circuit nor the PSLRA has established a controlling rule for calculating

attorneys' fees in PSLRA cases.  *Rawlings,* 9 F.3d at 515-17; *In re Microstrategy, Inc.*, 172 F.

Supp. 2d 778, 786 (E.D. Va. 2001).  Instead, it is within the discretion of this Court "to

determine the 'appropriate method for calculating attorneys' fees in light of the unique

characteristics of class actions in general, and the particular circumstances of the actual cases

pending before the Court.  *Bowling v. Pfizer, Inc.*, 102 F.3d 777, 779 (6th Cir. 1996) (citation

omitted).  The Court may choose either the lodestar approach or the percentage approach.  *Id*.

### a)  The Lodestar Approach

Under the lodestar approach, the trial court first scrutinizes the fee petition to ascertain

the number of hours Lead Counsel reasonably expended in creating, protecting, or preserving the

fund recovered, and then multiplies that number by a reasonable hourly rate for the attorneys'

services, to produce a "lodestar" figure.  Then, the Court may increase or decrease the lodestar

by multiplying it by a factor it deems reasonable (the "lodestar multiplier").  A court determines

an appropriate lodestar multiplier by assessing a variety of factors, including the nature of the

case, the market for such legal services, the risk involved, and the results achieved, such that the

Court rewards a lead counsel that takes on more risk, demonstrates superior quality, or achieves

a greater settlement with a larger lodestar multiplier.[9] *See In Re AOL Time Warner, Inc.*, No. 02

Civ. 5575, 2006 U.S. Dist. LEXIS 78101 at *19-20 (S.D.N.Y. Oct. 26, 2006); *In re*

*BankAmerica Corp. Secs. Litig.*, 228 F. Supp. 2d 1061, 1064 (E.D. Mo. 2002); *Microstrategy*,

172 F. Supp.2d at 778.

　　The lodestar method has been rightly criticized for generating avoidable hours,

discouraging early settlement, and burdening district judges with the tedious task of auditing

time records. *Goldberger*, 209 F.3d at 48-49. Because attorneys are paid based on the amount

of hours they work, there is an incentive to over-litigate or "churn" cases.[10] *Microstrategy*, 172

F. Supp. 2d at 787. Rather than reward attorneys for achieving the best outcome for the class, or

for doing so quickly and efficiently, the lodestar instead rewards attorneys for the number of

hours that they work, regardless of whether such hours provide the maximum benefit to the class.

In most industries, organizations strive for the best output while devoting the fewest number of

resources possible. Inprisoned by the billable hour, the lodestar encourages just the opposite.

Then, to protect the class's fund from unnecessary attorney padding, the Court must endure time-

---

[9]The lodestar approach was pioneered by the Third Circuit in *Lindy Brothers Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161, 167-68 (3d Cir. 1973), after the federal courts in the 1970s became concerned that balooning settlement numbers were generating excessive legal fees under the percentage system. *AOL,* 2006 U.S. Dist. LEXIS 78101 at *19 (citing, among others, *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 462 (2d Cir. 1974)).

[10]Some authorities, however, suggest that the concerns over the lodestar's susceptibility to excessive hours and delays are more theoretical than real. *See* 7B Charles Wright, Arthur Miller & M. Kane, Federal Civil Practice & Procedure 2d § 1803 at 508 (West 1986).

consuming parsing of reams of attorney time sheets and hindsight recalculations to determine the proper amount of work and charges. *AOL,* 2006 U.S. Dist. LEXIS 78101, at *26.

Even after such agonizing judicial review of the time sheets, however, the lodestar inquiry is not free from arbitrariness. Proponents of the lodestar approach often herald it as an "objective" method, because it is a pure mathematical calcuation based on the number of hours worked. *See, e.g., City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 470-71 (2d Cir. 1974) (only the lodestar method can "claim objectivity"). The use of a multiplier, however, injects a subjective element into the calculus, as the Court must decide based on the Circuit's factors by what measure to increase the lodestar—thereby diluting the "objectibity" of the lodestar approach. *AOL*, U.S. Dist. LEXIS 78101 at *30. Although the Court does not dispute that attorneys' fees should, in part, be based on the amount of time the attorneys expend through the cross-check required by the *Ramey* factors, the negative incentives and tedium attached to the lodestar method make it unsatisfactory as the preferred and most pragmatic approach.

### b) The Percentage Approach

Under the percentage approach, a court simply awards class counsel a reasonable percentage of the class settlement. *See Bowling*, 102 F.3d at 780. As a threshold matter, the Court notes that the percentage approach is the current prevailing method in securities class actions. *Microstrategy*, 172 F. Supp. 2d, at 787. At least two circuits have mandated, and seven circuits, including the Sixth, have explicitly approved the percentage approach in common fund cases. *Id; see Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1268-71 (D.C. Cir. 1993) (requiring the percentage-of-recovery method)); *Camden I Condominium Ass'n v. Dunkle,* 946 F.2d 768, 774 (11th Cir. 1991) (same); *Rawlings,* 9 F.3d at 515-17 (approving the percentage approach);

*Savoie v. Merchs. Bank*, 166 F.3d 456, 460 (2d Cir. 1999); *Johnston v. Comerica Mortgage Corp.*, 83 F.3d 241, 246 (8th Cir. 1996); *In re Thirteen Appeals Arising out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 307 (1st Cir. 1995); *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1296 (9th Cir. 1994); *Gottlieb v. Barry*, 43 F.3d 474, 487 (10th Cir. 1994); *Florin v. Nationsbank, N.A.*, 34 F.3d 560, 564-65 (7th Cir. 1994).

As these other courts have noted, the percentage approach encourages efficiency, judicial economy, and aligns the interests of the lawyers with the class in large securities cases. While the lodestar approach incentivizes attorneys to work more hours, without regard to the quality of the output or the class's needs, the percentage approach instead "rewards counsel for success and penalizes it for failure." *Cendant*, 243 F.3d at 732. Not only is the Court spared from the costly task of scrutinizing counsel's billable hours, but attorneys are discouraged from padding hours and encouraged to work more efficiently. Furthermore, because the attorneys receive a higher fee if they obtain a higher settlement, the interests of the class and the attorneys are aligned. As Professor John C. Coffee concludes, the percentage approach "relies on incentives rather than costly monitoring" to ensure that Lead Counsel is "essentially self-policing." John C. Coffee, Jr. *Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law through Class and Derivative Actions*, 86 Colum. L. Rev. 669, 724-25 (1986). Thus, this Court will follow the prevailing trend and utilize the percentage approach to calculate attorneys' fees in this case.

Despite the benefits over the lodestar method, the percentage fee approach has its own potential drawbacks that the Court must recognize and attempt to minimize in its analysis. As a threshold matter, cases that employ the percentage approach arbitrarily tend to start their analysis

with the attorneys' request, rather than at an objective marker, such as the hours worked.  Instead of reasoning based on other case law or abstract ideas about a reasonable fee, courts tend to anchor their analysis to the percentage first requested by counsel.  This method of analysis allows plaintiffs' counsel to set the baseline based on its biased valuation of its work.

Without vigilance, this anchoring effect easily biases courts' decisions.  Indeed, courts have shown a propensity to adjust the requested amount by only a few percentage points, if at all.  *See, e.g., AOL*, 2006 U.S. Dist. LEXIS 78101 (7% requested, 5.9% awarded); *In Re Prudential Ins. Co. of America Sales Practice Litig.*, 106 F. Supp. 2d 721 (6.7% requested, 5% awarded); *Royal Ahold*, 461 F. Supp. 2d (15% requested, 12% awarded).  This anchoring effect allows plaintiffs' counsel to manipulate the fee award they are likely to receive by simply requesting a higher percentage.  The Court wonders, for example, if the lead Plaintiff's in *Royal Ahold* had asked 20%, if the court would have awarded them 15%.  By arbitrarily tethering the reasonableness analysis to the fee requested, plaintiffs' counsel arbitrarily gains excessive control over the court's jurisprudence.

To minimize this problem, the Court will look primarily to the body of common law to determine an appropriate fee award, not Lead Counsel's request.  Using the *Ramey* factors, the Court can look to other cases with similar characteristics—an extraordinary settlement, skilled counsel, extensive discovery—to establish the baseline for its analysis.  Though this method may be imprecise because it relies on other courts that have arbitrarily anchored their analysis to the attorneys' requests, the body of post-PSLRA case law collectively provides the best available guidance to the Court as to what constitutes a reasonable attorneys' fee.

Another drawback of the percentage fee approach is that it can result in a windfall for the

plaintiffs' attorneys because the size of the settlement does not necessarily reflect the skill, efficiency, and hard-work of counsel.   A quick and fruitful settlement could be the work of extremely capable and efficient counsel, or it could result from good facts and a lucky break; but the percentage approach does not differentiate between the two.  Similarly, a large settlement could result from the mere happenstance that the class is large, even though the liability issue would be the same regardless of whether there were 8,000 or 80,000 class members.  *See AOL*, 2006 U.S. Dist. LEXIS 78101, at *60-61 ("[I]t is not ten times as difficult to prepare, and try or settle a 10 million dollar case as it is to try a 1 million dollar case") (quoting *Goldberger,* 209 F. 3d at 52 and *Union Carbide Consumer Prod. Bus. Secs. Litig*., 724 F. Supp. 160, 167-68 (S.D.N.Y.1989)). The "huge fees in a huge case might be less a function of the amount or quality of the attorneys' work, or even of the risk undertaken, and more simply a function of the fact that the lawyers managed to find and bring a case with huge damages." *Id.* (quoting Task Force on Contingent Fees, Tort Trial & Insurance Practice Section of the American Bar Association, *Report on Contingent Fees in Class Action Litigation*, 25 Rev. Litig. 459, 470 (2006)).

In order to address this flaw of the percentage approach, the Court will follow the "declining percentage principle," meaning the percentage of recovery allocated to attorneys' fees decreases as the size of the recovery increases.  *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 736 (3d Cir. 2001); *In re Sulzer Hip Prosthesis & Knee Prosthesis Liab. Litig.,* 268 F. Supp. 2d 907, 938 (N.D. Ohio 2003); *AOL,* 2006 U.S. Dist. LEXIS 78101, at *62.  Because recovery is partially the result of class size, and not just attorney skill, "the percentage awarded ordinarily should decrease as the amount of the recovery rises, particularly in 'mega-fund' cases where the recovery is above $100 million." *Royal Ahold*, 461 F. Supp. 2d at 385 (citing *Cendant PRIDES*,

243 F.3d at 736).  Accordingly, "district courts setting attorneys' fees in cases involving large settlements must avoid basing their awards on percentages derived from cases where the settlement amounts were much smaller."  *Cendant PRIDES*, 243 F.3d at 736.

Furthermore, most courts adopting the percentage approach conduct a "lodestar cross-check" to prevent counsel from receiving a windfall.  The cross-check requires the Court to calculate the lodestar multiplier in the case and ensure that the fee award is still roughly aligned with the amount of work the attorneys contributed.  The lodestar cross-check does not supplant the court's detailed inquiry into the attorneys' skill and efficiency in recovering the settlement, but instead acts as simply another factor required by the Sixth Circuit and many others to ensure that attorneys' fees accurately reflect the work of counsel.  *See, e.g, Ramey,* 508 F.2d at 1196*; In re Royal Ahold N.V. Sec. & ERISA Litig.*, 461 F. Supp. 2d 383, 385 (D. Md. 2006) ("district judges in this circuit have suggested a flexible analysis that uses the percentage of recovery method but applies the lodestar method as a cross-check, alleging that it is a 'useful tool for trial courts to use to inform and calibrate a judgment as to a fair and reasonable PSLRA fee award'"); *Goldberger*, 209 F.3d at 50; *Bowling*, 922 F. Supp. at 1281.   Given these cautionary measures, the Court finds the percentage approach the most appropriate method for determining reasonable attorneys' fees in this case.

### 2.  The *Ramey* Factors

The Sixth Circuit established the relevant factors for determining a reasonable fee award in *Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d 1188, 1196 (6th Cir. 1974).  The *Ramey* factors include: "1) the value of the benefit rendered to the corporation or its stockholders, 2) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to

-19-

others, 3) whether the services were undertaken on a contingent fee basis, 4) the value of the services on an hourly basis [the lodestar cross-check], 5) the complexity of the litigation, and 6) the professional skill and standing of counsel involved on both sides." *Id.* There is no formula for weighing these factors. Rather, the Court should be mindful that each case presents a unique set of circumstances and arrives at a unique settlement, and thus different factors could predominate depending on the case. *Rawlings,* 9 F.3d at 516.

### a) The Value of the Benefit

The first *Ramey* factor requires the Court to evaluate the benefit of the settlement to the Class. District courts in this Circuit widely regard the first *Ramey* factor as the most important. *See Basile v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 640 F. Supp. 697, 700 (S.D.Ohio 1986) (finding that the value of the benefit rendered is the first factor listed because it is the most important one); *Bowling,* 922 F. Supp. at 1280 ("Most important among these factors are the value of the benefit rendered to the plaintiff class and the value of Counsel's services on an hourly basis"). In this case, the value of the benefit to the class, in terms of the percentage of loss recovered, is in the top echelon of all securities class action settlements. The class recovered 20% of its alleged loss, outstripping the typical recovery in most securities class actions, which is usually between three and six cents on the dollar. *See* Elaine Buckberg, Todd Foster, Ronald Miller & Stephanie Planchich, *Recent Trends in Shareholder Class Action Litigation: Bear Market Cases Bring Big Settlements* 8 (NERA, Feb. 2005). By the Court's research, a settlement of $600 million represents the largest securities settlement ever reached in the Sixth Circuit, and one of the fifteen largest settlements ever reached in this country.

Because of the outstanding recovery in this case, this factor weighs in favor of awarding the attorneys a higher percentage than the average award in post-PSLRA cases.  The Logan Study demonstrates that the average settlement in post-PSLRA cases settling for greater than $100 million is approximately 15%.[11]  Though this average incorporates cases that settled for several billion dollars (which usually receive much lower percentage fees in the single digits) and cases that settled for several hundred million (which can receive higher fees around 30%),  it provides the Court with a reference point for determining a reasonable fee.

More instructive, however, are cases in the $600 million range where the court has found that the attorneys recovered a high percentage of the class's losses.  In *In re Lucent Technologies*, the court awarded 17% of the $610 million settlement in attorneys' fees. *Lucent*, 327 F. Supp. 2d at 436.  The court based its award on the fact that the class recovered an "extraordinary settlement" after four years of intensive work by talented attorneys.  Thus, based on *Lucent*, and extrapolating from other cases with highly beneficial settlements, the

---

[11]The court in *Sulzer Hip Prosthesis*, 268 F.Supp.2d at 938 n.45, clearly summarizes the Logan Study:

> Just before the Court issued this Order, it received notice of the recent publication of a legal periodical that is highly instructive regarding lodestars, multipliers, and percentages in common fund class action cases. See Stuart J. Logan, Dr. Jack Moshman & Beverly C. Moore, Jr., Attorney Fee Awards in Common Fund Class Actions, 24 Class Action Reports (March-April 2003). The authors undertook a survey of the common benefit fee awards entered by state and federal courts between 1973 and the present, in 1,120 class action cases. The authors also parsed the common benefit fee awards by size of recovery, type of case, and time of award. Among other things, the authors found that: (1) when measured as a percentage of the total recovery, common benefit awards (including both fees and expenses) averaged: (a) 18.4% across all 1,120 cases, (b) 15.1% across the 64 cases where the recovery exceeded $100 million, and (c) 16.1% across the 10 mass tort cases.

Court finds that approximately 15% to 20% of the settlement would be an appropriate fee award in a $600 million dollar settlement that included a high percentage recovery for shareholders.  *See, e.g., In re Royal Ahold*, 461 F. Supp. 2d at 387 (awarding 12% in attorneys' fees from a $1.1 billion settlement that reflected a 40% recovery for shareholders); *BankAmerica*, 228 F. Supp. 2d at 1064 (awarding 18% in fees from a $490 million settlement to attorneys who obtained a "significant recovery" for the class); *DPL,* 307 F. Supp. 2d at 952 (rejecting counsel's request for 35% of the settlement, and instead awarding 20% of the $110 million settlement to the attorneys who recovered 62% of shareholder losses in a "truly remarkable accomplishment").

## 2.  Society's Interest in Rewarding the Attorneys

The competing public policy considerations in this case are "the encouragement of counsel to accept worthy engagements and the discouragement of excessive lawyer compensation" at the class's expense.  *AOL*, 2006 U.S. Dist. LEXIS 78101, at * 52. Rewarding attorneys in securities class actions is important because absent class actions, most individual claimants would lack the resources to litigate a case of this magnitude, and individual recoveries are often too small to justify the burden and expense of litigation.  *In re Telectronics Pacing Systems, Inc.*, 137 F. Supp. 2d 1029, 1043 (S.D. Ohio 2001) ("Attorneys who take on class action matters serve a benefit to society and the judicial process by enabling . . . claimants to pool their claims and resources" to achieve a result they could not obtain alone.")  Reasonable fee awards in such cases "encourage and support other prosecutions, and thereby forward the cause of securities law enforcement and compliance."  *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 750-51 (S.D.N.Y. 1985).

-22-

Though the Court recognizes the importance of compensating attorneys in these cases, this factor does not heavily influence the Court's analysis.  Because the public interest factor is relatively constant throughout securities cases, it does not play a large role in distinguishing this case from other securities cases that inform the Court's calculation.

### 3. Services Rendered Were on a Contingent Fee Basis

This third *Ramey* factor stands as a proxy for the risk that attorneys will not recover compensation for the work they put into a case.  *Bowling*, 922 F. Supp. at 1282.  Several courts consider the risk of non-recovery the most important factor in the fee determination. *See, e.g., Bristol*, 361 F. Supp. 2d at 233-34 (citing *Goldberger,* 209 F.3d at 54 ("The first, and most important, *Goldberger* factor is the risk in pursuing the case.")); *Union Carbide Corp.,* 724 F. Supp. at 164 ("[C]ontingent fee risk is the single most important factor in awarding a multiplier").  Lead Counsel took this case on a contingent fee basis.  At the time that Lead Counsel undertook the prosecution of this action, it accepted the risk of investing substantial time and expenses without any assurance of being compensated.  For instance, if counsel failed to win a judgment or reach a settlement, the attorneys would have received nothing and also forfeited their expenses.  Had this not been a class action, counsel aver that their standard contingency fee would have been greater than 25%.

Although Lead Counsel faced the risk of non-recovery, it did not face an unusually high risk compared to other securities class actions.  First, Lead Counsel notes that it risked having to prove scienter, but scienter is one of the "general hurdles" facing plaintiffs in almost every securities case.  *See Goldberger*, 209 F.3d at 54.  In fact, Lead Counsel faced less risk than in other securities cases because it piggybacked on the success of a prior SEC

-23-

investigation. That is not to minimize Lead Counsel's success in procuring a much greater settlement than the SEC. After the SEC investigation, however, Cardinal admitted to misrepresenting revenue up to $1.2 billion dollars, thereby reducing counsel's risk of non-recovery. *See, e.g., Cendant PRIDES*, 243 F.3d at 741 (reversing the district court's award of fees, in part because it did not consider that "Cendant's liability and consequent collectability have been conceded at the outset" due to the work of public agencies).

Furthermore, damages were easier to prove than in an average securities case because the claims were precipitated by public events—specifically, the SEC's and others' investigations, and an October 2004 restatement of Cardinal's earnings. In some cases, "distilling the impact of defendants' account irregularities from [an] overlapping national recession and specific downturns" in particular markets can increase counsel's risk of proving loss causation. *AOL*, 2006 U.S. Dist. LEXIS 781011, at *46. Here, Lead Counsel would not have encountered as many problems in proving damages and also knew that Cardinal was able to pay such damages. *See, e.g., Lucent,* 327 F. Supp. 2d at 438 (because Lucent was on the brink of bankruptcy after its stock dropped, class counsel faced an "acute" risk of non-recovery). Therefore, Lead Counsel faced a lower risk of non-recovery than in many comparable securities class actions.

### 4. The Value of the Services on an Hourly Basis

Under the fourth *Ramey* factor, the Court must examine the value of the attorneys' services on an hourly basis by performing the lodestar cross-check. The Court performs a lodestar cross-check by comparing the lodestar multiplier used in this case to lodestar multipliers used in similar cases. In contrast to employing the lodestar method in full, when

using a lodestar cross-check, "the hours documented by counsel need not be exhaustively scrutinized by the district court.'" *In re WorldCom Sec. Litig.*, 388 F. Supp.2d at 355 (quoting *Goldberger*, 209 F.3d at 50). In this case, counsel worked 51,970 billable hours at a reasonable average hourly billing rate of approximately \$353.63. Thus, their lodestar is \$353.63 x 51,970, or \$18,378,122.75. Dividing the requested fee of \$145 million by the lodestar yields a proposed multiplier of approximately 7.89. If the Court awards 18% of the settlement, or \$108 million, as is common in comparable cases that recovered a high percentage of shareholder losses, then the lodestar multiplier would be approximately 5.9.

The objectors contend that awarding counsel eight times their billable hours constitutes a windfall. Citing *In re AOL Securities Litigation*, they argue that the hourly rate charged by counsel "inherently reflects risk, quality and other factors associated with an attorney's competitiveness, skills and overhead," and thus multiplying that figure by eight unduly compensates Lead Counsel. *AOL*, 2006 U.S. Dist. LEXIS 78101, at 80. Indeed, "it is the Court's duty to avoid any sense of vicarious generosity or to permit the lodestar to be enhanced without restraint above a fair and reasonable amount under all the facts and circumstances, precluding any notion that there are no decent limits to compensation for services of an attorney serving another's interests." *In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393, 397 (S.D.N.Y. 1999).

As the objectors correctly note, the requested lodestar multiplier of 7.89 is far beyond the range courts have found acceptable in other large securities actions. Most courts agree that the typical lodestar multiplier in a large post-PSLRA securities class actions ranges from 1.3 to 4.5. *See Cendant PRIDES*, 243 F.3d at 742 (noting that an acceptable multiplier range

for the $341 million settlement would be 1.35 to 2.99); *Sulzer*, 268 F. Supp.2d at 938 n.45

(relying on the Logan Study to conclude that "the courts' effective multipliers averaged: (a)

3.89 across all 1,120 cases, (b) 4.50 across the 64 cases where the recovery exceeded $100

million, and (c) 2.97 across the 10 mass tort cases."); *Sumimoto*, 74 F. Supp. 2d at 399 (noting

that lodestar multipliers between 3.0 and 4.5 have been common in federal securities cases);

*AOL*, 2006 U.S. Dist LEXIS 78101, at *8 (noting that a lodestar of 3.69 "is on the higher

side" of the acceptable range in large securities class actions); *In re Critical Path*, No. C

01-00551, 2002 WL 32627559, at *9-11 (N.D. Cal. 2002) (finding that the typical range of

lodestar multipliers considered reasonable in securities class actions is between 1.3 and 3.7).

If the lodestar multiplier exceeds this range, courts are likely to reduce the percentage fee

award, reasoning that it would overcompensate the attorneys at the expense of the class, and

that a smaller lodestar multiplier would still sufficiently incentivize attorneys to pursue future

cases. *See, e.g., BankAmerica*, 228 F. Supp. 2d at1065-66 (reducing the percentage fee from

25% to 18% because a lodestar multiplier over four would overcompensate the counsel at the

expense of the plaintiffs); *Microstrategy*, 172 F. Supp. 2d at 789-90 (reducing the fee from

27% to 18% of the settlement because awarding the attorneys four times their lodestar is

"more than necessary" to achieve the goals of the PSLRA and a lodestar multiplier of 2.6

would still compensate the lead counsel for its time and provide ample incentive for counsel

to pursue similar cases).

     In this case, however, the Court is not uncomfortable with deviating from the normal

range of lodestar multipliers, at least to some extent. Given the outstanding settlement in this

case and the noticeable skill of counsel, a lodestar multiplier greater than the average would

not be unwarranted or unprecedented.  Indeed, the Court has adopted the percentage approach, and the lodestar cross check is but one of several factors it must consider; it should not unilaterally control the Court's analysis.  From the Court's analysis of the previous factors, the Court has found that approximately 18% is a reasonable award, which would yield a lodestar multiplier of six.  Though significantly above average, the Court finds this award reasonable under the circumstances.

### 5.  Complexity of the Litigation

Lead Counsel contends that this litigation was extremely complex for the same reasons it contends that the case presented a  high risk of non-recovery.  Thus, the Court's analysis of this factor is markedly similar to its analysis of the third *Ramey* factor.  Specifically, Lead Counsel cites the necessity of proving Defendants' scienter, the causation of the alleged damages, and the magnitude of the alleged fraud as evidence of the complexity of the litigation.  As discussed under the third factor, proving scienter, causation, and damages in this case was no more difficult or complex than in securities class actions generally.  Thus, this factor does not weigh in favor of elevating the attorneys' fees.

### 6.  The Professional Skill and Standing of Counsel

The quality of representation in this case was superb.  Lead Counsel, Coughlin Stoia Geller Rudman & Robbins LLP, are nationally recognized leaders in complex securities litigation class actions.  The quality of the representation is demonstrated by the substantial benefit achieved for the Class and the efficient, effective prosecution and resolution of this action.  Lead Counsel defeated a volley of motions to dismiss, thwarting well-formed challenges from prominent and capable attorneys from six different law firms.  *AOL*, U.S.

Dist. LEXIS 78101, at *49; *In Re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 749

(S.D.N.Y. 1985) (acknowledging that the quality of opposing counsel is also important to the

court in evaluating the Lead Counsel's representation). This is no small feat considering the

fact that dismissal rates in securities class actions have nearly doubled since the passage of the

PSLRA. *See* Todd Foster, Ronald I. Miller, Ph.D., Stephanie Plancich, Ph.D., *Recent Trends*

*in Shareholder Class Action Litigation: Filings Plummet, Settlements Soar* at *4 (NERA Jan.

2007).

Moreover, Lead Counsel expended significant resources of both time and money to

reach a final resolution in this matter. It navigated through 7.2 million pages of documents

and interviewed ninety-eight potential witnesses. After several months of negotiations and

five mediation sessions with Professor Green of Boston University, Lead Counsel obtained

the highest settlement in Sixth Circuit history.

The quality of the service is unquestionable. Quality performance, however, does not

always justify an outlying fee, especially when Lead Counsel significantly benefitted from

work performed by others. *See AOL*, 2006 U.S. Dist LEXIS 78101 at *50; *Lucent*, 327 F.

Supp. 2d at 436, 444 (defending an above average fee award because "Lead Counsel did not

piggyback on any prior action brought by a governmental agency.") As noted above, the

formal SEC investigation and the subsequent restatement of earnings paved the Class's path

to recovery in this action. Attorney Rosen even commented that the bulk of the Class's

production came directly from the SEC's investigation. That is not to say that Lead Counsel's

skill did not play a role in transforming the SEC investigation into the outstanding settlement

in this case, but the Court is careful not to overstate that role. Lead Counsel contends that its

skill is demonstrated by the fact that it forced Cardinal to admit to $23.5 billion in revenue misstatements, when it only admitted to $1.2 billion during the SEC investigation. However, Cardinal admitted to misclassifying $23.5 billion only three months after Lead Counsel initiated the action in July 2004. Though the well-drafted complaint and threat of intense litigation undoubtedly pressured Cardinal to make such an admission, at that point Lead Counsel had just begun to initiate discovery and had not yet defended against the motions to dismiss. Thus, in all likelihood, Cardinal's admission was as much a response to the facts and documents uncovered in the SEC investigation as it was a result of Lead Counsel's skill.

Lead Counsel, building on the success of the SEC investigation, obtained a $600 million settlement. Its exceptional lawyering added significant value to the action and therefore, this factor weights slightly in its favor. Because Lead Counsel significantly benefitted by work performed by others, however, the exceptional lawyering in this case does not weigh as heavily in favor of awarding a fee percentage above and beyond that of other comparable cases as it may have otherwise.

### 7. Totality of the Circumstances

To determine a reasonable fee award, the Court must evaluate the six *Ramey* factors under the totality of the circumstances. The value of the settlement to the class in this case is undisputed: even the objectors acknowledge that a 20% recovery is remarkable. As noted above, such a recovery corresponds with other cases of similar magnitude that have awarded attorneys' fees between 15% and 20% of the settlement. Moreover, Lead Counsel expended considerable effort and time litigating this action and demonstrated a high degree of skill. This case did not involve the degree of risk, complexity, or public benefit, that would merit

increasing the percentage fee, particularly given that Lead Counsel was significantly aided by the SEC investigation and the public restatement of Cardinal's earnings.  Accordingly, the attorneys' fees should approximate other cases with settlements of around $600 million, with extraordinary percentage recovery for the class, with extensive time and effort invested by counsel, and with a high quality of legal representation by counsel.[12]

In *Lucent*, the court held that 17% of the $610 settlement was a reasonable fee for compensating attorneys who recovered an "extraordinary settlement."  *Lucent*, 327 F. Supp. 2d at 436.  Although the settlement in *Cardinal* may be more beneficial to the Class because it is a full cash settlement, while the Lucent settlement includes stocks, warranties, and cash, the magnitude and value to the plaintiffs are comparable.  In *Lucent*, counsel expended significant effort in litigating the case.  It recorded over 61,000 hours of legal work, including serving extensive document requests and forty-two third-party subpoenas, reviewing over 2.5 million pages, identifying over one hundred potential witnesses, and defeating a motion to dismiss. This is certainly comparable to Lead Counsel's effort here, which involved 51,970 hours, over seven million documents, and almost one hundred potential witnesses.

Finally, the *Lucent* court reasoned, as here, that the successful settlement reflected the excellent quality of counsel and the skill it demonstrated in negotiating such a remarkable settlement. *Id.* at 436.  Unlike in this case, however, the court in *Lucent* found that the skill of counsel was particularly laudable because it achieved results without the help of a government

--------

[12]Most Circuits require district courts to compare the fee award to other comparable cases as part of their reasonableness-factor test.  *See, e.g., Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190, 195 n.1 (3d Cir. 2000).  Though the Sixth Circuit does not have a separate factor for comparing similar awards in other cases, courts in the Sixth Circuit often choose to analyze fees in comparable cases, either in one of the factors, or at the end of their factor analysis.

investigation. *Id.* at 436. Also, in *Lucent*, counsel faced a "truly grave possibility of non-payment," and thus faced significantly higher risk than Lead Counsel in this case. *Id.* at 438. Though the higher risk and help of an SEC investigation perhaps militates toward setting a lower fee here, the full cash settlement and stark similarities between *Lucent* and *Cardinal* suggest that a fee close to 17% would be reasonable.

Similarly, in *BankAmerica*, the court held that 18% of the $490 million settlement was a reasonable attorneys' fee in a complex securities class action. *BankAmerica,* 228 F. Supp. 2d at 1061, 1066. As with the instant case, the court in *BankAmerica* found that the attorneys expended considerable effort litigating the case, including reviewing over 1.5 million documents, consulting experts, and otherwise preparing for trial over a period of three years and 81,000 hours. *Id.* at 1065. The court further found that the attorneys were experienced and highly skilled, and that they obtained a significant recovery that was "overwhelmingly favorable." *Id.* Though counsel requested 25% of the settlement, the court reviewed settlements in comparable cases, and found that 18% better reflected a reasonable fee for skilled attorneys who devoted significant resources to obtain an impressive settlement. *Id.* at 1064 n.5.

Analyzing the *Ramey* factors under the totality of the circumstances, in the context of *Lucent*, *BankAmerica*, and the other authorities cited in this opinion, the Court finds that 18% of the settlement is a reasonable attorneys' fee. Though it is not the 24.167% requested, the Court's award is well-above the average 15% cited in the Logan Study, particularly considering that the Logan Study is composed of cases that settled for well below $600 million, and would thus have higher fee awards under the declining principle theory. This

award honors Lead Counsel's excellent recovery, considerable effort and time, and high quality of lawyering.  Undoubtedly, this award of almost $108 million, or 6 times the lodestar, aptly compensates Lead Counsel for its work and will incentivize attorneys to undertake similar cases in the future.

### IV.  ANALYSIS OF REASONABLE EXPENSES

The Court has reviewed Lead Counsel's request for expenses in the amount of $2,241,821.10 and Lead Plaintiff's request for expenses totaling $82,452.81.  It has noted the objections.  After thoroughly reviewing these requests for expenses and the few objections, the Court finds the requested expenses to be fair and reasonable.  As such, the Court awards Lead Counsel $2,241,821.10 in expenses, and Lead Plaintiff $82,452.81 in expenses (PACE is to receive $10,830.67, Ironworkers is to receive $14,812.50, and Amalgamated is to receive $56,809.64).

The Court will subtract these expenses before it awards Lead Counsel its attorneys' fee award.  Thus, the Court will calculate the 18% from the "net settlement" instead of the gross settlement of $600 million.  The PSLRA states:

> Total attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest *actually paid to the class*.

15 U.S.C. § 78u-4(a)(6) (emphasis added).

Lead Counsel contends that the Court should award its percentage fee before subtracting expenses.  To support this proposition, Lead Counsel cites the Ninth Circuit in *Powers v. Eichen*, 229 F.3d 1249 (9th Cir. 2000).  But *Powers* does not require the Court to use the gross settlement amount, but instead leaves the decision to the discretion of the Court

as long as the final award is reasonable.  In *Powers*, the appellant argued that the district court erred by awarding attorneys' fees based on the gross recovery rather than the recovery minus expenses because the phrase "actually paid to the class" in 15 U.S.C. § 78u-4(a)(6) indicates that the percentage fee should be awarded on the net amount that the class receives after the expert fees, litigation costs, and other expenses have been subtracted.  The Ninth Circuit rejected this reading of the PSLRA, stating that the Act does not "mandate a particular approach to determining fees."  Instead, the Court held that the choice of whether to base attorneys' fees on either the net or gross recovery is discretionary, as long as the resulting fee is reasonable.  *Id.* at 1258.  Indeed, courts throughout the country have used both the gross and net recovery to calculate attorneys' fees.  *See, e.g, In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 525 n.34 (S.D.N.Y. 2003) (awarding fees based on the gross settlement); *BankAmerica*, 228 F. Supp. 2d at 1064 n.4 ("Attorneys' fees shall be calculated from the common funds only after ALL costs and expenses have been subtracted."); *Wise v. Popoff*, 835 F. Supp. 977, 982 (E.D. Mich. 1993) (finding it more reasonable to award attorneys' fees based on the net recovery).

Given the Court's discretion to calculate attorneys' fees based either on the gross settlement or net recovery, the Court chooses to subtract the expenses before awarding Lead Counsel its fee award.  The net recovery more truly approximates the amount of money that benefits the Class.  Because the percentage approach is meant to align the attorneys' fees with the amount of money the class receives, the net recovery is a more appropriate metric.  To calculate the net recovery, the Court adds the $600 million settlement, plus the interest that has accumulated to the date of this judgment, and then subtracts the expenses.  Lead Counsel

will then receive 18% of this net recovery (approximately $107.58 million before interest is included).  The remaining amount of the settlement will be distributed to the class based on the Plan of Allocation.

## V.  CONCLUSION

For the reasons stated herein, the Court **GRANTS** Lead Counsel's request for expenses in the amount of $2,241,821.10 and **GRANTS** Lead Plaintiff's request for expenses in the amount of $82,452.81.  Further, it **AWARDS** Class Counsel 18% of the net recovery in attorneys' fees.

**IT IS SO ORDERED.**

<u>**s/Algenon L. Marbley**</u>

**ALGENON L. MARBLEY
UNITED STATES DISTRICT JUDGE**

**DATED: December 31, 2007**